UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>(1) MAHDI MOHAMMAD SADEGHI, a/k/a MOHAMMAD MAHDI SADEGHI and<br>(2) MOHAMMAD ABEDININAJAFABADI, a/k/a "MOHAMMAD ABEDINI"<br><br>Defendants. | No. 1:24-CR-10391-IT |

**MEMORANDUM OF THE UNITED STATES IN SUPPORT OF DETENTION**

The United States of America hereby moves this Court to order the detention of defendant Mahdi Mohammad Sadeghi pending trial. Sadeghi poses a significant flight risk, and there is no condition or combination of conditions that will guarantee his appearance at trial.[1]

As discussed in greater detail below, Sadeghi is a highly educated, dual U.S.-Iranian citizen who has extensive personal and professional ties to Iran. He has been charged with multiple serious national security crimes—namely, that he conspired to and did in fact engage in an illegal scheme to provide U.S.-origin electronic components and technology, including sensitive materials from his U.S. employer, to his Iranian co-defendant for the benefit of an Iranian company that supports Iran's lethal drone program. If convicted, Sadeghi faces a significant prison sentence and other significant financial and employment consequences. In light of these circumstances, he has every reason to flee the United States to Iran—the country where he was born and educated, where his family resides, where he could readily find gainful employment using his professional

---

[1] The Government's recommendation is consistent with the recommendation of the U.S. Probation Office.

1

connections, substantial skills, and advanced degrees, and where he would remain far beyond the reach of the United States justice system.

It is also not unreasonable to believe that the government of Iran would help facilitate Sadeghi's flight to Iran. Iran has repeatedly demonstrated its willingness to go to great lengths to help its nationals who have been charged by the United States. Here, Sadeghi has special skills that have and could continue to benefit the Iranian government, has repeatedly shown his support for SDRA, an organization that plays a significant role in Iran's lethal drone program, and has relationships with individuals, like Abedini, who have powerful connections to Iranian government officials.

For these reasons, and those discussed below, the Court should order Sadeghi's detention pending trial.

## I.  BACKGROUND

On December 16, 2024, in the District of Massachusetts, Sadeghi was arrested and appeared before this Court on charges that he conspired to violate and did violate the International Emergency Economic Powers Act ("IEEPA") based on his role in a multi-year scheme to export U.S.-origin electronic components and technology to Iran. *See* Dkt. 6. Many of Sadeghi's illegal activities were taken in coordination with or on behalf of his co-defendant, Mohammad Abedini. Abedini is an Iranian citizen with significant and longstanding ties to the Iranian government, including the Islamic Revolutionary Guards Corp. ("IRGC"), which the United States has designated as a foreign terrorist organization. At the request of the United States, Italian authorities provisionally arrested Abedini on December 16, 2024, at Milan's Malpensa Airport, Italy. He was

detained until on or about January 12, 2025, at which time, the Italian government released him.[2] Open-source reporting has linked Iran's detention of Cecilia Sala, an Italian journalist in Iran, and her subsequent release to Abedini's arrest and subsequent release in Italy.[3] Abedini is now at large.

After their arrests, Sadeghi and Abedini were indicted by a grand jury in this District on December 19, 2024. Sadeghi and Abedini were both charged with one count of conspiracy to violate IEEPA and the Iranian Transactions and Sanctions Regulations ("ITSR"), in violation of Section 1705 of Title 50 of the United States Code, and Part 560 of Title 31 of the Code of Federal Regulations; and seven substantive counts of violating the IEEPA and the ITSR. Abedini was also charged with conspiracy to provide material support to a foreign terrorist organization resulting in death, in violation of Section 2339B(a)(1) of Title 18 of the United States Code, and with provision and attempted provision of material support to a foreign terrorist organization resulting in death, in violation of Section 2339B(a)(1) of Title 18 of the United States Code. *See* Dkt. 14.

As set forth in the affidavit supporting the criminal complaint ("Affidavit"),[4] beginning in or about August 2015, Sadeghi, who has an undergraduate degree from the University of Tehran, sought to utilize his ties to Iran to procure funding for a company he had recently helped found in

---

[2] Angelo Amante and Emilio Parodi, *Iranian businessman arrested in Italy returns home*, REUTERS, Jan. 12, 2025, *available at* https://www.reuters.com/world/italian-minister-requests-revoking-arrest-detained-iranian-businessman-2025-01-12/.

[3] *See* Nicole Winfield, *Iran Warns Italy that Bilateral Ties at Risk if it Bows to 'Hostile' US Demands Over Drone Suspect*, Washington Post, Jan. 3, 2025, *available at* https://www.washingtonpost.com/world/2025/01/03/italy-iran-journalist-engineer/3659f8c4-c9f2-11ef-a9b8-74e0b395057f_story.html; Marcus Walker, *Italy, Caught Between U.S. and Iran, Seeks to Free Journalist Cecilia Sala*, WALL STREET JOURNAL, Jan. 3, 2025, *available at* https://www.wsj.com/world/middle-east/italy-caught-between-u-s-and-iran-seeks-to-free-journalist-cecilia-sala-5bb496c1; Rebecca Rosman, *Italy releases Iranian man wanted by U.S. over drone attack that killed 3 soldiers*, REUTERS, Jan. 12, 2025, *available at* https://www.npr.org/2025/01/12/nx-s1-5257521/italy-iran-drone-strike-us-jordan-abedini-sala.

[4] A copy of the Affidavit is attached hereto as Exhibit 1 and incorporated by reference.

Massachusetts. Dkt. 6-1 at ¶ 35. Specifically, Sadeghi sought funding from the Iranian National Elites Foundation ("INEF"), which is an Iranian governmental organization whose main purpose is to recognize, organize, and support Iran's elite national talents. *Id.* at ¶ 36. Sadeghi ultimately formed an Iranian-based sister company ("Iranian Company 1") for his Massachusetts company in exchange for funding from INEF. *Id.* at ¶¶ 36-37. During the period in which Sadeghi traveled to Iran and sought funding from INEF, Sadeghi was on multiple email chains that demonstrate he was aware that his conduct was illegal. *Id.* at ¶ 38. Nevertheless, as described below, Sadeghi continued to violate the law utilizing his network of Iranian contacts.

Specifically, shortly after forming Iranian Company 1, in or about November 2016, Sadeghi, through Iranian Company 1, entered into a contract with Abedini's company, San'at Danesh Rahpooyan Aflak Co. ("SDRA" or "SADRA") in Iran. *Id.* at ¶ 46. At the time, SDRA's primary business was the sale of technology to the Iranian government, including in support of the IRGC's drone program. *Id.* at ¶¶ 6, 10, 91, 94-95. The evidence indicates that, at all relevant times, Sadeghi was familiar with SDRA's business operations. For example, among other things, Sadeghi's IP-login history reflects that Sadeghi utilized a SDRA IP address on multiple occasions while in Iran, indicating that Sadeghi was physically present at SDRA on multiple occasions. *Id.* at ¶ 48. Moreover, during a voluntary post-arrest interview with the Federal Bureau of Investigation ("FBI") Sadeghi admitted to having visited SDRA's offices in Tehran on multiple occasions. Declaration of Robert Plumb ("Plumb Decl.") ¶ 5, attached hereto as Exhibit 2.

Thereafter, Sadeghi not only helped procure and provide U.S.-origin electronic components and technology to Abedini and SDRA, but he also helped facilitate a lucrative contract between his co-defendant, who was using a Swiss-based front company called Illumove to conceal his relationship with Iran and SDRA, and his employer, a Massachusetts-based global

4

semiconductor company ("U.S. Company 1").  Dkt. 6-1 at ¶¶ 59-62, 65-66, 68-73.  During the course of that contract, Sadeghi transferred and helped facilitate the transfer of sensitive, non-public U.S.-origin goods and technology from U.S. Company 1 to Abedini, with knowledge that such goods and technology were destined for Iran and were for the benefit of Iran, the government of Iran, and/or SDRA.  Dkt. 6-1 at ¶¶ 66, 82-86.

Moreover, during the course of Sadeghi's interactions with Abedini—both prior to and during Abedini's work with U.S. Company 1 through Illumove—he traveled to Iran on multiple occasions.  On certain of those occasions, he visited SDRA and/or Abedini.  *See* Dkt. 6-1 at ¶ 86; *see also* Plumb Decl. ¶ 5.

Both SDRA and Abedini have significant ties to the Iranian government and Iranian government officials through their work with the IRGC Aerospace Force, Shahed Aviation Industries Research Center, and the IRGC Navy—all of which have been sanctioned by the Department of the Treasury's Office of Foreign Assets Control.  Dkt. 6-1 at ¶ 29.

## II.     STANDARD OF PROOF AND STATUTORY FACTORS

Congress empowered judicial officers to release or detain defendants pending trial. 18 U.S.C. § 3141(a).  Detention determinations proceed pursuant to the terms of 18 U.S.C. § 3142.  Under § 3142(f)(2), the Court must hold a detention hearing upon the government's motion (or *sua sponte*) when the case involves "a serious risk that [the defendant] will flee" or "a serious risk that [the defendant] will obstruct or attempt to obstruct justice."  18 U.S.C. § 3142(f)(2).  Ultimately, the Court shall detain a criminal defendant pending trial upon a determination that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e); *United States v. Montalvo–Murillo*, 495 U.S. 711, 716-17 (1990).  On the issue of flight, the government

must prove that the defendant is a serious risk of flight by a preponderance of the evidence. *See United States v. Dillon*, 938 F.2d 1412, 1416 (1st Cir. 1991).

In evaluating whether conditions can reasonably be fashioned, the Court must consider the following: (1) the nature and circumstances of the offense; (2) the weight of the evidence; (3) the defendant's history and personal characteristics; and (4) dangerousness. 18 U.S.C. § 3142(g). For the reasons discussed below, the Government submits that these factors weigh in favor of detention.

### III. SADEGHI SHOULD BE DETAINED PENDING TRIAL

Sadeghi presents a substantial risk of flight that cannot be addressed through bail conditions due to the serious nature of the charged conduct, the weight of the evidence, and his personal characteristics, including his significant foreign ties. *See United States v. Townsend*, 897 F.2d 989, 994-95 (9th Cir. 1990) (denying bail to defendants charged with export violations where defendants faced substantial sentences, had extensive foreign ties, engaged in "sophisticated criminal conduct," could "adapt easily to foreign countries" and where the nature of the crime made it possible that other countries would "provide a haven" for such a defendant who jumped bail).

#### A. The Nature and Circumstances of the Offense

The nature and circumstances of this case support detention. IEEPA is statute that authorizes the President to deal with "unusual and extraordinary threat[s] . . . to the national security, foreign policy, or economy of the United States" by declaring a national emergency with respect to such threats, 50 U.S.C. § 1701(a), and to take steps to address such threats, 50 U.S.C. § 1702. Indeed, with respect to Iran, "[t]he United States has imposed economic sanctions and regulations to help ensure that the Government of Iran and Iranian companies do no harm to the

6

United States." *See United States v. Zarrab*, No. 15-Cr.-867 (RMB), 2016 WL 3681423, at *3 (S.D.N.Y. June 16, 2016). Here, however, Sadeghi willfully and repeatedly disregarded the national security interests of the United States, thereby causing precisely the type of harm that IEEPA was designed to prevent.

As discussed in the Affidavit, Sadeghi facilitated the illegal transfer of sensitive U.S.-origin goods and technology to Abedini who supplied the IRGC—a foreign terrorist organization—with the technology that would allow the IRGC's one-way attack drones to reach their intended targets. Sadeghi is a sophisticated engineer who worked for the very company whose electronic components and non-public technology he provided to Abedini, and he would have understood their military applications and their significance to Abedini and to SDRA. That understanding is made clear by a CNN article, which discusses the use of U.S.-origin electronic components, including U.S. Company 1 electronic components, in Iranian drones, which Sadeghi sent to a U.S. Company 1 colleague. Plumb Decl. ¶ 6(a). Sadeghi sent the article in 2023, which is after Sadeghi facilitated Abedini and Illumove's contract with U.S. Company 1 and during the period in which Sadeghi knew that Abedini was continuing to obtain sensitive U.S. Company 1 electronic components and technology while in Iran.

Nevertheless, Sadeghi continued to illegally transfer and to facilitate the transfer of U.S. Company 1 goods and technology—including electronic components that have drone applications—to Abedini and to SDRA in Iran. Thus, through his egregious actions over the course of multiple years, Sadeghi not only directly violated U.S. sanctions on Iran—including through deception during the course of his employment—but in so doing, directly and knowingly harmed the national security of the United States by facilitating Abedini's and SDRA's access to sensitive U.S. technology. In cases where similar factors were at issue, courts have found that

7

such conduct warrants detention. *See Zarrab*, 2016 WL 3681423, at *3 (finding that violating economic trade sanctions with Iran is a serious offense that favors detention); *see also United States v. Jam*, 2:20-Cr.-20550-01-SJM-RSW, ECF No. 34 at 2 (E.D. Mich. March 31, 2021) (denying defendant's motion for revocation of detention in case where defendant was alleged to have "lied to American companies to purchase more than $100,000 in goods destined for Iran").

The possible maximum term of imprisonment that Sadeghi faces upon conviction for his exceptionally serious conduct provides a significant incentive to flee. Sadeghi faces up to 20 years of imprisonment for each of the charged violations of IEEPA. Courts have repeatedly held that with serious charges and the possibility of considerable punishment comes a substantial incentive to flee the United States. *See Zarrab*, 2016 WL 3681423, at *3; *Jam*, 2:20-Cr.-20550-01-SJM-RSW, ECF No. 34 at 3 ("The nature and circumstances of the offense are unquestionably serious. Defendant is charged with conspiring to violate international sanctions and secure goods to send to Iran."); *United States v. Gray*, 529 F. Supp. 2d 177, 182 (D. Mass. 2007) (finding that the defendant posed a risk of flight because, inter alia, he faced a "formidable maximum sentence of ten years imprisonment and $250,000 in fines"); *see also United States v. Vick*, No. 16-10126-ADB, 2017 WL 773860, at *3 (D. Mass. Feb. 28, 2017) (finding that a 41-53 month sentence on the heels of a previously served 18 month sentence would create a significant incentive to flee). Simply put, Sadeghi has little incentive to appear before this Court and to submit to the jurisdiction of the United States.

What is also significant for this Court, however, is that the charges in this case implicate not only Sadeghi and Abedini, but also the activities of the Iranian regime, a designated supporter of international terrorism with which the United States enjoys no formal diplomatic relations. As discussed in greater detail below, Sadeghi has significant family and professional relationships in

Iran—including with Iranian government officials—that could help facilitate his flight. The possibility that Sadeghi has connections that could help him evade the reach of this Court "must be taken into account in evaluating the risk of flight." *Townsend*, 897 F.2d at 994; *see also id.* (finding that the ultimate purchaser of goods sent in violation of U.S. export control laws "would provide a haven for anyone accused of such offenses who jumped bail").

If Sadeghi were to flee to Iran, or a country friendly with Iran, he could remain outside the reach of this Court indefinitely. *See United States v. Butina*, No. 18-00218 (D.D.C. July 24, 2018) ECF No. 15 at 6 ("A defendant's citizenship of a country with which the United States has no extradition treaty is a factor relevant to an assessment of the defendant's history and characteristics."); *see also United States v. Acherman*, No. 15-10046-LTS, 2015 WL 4576926, at *2 (D. Mass. July 30, 2015) (considering in its risk of flight analysis that the defendant was a citizen of Venezuela, which bars the extradition of its own citizens); *United States v. Amar*, 300 F. Supp. 3d 287, 289 (D.D.C. 2018) (finding that a defendant who was a citizen of a country with which the United States had no extradition treaty had a "plausible destination to which to flee"); *United States v. Tajideen*, No. CR 17-46 (RBW), 2018 WL 1342475, at *7 (D.D.C. Mar. 15, 2018), aff'd, 724 F. App'x 6 (D.C. Cir. 2018) (considering the defendant's foreign citizenship, including "citizenship in a country that does not have an extradition agreement[] with the United States" as a factor weighing in favor of detention); *see also United States v. Ho*, No. 3:16-CR-46-TAV-HBG-1, 2016 WL 5875005, at *6 (E.D. Tenn. Oct. 7, 2016), aff'd, 2016 WL 10077327 (6th Cir. Dec. 9, 2016) (defendant's citizenship of a country with which the United States had no extradition treaty warrants the conclusion that "the United States cannot procure [the defendant's] return[,] . . . suggest[ing] opportunities for flight.") (citation omitted). Accordingly, this factor weighs heavily in favor of the Government's motion to detain Sadeghi pending trial.

B. <u>The Weight of the Evidence Against Sadeghi</u>

The possibility of a significant prison sentence is certainly sufficient to motivate Sadeghi to flee. That incentive, however, is only increased when the strength of the evidence against Sadeghi—and thus the likelihood of conviction—is factored into the equation. *See United States v. Quintina*, 845 F. Supp. 38 (D. Mass. 1994). Here, the case against Sadeghi is powerful and the evidence substantial. As detailed in the Affidavit and Indictment, there is significant evidence showing how Sadeghi carried out the alleged scheme, including his own statements, multiple emails and other items recovered from his accounts, as well as those of his co-conspirators, travel records, shipping records, and photographs of Sadeghi in Iran with Abedini at INEF and at least one INEF official. *See* Plumb Decl. ¶ 6(b)-(d). The weight of the evidence also weighs heavily in favor of the Government's motion to detain Sadeghi. *See Zarrab*, 2016 WL 3681423, at *5 (noting that the ultimate strength of the Government's case "will be tested at or before trial" but finding that, for purposes of setting bail, the evidence as set out in the indictment appeared strong and weighed in favor of detention"); *United States v. McForbes*, 109 F. Supp. 3d 365, 367-368 (D. Mass. 2015) (same).

C. <u>The History and Characteristics of Sadeghi</u>

Pursuant to 18 U.S.C. § 3142(g)(3)(A), Sadeghi's employment, educational, familial, and community ties are all factors the Court must consider in weighing detention. Here, Sadeghi has significant employment prospects in Iran, he was educated in Iran, and his family resides in Iran. By contrast, in the United States, Sadeghi is facing years of incarceration on significant national security charges, was recently terminated from a lucrative engineering job, and likely has limited

10

remaining prospects for his chosen livelihood.  The overwhelming balance of the § 3142(g)(3)(A) factors weigh in favor of detention.

        1. *Family Ties*

First, Sadeghi has deep and significant familial ties in Iran that would be able to support him should he flee to Iran.  As noted in the Pretrial Services Report, Sadeghi and his wife are both dual citizens of Iran and the United States.  *See* Pretrial Services Report at 2.  Sadeghi lived in Iran until 2007 and obtained a degree from the University of Tehran before moving to the United States for graduate school.  Dkt. 6-1 at ¶ 34; *see also* Dec. 29, 2024 Letter to U.S. Attorney's Office.  Sadeghi's parents, in-laws, and three of his four siblings live in Iran.[5]  Pretrial Services Report at 1; Dec. 29, 2024 Letter.  Sadeghi regularly travels to Iran, having visited at least ten times between 2015 and 2024, most recently in July and August 2024, and often remains in Iran for weeks at a time.  Plumb Decl. ¶ 7.

Although Sadeghi's children reside with him and his wife in Massachusetts, they too have Iranian passports and are Iranian citizens.  *See* Pretrial Services Report at 2; *see also* Article 976, Iranian Code (stating that the children of Iranian fathers are considered Iranian subjects regardless of whether they were born in or outside Iran), *available at* https://irandataportal.syr.edu/nationality-law.  Sadeghi did not report having any other family ties to Massachusetts.  To the extent Sadeghi claims he does not wish to return to Iran, such claims are not believable given his personal ties and business interests there.  Regardless, courts have found such proffers unavailing.  *See, e.g.*, *United States v. Kouchekzadeh*, No. 08-CR-03A, 2008 WL 1902434, at *3 (W.D.N.Y. Apr. 28, 2008) ("Although the defendant proffered that he is a refugee from Iran and has no intention to return there, the possibility exists that he could flee to Iran, where

---

[5] Sadeghi's fourth sibling lives in Switzerland.  Pretrial Services Report at 1.

no extradition treaty exists."); *see also United States v. Letellier*, No. 13-10309-GAO, 2016 WL 3350990, at *3 (D. Mass. June 15, 2016) (finding that the incentive to flee could not be ignored where the defendant had available to him "at least one plausible haven, his wife's native country.").

In short, Sadeghi has significant personal reasons to return to Iran, and should he flee, his wife and children—who all also have Iranian citizenship—could easily follow.[6]

2. *Professional Ties*

Second, Sadeghi's greatest chance of finding employment that would allow him to utilize his advanced degrees and skills, to pursue his occupation of choice, and to meaningfully support his young family is in Iran. Sadeghi's significant business and professional ties in Iran, including to the Iranian government, would allow him—unlike in the United States—to achieve those objectives.

Sadeghi's relationship with INEF is one way that he could pursue gainful employment in Iran. As discussed above and in greater detail in the Affidavit, Sadeghi founded Iranian Company 1 in or about 2016 in Iran. He subsequently traveled to Iran and met with officials from INEF, the Iranian governmental organization that supports Iran's "national talents." INEF recognized Sadeghi's promise and provided funding for Iranian Company 1. Since receiving that funding, Sadeghi has maintained a relationship with INEF. As recently as August 2022—as depicted in a photo from Sadeghi's phone—Sadeghi met with an INEF official, whose title was "Coordinator, International Affairs," for lunch while in Iran ("Iranian Official 1"). Plumb Decl. ¶ 6(b)-(c).

---

[6] Although the Government acknowledges that Sadeghi's wife has indicated her willingness to surrender her passport and those of the children, the surrender of their travel documents is only a temporary barrier to their own flight. To the extent Sadeghi flees to Iran, the Government could not continue to hold the family passports indefinitely; thus, there would be nothing to stop them from following Sadeghi to Iran at a later time.

12



Thereafter, while still in Iran, Iranian Official 1 solicited Sadeghi's professional advice and guidance for an organization called the Strategic Center for Converging Technologies, or NBIC. Sadeghi agreed to help on the same day. *Id.* ¶ 6(d). Based on the evidence, it is apparent that INEF values Sadeghi's expertise. And if INEF values his expertise enough to ask for his assistance, it surely values it enough to help him find employment should he return to Iran. *See United States v. Bothra*, No. 19-1092, 2019 WL 8883547, at *2 (6th Cir. March 28, 2019) ("[G]iven that the Indian government recognized his medical skills, he can likely obtain employment abroad.")

Sadeghi also has enduring ties with high-level SDRA officials that could provide him with a substantial employment advantage should he return to Iran. Specifically, as discussed above, Sadeghi first engaged with Abedini nearly a decade ago, in or about 2016, when Sadeghi entered into a contract with SDRA for the purchase of $250,000 worth of SDRA (*i.e.*, Iranian) technology. *See* Dkt. 6-1 at ¶ 46. Since then, Sadeghi has continued his relationship with Abedini and SDRA— including by conspiring to violate U.S. law. Given Abedini's connections and significance to the

13

Iranian government, a nearly ten-year relationship with Abedini would itself provide a significant employment advantage, should Sadeghi return to Iran.

But Sadeghi also has a relationship with SDRA's chief technology officer (referred to in the Affidavit as SDRA Employee 1), who, on information and belief, remains in Iran, was likely in charge of SDRA's operations in Abedini's absence, and undoubtedly also has significant ties to the Iranian government based on the nature of SDRA's business. Specifically, as discussed in the Affidavit, SDRA Employee 1 was the signatory on SDRA's contract with Sadeghi's company in or about 2016. *Id.* And as recently as 2024, Sadeghi appears to have met with SDRA Employee 1 and Abedini in Iran, based on a photograph the FBI located on Sadeghi's phone, which depicts a selfie Sadeghi took of himself, Abedini, and SDRA Employee 1. Plumb Decl. ¶ 6(e).



In sum, Sadeghi has longstanding connections to both Abedini and SDRA Employee 1 (and likely other SDRA employees)[7] that would serve to benefit him, should he return to Iran. Any one of these contacts could activate their government connections—connections that extend to multiple branches of the IRGC and likely beyond—in an effort help Sadeghi flee. And, given Sadeghi's familiarity with SDRA's business and the technology underlying SDRA's Sepehr

---

[7] Sadeghi also had the contact information for two other known SDRA employees in his phone, which is unsurprising given that Sadeghi was physically present at SDRA in Iran on multiple occasions. This evidence further demonstrates Sadeghi's significant ties to SDRA.

Navigation System, Sadeghi would surely be a valuable addition to the SDRA team—or to any number of companies to which Abedini or SDRA Employee 1 could connect him—should he return to Iran. Given the allegations against him, if convicted, Sadeghi will likely be barred from comparable professional positions in the United States in the future. This factor, too, weighs in favor of detention.

        3. *Sadeghi's Financial Circumstances*

Third, although Sadeghi has property in the United States, a bond on Sadeghi's home is an insufficient incentive to remain in the United States to face trial and an uncertain future. As an initial matter, based on the significant household expenses outlined in the Pretrial Services Report, it is unlikely that Sadeghi and his wife would be able to maintain both their rental property and their home on a single income for any significant period of time.[8] Accordingly, to meet their monthly expenses, it is likely that Sadeghi and his wife would have to consider cashing out their retirement accounts and other illiquid assets during an indeterminate pretrial and custodial period.[9] Given an uncertain financial future in the United States and the relative likelihood of professional and personal security in Iran, Sadeghi has every financial incentive to flee and few to remain.[10]

Moreover, as discussed above, given Sadeghi's personal and professional connections to Iranian government officials and to individuals who are closely associated with Iranian government officials, he has the means and connections to flee to Iran if released regardless of any

---

[8] Indeed, the monthly salary of Sadeghi's wife would be unlikely to cover the mortgage and utilities, let alone car payments and education loans. *See* PSR at 2-3.

[9] The current balance of Sadeghi's savings and retirement accounts provide ample resources that would allow Sadeghi to fund his and his entire family's flight to Iran, which is itself a factor that weighs in favor of detention.

[10] In an effort to preserve their other assets, Sadeghi could choose to sell the home to remain afloat. If Sadeghi determines that the loss of his home is the most likely outcome, a bond on the home provides even less incentive for Sadeghi to remain in the United States.

conditions imposed. That is particularly true where, as here, those connections are powerful, well-funded, and well-connected. *See e.g.*, *Dillon*, 938 F.2d at 1416-17 (noting that, even where a home was posted as security for bail, "it is reasonable to infer, for detention purposes, that the drug organization to which appellant belongs, should it so choose to assist him in relocating, probably could absorb the loss of $200,000 worth of security.")

Moreover, multiple courts have found that even where a home or significant assets are posted as security for bail, even a significant security can still be insufficient to reasonably assure a defendant's appearance at trial. *See Acherman*, 2015 WL 4576926 (finding that the "security, home confinement, and surrender of travel documents" proposed by the defendant did "little to mitigate the serious risk of flight"); *United States v. Epstein*, 155 F. Supp. 2d 323, 326 (E.D. Penn. 2001) ("The crucial factor, however, is defendant's lack of ties to the United States and his extensive ties to Brazil with which no extradition treaty exists. In our view, his forfeiture of $1 million worth of assets in the United States would not deter him from flight when in Brazil he has significant wealth, a lucrative job, the presence of his family, and insulation from ever being forced to stand trial.").

Here, even if Sadeghi posts his home as a security, given Sadeghi's connections to Iran and the Iranian government and the potential for a lucrative engineering position in Iran, such a security would still be insufficient to reasonably assure Sadeghi's appearance at trial. Moreover, to the extent that any one of those connections could illicitly provide him with travel documents, electronic monitoring would be wholly insufficient to prevent flight; "it [would] simply report[] it when it has occurred." *Letellier*, 2016 WL 3305990, at *3; *see also Townsend*, 897 F.2d at 994-95 ("Nor does the wearing of an electronic device offer assurance against flight occurring before measures can be taken to prevent a detected departure from the jurisdiction.").

## **CONCLUSION**

Based upon the foregoing, the Government has met its burden to show that no conditions of release will reasonably assure Sadeghi's appearance and the integrity of this proceeding. Accordingly, the government requests the Court order Sadeghi detained prior to trial.

Respectfully submitted,

JOSHUA S. LEVY
United States Attorney

By:   /s/ Christina A. Clark
      JARED C. DOLAN
      ALATHEA PORTER
      Assistant United States Attorneys
      District of Massachusetts

      CHRISTINA A. CLARK
      Trial Attorney
      National Security Division
      United States Department of Justice

**CERTIFICATE OF SERVICE**

      I hereby certify that this document filed today through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                              */s/ Christina A. Clark*
                                              Christina A. Clark
                                              Trial Attorney

January 13, 2025