UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | * |
| | *   Criminal Action No. 1:24-cr-10391-IT-1 |
| MAHDI MOHAMMAD SADEGHI, | * |
| | * |
| Defendant. | * |

MEMORANDUM & ORDER

May 6, 2025

TALWANI, D.J.

Pending before the court is the government's Motion for Revocation of Release Order [Doc. No. 66]. For the reasons set forth below, the government's Motion [Doc. No. 66] is GRANTED.

I.    The Indictment

Defendant Mahdi Mohammad Sadeghi and his co-Defendant Mohammad Abedininajafabadi (also known as Mohammad Abedini) are charged with conspiracy to violate, and three violations of, the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705, and the Iranian Transactions and Sanctions Regulations, 31 C.F.R. § 560. Indictment, counts 1–4 [Doc. No. 14].[1] The Indictment alleges that Sadeghi "did knowingly and willfully export, reexport, supply, and cause the exportation, reexportation, and supply of technology from the United States and by a U.S. person to Iran and the Government of Iran,

---

[1] Abedini is also charged with four additional violations of the IEEPA and the Iranian Transactions and Sanctions Regulations and with Conspiracy to Provide Material Support to a Foreign Terrorist Organization Resulting in Death, in violation of 18 U.S.C. § 2339B(a)(l), and Provision and Attempted Provision of Material Support to a Foreign Terrorist Organization Resulting in Death, in violation of 18 U.S.C. § 2339B(a)(l). Id., counts 5–10. Sadeghi is not named in these additional charges.

including through Switzerland . . . ." Id. at ¶ 29. Specifically, the Indictment alleges that Sadeghi transferred draft datasheets from an entity referred to as "U.S. Company 1" to Abedini, and that Abedeni "in turn, transferred the draft datasheet or datasheets to a [San'at Danesh Rahpooyan Aflak Co. ("SDRA")] employee." Id. The Indictment alleges that SDRA, a company based in Tehran, Iran, specializes in the sale of navigation systems and supporting software that have significant military applications. Id. at ¶ 6.

## II.     Procedural Background

Sadeghi was arrested on a criminal complaint on December 16, 2024, and participated in a Mirandized interview with the FBI on the day of his arrest. Plumb Aff. ¶ 5 [Doc. No. 28-2].[2] Defendants were charged by Indictment on December 19.

The government moved for Sadeghi's detention pending trial.[3] The government provided two affidavits from FBI agents to support the motion. Mem. ISO Detention [Doc. 28]; Neal Aff. [Doc. No. 28-1]; Plumb Aff. [Doc. 28-2]. The Magistrate Judge held a detention hearing on January 14, 2025, and took the matter under advisement. Clerk's Notes [Doc. No. 32]. On March 20, 2025, the Magistrate Judge ordered Sadeghi released on conditions (discussed further below). The Magistrate Judge also granted the Probation Office's request to issue a warrant in abeyance. Status Conference Tr. 12–13 [Doc. No. 59].

The Magistrate Judge stayed the release order for seven days. Elec. Order [Doc. No. 57]. The government filed its Motion for Revocation of Release Order on March 27, 2025. [Doc. No.

---

[2] Abedini was arrested the same day in Italy at the U.S. government's request.

[3] Abedini was also detained, but only until on or about January 12, 2025, when he was released by the Italian government. Mot. 7 [Doc. No. 66]. He reportedly has now returned to Iran. Id.

2

66]. At a hearing on the motion, this court continued the stay pending resolution of the government's motion.

### III. Standard of Review

The Bail Reform Act of 1984 authorizes a judicial officer to hold a detention hearing only upon a motion by the government for certain categories of offenses posing a danger to the community, 18 U.S.C. § 3142(f)(1), or upon the motion of the government or on the judicial officer's own motion where there is (A) a serious risk that the defendant will flee; or (B) a serious risk that the defendant will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate a prospective witness or juror. 18 U.S.C. § 3142(f)(2).

Following a detention hearing, the judicial officer shall order the defendant detained pending trial only if the judicial officer determines that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e).

In determining whether any condition or combination of conditions of release will reasonably assure the defendant's appearance as required and the safety of the community, the judicial officer must consider the following factors:

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591 [sex trafficking], a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and,

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing,

>
> appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

Id. § 3142(g).

"If a person is ordered released by a magistrate judge . . . the Government may file . . . a motion for revocation of the order or amendment of the conditions of release." 18 U.S.C. § 3145(a)(1). This court reviews a Magistrate Judge's release order *de novo*. See United States v. Tortora, 922 F.2d 880, 883 n.4 (1st Cir. 1990) ("We believe that the proper approach is for the district court to engage in *de novo* review of the contested order."); see also United States v. Oliveira, 238 F. Supp. 3d 165, 167 (D. Mass. 2017).

### IV. Risk of Flight

The government argues that the statutory factors support a finding that Sadeghi presents a serious risk of flight, which conditions of release "cannot meaningfully address." Mot. 9 [Doc. No. 66].[4] Sadeghi counters that his ties to the United States and his cooperation with authorities support a finding that he is not a flight risk, and alternatively that conditions of release can be crafted that will reasonably mitigate any flight risk he poses. Opp'n 10–12 [Doc. No. 78].

Based on the factors discussed below, the court finds that Sadeghi poses a flight risk, and that no conditions of release will mitigate that risk and reasonably assure Sadeghi's appearance.

---

[4] The government concedes that Sadeghi's release does not pose an immediate physical danger to the community. Mot. 17 [Doc. No. 66]; see 18 U.S.C. § 3142(e). Where the record contains no suggestion that Sadeghi has a history of engaging in violence or other criminal activity, the court finds his release poses no threat of danger to the community.

A.    *Nature and Circumstances of the Offense*

The IEEPA grants the president authority "to deal with any unusual and extraordinary threat" from outside the United States "to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). This includes authority to regulate or prohibit foreign transactions. Id. §§ 1702(a)(1), 1704.

The Iranian Transactions and Sanctions Regulations generally prohibit "the exportation, reexportation, sale, or supply" of goods and technology "from the United States, or by a United States person . . . to Iran or the Government of Iran." 31 C.F.R. § 560.204. These regulations were enacted pursuant to the IEEPA. See 31 C.F.R. §§ 560.101 *et seq*. This prohibition thus reflects an executive judgment that the prohibited activity is counter to the United States' national security, foreign policy, and/or economic interests.

In light of this determination, Sadeghi's alleged willful engagement in activity prohibited by the regulations (and his alleged participation in a conspiracy to engage in such conduct) are serious offenses, as reflected by the potential penalty of up to 20 years imprisonment and up to $1,000,000 in fines, and a guideline sentencing range of 63–78 months.

These substantial penalties, if he is convicted, create an incentive to flee.

B.    *The Weight of the Evidence*

    1.    Facts Proffered in Support of the Charges

The following facts are set forth in Affidavits submitted by Special Agent Ronald Neal and Supervisory Special Agent Robert Plumb of the Federal Bureau of Investigation ("FBI"):

In 2011, Abedini and two others co-founded SDRA; Abedini has since served as its CEO and/or Managing director. Neal Aff. ¶¶ 6, 27–28 [Doc. No. 28-1]. SDRA is based in Iran and, since at least 2014, has sold a navigation system and other products with military applications to

5

the Islamic Revolutionary Guard Corps ("IRGC"), which is an Iranian military and counterintelligence organization that plays a key role in Iran's development of ballistic missiles. Id. at ¶¶ 6, 29–30. Abedini has attempted to procure parts from U.S. Company 1 through several means since at least 2014. Id. at ¶¶ 41–45.

In or about 2015, Sadeghi and two co-founders formed a Massachusetts-based fitness wearables company (referred to as U.S. Company 2), which specializes in wearable sensors that provide kinetic monitoring. Id. at ¶ 35. In or about August 2015, they created a business proposal for presentation to the Iranian National Elites Foundation ("INEF"), an Iranian governmental organization whose purpose is to recognize, organize, and support Iran's elite national talents. Id. at ¶ 36. In exchange for INEF funding, Sadeghi proposed to create a sister company in Iran (referred to as Iranian Company 1). Id.

Sadeghi traveled to and stayed in Iran from January 2, 2016, through February 13, 2016, and from July 27, 2016, through August 11, 2016. Plumb Aff. ¶ 7 [Doc. No. 28-2].

In or about November 2016, Iranian Company 1 contracted with SDRA in Iran to purchase firmware and hardware prototypes from SDRA for $250,000. Neal Aff. at ¶ 46 [Doc. No. 28-1]. The contract listed Sadeghi as the representative of Iranian Company 1. Id. Sadeghi sent a copy of the contract to Abednini and another SRDA employee. Id.

Sadeghi traveled to and stayed in Iran from January 12, 2017, through February 10, 2017. Plumb Aff. ¶ 7 [Doc. No. 28-2].

In or about August 2017, Sadeghi reached out to U.S. Company 1 and suggested a joint project between U.S. Company 2 and U.S. Company 1. Neal Aff. ¶ 57 [Doc. No. 28-1]. Sadeghi and U.S. Company 2 entered into a non-disclosure agreement with U.S. Company 1, and U.S. Company 1 subsequently provided proprietary parts and datasheets to Sadeghi. Id.

6

Also in 2017, Sadeghi logged into his U.S.-registered email account using an Iran-hosted SDRA IP address. Id. ¶ at 48. According to travel records, Sadeghi was physically in Iran at this time.[5] Id.

Sadeghi traveled to and stayed in Iran from May 16, 2018, through June 23, 2018. Plumb Aff. ¶ 7. [Doc. No. 28-2].

In or about January 2018, Sadeghi emailed Abedini with contact information for a U.S. Company 1 distributor in Hong Kong. Neal Aff. ¶ 49 [Doc. No. 28-1]. Also in 2018, Abedini purchased an 11% stake in U.S. Company 2 in exchange for U.S. Company 2 intellectual property. Id. at ¶ 50. On or about September 10, 2018, Abedini and another individual submitted a business plan in Switzerland in support of a new company named SadraLab that would focus on providing navigation systems to a wide range of industries. Id. at ¶ 53. The business plan listed U.S. Company 2 as a current customer, attached a letter of intent signed by Sadeghi as CEO of U.S. Company 2, and omitted any mention of Abedini's relationship with SDRA. Id. at ¶¶ 53–54.

Sadeghi traveled to and stayed in Iran from February 1, 2019, through February 25, 2019. Plumb Aff. ¶ 7. [Doc. No. 28-2]. While he was there, he again accessed his email account using SDRA's IP address. Neal Aff. ¶ 58 [Doc. No. 28-1]. In or about March 2019, U.S. Company 1 hired Sadeghi to work as a microelectromechanical systems engineer. Id.

In or about mid-2019, Abedini and another individual formed the new company in Switzerland, which they named Illumove, S.A., rather than SadraLab. Id. at ¶ 55. On or about

---

[5] Sadeghi stated when he was interviewed following his arrest that he visited SDRA "maybe once a year" and that every time he visited Abedini it was usually at Abedini's office. Plumb Aff. ¶ 5 [Doc. No. 28-2].

August 6, 2019, Sadeghi paid for Abedini to travel to Switzerland. Id. at ¶ 60. While in Switzerland, Abedini registered a domain name for Illumove with a U.S.-based web hosting company and domain registrar. Id. at ¶ 60. Sadeghi then provided Abedini's contact information at Illumove to a U.S. Company 1 employee, explaining that Abedini had recently started a company in Switzerland, and that Abedini was very competent in hardware, firmware, and software development. Id. at ¶ 62.

After Sadeghi introduced Abedini and Illumove to U.S. Company 1, the U.S. Company 1 employee emailed Abedini about a potential collaboration with Illumove. Id. at ¶ 65. Abedini signed a non-disclosure agreement that provided for sharing of proprietary information. Id. On or about September 11, 2019, Sadeghi sent U.S. Company 1 proprietary information relating to requirements for a potential project known as the "Evaluation Board Project" to Abedini. Id. at ¶ 66.

Sadeghi traveled to and stayed in Iran from December 16, 2019, through January 11, 2020, and again from July 3, 2021, through July 24, 2021. Plumb Aff. ¶ 7 [Doc. No. 28-2]. In or about August 2021, Abedini and Illumove, with Sadeghi's assistance, secured a contract from U.S. Company 1 for the Evaluation Board Project. Id. at ¶ 73. Pursuant to this contract, Illumove would develop an evaluation board to test U.S. Company 1 inertial sensors, including the type used in the navigation system that SDRA had sold to IRGC. Id. As part of this project, Sadeghi emailed proprietary U.S. Company 1 datasheets to Abedini's Illumove email account, and Abedini forwarded those datasheets to a SDRA employee. Id. at ¶ 83.[6]

---

[6] The court has not included here the facts set forth in the Affidavit that are only relevant to the additional charges against Abedini.

2.   Discussion

To establish a criminal violation of the IEEPA, the government must prove that Sadeghi willfully violated or willfully conspired to violate the Iranian Transactions and Sanctions Regulations. See 50 U.S.C. § 1705. The government asserts that the evidence that Sadeghi engaged in conduct prohibited by the IEEPA "is overwhelming." Mot. 14 [Doc. 66]. The government further claims that it has ample facts to prove Sadeghi acted willfully. Id. Sadeghi argues that there is no evidence demonstrating that he knew of the alleged transfer of intellectual property from Illumove to SDRA. Opp'n 15 [Doc. No. 78].

The government has offered significant circumstantial evidence that Sadeghi willfully participated in transactions prohibited by the Regulations. The government has offered affidavit evidence that Sadeghi's working relationship with Abedini and SDRA is longstanding, that Abedini has attempted to procure parts from U.S. Company 1 through several means since at least 2014, and that Sadeghi was familiar with SDRA's business operations before Sadeghi joined U.S. Company 1. Neal Aff. ¶¶ 41–50 [Doc. No. 28-1].

The record lacks direct evidence that Sadeghi sent Abedini datasheets with the intention that they be provided to SDRA. Nonetheless, the government has provided substantial circumstantial evidence that Illumove was a "front" for SDRA and that Sadeghi knew Abedini established Illumove to facilitate the transfer of technology or proprietary information from U.S. Company 1 to SDRA. Accordingly, the government has provided substantial evidence that Sadeghi willfully violated 50 U.S.C. § 1705.

    C.    *Sadeghi's History and Characteristics*

    1.  Sadeghi's Background

Sadeghi is a dual citizen of the United States and Iran and a resident of Natick, Massachusetts. He was born in Iran and came to the United States on a student visa in 2007 to pursue his PhD. See Mot. for Release Ex. 2 [Doc. No. 33-2]. He received his doctorate degree from the University of Michigan in 2014.

Sadeghi's wife is also a dual citizen of the United States and Iran. She and Sadeghi married in 2009. The couple lived in Michigan until 2016, when they moved to Massachusetts after his wife received a job offer in Natick. See Opp'n Ex. 7 [Doc. No. 78-8]. The couple purchased their home in Natick in May 2016. Opp'n Ex. 9 [Doc. No. 78-10]. The couple has two young children. One child attends daycare and the other attends elementary school.

Numerous letters to the court indicate that Sadeghi has developed close ties with academic and Iranian-American communities in the Boston area. See generally Mot. for Release Ex. 1 [Doc. No. 29-1]. These letters describe Sadeghi as warm, welcoming, and helpful to others who have recently moved to his community. Sadeghi is further described as a mentor to individuals seeking employment and a consistent presence at cultural and community events.

Sadeghi's parents live in Tehran, Iran, and he reports that he speaks with them often. Sadeghi applied for green cards for both of his parents; his mother's green card has been approved but she has not yet traveled to the United States, while his father's application is still pending. Opp'n Ex. 7 [Doc. No. 78-8]. Sadeghi's wife has applied for a green card for her sister but has not yet applied for her own parents. Id. Sadeghi and his wife's long-term plan has been to have their children's four grandparents move to the United States.

Sadeghi reports that he is also in regular contact with his four siblings, three of whom live in Iran, and one of whom lives in Switzerland. He has traveled internationally on various occasions since moving to the United States, including several visits to Iran. Opp'n Ex. 7 [Doc. No. 78-8]. He has spent five or six weeks during each of the last three summers in Iran. See Plumb Aff. ¶ 7. [Doc. No. 28-2].

2. Discussion

Sadeghi has presented substantial evidence that it has been his and his wife's long-standing plan that they would stay and raise their children here in the United States, as American citizens. The letters offered in Sadeghi's support demonstrate his strong ties to his community in the Boston area. During his time in Massachusetts, Sadeghi has formed strong social and professional relationships and helped several people, including individuals from Iran, find their footing after moving into the area. Further, Sadeghi and his wife own their home in Natick, and they have young children in school and daycare. Sadeghi and his wife's efforts to obtain green cards for family members further support his plan to remain in the United States.

Sadeghi has no criminal history and no history of evading court proceedings. To the contrary, the evidence shows that he has complied with United States immigration and naturalization requirements and is attempting to help his parents lawfully immigrate to the United States. Additionally, Sadeghi immediately agreed to an interview upon his arrest and has been willing to provide the government with information regarding his assets, his family and connections in Iran, and his travel. See Opp'n Ex. 7 [Doc. No. 78-8]. His transparency and cooperation in this case weigh against a finding that he is likely to flee prosecution or otherwise fail to comply with conditions of release.

But despite his plan to stay in this country with his family and his cooperation with law enforcement here, the circumstances the family faces have changed by the filing of the Indictment. There is no indication that green card applications he and his wife have sponsored will be approved while this prosecution is pending. If Sadeghi is convicted of the charged crimes and incarcerated, his wife will have no familial support in New England. And while Sadeghi may want his children to have opportunities available in the United States and not in Iran, removing the family to Iran at this juncture would not limit the children's ability to return here on their own as adults, as they are U.S. citizens. At the same time, Sadeghi has maintained professional ties to Iran and has regularly spent time there, and Sadeghi's parents, parents-in-law, three of his siblings, and his wife's sister remain in Iran. These connections would make Sadeghi's return there, if he chose to flee, that much easier than someone without such ties.

In sum, Sadeghi's history and characteristics include factors weighing both for and against a flight risk.

  D. *Conclusion*

The seriousness of the charges and the weight of the evidence against Sadeghi give him incentive to flee if he is released, and Sadeghi's dual citizenship and connections to Iran give him the means to do so. Consequently, despite the countervailing factors, the court finds that Sadeghi poses a flight risk.

**V. Adequacy of Conditions of Release**

The Magistrate Judge ordered Sadeghi's release on standard conditions plus the additional conditions that he submit to supervision by U.S. Probation and Pretrial Services; surrender his and his wife and children's passports; not obtain any passport or other international travel document; avoid all direct and indirect contact with any person who is or may be a victim or witness in the case, including his co-defendant, unless in the presence of Sadeghi's attorney;

12

submit to location monitoring with home incarceration; and post a $100,000 appearance bond. Release Order [Doc. No. 56]; Appearance Bond [Doc. No. 55]. The Magistrate Judge also granted the Probation Office's request to issue a warrant in abeyance. Status Conference Tr. 12–13 [Doc. No. 59]. At the hearing on the government's motion, Sadeghi also indicated he was willing to agree to monitoring of his internet usage.

Sadeghi asserts that these conditions will reasonably assure Sadeghi's presence as required. Opp'n 19, 23 [Doc. No. 78]. The government responds that conditions of release do not meaningfully address the risk that Sadeghi will flee, arguing that the secured bond on Sadeghi's residence is modest in light of the overall resources available to him,[7] that home detention and location monitoring would only provide "historical notice" of Sadeghi's flight rather than preventing it, and that surrender of Sadeghi's and his family's passports would not prevent their flight where the Iranian government can mail new passports or facilitate hand delivery "through any number of people in Sadeghi's orbit who routinely travel back and forth to Iran." Mot. 9–10 [Doc. No. 66].

In light of Sadeghi's connections to Iran, his relationship with his co-defendant, and his incentive to flee, the court agrees that these conditions do not reasonably assure Sadeghi will remain in the United States if released. The record suggests that Sadeghi has the means to return to Iran with his family and continue their life there. He and his wife have maintained their Iranian citizenship. And while Sadeghi and his family have established residence and community in Natick, their immediate families remain in Iran. Given Sadeghi's connections to Abedini and

---

[7] The government also suggests the Iranian government would provide Sadeghi with additional resources if he repatriated. Mot. 9–10 [Doc. No. 66].

13

the Iranian government and his close relationships with individuals in Iran, he will have ample opportunities to evade any restrictions imposed on his release and flee this prosecution.

The court is unable to conceive of a way to prevent Sadeghi from fleeing if he chooses to do so. Monitoring of Sadeghi's mail and internet usage could cut off some avenues by which the Iranian government or Sadeghi's contacts could help him obtain new passports or make travel arrangements, but any such barriers could easily be circumvented through the assistance of others. And imposing location monitoring combined with the issuance of a warrant in abeyance reduces the risk that Sadeghi could evade custody if he violated home confinement, but in light of the opportunities he has to obtain an Iranian passport, this monitoring will not sufficiently mitigate the flight risk that his release presents.

## VI.    Conclusion

For the foregoing reasons, the government's <u>Motion</u> [Doc. No. 66] is GRANTED and the Magistrate Judge's release order is revoked.

IT IS SO ORDERED.

May 6, 2025                                         /s/Indira Talwani
                                                    United States District Judge