UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>(1) MAHDI MOHAMMAD SADEGHI,<br>a/k/a MOHAMMAD MAHDI<br>SADEGHI, and<br>(2) MOHAMMAD<br>ABEDININAJAFABADI,<br>a/k/a MOHAMMAD ABEDINI,<br>Defendants | Criminal No. 24-10391-IT<br><br>Violations:<br><br>Count One: Conspiracy to Violate the International Emergency Economic Powers Act ("IEEPA") and the Iranian Transactions and Sanctions Regulations ("ITSR")<br>(50 U.S.C. § 1705 and 31 C.F.R. 560)<br><br>Counts Two Through Eight: Violation of the IEEPA and the ITSR; Aiding and Abetting<br>(50 U.S.C. § 1705 and 31 C.F.R. 560; 18 U.S.C. § 2)<br><br>Count Nine: Conspiracy to Provide Material Support to a Foreign Terrorist Organization Resulting in Death<br>(18 U.S.C. § 2339B(a)(1))<br><br>Count Ten: Provision and Attempted Provision of Material Support to a Foreign Terrorist Organization Resulting in Death; Aiding and Abetting<br>(18 U.S.C. §§ 2339B(a)(1) and 2)<br><br>Forfeiture Allegation:<br>(18 U.S.C. § 981(a)(1)(C) and (G) and 28 U.S.C. § 2461, 19 U.S.C. § 1595a(d)) |

## SUPERSEDING INDICTMENT

At all times relevant to this Superseding Indictment:

### General Allegations

1.  Defendant MAHDI MOHAMMAD SADEGHI, a/k/a MOHAMMAD MAHDI

SADEGHI ("SADEGHI"), was a naturalized U.S. citizen originally from Iran and a resident of

1

Natick, Massachusetts.   SADEGHI obtained a degree from the University of Tehran in electrical engineering and electronics and subsequently received a Ph.D. in electrical engineering from a university in the United States.   Since March 2019, SADEGHI was employed as an engineer for a global semiconductor manufacturer headquartered in Massachusetts ("U.S. Company 1").

2.       In or about 2015, SADEGHI and two other individuals, at least one of whom is known to be a U.S. citizen, whose identities are known to the Grand Jury ("Person 1" and "Person 2"), formed a company based in Massachusetts that held itself out as a fitness wearables company, which specialized in wearable sensors that provide kinetic monitoring ("U.S. Company 2").

3.       In or about August 2015, SADEGHI and other individuals whose identities are known to the Grand Jury, including Person 1 and Person 2, created a business proposal for a presentation to the Iranian National Elites Foundation ("INEF"), which was an Iranian governmental organization whose main purpose was to recognize, organize, and support Iran's elite national talents.   In exchange for funding from INEF, SADEGHI proposed to create a sister company to U.S. Company 2 in Iran ("Iranian Company 1").

4.       In or about August 2016, SADEGHI and Person 2 traveled to Iran and made an in-person presentation to INEF in support of their business proposal.   SADEGHI and Person 2 sought a business loan of $790,000 from INEF, and in return, the "IRAN Benefits" would include, among other things, intellectual property, knowledge transfer, and capability development.   In or about February 2017, INEF subsequently provided U.S. Company 2's sister company, Iranian Company 1, with a portion of the requested funding.

5.       Defendant MOHAMMAD ABEDININAJAFABADI, a/k/a MOHAMMAD ABEDINI ("ABEDINI"), was an Iranian citizen and was a resident of Iran and Switzerland.

ABEDINI obtained a Bachelors, Masters, and Doctoral Degree in mechanical engineering from Sharif University in Tehran, Iran. ABEDINI completed his post-doctoral work at a university in Lausanne, Switzerland. ABEDINI was a co-founder of San'at Danesh Rahpooyan Aflak Co. ("SDRA" or "SADRA") in Iran, and from in or about 2011 to the present, he served as the CEO and/or the Managing Director of SDRA.

6. SDRA was a company based in Tehran, Iran that specializes in the sale of navigation systems and supporting software that have significant military applications. SDRA's primary business was the design and manufacture of its proprietary Sepehr Navigation System ("Sepehr"), which had applications in Unmanned Aerial Vehicles ("UAVs"), also known as drones, as well as cruise and ballistic missiles.

7. In or about November 2016, SADEGHI entered into a contract with SDRA, on behalf of Iranian Company 1, to purchase technology from SDRA. SADEGHI subsequently sent a copy of the contract, which SADEGHI signed on behalf of Iranian Company 1, to ABEDINI.

8. Since at least in or about 2014, SDRA has sold products, including the Sepehr Navigation System, to the Islamic Revolutionary Guard Corps ("IRGC")[1] Aerospace Force, which

---

[1] Also known as IRGC; Islamic Revolutionary Guards Corps; Islamic Revolution Guards Corps; Iran's Revolutionary Guard Corps; Islamic Revolutionary Corps; IRG; The Iranian Revolutionary Guards; Islamic Revolutionary Guards; Iran's Revolutionary Guards; Revolutionary Guards; Revolutionary Guard; Army of the Guardians of the Islamic Revolution; The Army of the Guardians of the Islamic Revolution; AGIR; Pasdaran; Pasdaran-e Inqilab; Pasdarn-e Enghelab-e Islami; Sepah; Sepah Pasdaran; Sepah-e Pasdaran-e Enghelab-e Eslami; Sepah-e Pasdaran Enghelab Islami; Islamic Revolutionary Guard Corps-Qods Force; IRGC-Quds Force; IRGC-QF; Qods Force; Sepah-e Qods; Jerusalem Force; Al Qods; Islamic Revolutionary Guard Corps (IRGC)-Qods Force; Pasdaran-e Enghelab-e Islami (Pasdaran); Sepah-e Qods (Jerusalem Force); Qods (Jerusalem) Force of the IRGC; Quds Force; IRGC Ground Forces; Islamic Revolution Guards Corps Ground Force; Basij; Baseej; Basij-e Melli; Islamic Revolution Guards Corps Resistance Force; Basij Resistance Forces; Mobilization of the Oppressed; Mobilization of the Oppressed Unit; Mobilization of the Oppressed Organization; Organization of the Mobilisation of

was the strategic missile, air, and space force within the IRGC and served as the primary operator of Iran's fleet of UAVs.   The IRGC was an Iranian military and counterintelligence organization under the authority of the Supreme Leader of Iran.   Among other things, the IRGC played a key role in Iran's development of ballistic missiles, UAVs, and in Iran's support for international terrorism and foreign terrorist organizations.

9.    The IRGC was designated on October 25, 2007 by the U.S. Department of Treasury, Office of Foreign Assets Control ("OFAC"), as a Specially Designated National ("SDN") under Executive Order 13382, relating to the proliferation of weapons of mass destruction ("WMDs"), for its role in supporting the proliferation of ballistic missiles capable of carrying WMDs and procuring equipment that could be used to support the Government of Iran's ballistic missile and nuclear programs.   The IRGC was further designated on October 13, 2017 by OFAC as a Specially Designated Global Terrorist ("SDGT") under Executive Order 13224, relating to global terrorism, for its role in supporting the terrorist activities of the Islamic Revolutionary Guards Corps-Qods Force ("IRGC-QF").   The IRGC Air Force, now known as the IRGC Aerospace Force, was further designated in 2010 as an SDN, under Executive Order 13382.

10.    On April 15, 2019, the U.S. Department of State designated the IRGC as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act for the

_____

the Oppressed; Sazman Basij Melli; Sazman-e Moghavemat-e Basij; Sazeman-e Basij-e Mostazafan; Vahed-e Basij-e Mostazafeen; Vahed-e Basij Mostaza'feen; National Mobilization Organization; National Resistance Mobilization; Resistance Mobilization Force; Nirooye Moghavemate Basij; Niruyeh Moghavemat Basij; IRGC Air Force; Islamic Revolution Guards Corps Air Force; Islamic Revolutionary Guards Corps Air Force; Islamic Revolutionary Guard Corps Air Force; IRGCAF; Sepah Pasdaran Air Force; Air Force, IRGC (Pasdaran); Islamic Revolutionary Guards Corps Aerospace Force; Aerospace Force of the Army of the Guardians of the Islamic Revolution; AFAGIR; Aerospace Division of IRGC; IRGC Aerospace Force; IRGCASF; IRGC Navy; Islamic Revolution Guards Corps Naval Force.

IRGC's direct involvement in terrorist plotting, support for terrorism, and hostage-taking.

11.     Among its activities hostile to the United States and its allies, the IRGC actively targeted nationals of the United States and its allies living around the world for kidnapping and/or execution, both to repress and silence dissidents critical of the Iranian regime and to take vengeance for the death of Qasem Soleimani, who was killed by a U.S. drone strike in Baghdad on or about January 3, 2020.   For example, in 2022, U.S. law enforcement detected and disrupted an IRGC plot to murder a former U.S. National Security Advisor in or around Washington D.C.

### The IRGC's Military Drone Program and 2024 Drone Strike in Jordan

12.     The IRGC, including the IRGC Aerospace Force, has played a key role in the development and manufacture of lethal one-way attack UAVs, including the Shahed-101, which have been utilized by Iran and other actors, including Iran-backed militias.   Unmanned combat UAVs, including the Shahed-101, are designed to kill, and they have resulted in deaths, including the deaths of civilians and U.S. service members.

13.     For example, on or about January 28, 2024, three U.S. service members were killed, and more than forty others were injured, by an Iranian-made Shahed-101, in a drone attack by Iran-backed militants on a military base (known as "Tower 22") located in northern Jordan, near the Syrian border. The Shahed-101 that caused the death of the U.S. service members contained a Sepher Navigation System manufactured by ABEDINI's company, SDRA.

### The International Emergency Economic Powers Act

14.     The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50, United States Code, Sections 1701 to 1708, confers upon the President authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States.

Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."  50 U.S.C. § 1705(a).

15.    Beginning with Executive Order 12170, issued on November 14, 1979, the President has found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States" and declared "a national emergency to deal with that threat."

16.    On March 15 and May 6, 1995, the President issued Executive Orders 12957 and 12959, prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a U.S. person, wherever located, and on August 19, 1997, issued Executive Order 13059 clarifying the previous orders.  These Executive Orders, which remained in effect at all times relevant to the conduct described herein, authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders.   Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations (renamed in 2013 the Iranian Transactions and Sanctions Regulations, or "ITSR"), implementing the sanctions imposed by the Executive Orders.  *See* 31 C.F.R. Part 560.

17.    Title 31, Code of Federal Regulations, Section 560.204 of the ITSR prohibits, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a U.S. person, of goods, technology, or services to Iran or the Government of Iran (with certain limited exceptions), including the exportation, reexportation, sale, or supply of goods, technology, or services to a third country knowing that such goods, technology, or services

are intended for Iran or the Government of Iran, without a license from the U.S. Department of Treasury, Office of Foreign Assets Control ("OFAC").   Section 560.205 of the ITSR further prohibits, among other things, the reexportation from a third country by a non-U.S. person of any goods, technology, or services that have been exported from the United States, knowing that such goods, technology, or services are intended for Iran, without a license from OFAC.   And Section 560.206 of the ITSR prohibits, among other things, U.S. persons, wherever located, from engaging in any transaction or dealing in or related to goods or services of Iranian origin, or goods, technology, or services for exportation, reexportation, sale, or supply, directly or indirectly, to Iran or the Government of Iran.

18.     The ITSR further prohibit transactions that evade or avoid, have the purpose of evading or avoiding, cause a violation of, or attempt to violate the ITSR.   See 31 C.F.R. § 560.203.

19.     Pursuant to its authority under the Export Control Reform Act, 50 U.S.C. §§ 4801-4826—and prior to August 2018, IEEPA—the U.S. Commerce Department's Bureau of Industry and Security ("BIS"), through the Export Administration Regulations ("EAR"), 15 C.F.R. Parts 730-774, reviews and controls the export of certain items, including goods, software, and technologies, often called dual-use items, from the United States to foreign countries.

20.     In particular, the EAR restricts the export of items that could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States.   The EAR imposes licensing and other requirements for items subject to the EAR to be lawfully exported from the United States or lawfully reexported from one foreign destination to another.

21.     The most sensitive items subject to EAR controls are identified on the Commerce

Control List ("CCL"), published at 15 C.F.R. part 774, Supp. No. 1. Items on the CCL are categorized by Export Control Classification Number ("ECCN"), each of which has export control requirements depending on destination, end use, and end user. An ECCN identifies the export controls associated with a specific item.

Objects of the IEEPA Conspiracy

22.   The objects of the IEEPA conspiracy were:

    a.   to export U.S. goods, technology, and services, directly and indirectly, to Iran, including to ABEDINI and/or SDRA;

    b.   to conceal the prohibited activities and transactions from detection by the U.S. Government to avoid penalties and disruption of the illegal activities; and

    c.   to violate and evade the prohibitions and licensing requirements of the IEEPA and the ITSR.

Manner and Means of the IEEPA Conspiracy

23.   Among the manner and means by which the defendants and coconspirators known and unknown to the Grand Jury carried out the IEEPA conspiracy were the following:

    a.   In or about 2016, ABEDINI ordered controlled parts from U.S. Company 1 for delivery to his university address in Switzerland. An invoice from U.S. Company 1 reflected that the products were shipped to Switzerland and that the recipient was "SDRA, Mohammad Abedini."

    b.   In or about December 2016, SADEGHI placed an order for electronic components, including Microelectromechanical Systems ("MEMS") from U.S. Company 1, through a U.S.-based electronics distributor. MEMS devices

8

utilize mechanical and electronic components on a microscopic scale and are often integrated into a wide range of products, including those that detect and measure acceleration and orientation. SADEGHI listed "SDRA" as the customer reference for two of the items. SADEGHI forwarded the order and invoice documentation to ABEDINI in or about April 2017.

c. From in or about January 2016 to January 2018, ABEDINI used U.S.-based electronics distributors to order electronic components, including MEMS, from multiple U.S.-based manufacturers, including U.S. Company 1. These orders were often shipped to ABEDINI's university address in Switzerland.

d. In or about 2018, ABEDINI took steps to create a front company in Switzerland to facilitate ABEDINI's receipt in Switzerland of U.S.-origin goods, technology, and services, which could not otherwise be exported from the United States to Iran, including to SDRA, due to U.S. export control and sanctions laws.

e. Specifically, on or about September 10, 2018, ABEDINI and an individual whose identity is known to the Grand Jury ("Swiss Employee 1") submitted a business plan to an innovation and investment promotion agency in Switzerland in support of a new company named SadraLab. SadraLab was intended to be the sales and branding arm of SDRA (or SADRA) in Switzerland, created for the purpose of evading U.S. sanctions and export restrictions imposed on Iran.

f. In or about mid-2019, ABEDINI and Swiss Employee 1 ultimately formed a company called Illumove, S.A. in Lausanne, Switzerland. One of the

9

objectives of Illumove was to evade U.S. sanctions and export restrictions imposed on Iran, and funds from Illumove were to be transferred through ABEDINI to SDRA in Iran.

g. In August 2019, SADEGHI forwarded ABEDINI an invoice for travel from Iran to Switzerland. Upon ABEDINI's arrival in Switzerland, and shortly after Illumove S.A. created its public-facing website, SADEGHI introduced ABEDINI and Illumove to U.S. Company 1. SADEGHI told a colleague at U.S. Company 1 (the "U.S. Company 1 Employee") that SADEGHI had worked with ABEDINI and the team at Illumove and claimed— notwithstanding that Illumove had only recently been formed—that they had expertise in hardware, firmware, and software development.

h. After being introduced, U.S. Company 1 Employee emailed ABEDINI about a potential collaboration between Illumove and U.S. Company 1. U.S. Company 1 Employee copied SADEGHI on the email to ABEDINI. ABEDINI returned a signed Non-Disclosure Agreement to U.S. Company 1 on or about September 2, 2019.

i. In or about May 2021, SADEGHI provided ABEDINI with information on how ABEDINI could procure U.S.-origin electronic components, including MEMS, from a U.S. Company 1 distributor in Germany.

j. In or about August 2021, ABEDINI, through Illumove, entered into a contract with U.S. Company 1. Pursuant to the contract, Illumove would develop an evaluation board to test a wide range of U.S. Company 1 inertial sensors,

including sensors similar to those used in SDRA's Sepehr Navigation System, and to display the results of those tests on a user interface.   Among other things, Illumove was to develop the evaluation board hardware, as well as source code for the project, which would be provided to U.S. Company 1. Illumove was also to develop a particular algorithm that would remain embedded in U.S. Company 1 software.   SADEGHI was to serve as a backup support engineer on the project.

k.  As part of the collaboration on the project, technical experts employed by U.S. Company 1 also met virtually with ABEDINI and other purported employees of Illumove (who were in fact employees of SDRA in Iran) through a U.S. Company 1 cloud-based collaboration application.

l.  One or more SDRA employees in Iran also provided support for the U.S. Company 1 project, including by helping to develop the firmware that ABEDINI provided to U.S. Company 1.

m.  Additionally, through Illumove's purported work on the U.S. Company 1 project, ABEDINI and SADEGHI caused U.S. Company 1 to export goods and technology to Switzerland, including tens of thousands of dollars' worth of electronic components—including MEMS—certain of which had applications in the navigation of drones.   ABEDINI subsequently transported U.S. Company 1 goods and technology to Iran.

n.  ABEDINI and SADEGHI also caused U.S. Company 1 to transfer U.S. Company 1 datasheets to ABEDINI, who then transferred the U.S.-origin

datasheets to Iran, including to employees of SDRA.   The datasheets, which were not yet publicly available, discussed the technical performance and characteristics of U.S. Company 1's electronic components—including for components that had the same navigation applications described above.

<u>Objects of the Material Support Conspiracy</u>

24.    The object of the material support conspiracy was to provide the IRGC with material support and resources, to wit, services, property, and personnel, knowing that the IRGC was a designated terrorist organization (as defined in Title 18, United States Code, Section 2339B(g)(6)); that the IRGC engages in and has engaged in terrorist activity (as defined in Section 212(a)(3)(B) of the Immigration and Nationality Act); and that the IRGC engages in and has engaged in terrorism (as defined in Section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989), in violation of Title 18, United States Code, Section 2339B.

<u>Manner and Means of the Material Support Conspiracy</u>

25.    Among the manner and means by which ABEDINI and coconspirators known and unknown to the Grand Jury carried out the material support conspiracy were the following:

a.    In or about 2011, ABEDINI founded SDRA in Iran to manufacture advanced products in guidance and control systems, *i.e.*, navigation systems, which SDRA intended to sell to the military and missile industries in Iran. Thereafter, ABEDINI served as the CEO and/or the Managing Director of SDRA.

b.    ABEDINI procured U.S. goods, technology, and services used in the manufacturing of SDRA's Sepehr Navigation System in violation of U.S.

sanctions and export restrictions.    At times, ABEDINI obtained parts that are known to be used in the Sepehr Navigation System from U.S. Company 1 and other U.S. companies using his Illumove address in Switzerland.

c.  From at least in or about 2014 through the present, SDRA supplied the IRGC Aerospace Force with the Sepehr Navigation System, including over 1,800 units of the Sepehr during the 2022-2023 fiscal year.    During that same fiscal year, the IRGC Aerospace Force paid SDRA over 290,492,106,100 Rials (approximately $6,875,541 USD).

d.  Since at least 2019 to the present, SDRA has publicly obfuscated its Iranian military ties.    As compared to its website from in or about 2016 to 2018, which indicated that SDRA designed and manufactured navigation modules for cruise and ballistic missiles, SDRA's current website provides a general overview of SDRA products and services, but does not reference its military ties. However, SDRA's target market for its navigation products was, and continued to be, the IRGC.

<u>COUNT ONE</u>
Conspiracy to Violate the International Emergency Economic Powers Act and
the Iranian Transactions and Sanctions Regulations
(50 U.S.C. § 1705 and 31 C.F.R. 560)

The Grand Jury charges:

26.     Paragraphs 1 through 25 of the General Allegations section of this Superseding

Indictment are restated and realleged as if fully set forth herein.

27.     From at least in or about January 2016 through December 16, 2024, in the District

of Massachusetts, and elsewhere, the defendants,

MAHDI MOHAMMAD SADEGHI, a/k/a MOHAMMAD MAHDI SADEGHI, and
MOHAMMAD ABEDININAJAFABADI, a/k/a MOHAMMAD ABEDINI,

did knowingly and willfully combine, conspire, confederate, and agree together and with others

known and unknown to the Grand Jury, to violate and to cause a violation of licenses, orders,

regulations, and prohibitions issued under the IEEPA, in violation of Title 50, United States Code,

Section 1705, to wit, exporting, reexporting, selling, and supplying, and causing the exportation,

reexportation, sale, and supply of, goods, technology, and services to Iran and the Government of

Iran from the United States, without prior authorization or a license from the Department of

Treasury, and evading the requirements of U.S. law with respect to the provision of goods,

technology, and services to Iran and the Government of Iran from the United States and by one or

more U.S. persons.

All in violation of Title 50, United States Code, Section 1705(c) and 31 C.F.R. 560.203-

206.

<u>COUNT TWO</u>
Violation of the International Emergency Economic Powers Act and
the Iranian Transactions and Sanctions Regulations; Aiding and Abetting
(50 U.S.C. § 1705 and 31 C.F.R. 560; 18 U.S.C. § 2)

The Grand Jury further charges:

28.     Paragraphs 1 through 25 of the General Allegations section of this Superseding

Indictment are restated and realleged as if fully set forth herein.

29.     On or about September 29, 2022, in the District of Massachusetts, and elsewhere,

the defendants,

MAHDI MOHAMMAD SADEGHI, a/k/a MOHAMMAD MAHDI SADEGHI, and
MOHAMMAD ABEDININAJAFABADI, a/k/a MOHAMMAD ABEDINI,

did knowingly and willfully export, reexport, supply, and cause the exportation, reexportation, and

supply of goods, technology, and services, to wit, one or more U.S.-origin electronic components,

including MEMS, from the United States to Iran and the Government of Iran, including through

Switzerland, and attempted to do so, without prior authorization or a license from the Department

of the Treasury.

All in violation of Title 50, United States Code, Section 1705(c) and 31 C.F.R. 560.203-

206 and Title 18, United States Code, Section 2.

15

<u>COUNT THREE</u>
Violation of the International Emergency Economic Powers Act and
the Iranian Transactions and Sanctions Regulations; Aiding and Abetting
(50 U.S.C. § 1705 and 31 C.F.R. 560; 18 U.S.C. § 2)

The Grand Jury further charges:

30.    Paragraphs 1 through 25 of the General Allegations section of this Superseding Indictment are restated and realleged as if fully set forth herein.

31.    On or about April 18, 2023, in the District of Massachusetts, and elsewhere, the defendant,

MOHAMMAD ABEDININAJAFABADI, a/k/a MOHAMMAD ABEDINI,

did knowingly and willfully export, reexport, supply, and cause the exportation, reexportation, and supply of goods, technology, and services, to wit, one or more U.S.-origin electronic components, including MEMS, from the United States to Iran and the Government of Iran, including through Switzerland, and attempted to do so, without prior authorization or a license from the Department of the Treasury.

All in violation of Title 50, United States Code, Section 1705(c) and 31 C.F.R. 560.203-206 and Title 18, United States Code, Section 2.

<u>COUNT FOUR</u>
Violation of the International Emergency Economic Powers Act and
the Iranian Transactions and Sanctions Regulations; Aiding and Abetting
(50 U.S.C. § 1705 and 31 C.F.R. 560; 18 U.S.C. § 2)

The Grand Jury further charges:

32.    Paragraphs 1 through 25 of the General Allegations section of this Superseding

Indictment are restated and realleged as if fully set forth herein.

33.    On or about July 11, 2023, in the District of Massachusetts, and elsewhere, the

defendant,

MAHDI MOHAMMAD SADEGHI, a/k/a MOHAMMAD MAHDI SADEGHI, and
MOHAMMAD ABEDININAJAFABADI, a/k/a MOHAMMAD ABEDINI,

did knowingly and willfully export, reexport, supply, and cause the exportation, reexportation, and

supply of goods, technology, and services, to wit, one or more U.S.-origin electronic components,

including MEMS, from the United States to Iran and the Government of Iran, including through

Switzerland, and attempted to do so, without prior authorization or a license from the Department

of the Treasury.

All in violation of Title 50, United States Code, Section 1705(c) and 31 C.F.R. 560.203-

206 and Title 18, United States Code, Section 2.

17

<u>COUNT FIVE</u>

Violation of the International Emergency Economic Powers Act and
the Iranian Transactions and Sanctions Regulations; Aiding and Abetting
(50 U.S.C. § 1705 and 31 C.F.R. 560; 18 U.S.C. § 2)

The Grand Jury further charges:

34.    Paragraphs 1 through 25 of the General Allegations section of this Superseding Indictment are restated and realleged as if fully set forth herein.

35.    On or about October 2, 2023, in the District of Massachusetts, and elsewhere, the defendant,

MOHAMMAD ABEDININAJAFABADI, a/k/a MOHAMMAD ABEDINI,

did knowingly and willfully export, reexport, supply, and cause the exportation, reexportation, and supply of goods, technology, and services, to wit, one or more U.S.-origin electronic components, including MEMS, from the United States to Iran and the Government of Iran, including through Switzerland, and attempted to do so, without prior authorization or a license from the Department of the Treasury.

All in violation of Title 50, United States Code, Section 1705(c) and 31 C.F.R. 560.203-206 and Title 18, United States Code, Section 2.

<u>COUNT SIX</u>
Violation of the International Emergency Economic Powers Act and
the Iranian Transactions and Sanctions Regulations; Aiding and Abetting
(50 U.S.C. § 1705 and 31 C.F.R. 560; 18 U.S.C. § 2)

The Grand Jury further charges:

36.     Paragraphs 1 through 25 of the General Allegations section of this Superseding
Indictment are restated and realleged as if fully set forth herein.

37.     On or about December 29, 2023, in the District of Massachusetts, and elsewhere,
the defendant,

MOHAMMAD ABEDININAJAFABADI, a/k/a MOHAMMAD ABEDINI,

did knowingly and willfully export, reexport, supply, and cause the exportation, reexportation, and
supply of goods, technology, and services, to wit, one or more U.S.-origin electronic components,
including MEMS, from the United States to Iran and the Government of Iran, including through
Switzerland, and attempted to do so, without prior authorization or a license from the Department
of the Treasury.

All in violation of Title 50, United States Code, Section 1705(c) and 31 C.F.R. 560.203-
206 and Title 18, United States Code, Section 2.

## COUNT SEVEN
Violation of the International Emergency Economic Powers Act and
the Iranian Transactions and Sanctions Regulations; Aiding and Abetting
(50 U.S.C. § 1705 and 31 C.F.R. 560; 18 U.S.C. § 2)

The Grand Jury further charges:

38.     Paragraphs 1 through 25 of the General Allegations section of this Superseding

Indictment are restated and realleged as if fully set forth herein.

39.     On or about March 15, 2024, in the District of Massachusetts, and elsewhere, the

defendants,

MAHDI MOHAMMAD SADEGHI, a/k/a MOHAMMAD MAHDI SADEGHI, and
MOHAMMAD ABEDININAJAFABADI, a/k/a MOHAMMAD ABEDINI,

did knowingly and willfully export, reexport, supply, and cause the exportation, reexportation, and

supply of goods, technology, and services, to wit, one or more U.S.-origin electronic components,

including MEMS, from the United States to Iran and the Government of Iran, including through

Switzerland, and attempted to do so, without prior authorization or a license from the Department

of the Treasury.

All in violation of Title 50, United States Code, Section 1705(c) and 31 C.F.R. 560.203-

206 and Title 18, United States Code, Section 2.

<u>COUNT EIGHT</u>
Violation of the International Emergency Economic Powers Act and
the Iranian Transactions and Sanctions Regulations; Aiding and Abetting
(50 U.S.C. § 1705 and 31 C.F.R. 560; 18 U.S.C. § 2)

The Grand Jury further charges:

40.    Paragraphs 1 through 25 of the General Allegations section of this Superseding Indictment are restated and realleged as if fully set forth herein.

41.    On or about May 6, 2024, in the District of Massachusetts, and elsewhere, the defendants,

MAHDI MOHAMMAD SADEGHI, a/k/a MOHAMMAD MAHDI SADEGHI, and
MOHAMMAD ABEDININAJAFABADI, a/k/a MOHAMMAD ABEDINI,

did knowingly and willfully export, reexport, supply, and cause the exportation, reexportation, and supply of goods, technology, and services, to wit, one or more U.S.-origin electronic components, including MEMS, from the United States to Iran and the Government of Iran, including through Switzerland, and attempted to do so, without prior authorization or a license from the Department of the Treasury.

All in violation of Title 50, United States Code, Section 1705(c) and 31 C.F.R. 560.203-206 and Title 18, United States Code, Section 2.

<u>COUNT NINE</u>
Conspiracy to Provide Material Support to a
Foreign Terrorist Organization Resulting in Death
(18 U.S.C. § 2339B(a)(1))

The Grand Jury further charges:

42.    Paragraphs 1 through 25 of the General Allegations section of this Superseding Indictment are restated and realleged as if fully set forth herein.

43.    From at least on or about April 15, 2019, through in or about December 16, 2024, in the District of Massachusetts, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, the defendant,

MOHAMMAD ABEDININAJAFABADI, a/k/a MOHAMMAD ABEDINI,

knowingly and willfully conspired with others known and unknown to the Grand Jury to provide material support and resources, as defined in Title 18, United States Code, Section 2339A(b)(1), including property, services, and personnel (including himself), to a foreign terrorist organization, to wit, the IRGC, which at all relevant times was designated by the Secretary of State as a foreign terrorist organization pursuant to Section 219 of the Immigration and Nationality Act, knowing that the IRGC was a designated terrorist organization (as defined in Title 18, United States Code, Section 2339B(g)(6)); that the IRGC engages in and has engaged in terrorist activity (as defined in Section 212(a)(3)(B) of the Immigration and Nationality Act); and that the IRGC engages in and has engaged in terrorism (as defined in Section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989), and the offense occurred in and affected interstate and foreign commerce and, after the conduct required for this offense occurred, the defendant is expected to be first brought to and arrested in the District of Massachusetts, and the offense resulted in the death of one or more persons.

All in violation of Title 18, United States Code, Sections 2339B(a)(1), (d)(1)(C), (d)(1)(D), (d)(1)(E), (d)(1)(F), and 3238.

<u>COUNT TEN</u>
Provision and Attempted Provision of Material Support to a
Foreign Terrorist Organization Resulting in Death; Aiding and Abetting
(18 U.S.C. §§ 2339B(a)(1) and 2)

The Grand Jury further charges:

44.     Paragraphs 1 through 25 of the General Allegations section of this Superseding Indictment are restated and realleged as if fully set forth herein.

45.     From on or about April 15, 2019, through in or about December 16, 2024, in the District of Massachusetts, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, the defendant,

MOHAMMAD ABEDININAJAFABADI, a/k/a MOHAMMAD ABEDINI,

together with others, did knowingly provide and attempt to provide material support and resources, as defined in Title 18, United States Code, Section 2339A(b)(1), including property, services, and personnel (including himself), to a foreign terrorist organization, to wit, the IRGC, which at all relevant times was designated by the Secretary of State as a foreign terrorist organization pursuant to Section 219 of the Immigration and Nationality Act, knowing that the IRGC was a designated terrorist organization (as defined in Title 18, United States Code, Section 2339B(g)(6)); that the IRGC engages in and has engaged in terrorist activity (as defined in Section 212(a)(3)(B) of the Immigration and Nationality Act); and that the IRGC engages in and has engaged in terrorism (as defined in Section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989), and the offense occurred in and affected interstate and foreign commerce and, after the conduct required for the offense occurred, the defendant is expected to be first brought to and arrested in the District of Massachusetts, and the offense resulted in the death of one or more persons.

All in violation of Title 18, United States Code, Sections 2339B(a)(1), (d)(1)(C), (d)(1)(D), (d)(1)(E), (d)(1)(F), 2, and 3238.

FORFEITURE ALLEGATION
(18 U.S.C. §§ 981(a)(1)(C) and (G) and 28 U.S.C. § 2461(c), 19 U.S.C. § 1595a(d))

46.    Upon conviction of one or more of the offenses set forth in Counts One through Eight, the defendants,

MAHDI MOHAMMAD SADEGHI, a/k/a MOHAMMAD MAHDI SADEGHI, and
MOHAMMAD ABEDININAJAFABADI, a/k/a MOHAMMAD ABEDINI,

shall forfeit to the United States,

(a) pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, that constitutes, or is derived from, proceeds traceable to the commission of the offense; and

(b) pursuant to Title 19, United States Code, Section 1595a(d), any merchandise exported or sent from the United States or attempted to be exported or sent from the United States contrary to law, or the proceeds or value thereof, and any property used to facilitate the exporting or sending of such merchandise, the attempted exporting or sending of such merchandise, or the receipt, purchase, transportation, concealment, or sale of such merchandise prior to exportation.

47.    Upon conviction of one or more of the offenses set forth in Counts Nine and Ten, the defendant,

MOHAMMAD ABEDININAJAFABADI, a/k/a MOHAMMAD ABEDINI,

shall forfeit to the United States,

(a) pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, that constitutes, or is derived from, proceeds traceable to the commission of the offense; and

(b) pursuant to Title 18, United States Code, Section 981(a)(1)(G) and Title 28, United States Code, Section 2461(c), all assets, foreign or domestic of any individual, entity, or organization engaged in planning or perpetrating any Federal crime of terrorism (as defined in Section 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property, and all assets, foreign or domestic, affording a source of influence over any such entity or organization; all assets, foreign or domestic, acquired or maintained with the intent and for the purpose of supporting, planning, conducting, or concealing any Federal crime of terrorism (as defined in Section 2332b(g)(5) against the United States, citizens or residents of the United States, or their property; or all assets, foreign or domestic, derived from, involved in, or used or intended to be used to commit any Federal crime of terrorism (as defined in Section 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property.

48.     If any property described in Paragraphs 46 and 47 above, as being forfeitable pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and (G) and Title 28, United States Code, Section 2461(c), or Title 19, United States Code, Section 1595a(d), as a result of any act or omission of the defendants –

      a.     cannot be located upon the exercise of due diligence;

      b.     has been transferred or sold to, or deposited with, a third party;

      c.     has been placed beyond the jurisdiction of the Court;

      d.     has been substantially diminished in value; or

      e.     has been commingled with other property which cannot be divided without difficulty

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property described above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and (G) and Title 28, United States Code, Section 2461(c), and Title 19, United States Code, Section 1595a(d).

A TRUE BILL



FOREPERSON

JARED C. DOLAN
ALATHEA E. PORTER
ASSISTANT UNITED STATES ATTORNEYS
DISTRICT OF MASSACHUSETTS

CHRISTINA A. CLARK
LESLIE C. ESBROOK
TRIAL ATTORNEYS
NATIONAL SECURITY DIVISION

District of Massachusetts: December _\16_, 2025
Returned into the District Court by the Grand Jurors and filed.

/s/ Leonardo T. Vieira, 2:12pm

DEPUTY CLERK

28