UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>MAHDI MOHAMMAD SADEGHI,<br>a/k/a MOHAMMAD MAHDI SADEGHI<br><br>Defendant. | No. 1:24-CR-10391-IT |

**GOVERNMENT'S TRIAL BRIEF**

## TABLE OF CONTENTS

I.  The Superseding Indictment and the Applicable Law ........................................................ 1

    a.  Interpretation of "knowing or having reason to know"
       under 31 C.F.R. § 560.204 .................................................................................... 1

    b.  Criminal Liability for Causing an IEEPA Violation: ............................................... 3

    c.  Application of Pinkerton Liability .......................................................................... 4

II. Factual Background ........................................................................................................... 5

    a.  Count Two ............................................................................................................. 7

    b.  Count Four ............................................................................................................. 8

    c.  Count Seven .......................................................................................................... 9

    d.  Count Eight ............................................................................................................ 9

III. Anticipated Evidentiary Issues ....................................................................................... 10

    a.  Translations ......................................................................................................... 10

    b.  Co-Conspirator Records ...................................................................................... 10

        1. Authenticity ................................................................................................. 10

        2. Hearsay ........................................................................................................11

    c.  Mehdi Aghagolzadeh ........................................................................................... 13

    d.  Location Data ...................................................................................................... 13

    e.  Expert Testimony ................................................................................................ 14

IV. Special Arrangements ..................................................................................................... 14

    a.  Paralegal. ............................................................................................................. 14

    b.  Witnesses ............................................................................................................. 14

    c.  Reader .................................................................................................................. 14

    d.  Case Agent .......................................................................................................... 15

# TABLE OF AUTHORITIES

### Cases

*Bryan v. United States*, 524 U.S. 184 (1998) ................................................................... 2, 3

*Cheek v. United States*, 498 U.S. 192 (1991) ...................................................................... 2

*Epsilon Elecs., Inc. v. U.S. Dep't of Treasury*, 857 F.3d 913 (D.C. Cir. 2017) ................. 2

*United States v. Andrade*, 135 F.3d 104 (1st Cir. 1998) .................................................... 4

*United States v. Blanchard*, 867 F.3d 1 (1st Cir. 2017) ....................................................11

*United States v. Burden*, 934 F.3d 675 (D.C. Cir. 2019) ................................................... 3

*United States v. Elashyi*, 554 F.3d 480 (5th Cir. 2008) ..................................................... 3

*United States v. Garcia*, 452 F.3d 36 (1st Cir. 2006) .......................................................11

*United States v. Gershman*, 31 F.4th 80 (2d Cir. 2022) .................................................... 5

*United States v. Holmquist*, 36 F.3d 154 (1st Cir. 1994) ................................................. 10

*United States v. Lyons*, 740 F.3d 702 (1st Cir. 2014) ...................................................... 12

*United States v. Marino*, 277 F.3d 11 (1st Cir. 2002) ...................................................... 12

*United States v. Moran*, 493 F.3d 1002 (9th Cir. 2007) .................................................. 12

*United States v. Nivica*, 887 F.2d 1110 (1st Cir. 1989) ................................................... 12

*United States v. Quinn*, 403 F. Supp. 2d 57 (D.D.C. 2005) .............................................. 3

*United States v. Ratzlaf*, 510 U.S. 135 (1994) ................................................................... 2

*United States v. Sabatino*, 943 F.2d 94 (1st Cir. 1991) ..................................................... 4

*United States v. Sanchez*, 918 F.2d 607 (1st Cir. 1990) .................................................... 5

*United States v. Serrano-Delgado*, 29 F.4th 16 (1st Cir. 2022) ........................................ 5

*United States v. Soussi*, 316 F.3d 1095 (10th Cir. 2002) .................................................. 3

*United States v. Turner*, 718 F.3d 226 (3d Cir. 2013) ..................................................... 12

### Statutes

18 U.S.C. § 2 ........................................................................................................................ 4

International Emergency Economic Powers Act, 50 U.S.C. § 1705…………..………………….1

    50 U.S.C. § 1705(a) ................................................................................................. 2, 4

    50 U.S.C. § 1705(c) ................................................................................................. 2, 4

## Rules

Fed. R. Evid. 404(b) ............................................................................................................. 13

Fed. R. Evid. 701 ................................................................................................................. 14

Fed. R. Evid. 702 ................................................................................................................. 14

Fed. R. Evid. 801(d)(2)(E) ....................................................................................................11

Fed. R. Evid. 807 ................................................................................................................. 12

Fed. R. Evid. 901(a) ............................................................................................................. 10

Fed. R. Evid. 901(b)(4) .........................................................................................................11

## Regulations

Iranian Transactions and Sanctions Regulations, 31 C.F.R. Part 560 *et seq*........................1, 2

    31 C.F.R. § 560.203 ...................................................................................................... 4

    31 C.F.R. § 560.204 ............................................................................................... 1, 2, 4

    31 C.F.R. § 560.204(a) ................................................................................................. 2

    31 C.F.R. § 560.406 ..................................................................................................... 2

Pursuant to the Court's pre-trial order, the government hereby submits its Trial Brief in connection with the above-captioned matter.

   I.   The Superseding Indictment and the Applicable Law

Defendant Mahdi Mohammad Sadeghi is charged in the Superseding Indictment with Conspiracy to Violate the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705, and the Iranian Transactions and Sanctions Regulations, 31 C.F.R. Part 560 *et seq*. (Count One) and four substantive violations of the same law and regulations (Counts Two, Four, Seven, and Eight).

As demonstrated by the parties' proposed jury instructions and mutual objections, the parties dramatically disagree over key aspects of the applicable law and regulations. The government has filed objections to the Defendant's proposed jury instructions (*see* Dkt. No. 204). While ordinary wordsmithing can typically be dealt with at the charge conference, because the Court's ruling on how it intends to instruct the jury on the elements of the charged offenses will fundamentally affect how the government presents its case-in-chief, the government requests that the Court resolve the dispute prior to swearing in the jury. The key disputes appear to be the following:

   a.   Interpretation of "knowing or having reason to know" under 31 C.F.R. § 560.204: The parties' main disagreement on the law relates to the *mens rea* required to prove a willful violation of 31 C.F.R. § 560.204(a), which prohibits exportation of goods to a person in a third country with knowledge or reason to know that the goods will be re-exported to Iran. The government requests an instruction that the jury may find Sadeghi guilty if he intended to export or re-export goods to Iran *or* if he exported or re-exported goods with knowledge or reason to know that a third-party exporter (Abedini) specifically intended the goods to be re-exported to

Iran. The parties appear to agree that, pursuant to 50 U.S.C. §§ 1705(a), (c), and 31 C.F.R. § 560.204, the law prohibits willful exportation of goods from the United States to Iran directly or indirectly without a license, that is, exportation by a defendant with knowledge that his conduct is unlawful. *See Bryan v. United States*, 524 U.S. 184, 194 (1998).[1] However, the parties disagree as to which elements of the crime "willfulness" must attach for a defendant to be found criminally liable of 31 C.F.R. § 560.204(a)'s prohibition of exportation "to a person in a third country undertaken with knowledge or reason to know that [] [s]uch goods are intended specifically for" reexportation to Iran.

Sanctions on Iran are comprehensive and vast in scope. 31 C.F.R. Part 560 generally prohibits a greater scope of conduct than exports specifically intended for Iran. *See, e.g.*, Section 560.406 (stating transshipment of foreign goods through the United States under Section 560.204 is prohibited for goods "which are intended *or destined* for Iran"). The Defendant's interpretation of Section 560.204 would make the clause redundant, as it would essentially eliminate the prohibition on exporting *with knowledge or reason to know* that a good is ultimately destined for Iran. It would also render meaningless the subsequent clause that goods are "intended specifically" for re-exportation—that passive voice intent is naturally read to encompass the intent of the "person in a third country" described directly prior to the phrase. *See Epsilon Elecs., Inc. v. U.S. Dep't of Treasury*, 857 F.3d 913, 920 (D.C. Cir. 2017) (analyzing Section 560.204(a) in the civil

---

[1] In its Objections to the Government's Proposed Jury Instructions, Defendant states that the government "must prove that Mr. Sadeghi knew that his conduct was unlawful." Dkt. No. 205 at 7 (citing *United States v. Ratzlaf*, 510 U.S. 135 (1994); *Cheek v. United States*, 498 U.S. 192 (1991)). While the government believes that *Ratzlaf* and *Cheek* are distinguishable because they imposed heightened *mens rea* requirements for knowledge of specific aspects of the law and such a heightened *mens rea* is not required for willful sanctions or export violations, *see* Dkt. 187 at 7 n.7 (Government's proposed jury instructions and case law in support), the parties appear to agree on a proposed definition of willfulness. *See* Defendant's Strikethough of Dkt. No. 187 at 7 (Defendant's limited objection to the Government's proposed willfulness definition).

2

context and stating the prohibition "on its face" has two elements "(1) the exportation of goods to 'a person in a third country' and (2) 'knowledge or reason to know' that the third-country recipient plans to send the goods on to Iran"; proof that the goods arrived in Iran "is not required for a liability finding under the prohibition on third-country exports").

Conduct that violates Section 560.204(a) may be criminally penalized under 50 U.S.C. § 1705(c) if it is done "willfully." The conduct that must be willful is the "actus reus"; here, the "unlicensed export of the items from the United States." *United States v. Burden*, 934 F.3d 675, 692-93 (D.C. Cir. 2019) (citing *Bryan*, 524 U.S. at 193). If Sadeghi *knew* it was unlawful to send goods that would end up in Iran because Abedini would re-export them to Iran, and Sadeghi sent those goods, the willfulness element of this offense would be satisfied. *See United States v. Quinn*, 403 F. Supp. 2d 57, 64 (D.D.C. 2005) (holding defendants could be criminally liable if "defendants knew specifically that *indirect* exports to Iran (ie shipment through a middleman in a third country) were illegal" and instructing with know or reason to know language); *see also United States v. Elashyi*, 554 F.3d 480, 492-94 (5th Cir. 2008) (upholding IEEPA conviction where "evidence was sufficient for a rational trier of fact to find beyond a reasonable doubt that [defendants] knew the shipments routed through [a third country] were destined for [a prohibited country]"); *United States v. Soussi*, 316 F.3d 1095, 1103 (10th Cir. 2002) (stating under similar IEEPA regulations that a "shipment is illegal if [an exporter] knows or has reason to know" that "goods will not come to rest in a third country"; upholding conviction for willful violation where evidence showed defendant "knew the trailers were destined for" a prohibited country).

      b.    <u>Criminal Liability for Causing an IEEPA Violation</u>: The parties' proposed jury instructions and objections to the same (Dkt Nos. 174, 187, 204, 205) discuss the parties' respective positions on whether 50 U.S.C. § 1705(c) criminalizes causing another to commit or attempt to

3

commit a violation of IEEPA.  The government submits that the plain text of IEEPA, 50 U.S.C. §§ 1705(a) and (c), as well as the text of 31 C.F.R. §§ 560.203-204, confer criminal liability twice over on individuals who cause others to commit violations of IEEPA or its regulations.  First, because willful commission of an unlawful act described in Section 1705(a) is criminalized, and unlawful acts in Section 1705(a) include "caus[ing]" violations.  Second, because violation of any "regulation" is also an unlawful act under 1705(a), and 31 C.F.R. § 560.203 is a regulation under IEEPA that prohibits transactions that "cause[] a violation of" the other regulations discussed in Chapter 31, including the prohibition of exporting to Iran (31 C.F.R. § 560.204).

In addition, the verbs used in Section 1705(c) ("commits," "aids and abets in the commission of") differ from those in Section 1705(a) (*e.g.*, "violates"), which should be read as an expansion, not limitation, of the conduct encompassed within Section 1705(c)'s description. Defendant's read of Section 1705(c)'s limitations to Section 1705(a)'s string of verbs would similarly mean that Section 1705(b), which states that a civil penalty may be imposed on any person "who commits an unlawful act" described in Section 1705(a), would cabin civil liability to only *violations* of Section 1705(a).  This reading would make meaningless the additional verbs in Section 1705(a) under both the civil and criminal penalty provisions.  Moreover, regardless of how Section 1705(c) is read, 18 U.S.C. § 2 imports a general causing theory of liability.  *United States v. Sabatino*, 943 F.2d 94, 99 (1st Cir. 1991) (stating 18 U.S.C. § 2 "is implicit in all indictments for substantive offenses").  Contrary to Defendant's assertion, Section 2 is not supplanted by the text of other statutes because it "is not a separate offense but a general principle of liability." *United States v. Andrade*, 135 F.3d 104, 110 (1st Cir. 1998).

c. Application of Pinkerton Liability: The parties disagree as to whether the Defendant may be found guilty of conspiracy to violate IEEPA under a Pinkerton theory of liability.  Defendant

4

claims that a Pinkerton theory should not apply in a complex case where evidence of substantive acts was great, but the conspiracy linking them was weak. This is not such a case. The government will elicit testimony and admit evidence showing a conspiracy to export U.S.-origin parts to Iran in violation of U.S. sanctions law going back to at least 2016, and that the Defendant joined the conspiracy long before any of the substantive acts charged in Counts Two, Four, Seven, or Eight occurred. "Pinkerton is the law in federal court." *United States v. Serrano-Delgado*, 29 F.4th 16, 26 (1st Cir. 2022). Where evidence that a defendant "took part in" the relevant conspiracy is "strong," the defendant may be convicted of substantive charges based on a Pinkerton theory of liability. *United States v. Gershman*, 31 F.4th 80, 101-02 (2d Cir. 2022); *see United States v. Sanchez*, 918 F.2d 607, 612 & n.4 (1st Cir. 1990) (describing cases that deny Pinkerton instructions as "marginal case[s]" and approving instruction where there was sufficient evidence to enable jury to conclude that co-conspirators were members of the same conspiracy); *Serrano-Delgado*, 29 F.4th at 26 (approving of Pinkerton charge where crimes to which the charge was relevant were not the basis for inferring the relevant conspiracy).

II.   Factual Background

The Court is well familiar with the underlying facts as to the charged conspiracy. Mohammad Abedini founded SDRA, an Iranian company, with two unindicted co-conspirators, K.M. and H.S. The goals and purposes of the company are aptly described in SDRA's business plan, which Abedini emailed to SDRA co-founder H.S. in 2014. In January 2016, Abedini began receiving shipments of micro-electromechanical systems ("MEMS") and other electronic components at the Swiss Federal Technology Institute of Lausanne ("EPFL"). Sadeghi met Abedini not later than October 2016 and Sadeghi ordered parts from an electronic reseller in December 2016 with a customer reference of "SDRA." Sadeghi visited Abedini at SDRA's offices

5

in Iran on multiple occasions between 2016 and up until he was arrested in December 2024.[2] Between the end of 2016 and through 2018, Sadeghi and Abedini were engaged in a business relationship related to other projects. Records indicate that Sadeghi visited Abedini at SDRA's offices in Iran multiple times in 2017, and that Sadeghi met with both Abedini and K.M. while he was in Iran in 2017 and in 2018.

The business relationship between Sadeghi and Abedini continued into March 2019, when Sadeghi began working at Analog Devices, Inc., ("ADI") in Massachusetts. Within months, Sadeghi had introduced Abedini to his colleagues at ADI as a potential vendor under the Illumove branding for an evaluation board project ("Evaluation Board project"). Unindicted co-conspirator E.S. provided Abedini feedback (through Sadeghi) about how to improve the Illumove website, which E.S. described as "barebones." Abedini founded Illumove in Switzerland with unindicted co-conspirator M.K., who expressly disclaimed any liability for sanctions violations in a contract with Abedini.

In August 2021, ADI contracted with Abedini and Illumove on an evaluation board project. SDRA employees located in Iran were directly involved in the ADI evaluation board project and other projects, though Abedini represented those individuals to ADI to be Illumove employees. For example, unindicted co-conspirator L.H. appeared to function as the SDRA bookkeeper but also helped to design the Illumove logo. Unindicted co-conspirators V.K., A.I., and H.R. were SDRA employees that assisted Abedini with the ADI work. Abedini and his team worked on the evaluation board project for ADI from 2021 through 2024, and engaged in discussions to work on additional projects that would have given Abedini access to additional ADI parts and know-how

---

[2] During his post-arrest custodial interview, Sadeghi admitted that he visited the SDRA offices every year

6

during that time. The relationship between ADI and Abedini continued until the arrest of Sadeghi and Abedini on December 16, 2024. The facts underlying the substantive counts of the Superseding Indictment are as follows:

    a.    <u>Count Two</u>

As of September 2022, the evaluation board project was well underway between Illumove/Abedini and ADI. For ADI's part, the project had recently transitioned to a new engineer, Pablo Del Corro, when the prior engineer, Ian Beevers, left the company. While Sadeghi did not have direct responsibility for the project at ADI, he was copied on many emails at ADI because of his relationship with Abedini. Sadeghi and Abedini also remained in contact by Telegram, WhatsApp, and other platforms (the chats from Telegram and WhatsApp were recovered by searching Sadeghi's devices). In early September 2022, chat records reflect that Sadeghi and Abedini had a lunch meeting in Iran. After that meeting Sadeghi went to the SDRA office with Abedini, although the chat records do not reflect the purpose of that visit.

On September 26, 2022, Sadeghi messaged Abedini, "Look, Ian [Beevers, the prior ADI engineer for the Evaluation Board project] had messed up the project a little. We need your help. We want you to also add our new product to your first release of evalborad [sic]. 380/2. We can also send you samples. Let me know soon." Abedini responded, "Let me see what I can do. It might be possible." Sadeghi was the lead marketing engineer for the ADXL 380/2, a compact ultra-low noise, low-power, high-bandwidth accelerometer.

On September 27, 2022, Abedini messaged Sadeghi with the products that were going to be delivered during Phase One of the Evaluation Board project and offered to replace one of the products with the 380/2. Abedini then told Sadeghi, "I am boarding the airplane right now to go to Switzerland. I will be there for one week. It would be great if you could send the samples

tomorrow so I get them while I am there. If I'm not there to take delivery of it myself, getting it to Iran will become an issue again." Sadeghi responded, "I just spoke to Pablo. We agreed that you will do the 380/2 instead of 317. He will also send you the sample. He is supposed to send it today."

FedEx records reflect that on September 29, 2022, a package was shipped from Analog Devices in Wilmington, MA to Mohammad Abedini/Illumove in Switzerland. The commercial invoice/packing list reflects that the shipment included 10 ADXL382 parts.

According to travel records, Abedini traveled from Tehran, Iran to Milan, Italy on September 27, 2022, and returned to Tehran (from Geneva, Switzerland) on October 4, 2022.

b.   Count Four

Beginning as early as 2021, ADI was developing a new Inertial Measurement Unit, code named "Raptor," part number ADIS 16607. According to its datasheet, the Raptor had applications in the areas of navigation, unmanned and autonomous vehicles, and virtual reality. Sadeghi had involvement in sharing the Raptor with Abedini. For example, on March 10, 2022, Sadeghi sent Abedini the preliminary Raptor datasheet.

On July 11, 2023, Del Corro emailed Abedini that he shipped 3 units of the ADIS16607 (Raptor) to Abedini. FedEx records reflect that on July 11, 2023, a package was shipped from Analog Devices in Wilmington to Illumove/Abedini in Switzerland. The commercial invoice/packing list reflects that the shipment included 3 units of ADIS16607. At that point in time the ADIS16607 had not yet been released to the public. Sadeghi remained involved in the larger project involving Illumove at that time. For example, on July 13, 2023, Del Corro emailed multiple ADI employees, including Sadeghi, with the current invoice for Illumove, an update on the budget and current status of the performance, and performance metrics of the fusion algorithm.

8

The internal ADI team exchanged multiple emails about the status of the Illumove project in response, with Sadeghi copied each time.

According to Abedini's travel records, Abedini departed Tehran on October 8, 2023 and arrived in Switzerland the following day. He returned to Iran on October 27, 2023.

    c.    <u>Count Seven</u>

On March 7, 2024, an ADI employee sent an internal email to multiple other ADI employees, including Sadeghi, indicating that 48 samples of the Raptor were available. The email traffic made clear that Sadeghi would have the final say as to who would get the samples, given his role in the marketing department.

Fedex records reflect that on March 15, 2024, 46 total parts were shipped from Analog Devices in Wilmington, MA to Mohammad Abedini/Illumove in Switzerland. The commercial invoice/packing list reflects that the shipment included 10 ADIS16607-3, 15 ADIS16607-2, an evaluation board, and 20 accelerometers. Travel records indicate that Abedini was in Iran at the time and did not travel back to Switzerland until May, as set forth below.

    d.    <u>Count Eight</u>

In April 2024, Sadeghi contacted Abedini to request two motion capture board demos for Sensors Converge, an electronics convention for design engineers. These demos would involve two different ADI products – a gyroscope using the ADXL380 (an accelerometer) and a platform stabilization system, using the Osprey IMU ("inertial measurement unit"). The Osprey IMU is an export controlled IMU with mid-level applications in aerospace/defense and agricultural settings. On May 2, 2024, Sadeghi messaged Spencer Thompson, the ADI marketing manager over aerospace and defense, and asked Thompson to send samples of the Osprey to Illumove. A few minutes later, Sadeghi provided Thompson with Illumove's Switzerland address.

According to ADI records, ADI sent three units of the Osprey to Switzerland on May 3, 2024. According to FedEx records, those units were received in Switzerland on May 8, 2024. According to Abedini's travel records, Abedini arrived in Switzerland on May 7, 2024 from Iran. He returned to Iran on May 14, 2024.

    III.    Anticipated Evidentiary Issues

    a.    Translations

The government has produced English translations of a number of foreign language exhibits. The defense has indicated that it intends to object to the translations already provided but has not identified any specific objections to specific translations. The government continues to prepare translations of foreign language exhibits. *See* Doc. 184. As additional translations are finalized, the materials will be provided to both the Court and counsel upon receipt.

    b.    Co-Conspirator Records

Many of the government's exhibits are comprised of electronic records recovered from the email accounts and/or cloud storage of individuals the government has designated as unindicted co-conspirators. These records were exclusively obtained through federal search warrants. An analysis of the admissibility of these records is a two-step process: authenticity and, if applicable, hearsay.

    1.    Authenticity

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). "[T]he standard for authentication, and hence for admissibility, is one of reasonable likelihood." *United States v. Holmquist*, 36 F.3d 154, 168 (1st Cir. 1994). "If the court discerns enough support in the record to warrant a reasonable person in determining that

10

the evidence is what it purports to be, then Rule 901(a) is satisfied and the weight to be given to the evidence is left to the jury." *Id*. The First Circuit has repeatedly recognized that testimony from a percipient witness is not necessary to identify documentary evidence. *See United States v. Garcia*, 452 F.3d 36, 40 (1st Cir. 2006) ("The direct testimony of a custodian or a percipient witness is not a *sine qua non* to the authentication of a writing.") (quoting *Holmquist*, 36 F.3d at 167). Evidence of authenticity "can also come from elements of the document itself, such as '[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.'" *United States v. Blanchard*, 867 F.3d 1, 5-6 (1st Cir. 2017) (quoting Fed. R. Evid. 901(b)(4)).

For example, Exhibit 217 is a video found in the email account of L.H. L.H. is a SDRA employee, shown through the contents of her email account and other exhibits. The video begins by displaying a large image of the SDRA logo before continuing with a short tour of office space that is obviously designed for engineering and technical MEMS work. The SDRA logo is shown throughout the video in the upper righthand corner and there are captions stating what part of the office is depicted throughout the video. Under Fed. R. Evid. 901(b)(4) and based on the circumstances of the retrieval of the video, there is a reasonable likelihood that the video depicts a tour of the SDRA office space. It is relevant to show both the nature of SDRA's business and Sadeghi's knowledge, given the evidence of how frequently he visited the SDRA offices.

2. Hearsay

To the extent that any of the records contain hearsay that the government is seeking to admit for the truth, those records comfortably fit within the confines of Rule 801(d)(2)(E) as defined by the First Circuit. A conspiracy larger than the one charged at trial can provide the basis for admission of coconspirator statements. *United States v. Marino*, 277 F.3d 11, 25-26 (1st Cir.

2002). "Records that can be shown by a preponderance of the evidence to have been made by a member of the conspiracy may be admitted under Rule 801(d)(2)(E) even if their precise author cannot be identified." *United States v. Lyons*, 740 F.3d 702, 719 (1st Cir. 2014).

For example, Exhibit 220 is a ledger of Illumove's expenses found in Abedini's cloud storage. These expenses include Abedini's travel from and to Iran, use of a Virtual Private Network, and the cost of checking the mail at EPFL. The entries in the ledger are classic statements made by Abedini in furtherance of the Illumove conspiracy. Co-conspirator computer records tracking pertinent financial transactions are made in furtherance of the conspiracy. *See United States v. Moran*, 493 F.3d 1002, 1011 (9th Cir. 2007) (approving district court finding that "[I]n any conspiracy that involves complex financial transactions, it is in furtherance of the conspiracy to maintain a record of those transactions.").

As another example, Exhibit 222 is a SDRA foreign bank ledger from 2021-2022 that lists payment to a number of individuals as employees of SDRA (individuals who were also represented as Illumove employees to ADI). These records were found in Abedini's gmail records. The statements made within the SDRA ledger are similarly admissible as the Illumove ledger. Alternatively, the records are admissible pursuant to the Fed. R. Evid. 807, the residual exception to the hearsay rule.[3] *See United States v. Nivica*, 887 F.2d 1110, 1127 (1st Cir. 1989) (affirming admission of foreign bank records where documents were the best/only available proof of company's daily financial activity in foreign country); *see also United States v. Turner*, 718 F.3d 226, 233-34 (3d Cir. 2013) (admission of foreign bank records found during search of co-conspirator's residence and office).

---

[3] This trial brief will also serve as pretrial notice of the government's intent to rely on Rule 807 for these records, as required by the rule.

c.        <u>Mehdi Aghagolzadeh</u>

One of the government's witnesses, Mehdi Aghagolzadeh, is a former business associate of Sadeghi. Aghagolzadeh worked for Sadeghi's company Tacit Motion Inc. ("TMI") prior to Sadeghi working at ADI. The relationship between Sadeghi and Aghagolzaeh did not end well. During the meet and confer process, counsel for Sadeghi objected to testimony on the following subjects from Aghagolzadeh, which they characterized as prior bad acts under Rule 404(b): (1) Sadeghi allegedly used money from TMI to buy a house (*i.e.*, Sadeghi embezzled money from the company); (2) Sadeghi did not pay Aghagolzadeh for his work at TMI; (3) Sadeghi fired Aghagolzadeh from TMI; (4) Aghagolzadeh bought stock in TMI, but he lost access to it when Sadeghi fired him; and (5) Aghagolzadeh threatened to sue Sadeghi over their business disputes. Through counsel, Sadeghi indicated that the government should not address any of these subjects but that Sadeghi might do so on cross-examination. In light of that position, the government informed Sadeghi that if he wanted the subjects excluded, he should file a motion. He did not file such a motion.

The government has no objection to the above subjects being excluded. However, those subjects should then be excluded for all purposes. Sadeghi cannot preclude the government from fronting the potential bias of a witness and then conduct a cross-examination that lays bare that same bias while suggesting to the jury that the government was hiding that same information from the jury. Accordingly, the government intends to introduce some or all of the above facts, absent further direction from the Court and/or an agreement with counsel for Sadeghi.

d.        <u>Location Data</u>

During the search of Sadeghi's phone, multiple pictures of Sadeghi were located from when he appeared to be in Iran and at the SDRA offices. Those pictures also included latitude/longitude

13

data from where they were taken in the metadata. The government intends to offer a series of maps created with mapping software that plots the latitude/longitude locations from the metadata. The government will produce a competent witness to introduce this data.

  e. <u>Expert Testimony</u>

Based on Sadeghi's objections to the Government's proposed exhibits, it appears that Sadeghi may raise objections to testimony on the basis of Fed. R. Evid. 701/702 for certain exhibits related to the forensic examination of his devices. The Government believes this testimony is lay opinion and has already provided Sadeghi with the forensic examiner's reports. The government also reserves the right to notice an expert relating to the engineering materials found on Sadeghi's computers given the Court's prior ruling on the motions in limine.

  IV. <u>Special Arrangements</u>

  a. <u>Paralegal.</u>  The government respectfully requests that, in addition to trial counsel, the Court allow Jennifer Lewis, a paralegal from the United States Attorney's Office, to sit at counsel table. Ms. Lewis is an integral member of the prosecution team and will assist the undersigned counsel in their efforts to introduce the physical evidence, audio recordings, and video recordings in this case.

  b. <u>Witnesses</u>. Many of the government's witnesses must travel from outside Massachusetts. Depending on witness schedules, the government may request that certain witnesses be allowed to testify out of order.

  c. <u>Reader</u>.  The government intends to call one or more witnesses to read documentary evidence into the record. The government has identified one such witness, who also participated in the search of Sadeghi's residence. The government may also call an additional witness to read evidence into the record who would not have any direct knowledge of the case.

  d. <u>Case Agent</u>.  The government requests that the Court designate FBI Special Agent Ronald Neal as case agent.

Respectfully submitted,

| | |
|---|---|
| LEAH B. FOLEY<br>United States Attorney | JOHN A. EISENBERG<br>Assistant Attorney General |
| By: /s/ *Jared C. Dolan*<br>JARED C. DOLAN<br>ALATHEA E. PORTER<br>Assistant United States Attorneys | By: */s/ Leslie C. Esbrook*<br>LESLIE C. ESBROOK<br>Trial Attorney |

**CERTIFICATE OF SERVICE**

  I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

               */s/ Jared C. Dolan*
               Jared C. Dolan
               Trial Attorney

Date: February 17, 2026