IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MAHDI SADEGHI | No. 1:24-cr-10391-IT |

**DEFENDANT MAHDI SADEGHI'S MOTION
TO CONTINUE TRIAL**

Defendant, Mahdi Sadeghi, respectfully moves to continue the trial for at least 30 days to a date convenient to the Court and counsel. The government stated that it would need to review the defense filing and consult with the United States Marshals Service before taking a position on this request.

The defense has reluctantly concluded that a continuance is necessary for at least four independent reasons: 1) emergent significant obstacles to communication and sharing of documents between defense counsel and Mr. Sadeghi over the last two weeks have severely impaired the defense's ability to prepare for trial; 2) the government has recently (through and including yesterday) disclosed multiple English translations of Farsi-language exhibits that Mr. Sadeghi has not yet had meaningful opportunity to review; 3) the government disclosed yesterday evening that it will seek to qualify a fact witness from ADI as an expert to opine on the purported significance of the so-called "Sepehr manual" and "schematic" found on Mr. Sadeghi's computer, which will require additional time for the defense to review the still-forthcoming expert disclosure, evaluate and bring a possible *Daubert* challenge, and potentially engage a defense expert to respond; and 4) pervasive ongoing public discussion of likely armed conflict between the United States and Iran requires a continuance in order to ensure empanelment of an impartial jury.

**Argument**

I.    **Significant Obstacles to Defense Communication and Collaboration.**

In the last two weeks, Wyatt has cancelled without prior notice multiple evidence review sessions for Mr. Sadeghi and two scheduled attorney-client zoom meetings. As a result, the already-strained ability of Mr. Sadeghi to assist counsel to prepare his defense passed a breaking point even as important additional government productions have only recently been made. As of this filing, and as explained in more detail below, Mr. Sadeghi still has not been able to review the final set of government trial exhibits and multiple recently-produced English translations of government exhibits in Farsi, among other documents.

The volume of discovery in this case has been immense, including not only investigative documents but seized electronic devices and search warrant returns from multiple electronic record custodians (Google, Microsoft, etc.) for multiple user accounts. The charged conspiracy dates back to 2016 and a substantial amount of the materials are technical in nature and/or in a foreign language (Farsi).

In order to provide materials to Mr. Sadeghi for review, defense counsel must convert raw data and information into a format that can be reviewed on computers at Wyatt and then mail that material on a USB "thumb drive" to Wyatt, where it is processed and made available for Mr. Sadeghi to review on dedicated computers during limited, weekday-only time windows. Mr. Sadeghi is not permitted to create or copy electronic documents on the "review" computer, so he must make handwritten notes which he later, on a different computer, enters into Excel and/or Word files for eventual transmission back to counsel by Wyatt staff. While these procedures are extraordinarily cumbersome and time-consuming, the defense has attempted in good-faith to adapt to work within those challenging constraints.

On October 17, 2025, this Court entered an Order requiring Wyatt to afford Mr. Sadeghi at least 15 hours per week of discovery review computer access. *See* D.E. 134. Over the ensuing 13 weeks through mid-January, a review of logs revealed that Wyatt had actually provided 137 total hours of access, 58 hours less than the 195 hours due to Mr. Sadeghi over that time under this Court's Order. Undersigned counsel communicated with Wyatt in early February concerning this deficiency, emphasized the importance of complying with the Order as the trial date approached, and requested additional "make-up hours" to remedy the deficiency. In substance, Wyatt officials responded that they would endeavor to provide the required 15 hours per week despite various institutional constraints, but that it would be impossible to provide more time, even if the defense obtained a new court order for additional weekly hours above the previously-ordered 15 hours.

On February 11 and 17, 2026, defense counsel sent USB drives to Wyatt by tracked USPS Priority Mail (which is typically delivered to Rhode Island addresses the next day) containing the government's trial exhibits, proposed government exhibit translations available as of those dates, and other pretrial disclosure materials. On February 19, 2026, Wyatt confirmed receipt and processing of both USB drives. However, Mr. Sadeghi still has not yet been able to review *any* of those materials because all of his subsequent evidence-review sessions on February 20, 23, and 24 were cancelled without explanation. In addition, scheduled attorney-client Zoom conferences on February 13[1] and 24 were also cancelled without explanation.[2]

---

[1] The Clerk graciously permitted counsel to confer privately with Mr. Sadeghi on the Court's Zoom link at the conclusion of the February 13 hearing, but this was not a substitute for what had been scheduled as a 2-hour meeting.

[2] For some particularly urgent issues, defense counsel have emailed limited PDF compilations of documents to Wyatt where they can be printed for Ms. Sadeghi, but this is not an adequate substitute for access to voluminous files in multiple formats on a computer.

Defense counsel understand that Wyatt operates under various challenging institutional constraints, including availability of personnel, likely compounded by the recent blizzard. But there is no margin for flexibility in the immediate lead-up to trial that could enable defense counsel to deal with the most recent cancellations. The bottom line is that over the last two weeks, Mr. Sadeghi has been unable to meaningfully consult with counsel and to prepare his defense.

These are problems of constitution dimension, not mere matters of convenience. The right of the accused "in all criminal prosecutions . . . to have the Assistance of Counsel for his defence" is a direct right, grounded squarely in the Constitution. U.S. Const. amend. VI. A defendant's right to the effective assistance of counsel necessarily includes the right to consult with counsel and to participate in his own defense. *See generally Powell v. Alabama*, 287 U.S. 45 (1932).

"When the government[3] unreasonably interferes with a defendant's ability to consult confidentially with counsel in advance of trial, that interference can itself amount to a Sixth Amendment violation." *United States v. Guimaraes*, No. 1:25-cr-10129-JEK, 2025 U.S. Dist. LEXIS 130197, at *15 (D. Mass. July 9, 2025) (citing *Nordstrom v. Ryan*, 762 F.3d 903, 910 (9th Cir. 2014) ("A criminal defendant's ability to communicate candidly and confidentially with his lawyer is essential to his defense."), and *Benjamin v. Fraser*, 264 F.3d 175, 185 (2d Cir. 2001) ("in the context of the right to counsel, unreasonable interference with the accused person's ability to consult counsel is itself an impairment of the right").

Indeed, as the Supreme Court has recognized, "to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself." *Maine v.*

---

[3] The defense is not remotely suggesting that the prosecution team or USMS had any direct role in the emergent problems, or that Wyatt was intentionally violating Mr. Sadeghi's rights. Indeed, the recent blizzard likely played a major role in the problems since last Friday. But the detrimental effect on Mr. Sadeghi's ability to prepare a defense remains the same.

4

*Moulton*, 474 U.S. 159, 170 (1985); *see also Wolfish v. Levi*, 573 F.2d 118, 133 (2d Cir. 1978) ("One of the most serious deprivations suffered by a pretrial detainee is the curtailment of his ability to assist in his own defense."), *rev'd on other grounds, Bell v. Wolfish*, 441 U.S. 520 (1979)): *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1051 (8th Cir. 1989) (recognizing the constitutional risk that, when pretrial detainee's interest in effective communication with his attorneys is "inadequately respected during pre-trial confinement, the ultimate fairness of their eventual trial can be compromised")

Accordingly, a continuance is necessary on this basis, alone.[4]

## II.    Government Exhibit Translations.

Translations of multiple Farsi-language government exhibits, some of them lengthy, have only recently been produced by the government:

| Exhibit number | Date translation received | Number of pages |
|---|---|---|
| 2 – business plan | In progress | 30pp (defense has received 10pp to date) |
| 20 - Mouser Invoice | 2/17 | 8pp |
| 35 - Contract | 2/19 | 6pp |
| 36 - Hosseini tax document | 2/22 | 130pp |
| 74 - Hosseini logo inquiry | 2/21 (replacement) | 6pp |
| 98 - Hosseini email | 2/20 | 6pp |
| 198 – Sepehr user manual | 2/4 | 61pp |

---

[4] In more than 20 years of criminal defense practice, undersigned counsel have never tried a case for a detained client with anywhere close to the volume and complexity of discovery as in this case (other than *United States v. Tsarnaev*, which had a vastly larger defense team, expansive CJA resources behind it, and streamlined defense counsel access to the defendant at FMC Devens). To the extent the Court might wonder whether the need for a continuance at this juncture reflects a lack of imagination, planning, or diligence on the part of defense counsel, undersigned counsel, alone, bear responsibility for those deficiencies, which should not be permitted to inure to Mr. Sadeghi's detriment.

| 222 – SDRA ledger | 2/17 | 51pp |
| --- | --- | --- |
| 223 – SDRA FY report | 2/24 | 42pp |

As a result of the communication challenges described above, the defense has not had a meaningful opportunity to review the government's exhibit translations with Mr. Sadeghi, and it cannot yet constructively engage with the prosecution team in an effort to resolve any disputes regarding translated trial exhibits and, if necessary, to secure a defense expert to provide any alternative translation of Farsi-language communications and documents.

### III.  Additional Government Expert(s).

At the hearing on the cross-motions *in limine* concerning recovered "drone" evidence on February 13, 2026, the Court suggested that the government could call an expert to testify, for example, that certain parts "are used in drones," Tr. at 14, or that "any engineer would know that [the schematic found on Mr. Sadeghi's computer] can be used for drones," Tr. at 26-27, or "how the Sepehr system is used and/or its potential use," Tr. at 31.

More than 10 days later, on the evening of February 24, 2026, the government first advised defense counsel that it would file a motion to allow one of the disclosed ADI fact witnesses "to testify as an expert regarding the Sepehr Manual/schematic, consistent with the Court's suggestion." The government further stated that it would provide an expert disclosure and CV to the defense "as soon as we receive it."[5]

Putting aside the oddity of proposing to have a fact witness from ADI provide expert

---

[5] In the same communication, the government also stated that it would file a motion "allowing [FBI digital forensic analyst Christopher] Beckstrom to provide lay opinion or, alternatively, to designate him as an expert." While the defense does not expect to challenge Beckstrom's qualifications as an expert, the defense does not believe that reports by Beckstrom produced by the government to date satisfy the requirements of Fed. R. Crim. P. 16(a)(1)(G).

6

testimony about documents, translated from Farsi, that he surely never saw as part of his work for ADI and that were supposedly recovered from Mr. Sadeghi's personal computer, the defense will need time to review the proposed expert testimony, consult with Mr. Sadeghi about the disclosure, evaluate and mount a possible *Daubert* challenge, and potentially engage a responsive defense expert. None of that can realistically be accomplished in the two days remaining before jury selection, where the government has not yet even made the required expert disclosure.

### IV.     Potential Armed Conflict Between the United States and Iran.

As noted previously, it has been impossible to ignore the alarming media reports about a possible attack by the U.S. on Iran and the resulting risk of a wider regional war. Whether or not armed conflict actually breaks out, the heightened current attention to Iran and the "threats" that U.S. officials, including the President himself, believe that Iran currently poses would make it exceptionally difficult to empanel an impartial jury, and the outbreak of actual hostilities during the trial would make impartial deliberation impossible.

While it is not possible to fully insulate a trial from world events, this is not an appropriate time to begin the trial of an Iranian-American defendant, much less one that involves allegations of unlawful exports of technology to Iran and that will at least touch on the potential military use of the technology at issue. While the ultimate trajectory of world events over the next month is unknown, it is widely acknowledged that the United States is unlikely to maintain the massive deployed force currently in place for a very long time without either initiating military action or

drawing those forces back down. A continuance of at least 30 days will permit the parties and the Court to assess these unforeseen and unprecedented developments and plan for trial accordingly.

Short of actual miliary action, public attention to the Iran issue is likely at its zenith in the wake of the State of the Union Address last night, where the President stated:

> As president, I will make peace wherever I can, but I will never hesitate to confront threats to America wherever we must. That's why in a breakthrough operation last June, the United States military obliterated Iran's nuclear weapons program with an attack on Iranian soil known as Operation Midnight Hammer. For decades, it had been the policy of the United States never to allow Iran to obtain a nuclear weapon, many decades.
>
> Since they seized control of that proud nation 47 years ago, the regime and its murderous proxies have spread nothing but terrorism and death and hate. They've killed and maimed thousands of American service members and even millions of people with what's called roadside bombs, they were the kings of the roadside bomb. And we took out Suleimani, I did that during my first term, it had a huge impact. He was the father of the roadside bomb.
>
> And just over the last couple of months with the protests, they've killed at least, it looks like 32,000 protesters, 32,000 protesters in their own country. They shot them and hung them. We stopped them from hanging a lot of them with the threat of serious violence, but this is some terrible people.
>
> They've already developed missiles that can threaten Europe and our bases overseas, and they're working to build missiles that will soon reach the United States of America. After Midnight Hammer, they were warned to make no future attempts to rebuild their weapons program, in particular nuclear weapons, yet they continue. They're starting it all over.
>
> We wiped it out, and they want to start over again, and are at this moment again pursuing their sinister ambitions. We are in negotiations with them; they want to make a deal but we haven't heard those secret words: "We will never have a nuclear weapon."
>
> My preference — my preference is to solve this problem through diplomacy. But one thing is certain, I will never allow the world's No. 1 sponsor of terror, which they are by far, to have a nuclear weapon, can't let that happen.

> And no nation should ever doubt America's resolve. We have the most powerful military on Earth.[6]

Thus, even if the prosecution and its witnesses do not refer to Iran's support for international terrorism or attempts to acquire nuclear weapons, those facts are front-and-center in the public consciousness at this very moment.

In addition, the media continues to run front-page articles, on a daily basis, about the diplomatic conflict with Iran, the likelihood that it will develop into armed conflict, and the reasons why the U.S. has moved an "armada" – the President's word – into the region to address the regional and global "threats" from Iran.[7] For any potential juror who even casually follows the news, these reports are unavoidable and their message is unmistakable.  And whatever the Court

---

[6]*Available at* https://www.nytimes.com/2026/02/25/us/politics/state-of-the-union-transcript-trump.html.

[7]*See, e.g.*, Jon Gambrell, "Iran push back against Trump ahead of Geneva talks in face of major US military deployment," AP/The Boston Globe (Feb. 25, 2026), *available at* https://www.bostonglobe.com/2026/02/25/world/iran-nuclear-program-negotiations/?p1=BGSearch_Overlay_Results; Erika Solomon, "For Iran's Rulers, Refusing U.S. Demands Is a Risk Worth Taking," The New York Times (Feb. 24, 2026), *available at* https://www.nytimes.com/2026/02/23/world/middleeast/iran-us-nuclear-talks-war.html?searchResultPosition=1 (article ran at pA1 in print edition); Matthew Lee, "State Department orders nonessential US diplomats to leave Lebanon as tensions with Iran soar," AP/The Boston Globe (Feb. 23, 2026), *available at* https://www.bostonglobe.com/2026/02/23/world/state-department-orders-nonessential-us-diplomats-leave-lebanon-tensions-with-iran-soar/?p1=BGSearch_Overlay_Results; Margherita Stancati, "Anxiety Builds as Iranians Brace for Looming War with US," The Wall Street Journal (Feb. 23, 2026), *available at* https://www.wsj.com/search?query=iran&mod=searchresults_viewallresults; Julian Barnes et al., "Trump Considers Targeted Strike Against Iran, Followed by Larger Attack," The New York Times (Feb. 22, 2026), *available at* https://www.nytimes.com/2026/02/22/us/politics/trump-iran-strike-attack.html; Greg Norman-Diamond, "Potential US military strikes on Iran could target specific individuals, pursue regime change: report," Fox News (Feb. 21, 2026), available at https://www.foxnews.com/world/potential-us-military-strikes-iran-could-target-specific-individuals-pursue-regime-change-report.

instructs, it will be impossible for jurors to insulate themselves from such prejudicial coverage during a two-week trial.

## Conclusion

For the foregoing reasons, individually and together, the Court should continue the trial for at least 30 days.

Respectfully submitted,

**MAHDI SADEGHI**

by his attorneys,

*/s/ William W. Fick*
William W. Fick (BBO #650562)
Daniel N. Marx (BBO #674523)
Amy Barsky (BBO #601111)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
*wfick@fickmarx.com*
*dmarx@fickmarx.com*
*abarsky@fickmarx.com*

## LOCAL RULE 7.1 CERTIFICATION

Defense counsel certify that they conferred in good faith with counsel for the government in an effort to resolve or narrow the issues described herein.

*/s/ William W. Fick*

## CERTIFICATE OF SERVICE

I, William W. Fick, hereby certify that on February 25, 2026, I caused this document to be filed through the ECF system.

*/s/ William W. Fick*