IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MAHDI SADEGHI | No.  1:24-cr-10391-IT |

### DEFENDANT MAHDI SADEGHI'S MOTION FOR RELEASE IN LIGHT OF CHANGED CIRCUMSTANCES, PURSUANT TO 18 U.S.C. § 3142(f)

Defendant Mahdi Sadeghi respectfully moves for release pursuant to 18 U.S.C. § 3142(f). Undersigned counsel, who did not represent Mr. Sadeghi in the original detention proceedings, bring this motion based on the following changed circumstances: Mr. Sadeghi has now served almost 16 months in pre-trial detention, nearly 30% of a low-end Guideline sentence; the Superseding Indictment abandoned the original substantive charges and proceeds instead on even more factually and legally tenuous theories; late-produced exculpatory information substantially undermines the government's case; and the United States' war against Iran has rendered an always-very-remote possibility that Mr. Sadeghi might flee to Iran vanishingly unlikely.

### BACKGROUND

On December 16, 2024, Mr. Sadeghi was arrested on a criminal complaint and voluntarily submitted to a recorded interview with the FBI. GX186. On December 19, 2024, he was charged by Indictment with one count of conspiring to violate the IEEPA and ITSR, and four counts of substantive IEEPA and ITSR violations based on the alleged export of draft datasheets. D.E. 14.

Magistrate Judge Cabell held a detention hearing on January 14, 2025. D.E. 32. On March 20, 2025, Judge Cabell ordered Mr. Sadeghi released on conditions. D.E. 56. The government moved to revoke the release order. D.E. 66. At the hearing on the motion, the government

1

"acknowledge[d] that the defense has arguments. That is why, as they reference, we initially were considering agreeing to conditions of release. We understand that [Mr. Sadeghi] is a citizen of the United States. We understand that he has a . . . job here, that he's been here for quite some time.'" D.E. 102 (Tr.) at 14. However, the government argued no conditions could reasonably assure appearance asserting that Iran is "interested," "willing," and "ab[le]" to issue a new Iranian passport to Mr. Sadeghi, with which he "can return to his country of birth, work in his chosen profession, be with his family, and be beyond the reach of this Court forever." D.E. 102 at 24-25.

On May 6, 2025, this Court granted the government's motion and ordered Mr. Sadeghi detained pre-trial. D.E. 85. This Court "d[id] not dispute that, until this indictment came down, he had absolutely no plans to return to Iran," *id*. at 29, but was persuaded that the charges "create[d] an incentive to flee." D.E. 85 at 5.

On May 16, 2025, Mr. Sadeghi retained undersigned counsel. On May 21, 2025, Mr. Sadeghi appealed. On August 21, 2025, the First Circuit summarily affirmed. *See* D.E. 116. Applying "a degree of deference," the First Circuit "discern[ed] no error" in this Court's conclusion that the government showed a "serious risk that the defendant will flee." *Id*.

On October 14, 2025, Mr. Sadeghi moved to dismiss Counts 2-4 of the Indictment on the ground that datasheets are exempted "information," not prohibited "technology" under the statute or regulations. *See* D.E. 130, 131. At the hearing on November 17, 2025, the government indicated that it would file a superseding indictment, mooting the motion. *See* D.E. 245.

On December 16, 2025, the government filed its Superseding Indictment ("SI"), repeating the conspiracy allegation, abandoning the prior substantive charges based on datasheets, and substituting four new substantive charges based on the shipping of actual MEMS samples. *See* D.E. 149.

Based on pre-trial filings and discovery, it is now clear – and Mr. Sadeghi does not expect the government will dispute – that *Mr. Sadeghi did not actually make any of the charged exports.* Rather, all the charges arise from sample shipments *other people* at ADI sent to Abedini, in Switzerland, as part of the "evaluation board" project for which ADI had contracted Abedini and his company, Illumove.

The charging theory appears to be that Mr. Sadeghi "caused" his colleagues to export the samples to ADI's vendor, Abedini, in Switzerland. The government further maintains that after receiving the items in Switzerland, pursuant to the contract, Abedini then reexported the items to Iran, and Mr. Sadeghi is responsible for that, too, because he had "reason to know" Abedini might do that. Mr. Sadeghi has challenged both of these legal theories. *See* D.E. 205 at 1-3 (arguing there is no *criminal* liability under 50 U.S.C. § 1705(c) for "causing" a civil violation of the regulations); *id*. at 3-6 (arguing there is no § 1705(c) violation based on having mere "reason to know" that a third-country recipient might reexport items to a prohibited country); D.E. 218 at 3-4 (similar).

Both parties recognize that the government's case relies on these aggressive legal theories and have requested the Court rule on the jury instructions as soon as possible. Whatever the Court decides on the legal issues, Mr. Sadeghi also disputes the underlying factual allegations that he "caused" the shipments and that he knew or intended Abedini would re-export the items to Iran (if that even happened, which the government appears to assume but may not be able to prove).

## RELEVANT LAW

Mr. Sadeghi may only be detained if the government proves he poses a "*serious*" risk of flight, 18 U.S.C. § 3142(f)(2), *and* that "no condition or combination of conditions will *reasonably assure* [his] appearance." *Id*. § 3142(e) (emphasis added).

Section 3142(f) provides that a detention "hearing may be reopened … at any time before

3

trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required ….” At least three such circumstances are present here: (1) a new indictment that abandoned the original substantive counts; (2) exculpatory information that the government possessed but improperly and inexplicably failed to disclose prior to the detention litigation; and (3) the U.S. war against Iran. Moreover, further detention beyond the 16 months Mr. Sadeghi has already spent in custody would violate his constitutional rights; and the Court should re-weigh any supposed “incentive” Mr. Sadeghi might have to flee, in light of the time he has already been in custody.

## ARGUMENT

**I.    MR. SADEGHI ALREADY HAS SPENT NEARLY 16 MONTHS (30% OF A LOW-END GUIDELINES SENTENCE) IN CUSTODY AND FURTHER DETENTION WOULD VIOLATE HIS CONSITUTIONAL RIGHTS.**

Pretrial detention, even if once justified, may become unconstitutional over time. *See United States v. Zannino,* 798 F.2d 544, 548 (1st Cir. 1986). Mr. Sadeghi already has spent almost 16 months in detention for non-violent charges of which he is presumed innocent. His detention raises constitutional concerns. In evaluating the point at which pre-trial detention becomes unconstitutionally “punitive,” courts consider six factors: (1) “the seriousness of the charges,” (2) “the strength of the government's proof that defendant poses a risk of flight or a danger to the community” (3) “the strength of the government's case on the merits,” (4) “the length of the detention that has in fact occurred,” (5) “the complexity of the case,” and (6) “whether the strategy of one side or the other has added needlessly to that complexity.” *Id*. at 547.

The Second Circuit analyzed this issue in *United States v. Gonzales Claudio*, 806 F.2d 334 (2d Cir. 1986). The defendants, accused of participating in terrorism-like resistance activities in Puerto Rico, had been detained for 14 months. Ordering release, the court reasoned:

[W]e conclude that the continued detention of Gonzales Claudio and Camacho-Negron beyond fourteen months would exceed even the flexible standards of due process. In reaching this conclusion we recognize that the release of these defendants upon reasonable conditions creates a risk that they may flee. We are not indifferent to that prospect. But the enforcement of all constitutional restraints upon government in its efforts to administer the criminal law entails risks. Occasionally such enforcement creates the risk that a person convicted of crime may escape punishment. In this case the enforcement of due process limits upon the duration of preventive detention creates the risk that a person accused of crime may avoid a trial that might result in conviction and punishment. That risk is serious, but of at least equal gravity is the preventive detention for fourteen months of defendants who are presumed innocent and whose trial to determine guilt or innocence will not even begin until detention has lasted eighteen months. In mandating fundamental fairness, the Due Process Clause endeavors to set outer limits at which risks to society must be accepted to avoid unconscionable deprivations of the liberty of individuals.

*Id.* at 343. This was so despite evidence of dangerousness and previous uses of false identities and evasive behavior. *See id.* at 338. Notably, the Second Circuit had previously upheld the district court's finding of flight risk. *See id.* at 343. But its review of the emergent constitutional question was broader than its direct review of the initial detention decision. *See id.*; *accord Zannino*, 798 F.2d at 546 (reviewing *de novo* when pretrial detention becomes unconstitutional).

Here, all six *Zannino* factors either favor release or are neutral. First, the charges carry a moderately severe GSR of 63-78 months. Compare *Zannino*, 798 F.2d at 547 (defendant faced a maximum of 130 years imprisonment for RICO murder). These charges are not even in the same category of severity as many federal charges, where courts nevertheless have ordered release. *See, e.g.*, *United States v. Cardona*, No. 3:17-30022-TSH, 2020 U.S. Dist. LEXIS 67797, at *5 (D. Mass. Apr. 17, 2020) (releasing two years after detention, in 10-year mandatory minimum case); *United States v. Eischeid*, 315 F. Supp. 2d 1033, 1037 (D. Ariz. 2003) (finding even charges carrying the *death penalty* were insufficient to justify detention, absent any indication the individual defendant had "propensity to flee").

The second *Zannino* factor, the strength of proof that Mr. Sadeghi poses flight risk, again

5

favors Mr. Sadeghi. The theoretical flight risk here is based entirely on Mr. Sadeghi's ties to Iran and the "incentive" created by the charges, neither of which suggests any *individual* propensity to flee. Mr. Sadeghi maintains his innocence. He has no criminal history, and nothing in his history shows even a hint of defiance of any orders, missed court dates, a lack of respect for judicial proceedings, a transient lifestyle, the use of false identities, deceit, or any kind of non-compliance. He was cooperative with authorities upon arrest. *See* D.E. 85 at 11 (finding Mr. Sadeghi's "transparency and cooperation in this case weigh against a finding that he is likely to flee prosecution or otherwise fail to comply with conditions of release"). "Serious" charges, even those carrying "long sentence[s]," do not by themselves show an irremediable risk of flight. *See United States v. Friedman,* 837 F.2d 48, 50 (2d Cir. 1988). Nor do foreign ties alone suffice to show flight risk, absent evidence of an individual's propensity to flee. *See United States v. Karni*, 298 F. Supp. 2d 129, 130, 132 (D.D.C. 2004) (releasing Israeli defendant who lived in South Africa and had *no* ties to the U.S. charged with "acquir[ing] products capable of triggering nuclear weapons and export[ing] them to Pakistan, via South Africa"); *United States v. Himler*, 797 F.2d 156, 162 (3d Cir. 1986) (declining to detain defendant with significant foreign ties where "there is no direct evidence to suggest [defendant] would flee from prosecution in the future"); *United States v. Motamedi,* 767 F.2d 1403, 1408 (9th Cir. 1985) (ordering release of alleged Iranian spy, notwithstanding Iranian citizenship, given extensive ties to U.S.); *United States v. Giordano*, 370 F. Supp. 2d 1256, 1264 (S.D. Fla. 2005) (finding detention based on foreign ties justified only with "[e]vidence of a serious *intent* to flee the country in response to an indictment") (emphasis added); *United States v. Cruz*, 363 F. Supp. 2d 40, 47 (D.P.R. 2005) (requiring "concrete evidence" of intent to flee to justify detention despite foreign contacts).

As to the third factor, as discussed in sections II and III below, the strength of the

6

government's case is, at most, a neutral factor. Its case is far from "overwhelming." *See* D.E. 85 at 9. Mr. Sadeghi did not make *any* of the charged shipments himself; all the charged shipments of free, sample products were exported by other people at ADI. Moreover, all shipments went to Switzerland, pursuant to a contract between ADI and Illumove, which prohibited Abedini from redistributing the items. Mr. Sadeghi is the only person being criminally prosecuted for this conduct, which was entirely within the scope of his employment. The case hinges on Mr. Sadeghi's state of mind and the contours of the law as the Court interprets it. *See* § II, below. Significant late-produced exculpatory information undermines the government's case. *See* § III, below.

Under the Fourth *Zannino* factor, the length of Mr. Sadeghi's pre-trial detention (16 months) is constitutionally suspect. *See Zannino*, 798 F.2d at 547-48 (acknowledging that "in many, perhaps most, cases sixteen months would be found to exceed the due process limitation on pretrial confinement" but permitting further detention, given "palpably dangerous" defendant charged with RICO murder, who faced a statutory maximum of 130 years imprisonment and "played a . . . leadership role in mob activities, to which he ha[d] 'devoted his life'"); *see also Gonzalez-Claudio,* 806 F.2d at 341 ("Detention that has lasted for fourteen months and, without speculation, is scheduled to last considerably longer, points strongly to a denial of due process."). The instant 16-month detention is particularly concerning in relation to the sentencing exposure. The government has stated the GSR here is 63-78 months. *See* D.E. 85 at 5. A 63-month sentence, after good time, is 53.5 months.[1] By April 16, 2026, Mr. Sadeghi will have served 16 months, or 30% of the low-end of the GSR. Mr. Sadeghi understands that his exposure would be far more

---

[1] Moreover, JSIN data indicate that 67% of defendants with a primary guideline of §2M5.1, with a final offense level of 26 and a criminal history category of I (taking the government's GSR calculation at face value) received a below-Guidelines sentence. *See* https://jsin.ussc.gov/analytics/saw.dll?Dashboard. The average sentence was 50 months. With good time, that is 42.5 months. Mr. Sadeghi has now served 38% of that sentence.

severe if he attempted to flee. At this juncture, any rational "incentive" to flee is illusory.

The fifth and sixth *Zannino* factors ask about the complexity of the case and which side caused the delay, respectively. Here, the case is complicated, particularly due to the breadth of the evidence, the technical nature of the engineering issues, the language translation issues, and the complexity of the regulations. From the beginning, the defense pressed for an accelerated trial schedule, but the case now has been delayed because the United States chose to launch a war against Iran. Accordingly, these factors are either neutral or militate in favor of release.

The Court must also consider the degree to which continued detention will impair Mr. Sadeghi's ability to effectively prepare for trial or otherwise infringe on the Sixth Amendment right to counsel. *See Faretta v. California*, 422 U.S. 806, 819 (1975) (Sixth Amendment "does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense" (emphasis added)); *see also* 18 U.S.C. § 3142(i) (codifying due process limitation and authorizing release if "such release [is] necessary for the preparation of the person's defense or for another compelling reason").

## II. THE CHARGES IN THE SUPERSEDING INDICTMENT ARE FACTUALY ATTENUATED AND RELY ON UNTENABLE LEGAL THEORIES.

The SI repeats the original conspiracy charge and substitutes new substantive charges, which are legally and factually even more tenuous than the original charges. *See* D.E. 149. The government's case is therefore weaker than this Court may have previously believed. *See* D.E. 85 at 5, 9 (finding prosecution supported by "substantial circumstantial evidence").

The substantive counts against Mr. Sadeghi in the SI charge exports on four specified dates: September 29, 2022 (Count 2); July 11, 2023 (Count 4); March 15, 2024 (Count 7); and May 6, 2024 (Count 8). The government's trial exhibits make clear that the exports on those dates were sent to Abedini, in Switzerland, *by other people at ADI*, as part of the evaluation board project. *See*

GX113 (invoice for 9/22/29 shipment from Joseph Baviello at ADI to Illumove, in Switzerland, valued at $10); GX137 (FedEx document of 7/11/23 shipment from ADI "Shipping Department" to Abedini in Switzerland); GX138 (similar, showing value of $90); GX 139 (email from ADI's Pablo del Corro to Abedini, dated 7/11/23, stating "By the way, I shipped 3 units of ADIS16607"); GX169 (invoice showing shipment from Pablo del Corro to Abedini/Illumove in Switzerland, dated 3/15/24); GX170 (FedEx document of same, showing 46 parts were shipped with total value of $3200); GX 171 (FedEx label for same); GX 175 (5/6/24 FedEx document showing shipment from ADI Shipping Department to Illumove/Abedini); GX177 (FedEx label for same shipment, showing value of $1500). The government presents no evidence of Mr. Sadeghi sending exports to Switzerland (let alone to Iran), in even a single instance.

Thus, the government's theory must be that Mr. Sadeghi "caused" his colleagues to send parts and samples to Abedini, whom ADI had hired as a vendor and with whom it had a non-disclosure agreement. *See* D.E. 204 at 5 (Govt Opp. to Def. JI). For the reasons discussed in Mr. Sadeghi's filings addressing jury instructions, there is no criminal liability for "causing" an export to be sent, unless the conduct also meets the requirements of "conspir[ing]" or "aid[ing] and abet[ting]." *See* 50 U.S.C. § 1705(c); D.E. 205 at 1-3 (Def. Obj. to Govt. JI). Stated differently, there must be a principal who shares the *mens rea* for the crime and satisfies all of its elements. *See* D.E. 205 at 2; *id*. at 15 (aiding and abetting).

Despite its new charges, the government has not suggested a legal definition of "causation," which a jury might apply to determine whether Mr. Sadeghi "caused" anyone else at ADI to unlawfully export sample parts to an ADI-contracted vendor. *See, e.g.*, *Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 9 (2010) (discussing causation in the civil RICO context and finding liability only attaches if the RICO predicate offense "not only was a 'but for' cause of [the plaintiff's] injury,

but was the proximate cause as well. Proximate cause . . . requires some direct relation between the injury asserted and the injurious conduct alleged. A link that is too remote, purely contingent, or indirect is insufficient") (cleaned up) (citations omitted); *Burrage v. United States*, 571 U.S. 204, 218-19 (2014) (rejecting "contributory causation" theory in "death resulting"-from-mixed-drug-cocktail cases, and requiring the government to prove the decedent "would have lived" "but for" the ingestion of the defendant's drug).

Moreover, ADI's compliance department had the final say whether and which products ADI would export. *See* Sealed Ex. A (ADI Non-SAP Export Shipment Policy). Thus, even assuming, arguendo, that Mr. Sadeghi knew Abedini might reexport parts to Iran, it strains credulity to suggest he became criminally responsible for anything and everything ADI did with its own contracted vendor. As this Court is aware, ADI was sending parts to Abedini even before Mr. Sadeghi entered the picture, *knowing* that Abedini had traveled to Switzerland, from Iran, in order to receive the parts. *See* D.E. 102 at 51 (Apr. 1 Tr.) ("[Court:] So let me just make sure I understand this … [In 2016,] Mr. Abedini is getting [ADI] products. Mr. Abedini is associated with SDRA. SDRA is an Iranian company … [B]efore Mr. Sadeghi is in the picture, [ADI] is sending products to Switzerland to Mr. Abedini of SDRA Iranian company? [Government:] Yes"); *id.* at 53-54 (Court discussing a 2014 incident when Abedini tried to order ADI parts in Iran and ADI said, "'You are in Iran. We cannot send you any parts. Thank you.'" And Abedini said, "'Okay. I'll go to Switzerland and get them.' And [ADI] said, 'Okay. We'll send them there.'"); *id.* (government responding to Court's implicit skepticism, stating, "look, it shouldn't have happened," meaning ADI should not have sent the parts, but arguing the "difference" was that Mr. Sadeghi allegedly knew the parts were destined for Iran, while ADI did not).

The government's case is even more attenuated as to the back end of the shipments, all of

10

which were sent to Abedini *in Switzerland*, pursuant to contracts that prohibited Abedini from further disclosing or sharing the material. The government's theory is Mr. Sadeghi should be held criminally responsible for Abedini's alleged re-exportation of products to Iran because Mr. Sadeghi had mere "*reason to know*" that Abedini might re-export the items. As argued elsewhere, this stretches § 1705(c)'s *mens rea* element beyond recognition and is impermissible. *See* D.E. 205 at 3-6 (arguing willfulness *mens rea* requires intent); D.E. 218 at 3-4 (arguing "reason to know" is a negligence standard); *United States v. Ford,* 821 F.3d 63, 73 (1st Cir. 2016) ("having 'reason to know' suggests a negligence standard" and "materially deviates from the traditional *mens rea* formulation that the defendant know the facts that make his conduct illegal" (cleaned up)).

## III.    LATE-PRODUCED EXCULPATORY INFORMATION SUBSTANTIALLY UNDERMINES THE GOVERNMENT'S CASE.

Courts should and commonly do re-evaluate detention when exculpatory evidence arises, the government's case weakens, or pre-trial detention otherwise becomes unjust or unwarranted. *See, e.g.*, *United States v. Taderera,* No. 17-cr-10158-FDS, D.E. 79 (D. Mass. Apr. 13, 2018) (releasing defendant, over government objection, several days after *denying* suppression motion which called into question the government's identification evidence in a bank robbery case, despite foreign ties and demonstrated flight risk); *United States v. Reid*, No. 24-cr-10176-AK-5, D.E. 144 (D. Mass. Feb. 21, 2025) (releasing defendant after government and defense brought forward exculpatory evidence); *United States v. Wilder*, 797 F. Supp. 3d 642, 647 (S.D. W. Va. 2025) (releasing defendant after granting suppression motion; collecting similar cases). This Court rested its initial detention decision, at least in part, on the "strength of the government's case." D.E. 102 at 21 (Apr. 1 Tr.); *see also* D.E. 85 at 9 ("the government has provided substantial evidence that Sadeghi willfully violated 50 U.S.C. § 1705").

Here, on September 24, 2025, the government belatedly[2] produced substantial exculpatory information contained in FBI 302 reports of witness interviews. Recently it has produced even more such evidence in the leadup to trial. Among other things, witnesses told the government that: (1) even though Mr. Sadeghi introduced Abedini/Illumove to ADI, ADI made its own, independent decision to hire Illumove for the evaluation board project; (2) the evaluation board project, which was not run by Mr. Sadeghi, was a substantive, legitimate work collaboration between ADI and Illumove that required sending a small volume of sample parts to Abedini in Switzerland so that Illumove could provide know-how and services to ADI in the United States, not a sham operation to funnel technology to Abedini in Iran; and (3) as discussed above, Mr. Sadeghi did not send any of the charged shipments.

- Sealed Ex. B at USAO_419294 (302 report of 12/20/24 interview with ADI engineer Pablo Del Corro: "Sadeghi recommended Abedini for the project, but *the decision was not Sadeghi's to make. Hiring Abedini for the project was a consensus decision at ADI* made after putting together a table with pros and cons of the companies competing for the project. Illumove scored the best and was selected.") (emphasis added);

- Sealed Ex. C at 419450 (10/27/25 interview with Del Corro: "Illumove was selected for the eval board project because of their competitive cost in addition to their software and hardware expertise");

- *id.* at 409451 ("*Del Corro would ship these parts to Illumove to complete the project. Mark Looney was Del Corro's boss and would tell him to ship parts to Illumove as the project*

---

[2] Several of the FBI interviews at issue here were conducted in December 2024 and January 2025. Mr. Sadeghi was arraigned on January 2, 2025. The government has offered no explanation for its failure to disclose the exculpatory information for over 9 months, which, among other things, deprived Mr. Sadeghi of the opportunity to use the information in the original detention litigation. On December 17, 2024, Magistrate Judge Cabell entered an Order Pursuant to Fed. R. Crim. P. 5(f), reminding the government of its obligation to "disclose in a timely manner all exculpatory evidence … that is, all evidence that is material and favorable to the to the defendant[s] or that tends to cast doubt on the United States' case" and noting that failure to do so "may result in consequences including, but not limited to, reversal of any conviction, the exclusion of evidence, adverse jury instructions, dismissal of charges, contempt proceedings, disciplinary action, and/or other sanctions by the court." D.E. 12.  Local Rule 116.2 separately provides that the government must produce "information that would tend directly to negate the defendant's guilt concerning any count in the indictment or information" within 28 days of arraignment.

*progressed*") (emphasis added);

- *id*. at 419452 ("Del Corro described the quantities shown in Bates Doc 00400837 as a responsible quantity to ship to Illumove to perform the project'");

- *id*. at 419453 ("To send parts to Illumove, Del Corro shipped parts to Switzerland at an École Polytechnique Fédérale de Lausanne (EPFL) address. Del Corro knew Illumove was working with a professor at EPFL");

- Sealed Ex. D at  USAO_419299-300 (302 report of 12/17/24 interview with ADI Director of Marketing Tzeno Galchev, to whom Mr. Sadeghi reported: "Illumove was hired because ADI either did not have the resources or was just too busy and needed the extra help. The Illumove project includes the release of an evaluation board . . . . [, which is] an evaluation tool for ADI products. It can be used for some inertial measurement units, but *ones that would be of interest to Iran were not used*") (emphasis added);

- *id*. at 419300 ("ADI has shipped sample ADI parts to Illumove during the project. Some parts had not been released publicly but most were available in open markets. The unreleased parts can be shared under the NDA signed by Abedini");

- Sealed Ex. E at USAO_419593-4 (302 report of 10/21/25 interview with Galchev: "Illumove would have needed all the physical parts listed in order to build  and test the evaluation board and to write the API firmware[,] . . . . [the] datasheets, firmware drivers, and the products themselves. Illumove would have had access to release[d] and unreleased parts because the board was specifically designed to work with unreleased products");

- *id*. at 419594 ("It was Ian Beavers and Pablo Del Corro's responsibility to get Illumove the ADI parts they needed for the project");

- *id*. at 419595 ("Galchev thought Illumove was doing a good job with the project, and asked Sadeghi to elicit additional proposals from Illumove");

- Sealed Ex. F at USAO_419387 (302 report of 10/30/25 interview with ADI engineer Ian Beavers: "When it comes to ADI providing product samples to Illumove for this project, Beavers would initiate the process. From there, he would have the secretary or administrative assistant enter it into their SAP software. The request would be reviewed by other ADI departments where questions like who the parts were for, how many were needed, are they being paid for, and why the customer or vendor needed them may have to be answered. There would also be a compliance check as well");

- *id*. ("there was a distinction between the marketing team saying a product could be released, and the product being authorized to be shipped according to a trade compliance review");

- Sealed Ex. G at USAO_419392 (302 report of 10/24/25 interview with ADI engineer Mark Looney: "Looney had high level involvement in ADI's evaluation board project with

13

Illumove and also was involved in the original decision to select Illumove as the vendor for it. Illumove was perceived as a nimble and strong contractor in the market, so due to its success on [the] first project and Ian Beavers' praise, lllumove was also recommended for other projects over time at ADI");

- *id*. ("about late 2020 into 2021, Looney was asked to look at bids and help with deciding the vendor; he feels like *he ultimately chose Illumove*") (emphasis added);

- *id*. at 419393 ("when Looney received the task to be involved in the vendor choice, a Summary comparison was already done, and Looney took away from that that Illumove was hungrier and more eager to grow and willing to work than others who may have been viewed as established engineering resources for ADI. This combined with the cost difference, Illumove being cheaper than others, were what made them [ADI] choose Illumove");

- *id*. ("To create the evaluation board, IIlumove needed a subset of parts . . . . To complete the project, Illumove would also need open market datasheets, other products such as Groups 6 and 10, and pre-release parts that would be acquired via [NDA");

- Sealed Ex. H at USAO 419273 (302 report of 12/16/24 interview of Eugene Dariush Daneshvar, former affiliate of TacitMotion, Mr. Sadeghi's wearable fitness company: "He believed there was some mistake concerning the arrest of Sadeghi and would like to help clear things up. Daneshvar was disappointed with the FBI and felt that he and Sadeghi were being targeted because of their Iranian background. He noted that the subpoena did not list his first name 'Eugene,' but named him as 'Dariush Daneshvar.' Daneshvar felt this oversight was deliberate and meant to highlight his Iranian identity")

- Sealed Ex. I at USAO_419275 (302 report of 12/20/24 Daneshvar interview: "Daneshvar is familiar with Alogo, a horse-racing company for which Sadeghi helped design motion sensors. To Daneshvar's knowledge, this is all Alogo does, and there are no drone applications to the technology").

Moreover, contrary the allegation that Mr. Sadeghi conspired to export and willfully exported military technology to Abedini, knowing that it was destined for Iran, where SDRA was likely to use the parts for military projects, the 302s show that Mr. Sadeghi has repeatedly *eschewed* involvement with military projects or technology.

- Sealed Ex. B at USAO_419294 (Del Corro 302: "Del Corro worked with Sadeghi on IMU. There are defense applications, but Sadeghi did not want anything in defense and requested to work in the medical and industrial markets");

- Sealed Ex. J at USAO_422089 (302 report of 2/25/26 interview with ADI's Spencer Thompson: "Sadeghi told Thompson he did not want anything to do with [the] defense side

of ADI. Sadeghi said something along the lines of, 'I'm from Iran, the U.S. military and government have done a lot of harm in the region I'm from so I don't want to have anything to do with that.'");

- Sealed Ex. D at USAO_419301 (Galchev 302: "Galchev was surprised that Sadeghi had been arrested, as Sadeghi is a pacifist. Sadeghi does not want to know the defense side of projects at ADI");

- Sealed Ex. K at USAO_422072 (302 report of 2/20/26 Galchev interview: "Generally, [Galchev] described Sadeghi as against the conflict [in Gaza] or as a pacifist. When asked how Sadeghi reacted to ADI's work on defense projects, Galchev stated Sadeghi did not like that part of the business. Sadeghi would compartmentalize that part of the business and focus on the industrial side.").

## IV.    THE WAR AGAINST IRAN MAKES IT EVEN LESS PLAUSIBLE THAT MR. SADEGHI COULD OR WOULD FLEE THERE.

This Court detained Mr. Sadeghi based on the government's speculative theory that Iran could smuggle Mr. Sadeghi out of this country and that Mr. Sadeghi would find that an attractive option and choose to flee. *See* D.E. 102 at 24 (gov't arguing, "if he wants to go, he will have the assets and the ability to go. And unlike many individuals that come before this Court, it will not be a life on the run, moving from place to place and motel to motel, you know, from the government, where he can't live a real life. He can return to his country of birth, work in his chosen profession, [and] be with his family"); *see also* D.E. 85 ("The record suggests that Sadeghi has the means to return to Iran with his family and continue their life there. He and his wife have maintained their Iranian citizenship.").[3] Whatever the merit of that theory 16 months ago, it is

---

[3] The dual citizenship of Mr. Sadeghi and his wife came up repeatedly at the hearing. *See* D.E. 102 at 14; *id.* at 16 (government distinguishing this case from cases in which "'the person has no ties to a foreign country. They may have contacts there, business contacts, but they're not a citizen.'"); *id.* at 22 (government adding "'the fact that he's a dual citizen'" to the list of factors that "'make him a flight risk'"); *id.* at 32. But that fact is less telling than the government has suggested because it is nearly impossible to divest oneself of Iranian citizenship. *See* Spiro, Peter, Stuck with Two Passports, *Temple Law* (Feb. 1, 2016), https://www2.law.temple.edu/voices/stuck-two-passports/ ("In theory, you can renounce your citizenship under Iranian law, but in practice, it never happens . . . .if you were born Iranian, you will die Iranian"); *id.* ("Dual nationality tells us very little about a person's loyalty, trustworthiness or belief system. In fact, many people have dual nationality not

highly implausible today. Even if it were theoretically possible for Mr. Sadeghi to flee to Iran, given the devastation and danger, he would not voluntarily do so.

For starters, even getting to Iran would be an Odyssey at this point. "Commercial flights are currently not operating out of Iran." U.S. Virtual Embassy Iran, Security Alert (March 26, 2026), https://ir.usembassy.gov/security-alert-iran-march-26-2026/. Iran can be accessed via land routes from Armenia, Turkey, or Turkmenistan, which would require flights to those countries and permission to enter those countries. *See id.* A potential ground invasion of Iran, moreover, suggests the situation will be getting worse, not better. *See* "Pentagon prepares for weeks of ground operations in Iran," Washington Post (Mar. 29, 2026).[4]

Second, the government of Iran is at operating at a diminished capacity, as it deals with both the war and the devastation of its civilian infrastructure. There is no evidence the government of Iran has any connection to or awareness of Mr. Sadeghi, other than his having obtained a modest loan from the INEF ten years ago (akin to a United States researcher having at one point received a grant from the National Institutes of Health – which hardly means that person is connected to the

---

by choice but because they're stuck with it: Some countries simply won't let you go."); https://mumbai.mfa.ir/en/ViewPage/16161 (Article 988 of the Civil Code provides that "Iranian citizens cannot renounce their citizenship except under the following conditions . . . ," including that the "Council of Ministers should allow them to renounce their citizenship."); U.S. Virtual Embassy Iran, Security Alert (Mar. 26, 2026), https://ir.usembassy.gov/security-alert-iran-march-26-2026/ ("The Iranian government does not recognize dual nationality and will treat U.S.-Iranian dual nationals solely as Iranian citizens"); Immigration and Refugee Board of Canada (Aug. 22, 2017), https://www.justice.gov/eoir/page/file/1035111/dl?inline= (citing same; Why Iran Won't Let You Go, *YouTube* (Dec. 30, 2022), https://youtu.be/M0LC9Gd4R8Q?si=fLPC4gpM1Kk_OMv0 (cartoon video satirizing renunciation process). Thus, Mr. Sadeghi and his wife had no real option to nullify, renounce, or end their Iranian citizenship.

[4]Available at: https://www.washingtonpost.com/national-security/2026/03/28/trump-iran-ground-troops-marines/

U.S. government or the U.S. Defense Department).  Given the diminished capacity of the Iranian government, it is less likely to be able to facilitate the kind of escape the Court previously contemplated. *See* Apr. 1 Tr. at 25 (govt arguing, "Iranian passports certainly are capable of being issued by the government of Iran"); *id*. at 32 (Court positing that co-defendant could "make[] arrangements to get passports mailed here. What's so hard about that?").

And most importantly, no one – including Mr. Sadeghi – would plausibly *want* to live in Iran at this point, given the catastrophic disruption and damage being sustained there on a daily basis.  *See* U.S. Virtual Embassy Iran, Security Alert (Mar. 26, 2026) (recommending that anyone trapped in Iran "shelter in place until further notice," remain indoors, and, to the extent possible, "stay away from windows");[5] P Salehi, "Dispatch from Tehran: Bombs and Hardhsip are Reshaping Iranian Society," *Polis Project* (Mar. 17, 2026) ("In Tehran, the bombs do not seem to distinguish between neighborhoods. Areas such as Kamranieh, Niavaran, and the Sadr highway district, which are usually considered wealthier parts of the city, have also been hit");[6] *id*. (as of "March 10, . . . US-Israel strikes have destroyed 9,669 locations, including almost 8,000 residential homes as well as commercial centres, medical facilities, and schools. People watched in horror as buildings crumbled and attacks on oil depots caused toxic rain over Tehran"); "The Future of Iran's Internet Is More Uncertain Than Ever," Wired (Mar. 6. 2026) ("For more than six days, almost 90 million Iranians have been living under a total internet blackout").[7] Inflation is staggering. *See id*. ("The US and Israel's war on Iran began at a moment when the country had already been under

---

[5] Available at: https://ir.usembassy.gov/security-alert-iran-march-26-2026/

[6] Available at: https://thepolisproject.com/read/dispatch-from-tehran-bombs-hardship-iran/

[7] Available at: https://www.wired.com/story/the-future-of-irans-internet-is-more-uncertain-than-ever/

enormous economic pressure for years"); *see also* "'People are getting poorer': How Iran's struggling economy is changing how families live," *BBC News* (Feb. 26, 2026) (demonstrating $1 U.S. Dollar is now worth 1,645,700 Iranian rials). President Trump is threatening to bomb Iran "back to the stone ages." *See* "Trump Threatens to Bomb Iran 'Back to Stone Ages,' Won't Give Timeline for Ending War" *Democracy Now* (Apr. 2, 2026);[8] "Trump threatens to 'obliterate Iran's energy grid if ceasefire not reached 'shortly,'" *The Guardian* (Mar. 30, 2026) (Trump threatened to "destroy 'all of their Electric Generating Plants, Oil Wells and Kharg Island (and possibly all desalinization plants!)'").[9]

In sum, the war is another changed circumstance, which makes the remote possibility that Mr. Sadeghi would flee to Iran even more unlikely. *Compare* D.E. 61 (DLC Det. Hrg. Tr.) at 35 (government arguing, "the defendant currently sitting here today has the means to flee, and he has many reasons to go and comparatively few to stay"). The time he has served also changes this calculus. At minimum, the outbreak of war "has a material bearing on the issue whether there are conditions of release that will reasonably assure [Mr. Sadeghi's] appearance." 18 U.S.C. § 3142(f).

---

[8] Available at: https://www.democracynow.org/2026/4/2/headlines/trump_threatens_to_bomb_iran_back_to_stone_ages_wont_give_timeline_for_ending_war

[9] Available at https://www.theguardian.com/us-news/2026/mar/30/trump-threatens-to-obliterate-irans-energy-grid-if-ceasefire-not-reached-shortly

## CONCLUSION

For these reasons, as well as those expressed in connection with the original bail proceedings, Mr. Sadeghi respectfully requests that the Court order his release.

Respectfully submitted,

**MAHDI SADEGHI**

by his attorneys,

*/s/ Amy Barsky*
Amy Barsky (BBO # 601111)
William W. Fick (BBO #650562)
Daniel N. Marx (BBO #674523)
Amy Barsky (BBO #601111)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
*wfick@fickmarx.com*
*dmarx@fickmarx.com*
*abarsky@fickmarx.com*

## LOCAL RULE 7.1 CERTIFICATION

I, Amy Barsky, hereby certify that on April 6, 2026, the defense conferred with the government and was unable to narrow the issues in dispute.

*/s/  Amy Barsky*
Amy Barsky

## CERTIFICATE OF SERVICE

I, Amy Barsky, hereby certify that on April 10, 2026, I caused this document to be filed through the ECF system.

*/s/  Amy Barsky*
Amy Barsky