IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>MAHDI SADEGHI | No. 1:24-cr-10391-IT<br><br>Leave to file excess pages granted 7/24/2026 [D.E. 326] |

**DEFENDANT MAHDI SADEGHI'S MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL OR, ALTERNATIVELY, NEW TRIAL**

William W. Fick (BBO #650562)
Daniel N. Marx (BBO #674523)
Amy Barsky (BBO #601111)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
*wfick@fickmarx.com*
*dmarx@fickmarx.com*
*abarsky@fickmarx.com*

Dated: August 3, 2026

# TABLE OF CONTENTS


Table of Authorities ... iii

Introduction ... 1

Argument ... 2

I. This Court should enter a judgment of acquittal on all counts of conviction. ... 2

A. The evidence was insufficient to find Mr. Sadeghi guilty on Count 8. ... 2

1. The evidence failed to prove Mr. Sadeghi caused or attempted to cause anyone else to ship three Osprey samples to Illumove. ... 3

2. The evidence failed to prove Mr. Sadeghi intended the three ADIS16575 samples to be sent or taken to Iran. ... 6

3. The evidence failed to prove Mr. Sadeghi intended that the Osprey samples be unlawfully "exported" to Iran. ... 9

4. The evidence failed to prove Mr. Sadeghi acted "willfully." ... 11

B. The evidence was insufficient to find Mr. Sadeghi guilty on Count 2. ... 15

1. The evidence failed to prove Mr. Sadeghi caused or attempted to cause ADI to ship the 10 ADXL382 samples to Illumove. ... 16

2. The evidence failed to prove Mr. Sadeghi intended the ADXL382 samples to be sent or taken to Iran. ... 22

3. The evidence failed to prove Mr. Sadeghi intended that the ADXL382 samples be unlawfully "exported" to Iran. ... 27

4. The evidence failed to prove Mr. Sadeghi acted "willfully." ... 28

C. The evidence was insufficient to find Mr. Sadeghi guilty on Count 1. ... 28

1. The evidence failed to prove Mr. Sadeghi joined any criminal conspiracy to violate U.S. export laws. ... 28

2. The evidence failed to prove Abedini intended to violate U.S. sanctions. 32

II. This Court should order a new trial. ... 35

A. The prosecution's disruptive objection and the resulting impairment of the defense's closing argument warrant a new trial. ... 35

B. The admission of supposed Iranian bank records was erroneous and, given the prosecution's emphasis on the evidence in its closing, prejudiced Mr. Sadeghi. . 38

Conclusion ........................................................................................................................ 40

Certificate of Service ........................................................................................................ 41

# TABLE OF AUTHORITIES

## Cases

*Burrage v. United States*,
571 U.S. 204 (2014) ... 3

*Defense Distributed v. United States*,
838 F.3d 451 (5th Cir. 2016) ... 10

*Global-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011) ... 31

*Herring v. New York*,
422 U.S. 853 (1975) ... 36, 37

*Paroline v. United States*,
572 U.S. 434 (2014) ... 3, 6

*Ratzlaf v. United States*,
510 U.S. 1358 (1994) ... 12

*Swan & Finch Co. v. United States*,
190 U.S. 143 (1903) ... 10

*United States v. Andujar*,
49 F.3d 16 (1st Cir. 1995) ... 29

*United States v. Awer*,
770 F.3d 83 (1st Cir. 2014) ... 39

*United States v. Ehsan*,
163 F.3d 855 (4th Cir. 1998) ... 10

*United States v. Elashyi*,
554 F.3d 480 (5th Cir. 2008) ... 7

*United States v. Gonzalez-Perez*,
778 F. 3d 3 (1st Cir. 2015) ... 38

*United States v. Hajavi*,
No. 24-10329, 2025 U.S. App. LEXIS 13151 (11th Cir. May 30, 2025) ... 7, 11

*United States v. Kilmartin*,
944 F.3d 315 (1st Cir. 2019) ... 40

*United States v. Ledee*,

772 F.3d 21 (1st Cir. 2014) .......... 29

*United States v. Lizardo*,
445 F.3d 73 (1st Cir. 2006) .......... 31

*United States v. McFadden*,
116 F.4th 1069 (10th Cir. 2024) .......... 39

*United States v. Medina*,
155 F.4th 11 (1st Cir. 2025) .......... 31

*United States v. Mousavi*,
604 F.3d 1084 (9th Cir. 2010) .......... 11

*United States v. Nivica*,
887 F.2d 1110 (1st Cir. 1989) .......... 39, 40

*United States v. Ocampo*,
964 F.2d 80 (1st Cir. 1992) .......... 29, 30

*United States v. Piper*,
35 F.3d 611 (1st Cir. 1994) .......... 29

*United States v. Potomac Navigation, Inc.*,
No. 08-717, 2008 U.S. Dist. LEXIS 129199 (D. Md. July 3, 2008) .......... 10

*United States v. Reyes*,
270 F.3d 1158 (7th Cir. 2001) .......... 7

*United States v. Rose*,
104 F.3d 1408 (1st Cir. 1997) .......... 29

*United States v. Trenkler*,
61 F.3d 45 (1st Cir. 1995) .......... 39

*United States v. Turner*,
718 F.3d 226 (3d Cir. 2013) .......... 39

*United States v. Villa-Guillen*,
102 F.4th 508 (1st Cir. 2024) .......... 40

*United States v. Wilson*,
249 F.3d 366 (5th Cir. 2001) .......... 39

*United States v. Young*,
470 U.S. 1 (1985) .......... 36

**Statutes, Regulations, and Rules**

50 U.S.C. § 1701 *et seq*. ........ *passim*

31 CFR Part 560 ........ *passim*

Fed. R. Evid. 807 ........ 38

**Other Authorities**

First Circuit Pattern Criminal Jury Instructions § 2.17 ........ 10

First Circuit Pattern Criminal Jury Instructions § 2.16. ........ 31

F. D. Saylor, IV, and D. Small, "Storytelling in Closings," *Massachusetts Lawyers Weekly* (Apr. 26, 2018) ........ 37

M. Kelleher, "The Trial Transcript—The Most Important Document in Your Case," *Cogent Legal Blog* (2017) ........ 37

N. Weatherford, "Delivering a Powerful Closing Argument," *Advocate Magazine* (2024) ........ 37

W. LaFave, SUBSTANTIVE CRIMINAL LAW § 6.4(a) (2d ed. 2003) ........ 2

**INTRODUCTION**

This case turned on the prosecution's twin claims that Analog Devices, Inc. ("ADI")—*not Defendant Mahdi Sadeghi*—sent samples of its parts from the U.S. to Switzerland, and that Co-Defendant Mohammad Abedini—*again, not Mr. Sadeghi*—took those parts from Switzerland to Iran in violation of U.S. exports laws. But only Mr. Sadeghi stood trial, and he was held criminally responsible for the actions of other people. That unjust result cannot stand. Even viewed in the light most favorable to the verdict, the evidence was insufficient for the jury to find beyond a reasonable doubt that Mr. Sadeghi himself violated (or aided and abetted others who violated) IEEPA and ITSR (Counts 2 and 8) or conspired with Abedini to do so (Count 1).

Regarding the substantive charges, the evidence fell short at every step. It did not prove Mr. Sadeghi caused or attempted to cause ADI, a multibillion-dollar U.S. company, to work on marketing projects with Illumove, a Swiss start-up company, as an outside vendor subject to non-disclosure and consulting agreements. Nor did the evidence prove Mr. Sadeghi intended ADI parts would be sent from Switzerland to Iran. And even if Mr. Sadeghi knew such parts might be taken temporarily to Iran for work on ADI projects, no evidence proved he intended any "exports," as IEEPA and ITSR use that term. Finally, despite the testimony about an "embargo" on Iran, no evidence proved Mr. Sadeghi acted "willfully"—that he thought it was unlawful for ADI to work with Illumove in Switzerland because Abedini also worked with SDRA, another company in Iran.

As to the conspiracy charge, the evidence was similarly insufficient. Absent evidence that the charged shipments in 2022 and 2024 violated IEEPA and ITSR, the jury could not find beyond a reasonable doubt that Mr. Sadeghi conspired, starting in 2016, with Abedini to illegally export goods from the U.S. to Iran. No evidence proved Mr. Sadeghi joined a conspiracy with Abedini: indeed, Mr. Sadeghi had nothing to gain, and everything to lose. Nor did the evidence show that Abedini himself, who played the off-stage part of the Iranian bogeyman, intended to violate U.S.

law. Ironically, the evidence demonstrated that the parts at issue were widely available, from online sellers and on black markets. And to the extent that ADI and Illumove collaborated on specific projects, the flow of expertise was to the U.S., not from it. Essentially, ADI bought expertise and assistance from Illumove; it did not sell anything to Illumove (or SDRA).

Finally, even if the evidence had been sufficient, a new trial would still be necessary. As this Court recognized, given the prosecution's unusual trial presentation, which relied heavily on witnesses without any personal knowledge, the closings were critical. But the defense's closing was improperly interrupted by the prosecution's baseless objection to displaying excerpts from the official transcripts, a practice that is not only plainly appropriate but widely encouraged. In addition, the thin reed supporting the prosecution's central claim that Abedini's associates were working on ADI's projects in Iran consisted of inadmissible "bank records," which this Court erroneously admitted under Fed. R. Evid. 807 and the prosecution highlighted in its closing. No other evidence, in emails, texts, photographs, or metadata, made the critical connection to Iran.

## ARGUMENT

### I. This Court should enter a judgment of acquittal on all counts of conviction.

#### A. The evidence was insufficient to find Mr. Sadeghi guilty on Count 8.

Mr. Sadeghi was found guilty of unlawfully exporting three samples of ADIS16575, the "Osprey" IMU, from the United States to Iran, through Switzerland, on or about May 6, 2024. *See* D.E. 299 ("guilty" verdict on Count 8); Ex. 177 (ADI invoice). The evidence was insufficient, however, for a rational jury to conclude beyond a reasonable doubt that Mr. Sadeghi committed the charged offense. Specifically, the evidence failed to establish that Mr. Sadeghi (1) "caused" or "attempted to cause" any other person to ship ADI parts to Illumove, (2) intended those parts to be taken or sent "to Iran," (3) intended that they be "exported" to Iran, as IEEPA and ITSR use that term; or (4) acted "willfully"—that is, with the specific intent to violate U.S. export laws.

Accordingly, a judgment of acquittal should enter on Count 8.

**1. The evidence failed to prove Mr. Sadeghi caused or attempted to cause anyone else to ship three Osprey samples to Illumove.**

The evidence did not establish—and the prosecution has never alleged—that Mr. Sadeghi personally sent or took Osprey samples to Switzerland. Rather, the evidence proved Alex Nolan, the product manager, provided three samples for Illumove, *see* Tr. 9/60, Ex. 174; John DeRosa, a product coordinator, processed the order, Tr. 9/93, Ex. 177 (ADI invoice listing DeRosa); Spencer Thompson directed the shipment to Illumove, *see* Tr. 9/93, and FedEx delivered the package to Switzerland, *see* Exs. 176, 177. The jury apparently concluded Mr. Sadeghi caused this entire chain of events. But even viewed in the light most favorable to the verdict on Count 8, the evidence was insufficient to prove that Mr. Sadeghi caused or attempted to cause any unlawful export.[1]

To find that Mr. Sadeghi caused or attempted to cause another person to unlawfully export goods to Iran, the jury had to find his conduct was the actual ("but for") cause and the legal ("proximate") cause, meaning it was a "substantial factor" in bringing about another person's unlawful conduct and that there was a "direct relationship" between his conduct and the unlawful export, not a remote or attenuated link. *See* Tr. 13/20 (supp. charge); *see also Paroline v. United States*, 572 U.S. 434, 444-45 (2014) (discussing causation requirements in criminal law); *Burrage v. United States*, 571 U.S. 204, 210 (2014) (holding "a defendant generally may not be convicted unless his conduct is 'both (1) the actual cause, and (2) the "legal" cause (often called the "proximate cause") of the result.'" (quoting 1 W. LaFave, SUBSTANTIVE CRIMINAL LAW § 6.4(a) (2d ed. 2003)). Put simply, the evidence failed to prove "causation."

Following the success of the evaluation board project, ADI solicited additional proposals

[1] Mr. Sadeghi maintains (and does not waive) his legal argument, which this Court previously rejected, that 50 U.S.C. § 1705(c) does not criminalize "causing" or "attempting to cause" another person to violate U.S. export laws.

from Illumove for work as a potential vendor with expertise in fusion algorithms. These other projects included (1) Illumove's assistance in developing ADI's own GNSS/INS technology, which did not result in any contract, *see* Tr. 7/169 (Wolberg: "Q: Did ADI ultimately choose Illumove for the INS/GNSS project? A: No."), and (2) ADI's product demonstrations for "Sensors Converge," an electronics trade show in the United States, *see* Tr. 8/13 (Galchev), Tr. 9/54-56 (Thompson).

The second project began when Tzeno Galchev, Mr. Sadeghi's boss, "asked Mr. Sadeghi to go to Illumove and solicit [a] proposal[]." Tr. 8/13. At Galchev's direction, Mr. Sadeghi emailed Abedini about "2 demos for Sensor[s] Converge" on April 12, 2024, about two months before the trade show on June 24-26, 2026. Ex. 179; *see* Tr. 9/54-56 (Thompson). After Abedini responded, Mr. Sadeghi added his colleague, Spencer Thompson, to the thread. *See* Ex. 179 ("Thanks for getting back to me. I am adding my colleague, Spencer to the thread as he is also involved in the demos."). Then, on April 23, 2024, Mr. Sadeghi, Thompson, and Abedini had a Teams meeting to discuss the product demonstrations. *See* Ex. 179; Tr. 9/38 (Thompson: he had "Teams call or two" with Abedini and also "had some emails together"). No evidence established the substance of their discussions, but later that day, Thompson emailed Abedini, sent a preliminary datasheet for the Osprey IMU, and asked Abedini, "how many samples you need"? Ex. 172; *see* Tr. 9/89 (Thompson: testifying that he sent the datasheet to Abedini, asked Abedini "how many samples he needs," and was "one of the people helping to shepherd [the project] along" for ADI").

After the Teams meeting with Abedini and Thompson, Mr. Sadeghi sent a few internal, one-line Teams messages to move the project along. On May 2, 2024, Mr. Sadeghi asked Thompson, "can you get some samples sent to Illumove?" and provided the address in Switzerland. Exs. 173, 175. He also asked Nolan, "do you have 2-3 samples to give to [Thompson]? We wanted them for Illumove." Ex. 174. The evidence established, at most, that Mr. Sadeghi worked on this

project as part of an ADI team at ADI, including Thompson, Galchev, Nolan, DeRosa, and others.

Mr. Sadeghi and Thompson both worked as MEMS marketing managers. *See* Tr. 9/30-32, 35, 42-43 (Thompson), Ex. 165. Mr. Sadeghi focused on industrial markets; Thompson on defense customers. *See* Tr. 9/42-43, Ex. 165. They reported to Galchev, who directed the marketing group. *See* Tr. 9/42 (Thompson: Galchev was "responsible for the marketing applications team for MEMS"), Ex. 165. Mr. Sadeghi never supervised Thompson or directed his work. Meanwhile, Nolan, whose name appears on one of Teams messages, *see* Ex. 174, was the project manager for ADIS16575, *see* Tr. 9/60 (Thompson), and he did not report to Mr. Sadeghi. DeRosa was a new product coordinator who acted at Thompson's direction. *See* Tr. 9/93 (Thompson).

Although Thompson described Mr. Sadeghi as "the main point of contact" with Illumove on the project, *see* Tr. 9/58, the evidence established that from early on, Mr. Sadeghi included Thompson in all the discussions with Abedini, *see* Ex. 179. Thompson participated in the Teams meeting on April 23, 2024, and after that meeting, it was Thompson who sent the datasheet to Abedini and offered to send samples to Illumove. *See id.*; Tr. 9/56-58, 89. Then on May 6, 2024, it was again Thompson who directed DeRosa to send the three ADIS16575 samples to Illumove in Switzerland. *See* Tr. 9/61, 93, Ex. 177 (ADI invoice).

The facts that Mr. Sadeghi helped locate the samples (from Nolan) or provided the address in Switzerland (to Thompson) were insufficient to establish beyond a reasonable doubt that Mr. Sadeghi *caused* Nolan, Thompson, DeRosa, or ADI to send these parts to Illumove. That scant evidence failed to show that Mr. Sadeghi was the "but for" cause of the shipment, much less its "proximate" cause. Take the address in Switzerland, for example: ADI already had that shipping information.[2] At most, Mr. Sadeghi saved Thompson the trouble of looking up the address in

---

[2] ADI had the shipping address for Illumove as early as May 2022 (Ex. 109), was used for

Switzerland, but he did not "cause" Thompson to send the Osprey samples to Illumove.

Notably, the prosecution never asked—perhaps, intentionally—questions of Thompson (or other witnesses) that might have shed light on the critical question of Mr. Sadeghi's supposed "causation," such as whether Mr. Sadeghi directed anyone to send samples to Illumove or whether, if Thompson had known more about Abedini, he would not have sent them. Nor did the prosecution elicit testimony from Thompson (or other witnesses) that Mr. Sadeghi played any significant role in deciding to hire Illumove for the product demonstrations, providing ADIS16575 samples, or sending them to Switzerland. The record established all those events could—and most likely would—have happened without any involvement by Mr. Sadeghi whatsoever. Yet he was found criminally responsible for the collective conduct of Galchev, Thompson, Nolan, DeRosa, and ADI itself. That result is contrary to the fundamental principle, which the causation requirement protects, that "defendants should be made liable for the consequences and gravity of their own conduct, not the conduct of others." *Paroline*, 575 U.S. at 462.

**2. The evidence failed to prove Mr. Sadeghi intended the three ADIS16575 samples to be sent or taken to Iran.**

Even if Mr. Sadeghi somehow caused or attempted to cause ADI to ship three Osprey samples on or about May 6, 2024, to Illumove in Switzerland, no evidence proved he intended those specific parts to be unlawfully exported *to Iran*. To find that Mr. Sadeghi intended the unlawful export of those items in violation of the Iran sanctions, the jury had to find that Mr. Sadeghi specifically intended that they be sent or taken to Iran. *See United States v. Hajavi*, No. 24-10329, 2025 U.S. App. LEXIS 13151, at *22 (11th Cir. May 30, 2025) (affirming conviction for violation of IEEPA and ITSR, because "evidence was more than sufficient to prove that

---

shipments in September and October 2022 (Exs. 115, 117), April 2023 (Ex. 130), July 2023 (Ex. 137), March 2024 (Exs. 170-171), and it was listed in the evaluation board proposal (Exs. 73, 80).

[defendant] willfully violated his known legal duties not to export or reexport goods to Iran"); *United States v. Elashyi*, 554 F.3d 480, 492 (5th Cir. 2008) (to prove violations of IEEPA and Libya sanctions, "[t]he government had to prove that . . . Defendants knowingly exported goods, technology, or services from the United States to Libya"); *United States v. Reyes*, 270 F.3d 1158, 1170 (7th Cir. 2001) (to prove violations of IEEPA and ITSR, "[t]he government was required to establish that [he] willfully attempted to export goods to another country, knowing the ultimate destination was [Iran], without a license"). The evidence, even viewed in the light most favorable to the verdict, did not support that conclusion in this case.

The product demonstration project (the basis for Count 8) was markedly different from the evaluation board project (the basis for Counts 2, 4, and 7). The latter was a significant project that spanned several years, from November 2019 (when Illumove first sent its proposal, *see* Ex. 73) through December 2024 (when work stopped following Mr. Sadeghi's arrest, *see* Tr. 7/143 (Del Corro)). It involved all the product families in ADI's MEMS portfolio, *see* Ex. 187, Tr. 6/141-42, 161 (Beavers). In contrast, the demonstration project was a limited task with short turnaround. ADI solicited a proposal in April 2024, and Illumove finished all the work in June 2024. ADI paid Illumove about $30,000, far less than the nearly $450,000 for the evaluation project. *Compare* Ex. 179 *with* Ex. 80. Further, the Osprey product demonstration work was straightforward; it involved using a few samples to assemble a single gimbal device to show the effectiveness of the IMUs in stabilization (*i.e.*, keeping a camera steady while taking a picture). *See* Exs. 67, 96.

There was no evidence to prove where any of the related work took place. No evidence established that Abedini could not have completed the project on his own and in Switzerland, especially with the resources available at EPFL.[3] Put another way, no evidence proved that creating

---

[3] The jury could not have relied on Exhibit 181, admitted over defense objection, to find

the hardware, firmware, or software for the gimbal device would have required assistance from anyone else, much less anyone in Iran. The prosecution did not ask any witness how many people would be needed to complete the project or what special expertise would be required. *Contrast* Tr. 8/101-02 (Del Corro) (two people for evaluation board project). Nor did the prosecution present emails or metadata to show that additional people, perhaps in Iran, worked on the project with Abedini. *Contrast* Exs. 128-29, 145-46 (emails and related metadata regarding the evaluation board project); Exs. 135-36 (email with proposal and related metadata regarding GNSS/INS project). The lack of evidence about what work was done, by whom, and where is especially glaring, because Count 8 involved only three ADIS16575 samples, and from the outset, the plan was for Illumove to return them to ADI for use in product demonstrations in the U.S. *See* Tr. 7/92-93 (Thompson: samples parts that Illumove used for the gimbal device "absolutely came back to ADI" for its product demonstration).

Unlike Count 2, where the prosecution at least pointed to text messages that (according to the prosecution) suggested that Mr. Sadeghi knew that in 2022, Abedini planned to take product samples to Iran so that others could work on the evaluation board project, no similar evidence suggests that Mr. Sadeghi knew that in 2024, Abedini would take the Osprey samples to Iran for the product demonstration project. The long thread of WhatsApp messages between Mr. Sadeghi and Abedini ended by early January 2023, almost six months before the charged shipment in May 2024. *See* Ex. 206-1. And while a few messages in the Telegram thread touched on the project, there was no discussion about where Abedini was living or working in May 2024 or who, if anyone,

---

Abedini worked on the project in "Asia/Tehran" based on the apparent time-zone reference in the Teams invite. *See* Tr. 9/19 (Court: "to the extent [the prosecution is] suggesting that this is evidence at all that the meeting happened while [Abedini] was in Iran, that would be improper because [Exhibit 181] doesn't say that. And so it certainly isn't probative of that fact.").

might be helping him. *See* Ex. 205-1. Nothing in the innocuous chat permits a rational inference that Mr. Sadeghi knew and intended that Abedini would take these charged parts to Iran.

Finally, the prosecution's "summary chart" of Abedini's travel was not sufficient evidence of *Mr. Sadeghi's intent* for the purposes of Count 8. *See* Ex. 214. At trial, the chart was exposed as an unreliable farce. Many of the listed trips cannot be squared with other evidence, including multiple shipments to and from Abedini in Switzerland and numerous indicia of his life there (*e.g.*, having a child, obtaining visas and work permits, and purchasing health insurance, all in Switzerland), and the prosecution's reader witness conceded that she had not confirmed the information was correct or complete. *See* Tr. 10/94-97 (Ferrara). But even accepting the chart as accurate, it says nothing about whether Abedini took the charged Osprey samples to Iran or had any need to do so. The entries for travel from Switzerland to Iran and back in May and June 2024 do not prove, or permit any rational inference, that Abedini carried those specific parts with him on those trips (if he even traveled on those dates). Ex. 214. Such speculation about Abedini cannot be the basis for the criminal conviction of Mr. Sadeghi.

**3. The evidence failed to prove Mr. Sadeghi intended that the Osprey samples be unlawfully "exported" to Iran.**

A defendant cannot be convicted of intending to make, or causing another person to make, an unlawful export of goods from the U.S. to Iran, if the defendant did not intend that the goods at issue be "exported." Put another way, the *sine qui non* of a criminal export offense is the intent to "export" something in violation of U.S. law.

Neither IEEPA nor ITSR define what it means to "export" or "re-export" a good from the U.S. to a foreign country, *see* 50 U.S.C. § 1701 *et seq.*; 31 CFR Part 560; Tr. 3/106 (Krizek), which are technical terms with sometimes "surprising" or confusing meanings, *see* Tr. 3/174 (DeCarr). In *United States v. Ehsan*, 163 F.3d 855 (4th Cir. 1998), an IEEPA/ITSR prosecution, the Fourth

Circuit held, based on ordinary dictionaries and common-law sources, that "exportation involves the transit of goods from one country to another *for the purpose of trade*." *Id.* at 858 (citing *Swan & Finch Co. v. United States*, 190 U.S. 143, 145 (1903) ("the legal notion of exportation is a severance of goods from the mass of things belonging to this country with an intention of united them to the mass of things belonging to some foreign country")) (emphasis added); *see id.* (holding that, in U.S. legal history, "'exportation' has consistently meant the shipment of goods to a foreign country with the intent to join those goods with the commerce of that country").[4]

In *Ehsan*, the defendant shipped goods from the U.S. to the U.A.E. with the intent to then ship them to Iran. The Fourth Circuit affirmed his conviction based on evidence that, ultimately, the defendant "s[ought] a market in Iran" for the goods and "inten[ded] to join them with the commerce of Iran." *Id.* at 859. Here, in contrast, no evidence proved that Mr. Sadeghi (or anyone else) sought a "market" for ADI products or intended to "sever[]" them from "the mass of things belonging to this country" and "unit[e] them with the mass of things belonging to [Iran]." *Id.* at 858 (quoting *Swan & Finch Co.*, 190 U.S. at 145). At most, the evidence suggested that Abedini may have taken or sent to Iran some unspecified ADI parts, at some unspecified time, for some unspecified period, for some unspecified work by Illumove (or unspecified persons associated with Illumove) on the ADI project. But all the evidence established the project was *for ADI*—to help ADI market its products. And the agreements between ADI and Illumove restricted the use of any

[4] In opposing the defense's requested instruction on "export," the prosecution did not cite any contrary authority or provide any coherent reason to reject *Ehsan*. Nor did it reckon with cases that have followed *Ehsan* and adopted its definition. *See Defense Distributed v. United States*, 838 F.3d 451, 466-67 (5th Cir. 2016) (following *Ehsan* in AECA case and rejecting more expansive definition in State Department's regulations) (Jones, J., dissenting); *United States v. Potomac Nav., Inc.*, No. 08-717, 2008 U.S. Dist. LEXIS 129199, at *11-13 (D. Md. July 3, 2008) (following *Ehsan* in TCSA case and explaining, "[u]nder this understanding of the term 'export,' it is not clear whether towing [boat] to Greece for modification would be an export," even though that temporary activity would involve "sending" boat "to another country").

ADI property to that purpose only. Further, the evidence also establishes that, consistent with the overall plan, many (if not all) of the ADI parts that Illumove used for the project were shipped back from Switzerland to the U.S. *See* Exs. 122, 131.

No evidence established, or permitted any reasonable inference, that any of the ADI parts at issue were actually or intended to be introduced into the market in Iran or integrated into the trade of commerce there. An ADI part that was briefly sent or taken to Iran for use on an ADI project was no more "exported" to Iran than Mr. Sadeghi's ADI laptop which he carried to Iran so that he could do ADI work while visiting family in Iran. No evidence proved that, if Abedini took any ADI part to Iran, he left the part there, used it for any purpose other than the ADI project, or otherwise distributed, copied, or shared it.

**4. The evidence failed to prove Mr. Sadeghi acted "willfully."**

No evidence established that, whatever his involvement in ADI providing sample parts to Illumove, Mr. Sadeghi *willfully* violated IEEPA and ITSR. To convict Mr. Sadeghi, the jury had to find he "acted 'willfully,' that is, voluntarily and intentionally in violation of a known legal duty, specifically the prohibitions on exportation and re-exportation of items to Iran." *Hajavi*, 2025 U.S. App. LEXIS 13151, at *11-12; *United States v. Mousavi*, 604 F.3d 1084, 1093 (9th Cir. 2010) (holding for IEEPA violation, the prosecution must "prove that the defendants knew their actions violated the United States' embargo on transactions with Iran"); *see* 1st Cir. Pattern Crim. Jury Ins. § 2.17 (defining "willfulness"). The prosecution presented no direct evidence of Mr. Sadeghi's intent, and the meager circumstantial evidence about his limited role in shipments did not permit any reasonable inference that Mr. Sadeghi understood his conduct might violate U.S. export laws or that he deliberately sought to evade U.S. sanctions.

Based on the evidence, no rational jury could conclude Mr. Sadeghi thought that providing samples to Illumove for its work on the demonstration project violated U.S. export laws. The

critical question for the jury was not "was Sadeghi generally aware of an 'embargo' on Iran?" but "did he knew that his alleged conduct was contrary to U.S. export law?" The evidence was insufficient to answer "yes" to that question and, thus, to convict Mr. Sadeghi.[5] *See Ratzlaf v. United States*, 510 U.S. 135, 146-48 (1994) ("willful" *mens rea* requires proof that defendant knew his own conduct was unlawful, not only that bank had duty to report certain cash transactions).

The prosecution's OFAC sanctions expert, Jeremy Krizek, testified about a complete "embargo" on Iran. *See* Tr. 3/62-63, 72; *see id.* at 66 (describing an "embargo" as "prohibiting all transactions with an entire country"). DeCarr and other ADI employees gave similarly sweeping testimony about "do[ing] business with Iran." Tr. 3/154 (DeCarr: "You cannot do business with Iran . . ."); Tr. 8/73-74 (Del Corro: "Our company is not allowed to do any work with Iran."); Tr. 4/26 (Looney: "ADI's prohibited from doing business in Iran."); Tr. 7/175 (Galchev: ADI training listed Iran among "embargoed" countries and instructed that "you can[not] send anything from ADI to Iran without a license"). Even accepting that testimony, which usurped this Court's role to instruct the jury, it was insufficient, because it did not prove Mr. Sadeghi engaged in conduct that he knew violated U.S. law, whether characterized as an "embargo," sanctions, or otherwise.

As an initial matter, the "complete embargo" on Iran does not prohibit doing any business with all persons from Iran. *See* Tr. 11/30-31 (Court: it "isn't an accurate statement" to "define [Iran] to include any national of [Iran]"). Doing business with Abedini, the person, was not tantamount to doing business in Iran, the place. No witness testified Mr. Sadeghi knew, or was ever trained by ADI, that sending sample parts to Switzerland for another person from Iran (even

---

[5] To be clear, Mr. Sadeghi does not contend, and this motion does not depend on a finding, that he was unaware of any "embargo" on Iran. Nor does Mr. Sadeghi argue the prosecution must prove, as in a tax case, that he was specifically aware of IEEPA and ITSR. Rather the evidence was insufficient because it failed to prove, or permit any reasonable inference, that Mr. Sadeghi knew his conduct was "unlawful" or he acted "with a bad purpose to disobey or disregard the law."

a person with then-current connections to Iran or a company there) might violate U.S. export laws.

Although ADI employees were generally aware of the "embargo" on Iran, actual ADI training about export controls was remarkably limited. The non-disclosure agreement attached to Mr. Sadeghi's offer letter was only one of several forms for his on-boarding process, not part of any export training. *See* Exs. 48, 535. Moreover, the document mentioned EAR and ITAR (and listed Iran as a "Group E" country), but not ITSR. *See* Tr. 3/173 (DeCarr).[6] The only evidence about export training that ADI provided was a spreadsheet listing Mr. Sadeghi as one of many employees who completed a 25-minute, online training that involved clicking through various slides about general export issues and did not focus on MEMS sensors, Iran, or ITSR. *See* Ex. 77 (spreadsheet); Ex. 536 (invite and description); Tr. 3/186-87 (DeCarr).

Stray references in ADI documents and general testimony from ADI witnesses about an "embargo" on Iran was not sufficient, because as Krizek conceded, ITSR does not use that word, much less define it. *See* Tr. 3/103. Nor does ITSR define an "export" or "re-export," as Krizek also admitted. *See* Tr. 3/106. The failure to define those terms is critical, because "export" is a "technical term" under U.S. law, and its meaning can be "surprising" to a layperson. *See* Tr. 3/174 (De Carr: "Q: [Export] has a meaning [under U.S. law] that can be surprising sometimes to some people – what an export means in different contexts? A: Yes."). Krizek agreed, "when you go down into the details," or deal with "more nuances," defining what conduct may be unlawful under ITSR "can be a bit convoluted." Tr. 3/103. For example, Krizek balked at the question whether a person may take a company laptop on a personal trip to Iran, saying the person "might be able to" but he was "not 100 percent sure." Tr. 3/111. But ADI authorized Sadeghi to do just that. *See* Ex. 546.

---

[6] Mr. Sadeghi was not charged with violating EAR or ITAR, and the evidence at trial established all the ADI parts at issue in the substantive counts were "EAR99" and/or "NLR," meaning no license was required for their export to Switzerland. *See* Exs. 113, 138, 171, 177.

Further casting doubt on what Mr. Sadeghi may have known or understood, ITSR provides many exemptions, as Krizek also acknowledged. *See* Tr. 3/107-08. For example, even though the prosecution presented evidence that Sadeghi and other ADI employees sent datasheets to Abedini, implying that was somehow inappropriate, Krizek testified IEEPA itself makes clear that sending "information materials" is not unlawful. *See* Tr. 3/108. Del Corro confirmed the obvious that datasheets are simply "information," Tr. 8/151, and numerous ADI witnesses testified that it is typical ADI practice to provide non-public, pre-release datasheets to the customers and vendors under non-disclosure agreements. *See, e.g.*, Tr. 4/149 (Looney); Tr. 8/134-35 (Del Corro).

ITSR also permits, as Krizek admitted, a person to travel to Iran with various electronic devices, like laptops and cellphones, which contain numerous electronic parts, including MEMs motion sensors and IMUs. *See* Tr. 3/111-12. A person may take such devices to Iran so long as he later leaves from Iran with them. *See* 31 C.F.R. § 560.210. While that exemption is often described as a "personal use" provision, such language can be confusing, even misleading. For example, ADI authorized Mr. Sadeghi to take his work computer to Iran when he traveled there so he could do ADI work in Iran. *See* Ex. 546 (7/1/21 email from Barnes to Sadeghi). The exchange between Mr. Sadeghi and Laura Barnes, an ADI export control specialist (like DeCarr), established two important points: that Mr. Sadeghi sought to comply with the law (and to get expert guidance on doing so) and that ADI advised Mr. Sadeghi that it was appropriate to do ADI work on his ADI computer in Iran. *See id.* (advising Sadeghi to only take to Iran "what is needed" on his company laptop and, while there, to "access what [he] need[s] via VPN"). Del Corro confirmed that, when Mr. Sadeghi traveled to Iran, he remotely joined ADI meetings, something ADI employees could do with VPNs. *See* Tr. 8/125-26. No evidence indicated anyone ever told Mr. Sadeghi, or he otherwise believed, that such conduct might be unlawful.

Because Mr. Sadeghi believed in good faith that he was permitted to take his ADI laptop to Iran to do ADI work while visiting family and friends there, there was no basis for a rational jury to conclude that, at the same time, he also believed it would be unlawful for Abedini to temporarily take ADI parts to Iran to do Illumove work, so long as the end customer for the project was ADI in the U.S., and the ultimate purpose was to create products (*e.g.*, demonstration devices or evaluation boards) for ADI, not to obtain anything from ADI to use for any other purpose in Iran or by a company in Iran. *See* 50 U.S.C. § 1702(a)(3) ("good faith" immunity).

Finally, the vague but sweeping lay testimony from various ADI witnesses that the company "cannot do business *with Iran*" is unhelpful to the prosecution for yet another reason. *See* Tr. 3/154 (DeCarr) (emphasis added); *see also* Tr. 4/26 (Looney: "ADI's prohibited from doing business in Iran"). Mr. Sadeghi is charged with violating U.S. criminal law, not ADI corporate policy. DeCarr testified ADI sometimes implements export policies that are "more conservative" (*i.e.*, more restrictive) than U.S. law. *See* Tr. 3/191 (DeCarr: "sometimes," ADI "imposes restrictions on its people doing business that are even more strict than what the law requires"). Aside from DeCarr, who had no knowledge of Illumove's work, no ADI witness had expertise in export law, and their views that ADI prohibits certain activity does not establish that U.S. law forbids it—or more importantly, that Mr. Sadeghi shared such an understanding.

### B. The evidence was insufficient to find Mr. Sadeghi guilty on Count 2.

On Count 2, Mr. Sadeghi was found guilty of unlawfully exporting ten samples of ADXL382, an accelerometer, from the U.S. to Iran, through Switzerland, on or about September 29, 2022. *See* D.E. 299 ("guilty" verdict on Count 2); Ex. 113 (ADI invoice). The evidence was insufficient, however, for a rational jury to conclude that Mr. Sadeghi committed the charged offense. Specifically, the evidence failed to prove Mr. Sadeghi (1) caused or attempted to cause any other person to ship the charged ADI parts to Illumove, (2) intended those parts to be taken to

Iran, (3) intended that they be exported to Iran; or (4) acted willfully—that is, with the specific intent to violate U.S. export laws. Accordingly, a judgment of acquittal should enter on Count 2.

**1. The evidence failed to prove Mr. Sadeghi caused or attempted to cause ADI to ship the 10 ADXL382 samples to Illumove.**

The evidence did not prove—and the prosecution has never alleged—that Mr. Sadeghi personally sent the ADXL382 samples to Switzerland. Rather, the evidence proved that (1) Del Corro, who led the evaluation board project at the time, ordered the samples for Illumove, *see* Tr. 8/139-40 (Del Corro: "Q: [Y]ou were the person responsible for th[at] shipment? A: Yes."); (2) John Baviello, an ADI employee who handled shipping and logistics, processed the order, *see* Tr. 8/144 (Del Corro); Ex. 113 (ADI invoice listing Baviello under "Ship From"); and (3) FedEx delivered the package in Switzerland, *see* Ex. 115 (FedEx shipment information report). Thus, the jury apparently found that Mr. Sadeghi caused Del Corro, Baviello, or ADI itself to make the charged shipment of ADXL382 samples. But viewed in the light most favorable to the verdict on Count 2, the evidence was insufficient to support that conclusion.

The evidence established that, in 2019, Mr. Sadeghi suggested Illumove as a potential vendor for the evaluation board project. Mr. Sadeghi had a brief discussion with his boss, Galchev, and then sent a short email to him. *See* Ex. 57, Tr. 7/144-45 (Galchev: "[P]rior to this email, . . . Mr. Sadeghi had come and he had, essentially, introduced, basically, the same information to me verbally before he wrote the email."). In his email, Mr. Sadeghi provided the name and email address for Abedini, briefly described Illumove, and told Galchev: "You can take it from here." Ex. 57. A few days later, Galchev emailed Abedini to discuss "a development partner to help [ADI] in a new project." Ex. 61, Tr. 8/11. To facilitate that discussion, Galchev (for ADI) executed a non-disclosure agreement with Abedini (for Illumove). *See* Ex. 64, Tr. 8/11-12.[7]

---

[7] Long before the evaluation project began in 2021 (and even before ADI solicited

Mr. Sadeghi had suggested Illumove as a potential vendor and introduced Galchev to Abedini, but ADI also solicited formal proposals from four other vendors: 219, Accedia, KlikaTech, and MikroSystems. *See* Ex. 555. In early 2021, when the evaluation board project resumed after pandemic-related delays, Mr. Sadeghi shared all the materials from the five candidates with Mark Looney, who ran the MEMS sensors group. *See* Ex. 554.

Looney and other ADI employees, including Del Corro and Jiayuan Wang, reviewed the proposals, objectively ranked the potential vendors on multiple factors, and unanimously agreed that Illumove was the best candidate. *See* Ex. 556; Tr. 4/110-11 (Looney); Tr. 8/126-27 (Del Corro). In an email to an ADI colleague, Looney wrote, "Of the five companies that we submitted bids for, for the new evaluation platform, [Illumove] stood out and are likely to win this contract[.]" Ex. 558. No evidence indicated Mr. Sadeghi played any substantive role in ADI's selection process.

While Del Corro and Wang reviewed the proposals and ranked the vendors, Looney, Galchev, and Ian Beavers conducted additional "due diligence" about Illumove. For example, Looney spoke directly with Abedini on two calls, *see* Tr. 4/32; Galchev reviewed Illumove's website, *see* Tr. 8/112, and Beavers checked out the company's website and LinkedIn profile, which listed Abedini, linked Abedini's own profile, and noted that Abedini graduated from Sharif University, *see* Tr. 6/137, 149-54, Ex. 567. DeCarr, who works for ADI in export compliance, testified the company conducts due diligence regarding all its vendors and customers, and for that purpose, it routinely uses public information like company websites, LinkedIn profiles and other

proposals from potential vendors in 2019), ADI had previously sent many free samples to Abedini, both as a company representative of Illumove and as postdoc researcher at EPFL. *See* Ex. 537-542 (ADI records of free samples to Abedini/Illumove and EPFL); Ex. 543 (ADI records for shipments to Abedini/SDRA); Ex. 544 (ADI records for shipments to Abedini/EPFL); Ex. 547-553 (ADI records of free samples by Looney to Skaloud and Abedini at EPFL). Indeed, ADI records reflect shipments of free samples to Abedini as early as 2016, when he worked in a research lab at EPFL, and some make clear that ADI knew Abedini was associated with a company called "SDRA."

Google searches. Tr. 3/199-200; *see generally* Tr. 2/125 (Krizek: explaining OFAC guidance on best practices for U.S. companies that includes using public information, such as LinkedIn profiles and Google searches, to conduct due diligence about vendors and customers).

After reviewing proposals, ranking candidates, and conducting diligence, ADI chose to work with Illumove. The evidence proved Looney made that "final decision."

> Q: [B]ased on your review of this information that Mr. Sadeghi provided to you [*i.e.*, vendor proposals and ADI evaluation], you concluded, in your own opinion, that Illumove was the best vendor for the project?
>
> A: I did.
>
> Q: Okay. And you ultimately made the final decision for the company?
>
> A: Yes.

Tr. 4/111 (Looney). That decision reflected Looney's "own independent view that [Illumove] [w]as . . . the best vendor for this project." Tr. 4/117. In fact, as Looney wrote in a contemporaneous email to an ADI colleague who had asked about Illumove, Mr. Sadeghi "ha[d] gone out of his way" *not* to influence ADI's vendor decision and to ensure that the company's selection process was objective. *See* Ex. 558 ("Mahdi has a relationship with the founder [of Illumove], but in my view, Mahdi has gone out of his way to disclose that relationship and to avoid giving [Illumove] unmerited favor in this process.").

After Looney made the final decision for ADI to work with Illumove, Beavers handled the official paperwork. Beavers sent the statement of work, nondisclosure agreement, and consulting agreement to Illumove and executed all those documents for ADI. *See* Ex. 96 (statement of work), Ex. 513 (nondisclosure agreement), Ex. 514 (consulting agreement), Tr. 6/155. Mr. Sadeghi did not sign the statement of work or any of ADI's contracts with Illumove for the project.

At higher corporate levels, up to and including a Vice President, ADI approved the contract that Beavers (for ADI) and Abedini (for Illumove) executed. The "approvers" included Looney

along with Stephen Warde, Benjamin Annino, and Yasmine King. *See* Ex. 560; *see also* Ex. 557 (Gibson: "I would like to get this moving ASAP," and Annino: "Green light from my standpoint"). In addition to these ADI executives, several key departments at ADI, including legal, financial, and export compliance, all approved the engagement of Illumove as an outside vendor for the evaluation board project. *See* Tr. 4/133-34 (Looney); Tr. 6/155-56 (Beavers). Mr. Sadeghi did not approve the contracts between ADI and Illumove, nor was his approval even required. *See* Tr. 4/134-35 (Looney: "Mahdi Sadeghi is not listed [on Ex. 560] as an approver of this contract, is that right? A: That's correct. Q: And, in fact, his approval wasn't required for this contract to go into effect on behalf of ADI? A: To my understanding, his approval was not required.").

After the contracts were signed, other ADI employees led the project. Initially, Beavers was "the primary interface" for ADI with Illumove and reported to Looney, not Mr. Sadeghi. *See* Ex. 96 (SOW identifying Beavers as lead); Tr. 6/149, 158 (Beavers). Later, after Beavers left ADI in early 2022, Del Corro took over, and he also reported to Looney, not Mr. Sadeghi. *See* Tr. 8/127-128 (Del Corro). Both Beavers and Del Corro worked regularly and directly with Abedini, not through Mr. Sadeghi; neither typically included Mr. Sadeghi when meeting or emailing with Abedini about the project. *See* Tr. 6/158-59 (Beavers); Tr. 8/128-30 (Del Corro).

As the project leads, Beavers and Del Corro were responsible for all the charged shipments of free samples to Illumove in Switzerland for its use in designing the new evaluation board, including the shipment on or about September 29, 2022, which was the basis for Count 2. *See* Ex. 113 (ADI invoice), Ex. 190 (ADI chart of charged shipments listing other employees, not Mr. Sadeghi, as "initiators"). Del Corro unequivocally testified that, every time when he sent sample parts to Illumove for the project, including the charged shipment on or about September 29, 2022, he was "the person responsible for those shipments" by ADI, not Mr. Sadeghi. *See* Tr. 8/144-45.

Moreover, as a matter of company policy, export compliance personnel reviewed and approved all the shipments to Illumove. *See* Tr. 3/198-99 (DeCarr).

Put simply, the evidence proved other ADI employees—*not Mr. Sadeghi*—chose to work with Illumove as a vendor on the evaluation board project, entered contracts with Illumove for that purpose, and shipped sample parts to Illumove to create a new marketing tool for ADI to use with its own customers. Considering that evidence and drawing all reasonable inferences in favor of the prosecution, no rational jury could have concluded that Mr. Sadeghi caused anyone else or ADI to ship its parts from the U.S. to any other country, much less to Iran. Indeed, the evidence powerfully refuted that false allegation.

Del Corro's non-responsive answer to the prosecution's hypothetical question ("if you had known . . .") does not alter the analysis. His limited testimony was insufficient to prove Mr. Sadeghi caused ADI to make the charged shipment. The three-question colloquy went as follows:

> Q: In your conversations with Mr. Sadeghi about Mr. Abedini and Illumove, did he ever mention another company, Sanat Danesh Rahpuyan Aflak?
>
> A: No.
>
> Q: What, if anything, did he say about Mr. Abedini's connection to a company in Iran?
>
> A: He didn't mention to me any of that.
>
> Q: *Would that have had any impact on your ranking?*
>
> > Defense counsel: Objection, Your Honor.
> >
> > Court: I'll allow it.
>
> A: *Our company is not allowed to do any work with Iran.*

Tr. 8/73-74 (emphasis added). For numerous reasons, Del Corro's terse response falls far short of sufficient evidence to convict Mr. Sadegh of a substantive IEEPA violation.

First, Del Corro's testimony did not actually answer the question. The prosecution asked,

"Would that [*i.e.*, Mr. Abedini's connection to a company in Iran] have had any impact on your ranking [of potential vendors for the project]?" Del Corro responded: "Our company is not allowed to do any work with Iran." He did not testify about his "ranking" of vendors or the "impact" of any possible additional information on those rankings.

Second, Del Corro's response, even if accepted as true, was a *non sequitur*. ADI never contracted with SDRA in Iran. It hired Illumove in Switzerland. The contracts for the project, which were all standard ADI agreements, required Illumove to comply with U.S. export law and to keep confidential any propriety information from ADI. *See* Exs. 513, 514. The single sentence of testimony from Del Corro did not establish that, if he had known Abedini was "connect[ed]" both to Illumove in Switzerland and also SDRA in Iran, ADI would not have hired Illumove for the project, or even that Del Corro himself would have ranked Illumove lower on objective factors such as cost, familiarity with ADI products, and ability to perform all parts of the project.

Third, whatever Del Corro might have done if he had known more about Abedini, he was not the decision-maker. Looney made the "ultimate decision" to hire Illumove, and Looney did so because, in his view, they were the best candidate. In his email to a colleague, Looney reported:

> I have just started my relationship with Illumove, but so far, I am pretty impressed. Of the 5 companies that we submitted bids for, for the new evaluation platform, they stood out . . . . As part of this process, I am hoping to build stronger familiarity with the capability and hope that we might be able to grow this into a possible third-party partner. . . . [Illumove is] already familiar with our products (both components and IMUs) and our competitors. . . . I was impressed with [Abedini's] knowledge and how easy he was to talk to.

Ex. 558 (internal numbering omitted). No evidence showed, or permitted a reasonable inference, that if Looney had known that Abedini (like Mr. Sadeghi) was from Iran, had gotten his Ph.D. there, or had a "connection" to an Iranian company, his views about Illumove would have changed.

Finally, the premise that Mr. Sadeghi's initial "introduction" of Illumove as a potential vendor in 2019 was the "cause" of ADI's later activity with Illumove—or specifically, ADI's

shipments of free samples to Illumove in 2022, more than three years later, stretches the concept of "causation" beyond its breaking point, particularly where the question is whether Mr. Sadeghi is criminally responsible for the actions of other ADI employees. The prosecution called seven witnesses from ADI, but it asked this "causation" question only to Del Corro—not Looney, who decided to hire Illumove. And after getting an ambiguous response from Del Corro, the prosecution chose not to follow up, leaving the record ambiguous and, thus, insufficient to establish causation.

**2. The evidence failed to prove Mr. Sadeghi intended the ADXL382 samples to be sent or taken to Iran.**

At trial, the prosecution cast the evaluation board project as encompassing all of ADI's many motion sensors and tried to show ADI either had provided or planned to provide most (if not all) of its sensors to Illumove for work on the project. For example, the prosecution showed numerous ADI witnesses the ADI chart of its product families (or various slightly different versions of it). *See, e.g.*, Ex. 67 at 8 (including Calypso, which ADI abandoned); Ex. 187 (replacing Calypso with Falcon); Tr. 6/141 (Beavers: "These are the groups of a product family . . . that were part of the project that Illumove was going to work on.").

But Count 2 concerned only 10 samples of ADXL382, an accelerometer used primarily by industrial customers for vibration sensing in condition monitoring. Although the prosecution suggested Abedini must have taken these specific parts to Iran for work on the evaluation board project, no direct evidence proved that speculative contention. And the circumstantial evidence did not permit it. *See Spinney*, 65 F.3d at 234 (holding sufficiency review requires "reject[ing] those evidentiary interpretations and illations that are unreasonable, unsupportable, and overly speculative" and emphasizing "[t]his function is especially important in criminal cases, given the prosecution's obligation to prove every element of an offense beyond a reasonable doubt"). More importantly, no evidence proved Mr. Sadeghi intended for Abedini to take these parts to Iran.

Del Corro testified he thought Abedini was likely working with at least one other engineer on the evaluation project. *See* Tr. 8/101-02 (Del Corro: "Q: [H]ow many individuals would you expect Mr. Abedini would need to be completing the evaluation board project on his team? A: One person working on the hardware, and at least another person working on the software and firmware."). But that did not prove Abedini had a "team" in Iran. The other engineer could have been Mostafa Khosrownejad, who lived in Switzerland, earned his Ph.D. at EPFL, *see* Ex. 38 at 15, and signed Illumove's proposal to ADI, *see* Ex. 93. Because Del Corro never interacted with anyone else from Illumove (other than Abedini), *see* Tr. 8/101, he could not testify that Abedini was, in fact, working with other people, much less identify any other person or say where he may have been located (in Switzerland, Iran, or elsewhere). *See* Tr. 8/101.

Similarly, the FBI forensic examiner, Christopher Beckstrom, testified that metadata associated with several files sent by Abedini to Del Corro had "authors" fields with different names (*e.g.*, Vahid Khodaei and Arman Ilmak). *See* Ex. 145 (8/16/23 email from Abedini to Del Corro) and Ex. 146 (associated metadata); Ex. 151 (9/12/23 email from Abedini to Del Corro) and Ex. 152 (associated metadata). But on cross-examination, Beckstrom conceded the critical limitations of his testimony.

> Q: [T]he metadata here [*i.e.*, Ex. 152] indicated the author of the document is Arman Ilmak, right?
>
> A: That is correct.
>
> Q: You don't know who that person is?
>
> A: I do not.
>
> Q: You know if that's the person who actually created the document, right?
>
> A: That is correct. . . .
>
> Q: And *there is no indication of where this person is located, right?*

A: *That is correct*.

Tr. 5/168 (emphasis added).

Moreover, the ambiguous metadata evidence had no apparent connection to the charged shipment of ADXL382 samples. Of the four metadata exhibits, only one concerned ADXL382. *Compare* Ex. 121 (ADXL382) *with* Ex. 128 (ADXL317), Ex. 136 (GNSS/INS proposal), and Ex. 146 (MCB tester proposal). The problem for the prosecution is that the charged shipment of ADXL382 was sent by ADI on or about September 29, 2022, *see* Ex. 113, and a later, uncharged shipment of the same part was sent on October 21, 2022, *see* Ex. 118. The metadata file that, according to the prosecution, indicates "Arman Ilmak" asked questions about ADXL382, *see* Exs. 120, 121, was dated November 4, 2022, after the second shipment of ADXL382 samples. The rational inference from the chronology is that the questions Abedini sent to Del Corro concerned the later, uncharged shipment, which ADI sent to Illumove about 10 days earlier.

The prosecution cannot fill this fatal hole in its case by pointing to generic testimony that a person would likely need ADI parts "in hand" to do certain work or ask certain questions. Such evidence does not permit the necessary inference with regard to Count 2, which relates solely to ADXL382 samples. The prosecution tried this gambit with Del Corro, when it asked about a single email that Abedini sent to about "spikes on the data stream of ADXL100x." Ex. 117 (10/21/22 email from Abedini to Del Corro). Del Corro's limited testimony was insufficient to make the prosecution's broader case. In response to leading question, Del Corro merely testified: "You need to—to have the device to discern if it's a problem from the device." Tr. 8/94. That comment concerned ADXL100x, which is *not* the charged parts in Count 2.[8] The prosecution did not ask

[8] Even assuming someone needed the ADXL100x to raise the question in the email, there is no evidence about who that person was or where he may have been working. A rational jury could not simply assume an unidentified person *in Iran* had that part in his hands, much less the specific parts that are the basis of the substantive charges against Mr. Sadeghi. That guess would

any similar question to Del Corro about ADXL382. For example, it chose not to ask whether a person would need those parts "in hand" to come up with the questions in Exhibits 120 and 121.

Finally, the speculative notion that other people must have been working on the evaluation board project and that those people must have been *in Iran* because Abedini was from Iran, traveled there, and was connected to SDRA, was insufficient to sustain a conviction. The prosecution's first witness, Mehdi Aghalgozadeh, confirmed that, for tech start-ups, like Tacit Motion in the U.S. and Illumove in Switzerland, "remote distributed work is not unusual," as people can easily collaborate online and work across borders. *See* Tr. 2/32-33 (Aghagolzadeh). Not only can people work in disparate locations, but they can move from place to place during the course of their employment.

The only evidence that linked Ilmak, Khodaei, and Rezavi to SDRA or any activity in Iran was the translated "bank statement" that the prosecution introduced over the defense's objection. *See* Ex. 222-1. That document failed to close the loop:  it indicated only that the three individuals received "salary" from SDRA between May 2021 and March 2022; the relevant entries end more than six months before the charged shipment, so they cannot establish any of those people received payments from SDRA in September 2022. Regardless, the document lists payments but provides no evidence about what these individuals may have done or where they may have lived or worked. Nor does it prove that, during the same period, they did not also work for another company.

In its effort to prove that Mr. Sadeghi knew that Abedini would take the ADXL382 samples to Iran, and that Mr. Sadeghi intended that to happen, the prosecution relied heavily on the WhatsApp messages on September 26 and 27, 2022. *See* Ex. 206-1. In that discussion, Mr. Sadeghi told Abedini that ADI wanted to add ADXL380/2 to the first release of the evaluation board, which was then scheduled for completion by the "end of October."

---

be no more plausible than the assumption a person may have been at EPFL or anywhere else.

According to the prosecution's translation, Mr. Abedini wrote: "I am boarding the airplane right now to go to Switzerland. I will be there for one week. It would be great if you could send the samples tomorrow so I get them while I'm there. . . . If I'm not there to take delivery of it [them] myself, get it to Iran will become an issue again." Mr. Sadeghi responded: "I just spoke to Pablo. We agreed that you will do 380/2 instead of 317. . . . He will send you the sample. . . . He is supposed to send it today."

These messages are ambiguous[9], but even reading them in the light most favorable to the verdict, Abedini's statements reflect only his intent, not Mr. Sadeghi's. For his part, Mr. Sadeghi's texts said nothing about Abedini's travel or any plan to take the ADXL380/2 samples to Iran, even temporarily. Further, the evidence established that, whatever Abedini said in WhatsApp messages, Mr. Sadeghi had reason to believe that Abedini, in fact, stayed in Switzerland through October and November 2022. For example, Abedini received a subsequent (uncharged) shipment from Del Corro in Switzerland on October 21, 2022, *see* Ex. 118, and he sent a package back to Del Corro from Italy on November 11, 2022, *see* Ex. 122. Even assuming Mr. Sadeghi had reason to know Abedini might take the parts to Iran, he did not cause the shipment by ADI to Illumove to Switzerland, nor did he have any legal duty to stop it.

The subsequent WhatsApp messages about "the boards" that Illumove had created are similarly ambiguous. According to the prosecution's translation, on November 1, 2022, Abedini wrote: "When I was in Switzerland, I sent Pablo two boards. I had checked the boards initially and they worked properly. Of course, we had not activated all the features of the board at that time, so I can't say for certain that everything worked well." He continued: "The boards don't work

[9] For example, Khamooshi conceded he added words in his "translations" to render what he considered to be meaningful interpretations, and even with his alterations, the references to "them" (as in "so I get them") and "it" (as in "delivery of it") do not match. Tr. 6/80-82.

properly right now. It seems to have a hardware bugs. We have two boards here that are exactly the same as those and they are working." To state the obvious, the first message makes clear that Abedini had at least some "boards" in Switzerland. But the prosecution contends that, in his second message, "here" refers to Iran, meaning that he had other "boards" there. *See* Tr. 11/79-80 (closing). Even assuming that is correct, the discussion concerned the evaluation boards themselves, which Illumove was creating, not the motion sensors, which ADI was providing as test samples. Neither Abedini nor Mr. Sadeghi mentioned the charged parts—the ADXL382 samples—or said anything about working with them in Iran. As Beavers testified, with regard to the boards (the motion capture board, evaluation board, and breakout board), Illumove was obtaining those parts on its own, from various sources (including in China), not getting them from ADI. *See* Tr. 6/178-81 (Beavers). If Illumove purchased parts on the global market to build the boards in Iran, which it would have been relatively easy to do, *see id.*, that would not prove Mr. Sadeghi intended the ADXL382 samples would be sent or taken to Iran to test the boards.

**3. The evidence failed to prove Mr. Sadeghi intended that the ADXL382 samples be unlawfully "exported" to Iran.**

As explained above, *see* Argument I.A.3, *supra*, no evidence established Mr. Sadeghi intended to "export," or cause anyone else to "export," the ADXL382 samples to Iran for purposes of trade in Iran or to be integrated into the market for goods there. To the contrary, the evidence established ADI provided the samples to Illumove to install in prototype evaluation boards and then, a few weeks later, return them to ADI to be tested and used in the U.S. Even assuming that Abedini (or anyone else) may have temporarily taken or sent the samples from Switzerland to Iran, no evidence established Mr. Sadeghi or Abedini intended that the parts would be used for any reason other than creating evaluation boards for ADI. In other words, the evidence refuted the suggestion—and did not permit any reasonable inference—that Mr. Sadeghi or Abedini sought a

market for ADI's parts in Iran or planned to use them there for some other purpose.

**4. The evidence failed to prove Mr. Sadeghi acted "willfully."**

No evidence established that, whatever his role with Del Corro, Baviello, or ADI in sending ADXL382 samples to Illumove, Mr. Sadeghi *willfully* violated IEEPA and ITSR. As explained concerning Count 8, *see* Argument, I.A.4, *supra*, the prosecution failed to prove Mr. Sadeghi thought his conduct violated U.S. law. The absence of evidence about Mr. Sadeghi's *mens rea* is especially stark for Count 2, because the evidence proved ADI executives approved the ADI contract, *see* Exs. 557, 560; the compliance group approved the project (including information sharing with Illumove through SharePoint), *see* Tr. 6/155-56, 167-71 (Beavers), Ex. 570; *see generally* Tr. 3/180-81 (DeCarr); and the relevant agreements obligated Illumove to use ADI materials only for the project and to comply with all U.S. laws, *see* Exs. 513, 514.

**C. The evidence was insufficient to find Mr. Sadeghi guilty on Count 1.**

On Count 1, Mr. Sadeghi was found guilty of conspiring with Abedini to violate IEEPA and ITSR. *See* D.E. 299 ("guilty" verdict on Count 1). The evidence was insufficient, however, for a rational jury to conclude beyond a reasonable doubt that either Mr. Sadeghi or Abedini intended to violate U.S. export laws or that they agreed to accomplish that unlawful objective. Accordingly, a judgment of acquittal should enter on Count 1.

**1. The evidence failed to prove Mr. Sadeghi joined any criminal conspiracy to violate U.S. export laws.**

Given the jury's guilty verdicts on substantive Counts 2 and 8, charging specific shipments, it was not surprising that the jury convicted Mr. Sadeghi of Count 1, which charged him with the conspiracy. While a jury could in some cases theoretically find sufficient evidence of conspiracy despite acquittal on the related substantive counts, that possibility is vanishingly unlikely given the trial evidence. Accordingly, acquittals on Counts 2 and 8 also require acquittal on Count 1.

As explained above, no evidence established that Mr. Sadeghi willfully violated IEEPA or ITSR or caused any violation of those export laws. Absent that intent, Mr. Sadeghi cannot be guilty of the charged conspiracy. But Count 1 fails for a further reason: the evidence, viewed in the light most favorable to the prosecution, did not prove that Mr. Sadeghi intentionally conspired with Abedini (or anyone else) to accomplish that unlawful objective.

To convict Mr. Sadeghi on Count 1, the prosecution was required to prove he had (1) the "intent to agree" with Abedini to violate U.S. export laws and (2) the "intent to effectuate the commission of the substantive offense." *United States v. Piper*, 35 F.3d 611, 615 (1st Cir. 1994); *see United States v. Ledee*, 772 F.3d 21, 32 (1st Cir. 2014) ("To sustain a conspiracy conviction, the government must show that the defendant knowingly agreed with at least one other person to commit a crime, intending that the underlying offense be committed.").

As this Court instructed the jury, "[m]ere similarity of conduct among various persons, and the fact that they may have associated with each other, may have been together and discussed common interests is not sufficient to establish membership in a conspiracy." *United States v. Rose*, 104 F.3d 1408, 1416 (1st Cir. 1997); Tr. 11/170-71. It is also well-established that "[m]ere presence at the scene of a crime is insufficient to prove membership in a conspiracy." *United States v. Ocampo*, 964 F.2d 80, 82 (1st Cir. 1992). "Mere presence at the scene" and "close association with those involved" are "relevant" but "insufficient" for a conspiracy conviction. *United States v. Andujar*, 49 F.3d 16, 21 (1st Cir. 1995). Even if "it is a fair inference that the defendant *knew* what was going on," that is "not enough to establish *intent* to conspire." *Ocampo*, 964 F.2d at 82.

At trial, the evidence established Mr. Sadeghi wanted to be (and was) a productive, successful ADI employee. He contributed to the evaluation board project, because he, like his many ADI colleagues, believed the project would benefit the company, improve its marketing, and

generate millions in revenues. *See* Ex. 95, Tr. 4/121-25 (Looney: "Q: [T]hat was true of lots of people at ADI, right? Lots of people at ADI, including yourself, wanted this project to succeed? A: Yes."). To the extent that Mr. Sadeghi encouraged Abedini to submit a proposal, or helped him to improve Illumove's proposal, that conduct was consistent with typical business practices at ADI and, in any event, done at a time when Abedini was living primarily in Switzerland with his family. *See* Ex. 214 (Abedini travel chart showing that, from August 2019 to August 2021, he spent more than 85 percent of his time living in Switzerland); Ex. 220-1 (ledger showing Illumove purchases of insurance in Switzerland for Abedini and his family).

Evidence about earlier activities, such as Mr. Sadeghi's trip in 2017 to Iran (and his supposed visit to one of SDRA's offices) did not prove any decade-long conspiracy, as the prosecution claimed. *See* Tr. 11/50 (closing). That trip occurred two years before Mr. Sadeghi joined ADI and Illumove submitted its initial proposal for the evaluation board project in 2019 and four years before ADI decided to hire Illumove as a vendor in 2021. No evidence identified Abedini in the photographs from Mr. Sadeghi's phone or any other individual as someone who, many years later, may have worked on the evaluation project. *See* Ex. 211. Similarly, Mr. Sadeghi's Digi-Key order in 2016, for parts to be delivered to his home in Natick, did not prove that he and Abedini agreed to send those parts (or any others) to Iran. *See* Ex. 18-1. Although the prosecution heavily emphasized the references to "SDRA" in the Digi-Key invoice, *see* Tr. 11/143 (closing: "as early as December of 2016, the defendant was facilitating getting parts to Mr. Abedini in Iran"), no evidence established who entered those references, why or what they might mean. Further, no evidence established that the parts at issue—2 pieces of an amplifier that cost less than 40 dollars and 50 pieces of an inductor that cost less than a nickel each—ever went to Iran. The notion that Mr. Sadeghi and Abedini had a criminal conspiracy to export 5 dollars of inductors, technologically

basic and readily available parts, from the U.S. to Iran is absurd. Critically, in 2016, Mr. Sadeghi was busying trying to start Tacit Motion in the U.S., and Abedini was doing his post-doc at EPFL. Indeed, the evidence established that in 2016, ADI itself sent many free samples to Abedini at EFPL for "SDRA," Ex. 543 (ADI shipments to Abedini for "SDRA" at EFPL in 2016), and the prosecution never suggested those shipments were unlawful exports destined for Iran.

Even assuming the evidence proved that Abedini wanted to unlawfully export goods from the U.S. to Iran, it did not permit a reasonable inference that Mr. Sadeghi shared any such criminal intent. At worst, Sadeghi may have been indifferent to possibility that Abedini would take sample parts to Iran (if only temporarily and to complete work as a vendor for ADI), but that does not establish he willfully joined a criminal conspiracy with Abedini violate U.S. export laws.[10]

While motive is not an element of the charge offenses, the absence of evidence that Mr. Sadeghi had any motive to conspire with Abedini to violate U.S. export laws is itself powerful proof that he lacked the requisite intent—evidence that a rational jury could not properly ignore. *See United States v. Medina*, 155 F.4th 11, 21 (1st Cir. 2025) (holding "evidence of motive may aid in the termination of [defendant's] state of mind or his intent"). Here, no evidence even hinted at any motive for Mr. Sadeghi to agree with Abedini to violate U.S. export laws. For example, no evidence established Mr. Sadeghi received greater compensation from ADI based on the work that Illumove performed or any secret payments or kickbacks from Abedini. To the contrary, as a willful conspirator, Mr. Sadeghi would have deliberately risked his livelihood, career, liberty, and life in the United States by supplying Abedini with a relatively small quantity of ADI sample parts, many

[10] Even if the prosecution could have proven Mr. Sadeghi was willfully blind to Abedini's intent, that would have only established Mr. Sadeghi's knowledge, not his intent. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766-68 (2011). A conspiracy conviction "requires an intent to join the conspiracy, and that is not established by willful blindness." *United States v. Lizardo*, 445 F.3d 73, 75-86 (1st Cir. 2006); *see also* 1st Cir. Pattern Crim. Jury Ins. § 2.16.

of which were pre-release prototypes that were not fully functional, which ADI would have otherwise discarded; which Abedini could have obtained from many other sources, including a research lab at EPFL; and which, typically, Abedini had to return to ADI in the US.

**2. The evidence failed to prove Abedini intended to violate U.S. sanctions.**

At trial, the prosecution argued Abedini sought to illegally obtain goods from the U.S., but no witness testified about Abedini—and, critically, his alleged intent to violate IEEPA and ITSR. Nor did the prosecution present any documents that revealed his intent. Most of the documents related to Abedini, including emails and texts, said nothing about U.S. sanctions or plans to evade them. Tellingly, in hundreds of texts over several years, Abedini never mentioned U.S. sanctions in his discussions with Mr. Sadeghi, notwithstanding the fact (which the prosecution emphasized in its opening) that they used "encrypted communications." Tr. 2/32, 34, 38, 39. Indeed, only two documents connected to Abedini even mentioned sanctions or export restrictions. But they did not come close to proof beyond a reasonable doubt that Abedini intended to violate U.S. export law.[11]

First, in 2013, three years before the prosecution contends that the charged conspiracy began, Abedini contacted ADI to ask for a quote on parts. *See* Ex. 224. In his email, Abedini truthfully stated that he was a Ph.D. student in Iran and that he wanted parts from ADI for his thesis research. Abedini did not hide his name, nationality or location. It is not rational to infer that Abedini kicked off a decades-long sanctions-busting conspiracy by directly emailing ADI and asking the company to send him parts in Iran. In response, ADI advised Abedini that it could not

[11] In considering Abedini's intent regarding U.S. export laws, a rational jury, which followed this Court's instructions, could not have relied on the draft document, named "agreement initial," that was found in an archive file associated with Khosrownejad's Google account. *See* Ex. 105-1; Tr. 6/45 (Beckstrom). That document was admitted, over the defense's objection, and subject to a limiting instruction that it could be considered not for the truth of the matter and only as evidence of Khosrownejad's intent. *See* Tr. 5/227 (Dolan: "[T]he government is not at this point seeking to admit [Ex. 105/105-1] as a co-conspirator statement, but merely to show Mr. Khosrownejad's intent."); Tr. 10/181 (admitting Ex. 105-1 subject to limiting instruction).

provide him with "the product and/or information [he] requested" in Iran, but it did not reference IEEPA or ITSR. To the extent, ADI referenced "U.S. export laws," it misstated the applicable rules; for example, ADI told Abedini that it could not provide "information," about its products or prices, even though IEEPA expressly permits the export of "information," even to Iran. 18 U.S.C. § 1702(b). Moreover, ADI never told Abedini that it could not provide product samples to him in Switzerland; that fact is critical, because as the evidence establishes, ADI did just that a few years later, in 2016, when it sent numerous free samples to Abedini at EPFL. *See* Ex. 543.

Second, in 2014, two years before the conspiracy supposedly started, Abedini emailed a "Business Plan" to another individual, H.S., whom the prosecution never identified. *See* Ex. 2-1. The email includes no text, only an attachment. No evidence establishes who created the attachment, why Abedini sent it to H.S., or if anyone acted on the purported "plan." Even assuming the document reflects Abedini's intent to start a business, it does not establish his intent to violate U.S. sanctions. In two places on a single page, the document refers to sanctions generally, but not ITSR or any other U.S. law specifically. And it only refers to sanctions as an "important risk" for a new company in Iran. That, of course, does not mean the contemplated company planned to violate sanctions. It would be irrational, for example, to infer that by identifying "taxes" as a business risk in SEC filings, a public company is announcing its intent to commit tax fraud. The document states that, to address "sanctions," the new entity will try to obtain parts from "low level sources." A few pages later, the document refers "the Chinese sellers in this field," not name-brand U.S. companies, like ADI (which the document does not mention at all).

Finally, the fact that Abedini established a start-up in Switzerland, initially called the company SadraLabs, *see* Exs. 38, 41, and later changed its name to Illumove, *see* Ex. 88, did not prove that he intended to use the Swiss company, under any name, to violate U.S. sanctions.

Neither Abedini nor Khosrownejad, the co-founder of company, hid the connection between SadraLabs and Illumove. In his email to an unidentified local Swiss official, Khosrownejad wrote: "We were contacting you with the name Sadralab [but] we have incorporated our company with the name Illumove SA." *Id.* He asked the local official "to contact us from now on with the name Illumove SA," because "Sadralab is not anymore then name of our company." *Id.* And the evidence provided an innocent explanation for the name change: by the time Abedini got around to registering the domain name, another entity (or person) had already bought "SadraLabs.com." Ex. 205-1 at 88. Further, long before Abedini launched Illumove, ADI knew he was associated with "SDRA," because as early as 2016, when Abedini was a postdoc at EPFL, ADI had shipped many free samples to Abedini, as the representative of "SDRA" in Switzerland. *See* Ex. 543.

The evidence was extensive and undisputed that it was easy for Abedini and Illumove to obtain electronic components, including ADI parts, on the global markets. For example, Galchev testified resellers in China sold ADI parts below ADI prices, *see* Tr. 8/31-32, and Looney testified ADI parts were available on black markets, *see* Tr. 4/142-43. Given the ready availability of ADI parts, real and fake, the only rational inference was that Abedini intended to run a successful start-up focused on fusion algorithms, not to use Illumove as a "front" for SDRA or vehicle to violate IEEPA and ITSR to obtain electronics that he already possessed or had access to.

Nevertheless, despite such evidence, the prosecution falsely argued in closing that Abedini needed to work on the evaluation board project with ADI to obtain "pre-release parts." Tr. 11/142. That assertion was false; no evidence supports it, and internal ADI emails refuted it. *See* Ex. 558 (email discussing pre-release Raptor samples). More generally, the prosecution falsely argued Abedini needed access to "ADI engineers [and] know-how." T/11/149. To the contrary, as the evidence proved, Illumove sold its expertise *to ADI*. *See* Ex. 72 (describing Illumove's "unique

collection of expertise and experience"); Ex. 186 (arrest video at 28:02-10) (describing Abedini as expert in fusion algorithms); Tr. 8/74 (Del Corro: Illumove had "expertise . . . developing all the parts that w[ould] make up the system" for the evaluation board project); Tr. 8/114 (Del Corro: Abedini was "helping [ADI], creating . . . a software that will test each individual part or system from the motion capture board to verify the board was fully functional"); Tr. 2/113 (Aghagolzadeh: for TMI, the fusion algorithms were "done by Mohammad Abedini"). Thus, ironically, the flow of "know how" between engineers was always from Iran to the U.S., not the other way around.

## II. This Court should order a new trial.

### A. The prosecution's disruptive objection and the resulting impairment of the defense's closing argument warrant a new trial.

During the defense's closing argument, the prosecution objected to counsel's use of excerpts of official trial transcripts in a PowerPoint presentation. Tr. 11/101. A copy of the slide deck is attached as Exhibit A. After pausing the closing and convening a sidebar, this Court barred counsel from showing transcript excerpts, but it permitted counsel to read parts of the witness testimony. Tr. 11/103. The prosecution's objection was baseless,[12] and respectfully, this Court's in-the-moment ruling was an abuse of discretion. The disruption and impairment of the defense's closing argument warrant a new trial.

"There can be no doubt that closing argument for the defense is a basic element of the adversary factfinding process in a criminal trial." *Herring v. New York*, 422 U.S. 853, 858 (1975) (holding that denial of right to summation violated constitutional right to assistance of counsel). "In a criminal trial, which is in the end basically a factfinding process, no aspect of such advocacy could be more important than the opportunity finally to marshal the evidence for each side before

[12] The prosecution had no basis to think any of the Reporter's official transcripts were inaccurate, and it had declined the (pretrial) invitation to share the cost of daily copy, which Mr. Sadeghi paid, precisely because of the expected value for use in closing argument. Tr. 11/104.

submission of the case to judgment." *Id.* at 862. "[I]t is only after all the evidence is in that counsel for the parties are in a position to present their respective versions of the case as a whole." *Id.* Accordingly, "interruptions of arguments, either by an opposing counsel or the presiding judge, are matters to be approached cautiously." *United States v. Young*, 470 U.S. 1, 13 (1985).

That was especially true here because the prosecution presented much of its case through a forensic expert, a Farsi translator, and two FBI "readers," who had no knowledge of the case, rather than the case agent, who was present in courtroom during the trial. As this Court observed:

> I do find, for myself, the difficulty of . . . the presentation this way is it is a fairly confusing story with a lot of different numbers and parts and so forth. So I think the closing will—I think the jury will be hanging on every word of both of you on—both side on the closing to try to figure out what the case is about.

Tr. 6/189-90. "And for the defense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt." *Herring*, 422 U.S. at 862.

To be sure, a trial court has "great latitude in controlling the duration and limiting the scope of closing summations." *Id.* But at the same time, the "Constitutional right of a defendant to be heard through counsel necessarily includes his right to have his counsel make a proper argument on the evidence and the applicable law in his favor . . . unless he has waived his right to such argument, or unless the argument is not within the issues in the case, and *the trial court has no discretion to deny the accused such right*." *Id.* at 860 (emphasis added).

Counsel plainly may summarize, quote, and comment on testimony and exhibits admitted at trial and ask the jury to draw reasonable inferences from the evidence and testimony. Displaying excerpts of official verbatim transcripts is the most faithful and effective form of quoting the record because it cannot misstate the witness testimony. Indeed, the use of transcript excerpts in closing arguments is commonplace and has been widely taught for many years as a "best practice."

For example, Judge Saylor has admonished that "[g]iving a closing argument with just

spoken words is giving yourself a huge handicap—don't do it." F.D. Saylor, IV, and D. Small, "Storytelling in Closings," *Mass. Lawyers Weekly* (Apr. 26, 2018).

> Be creative in finding ways to show your story. The choices can vary widely depending on the available courtroom technology, and case budget but may include: Transcript excerpts—Key excerpts from testimony—either deposition or trial, if transcripts are available—can be blown up, highlighted, even summarized . . . .

*Id.*; *see also* N. Weatherford, "Delivering a Powerful Closing Argument," *Advocate Mag.* (2024) ("You do not need the trial court's or opposing counsel's permission to display any part of the trial testimony to the jurors during closing argument. Reading trial testimony during closing is effective but can be boring. The better practice is to display the testimony electronically during your closing."); M. Kelleher, "The Trial Transcript—The Most Important Document in Your Case," *Cogent Legal Blog* (2017) ("The best trial attorneys quote liberally from the transcript in closing argument. Particularly in a long trial, you need to remind jurors of the key evidence they heard and how it leads to the verdict you want . . . When you show trial testimony on a closing slide, using a photograph of the witness will help remind the jury of the witness and the testimony.").[13]

In *United States v. Gonzalez-Perez*, 778 F. 3d 3 (1st Cir. 2015), the First Circuit held that the district court did not abuse its discretion when it interrupted defense counsel's closing to instruct counsel not to refer to trial transcripts as being "in evidence" when counsel displayed them on the overhead projector. *See id.* at 18. Notably, however, the district court in *Gonzalez-Perez* did not bar counsel from showing the transcripts to the jury, nor did the First Circuit remotely suggest that projecting the transcripts was improper. Here, unlike in *Gonzalez-Perez*, defense counsel did not erroneously refer to the transcript excerpts as being "in evidence" or even as "the evidence."

---

[13] Cited articles *available at* https://masslawyersweekly.com/2018/04/26/storytelling-in-closings/; https://www.advocatemagazine.com/article/2024-october/delivering-a-powerful-closing-argument; https://cogentlegal.com/2017/09/the-trial-transcript-the-most-important-document-in-the-case/ .

Rather, excerpts were simply included in the slide deck to remind the jury visually—and accurately—what the witness testimony had been while defense counsel delivered the closing.

This Court abused its discretion when it sustained the government's unfounded objection and barred defense counsel from showing the slides with transcript excerpts. The disruption to the closing, the implicit suggestion to the jury that defense counsel did something wrong, and the resulting "handicap" inflicted on the defense warrant a new trial particularly where the jury had to process a "confusing story" that required close attention to counsel's "every word."

**B. The admission of supposed Iranian bank records was erroneous and, given the prosecution's emphasis on the evidence in its closing, prejudiced Mr. Sadeghi.**

At trial, the prosecution offered two documents it described as "bank records" and argued were admissible under the residual exception to the hearsay rule. D.E. 251 at 7-8 (citing Fed. R. Evid. 807); Tr. 10/17-18. This Court admitted Exhibits 222-1 and 223-1 over the defense's objections. *See* Tr. 10/20 (Court: "I may get reversed on this one, but I think those bank statements come in."). The prosecution then introduced them through its final witness, a FBI reader with no personal knowledge. *See* Tr. 10/87-88 (Ferrara). This Court's decision was erroneous, and in the context of the prosecution's closing, it prejudiced Mr. Sadeghi, because the supposed "bank records" were the only evidence that even purported to place associates of Abedini *in Iran*.

The First Circuit has long cautioned the residual exception to the hearsay rule should be "used very rarely" and "only in exceptional circumstances." *United States v. Awer*, 770 F.3d 83, 95 (1st Cir. 2014); *see United States v. Trenkler*, 61 F.3d 45, 57-58 (1st Cir. 1995) (holding trial court abused its discretion by admitting under the residual exception, evidence that "lacked sufficient circumstantial guarantees of trustworthiness"); *see also United States v. McFadden*, 116 F.4th 1069, 1081 (10th Cir. 2024) ("The residual exception should be used only in extraordinary circumstances."); *United States v. Turner*, 718 F.3d 226, 233 (3d Cir. 2013) ("The exception is to

be used only rarely [and] when certain exceptional guarantees of trustworthiness exist.”).

*United States v. Nivica*, 887 F.2d 1110 (1st Cir. 1989), on which the prosecution primarily relied, illustrates why the “bank records” in this case lacked the exceptional guarantees of trustworthiness that Rule 807 requires. There, a federal agent obtained business records concerning a bus company’s activities in Mexico, and the company’s treasurer then reviewed the records and identified them. *See id.* at 1127. Based on that testimony from a witness with personal knowledge, the First Circuit concluded the documents were “reliable and trustworthy” and, thus, admissible under Rule 803(24), the predecessor to Rule 807. *Id.*[14]

Here, in contrast, no witness identified Exhibits 222-1 and 223-1 as actual foreign bank records. Exhibit 223-1 is not even a bank record; on its face, it appears to be a corporate financial statement, the sort of document that an accountant might prepare for year-end financial purposes. The prosecution offered no evidence about who created the records, why, or based on what information. Meanwhile, Exhibit 222-1 has, on page 1, the name “Eghtesad Novin Bank.” But the prosecution offered no evidence that Eghtesad is an Iranian bank, much less that the document is a reliable record from that bank. Even assuming the prosecution’s assertion “it looks like a bank record” clears the low bar for authentication under Rule 901, it fails to satisfy the more demanding standard of Rule 807, which is to be “used stintingly.” *Nivica*, 887 F.2d at 1127.

The erroneous admission of these documents, especially Exhibit 222-1, was plainly prejudicial to Mr. Sadeghi. To convict Mr. Sadeghi, the prosecution needed to persuade the jury

---

[14] *United States v. Wilson*, 249 F.3d 366 (5th Cir. 2001), another case about admitting foreign bank records under Rule 807, also involved testimony to establish reliability. There, the prosecution obtained Bahamian records from a bankruptcy trustee, who obtained the documents from Bahamian counsel who, in turn, received them from the bank’s own counsel. *Id.* at 375. Based on that evidence, the Fifth Circuit concluded the district court had not abused its discretion in concluding the foreign records “possess[ed] the necessary guarantees of trustworthiness.” *Id.*

that the various unidentified individuals, whose names appeared in emails or metadata, lived and worked *in Iran*. The prosecution called no witness to identify those individuals or place them in Iran. Nor did the metadata itself make that critical connection. Instead, the prosecution relied entirely on speculative inferences from Exhibit 222-1.

Then, in closing, it repeatedly argued that "these are the bank records of SDRA" and that they prove "what SDRA was doing and who it was paying." Tr. 11/75-78.

> You know from the metadata who that team was. You know that that team are the people who are employees in SDRA. And *you know that because it's on Exhibit 222*. They were getting paid by SDRA. And you know that they were doing the work in Iran because that's the back-and-forth between Abedini and Del Corro.

Tr. 11/145 (emphasis added). No other evidence indicated these individuals worked in Iran. Exhibit 222-1's prominent place in the prosecution's closing proves its prejudicial effect and the need for a new trial. *See United States v. Villa-Guillen*, 102 F.4th 508, 524 (1st Cir. 2024) (holding erroneous admission of evidence was prejudicial and required new trial because "the government emphasized the testimony in its closing); *United States v. Kilmartin*, 944 F.3d 315, 340 (1st Cir. 2019) (same where "prosecutor's summation made abundant use" of improperly admitted evidence).

## CONCLUSION

For the foregoing reasons, Defendant Mahdi Sadeghi respectfully requests that this Court enter a judgment of acquittal on Count 1, 2, and 8 or, in the alternative, order a new trial.

Respectfully submitted,

**MAHDI SADEGHI**

by his attorneys,

*/s/ Daniel N. Marx*
William W. Fick (BBO #650562)
Daniel N. Marx (BBO #674523)
Amy Barsky (BBO #601111)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
*wfick@fickmarx.com*
*dmarx@fickmarx.com*
*abarsky@fickmarx.com*

Dated: August 3, 2026

**CERTIFICATE OF SERVICE**

I, Daniel N. Marx, hereby certify that on August 3, 2026, I caused this document to be filed through the ECF system.

*/s/ Daniel N. Marx*
Daniel N. Marx