IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>MAHDI SADEGHI | No. 1:24-cr-10391-IT<br><br>Leave to file granted 8/11/2026 [D.E. 330] |

**DEFENDANT MAHDI SADEGHI'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL OR, ALTERNATIVELY, NEW TRIAL**

William W. Fick (BBO #650562)
Daniel N. Marx (BBO #674523)
Amy Barsky (BBO #601111)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
*wfick@fickmarx.com*
*dmarx@fickmarx.com*
*abarsky@fickmarx.com*

Dated: September 14, 2026

# TABLE OF CONTENTS

Table of Authorities ........ ii

Introduction ........ 1

Argument ........ 3

I. This Court should enter a judgment of acquittal. ........ 3

A. The evidence was insufficient to sustain convictions on the substantive charges. . 3

1. Mr. Sadeghi did not cause the shipments in Counts 2 or 8. ........ 3

2. Neither shipment to Switzerland constituted an "export" to Iran. ........ 6

3. Mr. Sadeghi did not willfully violate IEEPA or ITSR. ........ 8

B. The evidence was insufficient to sustain a conviction on the conspiracy charge. .. 9

II. Alternatively, this Court should order a new trial. ........ 12

A. The prejudicial disruption of the defense closing and erroneous exclusion of transcript excerpts from its slide deck warrant a new trial. ........ 12

B. The erroneous admission of so-called "foreign bank records" unfairly prejudiced Mr. Sadeghi. ........ 14

Conclusion ........ 15

Certificate of Service ........ 16

# TABLE OF AUTHORITIES

## Cases

*Burrage v. United States*,
571 U.S. 204 (2014) .......... 3, 4

*In re Winship*,
387 U.S. 358 (1970) .......... 1

*Paroline v. United States*,
570 U.S. 434 (2014) .......... 3, 4

*Schmuck v. United States*,
489 U.S. 705 (1989) .......... 5

*Swan & Finch Co. v. United States*,
190 U.S. 143 (1903) .......... 7

*United States v. Banki*,
685 F.3d 99 (2d Cir. 2011) .......... 7

*United States v. Boulerice*,
325 F.3d 75 (1st Cir. 2003) .......... 13

*United States v. Bradley*,
869 F.2d 121 (2d Cir. 1989) .......... 13

*United States v. Coleman*,
149 F.4th 1 (1st Cir. 2025) .......... 1

*United States v. Ehsan*,
163 F.3d 855 (4th Cir. 1998) .......... 7

*United States v. El-Mezain*,
664 F.3d 467 (5th Cir. 2011) .......... 15

*United States v. Flores-Rivera*,
56 F.3d 319 (1st Cir. 1995) .......... 1

*United States v. Guo*,
2024 U.S. Dist. LEXIS 80747 (S.D.N.Y. May 2, 2024) .......... 15

*United States v. Homa International Trading Corp.*,
387 F.3d 144 (2d Cir. 2004) .......... 7

*United States v. Kidd*,
2025 U.S. App. LEXIS 33174 (2d Cir. Dec. 19, 2025) .......... 14

*United States v. Loder*,
23 F.3d 586 (1st Cir. 1994) .... 4

*United States v. Medina*,
155 F.4th 11 (1st Cir. 2025) .... 12

*United States v. Nivica*,
887 F.2d 1110 (1st Cir. 1989) .... 14

*United States v. Olbres*,
61 F.3d 967 (1st Cir. 1995) .... 2

*United States v. Perez*,
2003 U.S. Dist. LEXIS 2666 (S.D.N.Y. Feb. 28, 2003) .... 13

*United States v. Simon*,
12 F.4th 1 (1st Cir. 2021) .... 1

*United States v. Spinney*,
65 F.3d 231 (1st Cir. 1995) .... 1

*United States v. Tavares*,
844 F.3d 46 (1st Cir. 2016) .... 5

*United States v. Tome*,
61 F.3d 1446 (10th Cir. 1995) .... 15

*United States v. Turner*,
718 F.3d 226 (3d Cir. 2013) .... 15

*United States v. Wilson*,
29 F.3d 366 (5th Cir. 2001) .... 14

**Statutes, Rules, and Regulations**

18 U.S.C. § 1341 .... 5

18 U.S.C. § 1343 .... 5

Fed. R. Crim. P. 29(c) .... 1, 3

15 C.F.R. § 734.13 .... 7

19 C.F.R. § 101.1 .... 7

19 C.F.R. § 190.2 .... 7

19 C.F.R. § 192.1 .... 7

## INTRODUCTION

According to the prosecution, since the jury convicted Mr. Sadeghi on three counts, *ipso facto*, there must have been sufficient evidence. That view, which renders Fed. R. Crim. P. 29(c) a nullity, is not the law, because "juries do not have *carte blanche*." *United States v. Spinney*, 65 F.3d 231, 234 (1st Cir. 1995). Due process requires proof beyond a reasonable doubt of every element of the charged crime. *See In re Winship*, 387 U.S. 358, 364 (1970) ("It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent [people] are being condemned."). When a jury returns a guilty verdict without adequate proof, the responsibility falls on the trial court to safeguard that guarantee of our justice system. *See Spinney*, 65 F.3d at 234 ("This function is especially important in criminal cases, given the prosecution's obligation to prove every element of an offense beyond a reasonable doubt.").

In doing so, proper deference to the jury does not mean judicial abdication. Fed. R. Crim. P. 29(c) requires a trial court to "take a hard look at the record and to reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative." *Id.* When viewing the evidence "in the light most favorable to the verdict," a court cannot disregard deficiencies in the prosecution's case or ignore defenses. If the evidence gives "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence . . . , the court must reverse the conviction." *United States v. Coleman*, 149 F.4th 1, 42 (1st Cir. 2025) (quoting *United States v. Flores-Rivera*, 56 F.3d 319, 323 (1st Cir. 1995)); *see United States v. Simon*, 12 F.4th 1, 32 (1st Cir. 2021) ("the equipoise principle is firmly entrenched in this circuit's jurisprudence").

Rather than carefully review the record, the prosecution casually reprises its closing, making claims the evidence did not support—and in some cases, refuted. For example, the prosecution falsely accuses Mr. Sadeghi of hiding "his relationship with Abedini" from ADI and, at the same time, "do[ing] everything in his power to get Abedini" a contract. D.E. 333 at 3. But a

contemporaneous email from Mark Looney confirmed Mr. Sadeghi had "gone out of his way to disclose" his relationship with Abedini and not to influence ADI's decision to work with Illumove.

Message

**From:** Looney, Mark [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=7CCFCAF9F2324282B6B8898C2AE7B10E-LOONEY, MAR]
**Sent:** 7/2/2021 9:57:58 AM
**To:** Scannell, Bob [Bob.Scannell@analog.com]
**Subject:** RE: ADI / Leica/Hexagon/Illumove : Update next gen. IMUs (Raptor) ADIS16607

4. Mahdi has a relationship with the founder, but in my view, Mahdi has gone out of his way to disclose that relationship and to avoid giving them unmerited favor in this process.

Ex. 558; *see* Ex. 57 (email from Sadeghi to Galchev, introducing Abedini and stating Sadeghi had "worked with him and his team closely at Tacit Motion"). Looney testified that, after reviewing the proposals and interacting with Abedini, he formed the "independent view" that Illumove was "the best vendor." Tr. 4/115-19. No witness said Mr. Sadeghi shaped that view or even tried. Far from viewing that evidence in the light most favorable the verdict, the prosecution ignores it.[1]

The inaccurate assertion that shipments to Illumove for the evaluation board project "were valued at $80,000," D.E. 333 at 5 (citing Ex. 190), further illustrates the way that the prosecution mischaracterizes exhibits and disregards testimony.[2] For starters, the prosecution gets the math wrong. Exhibit 190 is a chart of some (not all) shipments by ADI to Illumove, and its "total value" column relates to the corresponding invoices, not the spreadsheet rows. To get to $80,000, the prosecution mistakenly added all the numbers, not the various subtotals. The proper calculation is

[1] Absent evidence that Mr. Sadeghi actually did anything, his one-line assurance to Abedini that he was "doing all I can so that you guys would get it" cannot reasonably be read as anything more than polite encouragement to a professional colleague, Ex. 206-1 at 81, especially after Mr. Sadeghi had made clear, earlier in the same thread, that he would not share price information from other vendors, *see id.* at 97 ("If I knew, I would tell you that I know but I can't tell you.").

[2] Although the prosecution correctly notes this Court must "consider the evidence as a seamless whole," D.E. 333 at 2 (quoting *United States v. Olbres*, 61 F.3d 967, 974 (1st Cir. 1995)), it fails to cite, in its 20-page opposition, a single word of testimony from any witness at trial.

only about $15,000. And even that figure is grossly overstated, because the sample parts had no commercial value. Tori DeCarr, who created Exhibit 190, testified the values were not actual prices, but numbers for "custom purposes only." Tr. 3/64, 197, 203; *see also*, *e.g.*, Ex. 171. All parts were provided by ADI to Illumove as free samples at no cost, *see* Tr. 3/204-5, and many were old revisions of products in development that ADI would have otherwise discarded, *see* Ex. 168. In making its misleading $80,000 claim, again, the prosecution does not view the evidence in the light most favorable to the verdict, it misstates the trial record.

Here, "a hard look at the record," which Fed. R. Crim. P. 29(c) requires, permits only one result: the evidence at trial was insufficient to convict Mr. Sadedghi, and accordingly, this Court should enter a judgment of acquittal on all counts. Alternatively, this Court should exercise its discretion, which Fed. R. Crim. P. 33 provides, to order a new, fair trial.

## ARGUMENT

### I. This Court should enter a judgment of acquittal.

#### A. The evidence was insufficient to sustain convictions on the substantive charges.

##### 1. Mr. Sadeghi did not cause the shipments in Counts 2 or 8.

*Causation.* Because Mr. Sadeghi did not personally send parts to Abedini, the prosecution had to prove he "caused" another person to make those shipments. In defending the guilty verdicts on Counts 2 and 8, the prosecution insists Mr. Sadeghi was "directly involved," D.E. 333 at 9, 12, but it cannot establish "causation." Instead, the prosecution improperly attempts to lower the legal bar for criminal liability by asking this Court to disregard recent Supreme Court precedents and look instead to irrelevant cases about mail and wire fraud.

First, the prosecution tries to side-step *Burrage v. United States*, 571 U.S. 204 (2014), and *Paroline v. United States*, 570 U.S. 434 (2014). Putting aside the oddity of dismissing Supreme Court decisions as "esoteric," both cases, which admittedly arose in different contexts, discussed

"causation" principles with broad applications in criminal law. *Burrage* states: "[t]he law," referring to criminal law in general, "has long considered causation a hybrid concept, consisting of two constituent parts: actual cause and legal cause," 571 U.S. at 201 (citing W. LaFave, Substantive Criminal Law, and Model Penal Code), and *Paroline* discussed "proximate causation" as a basic concept in criminal and civil law, 570 U.S. at 444-45 (citing LaFave). The prosecution offers no reason to disregard these familiar "causation" principles as inapplicable in this case.

Instead, the prosecution falls back on alternative theories of liability: "attempt" and "aiding and abetting." That two-part gambit fails. To the extent Mr. Sadeghi was charged with attempting to cause exports to Iran, "attempt" and "cause" are distinct concepts. "Attempt" concerns whether or not the exports succeeded, while "cause" refers to whether Mr. Sadeghi personally made the exports or prompted another person to do so. Even if there was sufficient proof that Mr. Sadeghi himself attempted to violate IEEPA and ITSR (there was not), that would not show that he caused anyone else to violate those laws. Meanwhile, "aiding and abetting" requires adequate proof that a "principal committed the underlying substantive crime." *United States v. Loder*, 23 F.3d 586, 590 (1st Cir. 1994). Here, in its closing, the prosecution invited the jury to speculate about Abedini as a possible principal. It argued that, by giving a shipping address to Thompson, Mr. Sadeghi "aided and abetted" Abedini: "The part [for the demonstration project] went out the door. It went to Abedini. *You know what he did with it*." Tr. 11/90. But based on the record, the jury could only guess. No evidence established Abedini temporarily took those parts to Iran before returning them to the U.S.—or that Mr. Sadeghi ever knowingly intended to help Abedini evade sanctions.

Finally, after chiding Mr. Sadeghi for relying on "unrelated definitions," the prosecution urges this Court to adopt the meaning of "causation" in the mail and wire fraud context, even though Mr. Sadeghi was not charged with those offenses. Under 18 U.S.C. §§ 1341 and 1343, the

use of mail or wires establishes federal jurisdiction over conduct that might otherwise violate state law, but it need not be "an essential element of the scheme." *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989). That is why to be convicted, "the defendant need not personally mail [or wire] anything." *United States v. Tavares*, 844 F.3d 46, 59 (1st Cir. 2016). Here, the "essential element" of the substantive offenses was making the unlawful exports to Iran—or causing another person to make such exports. It would make no sense to call exports "incidental" in this case, and to convict Mr. Sadeghi, it would not suffice to prove exports were "reasonably foreseeable" to him.

*Count 8.* Under the applicable "causation" principles, the evidence failed to prove Mr. Sadeghi caused anyone (or ADI) to ship three ADIS16575 samples to Illumove in Switzerland in May 2024. The prosecution relies on three short messages about the charged shipment, Exhibits 173, 174, and 175, and disregards the testimony from its own witnesses.

The messages show only that Mr. Sadeghi was one of many ADI employees who discussed the shipment, not that he caused it to happen. And the testimony proved Tzeno Galchev directed Mr. Sadeghi to solicit a proposal from Illumove; Mr. Sadeghi included his colleague, Spencer Thompson (who also reported to Galchev), in discussions with Abedini; Thompson communicated directly with Abedini about the project, both by Teams and email; Thompson—*not Mr. Sadeghi*—asked Abedini how many samples he would need for the demonstration project; and Thompson—*again, not Mr. Sadeghi*—directed DeRosa to ship the samples to Illumove in Switzerland. *See* Tr. 9/93; Ex. 177. The evidence also established ADI already had the address for Illumove, which had been working as a vendor and receiving parts in Switzerland since 2021. *See* Exs. 190, 534. Tellingly, the prosecution cites no evidence for its false claim that "*Sadeghi told his colleagues to send parts to Abedini and Illumove*, and they did so." D.E. 333 at 11 (emphasis added).

Moreover, regarding Count 8, there was no evidence, in the handful of messages or related

testimony, that if Galchev, Thompson or DeRosa had known Abedini also worked for SDRA or had connections to Iran, they would have done anything differently. The prosecution never asked those questions, and no rational jury could convict Mr. Sadeghi based on that speculation.

*Count 2*. Under the same principles, the evidence failed to prove Mr. Sadeghi caused an unlawful export of 10 ADXL380 samples in September 2022. The prosecution focuses narrowly on texts from Mr. Sadeghi to Abedini about discussions with Pablo Del Corro. D.E. 333 at 9 (citing Ex. 206-1 at 236-43). But without more, those messages are insufficient.

Considering the broader context, the evidence showed Mr. Sadeghi did not make the decision for ADI to work with Illumove on the evaluation board project, execute or approve the contracts, lead the project, or participate in the weekly meetings with Abedini. Nevertheless, relying on a few texts, the prosecution accuses Mr. Sadeghi—and no one else—of causing this shipment. Although the evidence showed Mr. Sadeghi talked with Abedini and Del Corro about which sensors would be included in the first version of the board, it did not prove he caused ADI to send ADXL380 samples in September 2022. By then, the project had been under contract since October 2021 and was already in progress. Indeed, ADI had previously sent numerous parts for the project to Illumove without Mr. Sadeghi's participation. *See* Ex. 190; Tr. 6/158-59, 172-78.

Again, as to Count 2, the prosecution never asked Del Corro if Mr. Sadeghi caused him to send the samples—or whether Del Corro would have stopped the shipments if he had known Abedini was connected to SDRA or Iran. Absent such evidence, a rational jury could not convict Mr. Sadeghi on an "incomplete information" theory.

**2. Neither shipment to Switzerland constituted an "export" to Iran.**

The prosecution concedes that no evidence proved any parts at issue were shipped to Iran *for the purpose of trade*. Instead, it disparages the defense's definition of "export" as "esoteric and unsupported." D.E. 333 at 15. That is a remarkable argument given *United States v. Ehsan*, 163

F.3d 855 (4th Cir. 1998), which adopted the same definition, characterized it as "manifest," and cited extensive support, including *Swan & Finch Co. v. United States*, 190 U.S. 143, 145 (1903). *Id.* at 858. Like this case, *Ehsan* involved a criminal prosecution for alleged violations of IEEPA and ITSR, and it is the only reported appellate decision to directly address the meaning of "export" in that context. But the prosecution completely ignores *Ehsan*, even as other courts have since followed it as persuasive precedent.

Instead, the prosecution cites a definition from the EAR, D.E. 333 at 15 (citing 15 C.F.R. § 734.13), but those regulations that do *not* apply here, because Mr. Sadeghi was charged with violating only IEEPA and ITSR. And in cherry-picking a single, inapplicable source from the entire CFR, the prosecution overlooks customs regulations that define "export," consistent with *Ehsan*, to mean "the transportation of merchandise out of the U.S. *for the purpose of being entered into the commerce of a foreign country*." 19 C.F.R. § 192.1 (emphasis added); *see also* 19 C.F.R. § 101.1 (defining "exportation" to mean "a severance of goods from the mass of things belonging to this country with the intention of uniting them to the mass of things belonging to some foreign country"); 19 C.F.R. § 190.2 (same); 19 C.F.R. § 192.1 (same).

It also ignores the salient differences between ITSR and EAR. The former is administered by OFAC (within Treasury) and intended to isolate the economy of Iran by barring commercial trade, including financial transactions. *See United States v. Banki*, 685 F.3d 99, 108 (2d Cir. 2011) (describing ITSR as "broad economic sanctions intended to isolate Iran") (citing *Ehsan*); *United States v. Homa Int'l Trading Corp.*, 387 F.3d 144 (2d Cir. 2004) (holding "the obvious purpose" of the Executive Order that authorized ITSR was "to isolate Iran from trade with the United States") (quoting *Ehsan*). The latter, in contrast, is administered by BIS (within Commerce) and requires licenses for dual-use items with military applications. Given those differences, it makes

sense that ITSR's "export" definition would incorporate notions of trade and commerce, while the EAR's definition might not.

**3. Mr. Sadeghi did not willfully violate IEEPA or ITSR.**

The prosecution argues Mr. Sadeghi willfully violated IEEPA and ITSR because he (1) was "directly involved" in shipments to Illumove in Switzerland and (2) knew that "nothing could be sent to Iran by ADI." D.E. 333 at 16. But the trial evidence fails to connect those disparate dots.

To be clear, even if Mr. Sadeghi was aware of a "strict embargo" on Iran, nothing was ever sent *to Iran* by ADI. All the charged shipments were sent to Switzerland.[3] The key issue, therefore, was whether Mr. Sadeghi knew that sending parts to Abedini, knowing that Abedini may then take those parts to Iran (temporarily, for work as ADI's vendor on ADI's project, and to be returned later to the U.S.) might violate IEEPA and ITSR, and *willfully* disregarded those laws—that is, whether Mr. Sadeghi deliberately did something he knew to be prohibited. No evidence proved Mr. Sadeghi had that understanding, and the prosecution cites no evidence on that critical point.

The two exhibits about ADI's training undermine the prosecution's case. Exhibit 48 is the NDA between ADI and Mr. Sadeghi, which was one of several standard forms attached to his offer letter. *See* Tr. 3/177. Although the NDA referenced the EAR and ITAR (and attached a list that identified Iran as a "Group E" country under EAR), it said nothing about IEEPA or ITSR—and provided no specific directions about work with a third-party vendor in Switzerland that had connections to Iran. Exhibit 78 was a form email congratulating Mr. Sadeghi for completing the only export training that ADI provided to him, a 25-minute online course about export controls

[3] The circumstantial evidence (*e.g.*, that people may have worked on the evaluation board project in Iran or that Abedini may have traveled to or from Iran around the time of the shipments) was too attenuated to prove that charged parts were ever actually sent or taken to Iran. The absence of such evidence further undermines the prosecution's unsupported assertion that Mr. Sadeghi intended that any parts would end up in Iran as opposed to in Switzerland or back in the U.S.

that was not specific to Iran, MEMS, or any of the complexities in this case (*e.g.*, possible re-exports by vendors in third countries). *See* Tr. 3/186-87. Generic evidence that Mr. Sadeghi knew about an "embargo" on Iran or got "export" training from ADI was not sufficient to prove he deliberately busted U.S. sanctions in his dealings with Illumove as ADI's vendor, especially given the testimony by the prosecution's own expert witness that, "when you get down into the details," ITSR can "be a little bit convoluted," Tr. 3/103; *see also* Tr. 3/174 (DeCarr: "export" is "technical term" that means different things in "different contexts").

Further, in focusing on its purported proof about ADI's export training, the prosecution disregards the undisputed evidence that the company's compliance officials, like DeCarr, approved all third-party contracts and international shipments to vendors. *See* Tr. 3/180-81. Mr. Sadeghi was entitled to rely on those internal controls, especially where ADI knew Abedini was from Iran, *see* Ex. 224; had previously sent samples to Abedini (for SDRA) at EPFL, *see* Ex. 543; and reviewed Illumove's LinkedIn page, which identified Abedini as a graduate of Sharif University, *see* Ex. 567; Tr. 6/137. Put another way, the evidence failed to prove, given ADI's own conduct, Mr. Sadeghi believed his personal conduct, as ADI's employee, might run afoul of U.S. export controls.

**B. The evidence was insufficient to sustain a conviction on the conspiracy charge.**

In Count 1, Mr. Sadeghi was not charged with conspiring with Abedini to start a new company in Switzerland (Illumove) or to help a related company in Iran (SDRA). He was charged only with conspiring to violate IEEPA and ITSR by unlawfully exporting goods from the U.S. to Iran, directly or through Switzerland. As to the charged conspiracy, the evidence failed to prove Mr. Sadeghi and Abedini ever discussed U.S. export laws, much less agreed to violate them.

*Abedini.* No witness testified Abedini intended to evade U.S. sanctions, and no documents proved that conjecture. To show Abedini's intent, the prosecution relies on Exhibit 2-1, the "business plan," and asserts, "[a]s early as 2014, Abedini intended SDRA would design the

navigation systems for military drones, missiles, and other military hardware." D.E. 333 at 4.[4] But as this Court recognized when admitting the document for a limited purpose, it "doesn't show an intent to import things illegally from the United States." Tr. 5/201; *id.* at 205 (distinguishing evidence of intent to start company in Iran from intent to export goods to Iran). The business plan does not include any reference to U.S. sanctions or describe any plan to violate them. Instead, it describes an effort to develop domestic capacity and the possibility of obtaining necessary parts from low-cost sellers in China, where ADI parts are readily available through resellers and knockoffs can be bought on black markets.

The prosecution also points to a DigiKey invoice from 2016 that Mr. Sadeghi forwarded to Abedini. D.E. 333 at 4 (citing Exs. 18, 19). No evidence sheds any light on why Abedini wanted the invoice, which he apparently manipulated in an effort to dupe a non-profit foundation in Iran. Regardless, the prosecution speculates the two customer references to "SDRA" mean Mr. Sadeghi intended to send those parts (one of which was an inductor that sells for $0.05 per unit) to Abedini in Iran. That is precisely the sort of unsupported inferential leap that Fed. R. Crim. P. 29 does not allow, for several reasons. First, no evidence proved the parts went to Iran; they were shipped to Mr. Sadeghi, who was then working in the U.S. to develop TMI's motion-tracking system using SDRA's fusion algorithm. *See* Exs. 22, 50. The search warrant photos confirm Mr. Sadeghi was building the prototype in his basement. *See* Exs. 525.3-5. Second, in 2016, ADI also made numerous shipments of sample parts to Abedini *for SDRA* at EPFL in Switzerland, where Abedini was then living and doing post-doctoral research, and no evidence suggests those parts ended up in Iran. *See* Ex. 543. Third, as this Court previously observed, if the notation "SDRA" meant that

[4] Exhibit 2-1, which pre-dated the alleged start of the charged conspiracy by two years, was not even a business plan *for SDRA*. It was a plan for a new, unnamed company, which apparently never came to be, in which SDRA would invest.

Mr. Sadeghi planned to unlawfully export parts to Iran, it would be irrational to tell DigiKey. No reasonable jury could conclude, as the prosecution surmises, that Mr. Sadeghi used the customer reference to pen a criminal confession.[5]

*Mr. Sadeghi.* Even assuming Abedini intended to violate U.S. export laws, no evidence proved Mr. Sadeghi shared that intent or conspired with Abedini to accomplish his unlawful objective. No witness substantiated the prosecution accusation that Mr. Sadeghi's innocent assistance with Illumove's initial proposal and later work as a vendor (*e.g.*, making an introduction for Abedini, facilitating his communications with ADI employees, and keeping the project on schedule) was as part of a nefarious plot to violate U.S. sanctions. To the contrary, they all testified that Mr. Sadeghi's conduct was entirely appropriate, given his role as a MEMS marketing manager, and completely consistent with ADI's objectives. *See, e.g.*, Tr. 4/124-24 (Looney: discussing Ex. 100). Although the evidence permits the reasonable inference that Mr. Sadeghi wanted to help Abedini to succeed, by helping Illumove to win a contract with ADI, no evidence supported the

[5] The prosecution cites two other documents which also fail to prove Abedini's intent to violate U.S. export laws. First, Exhibit 224, ADI's email to Abedini in 2013, undermines the prosecution's case. It proves that, as of 2013, Abedini told ADI he was from Iran and a Ph.D. student at Sharif, and nevertheless, starting in 2016, after Abedini began his post-doc research at EPFL, ADI sent him numerous samples in Switzerland. *See, e.g.*, Ex. 543 (chart of shipments in 2016 by ADI to Abedini for SDRA at EPFL); Exs. 547-53 (emails in 2020 between Sadeghi, Looney, Skaloud, and Abedini about ADI samples for EPFL-TOPO lab). ADI's initial shipments pre-dated Mr. Sadeghi's employment by several years, and no evidence permits an inference that they furthered a deliberate criminal scheme by Abedini (or anyone else) to evade U.S. sanctions. Notably, Laura Barnes, the ADI export compliance official who received a copy of Abedini's email in 2013, Ex. 545, later approved the company's SharePoint collaboration with Illumove, Ex. 570, and Mr. Sadeghi's travel to Iran with his ADI laptop (and his use of a VPN to do ADI work from Iran), Ex. 546. Second, Exhibit 105-1, the "agreement initial" document found in cloud storage associated with Mostafa Khosrowenjad, cannot be considered, because it was admitted only to show his intent, not Abedini's. *See* Tr. 5/227-37; *see also* Tr. 9/15 (prosecution argument: "Exhibit 105 . . . is that document from Mr. Khosrownejad's OneDrive talking about his intent[.]"); Tr. 11/68 (prosecution closing: same). In any event, the incomplete draft's vague reference to "responsibility for any illegal activities" does not establish anyone's intent to violate U.S. sanctions as opposed to Swiss or Iranian regulations on business activities or financial transactions.

conclusion that Mr. Sadeghi conspired with Abedini to violate IEEPA or ITSR.[6]

Nor does the evidence about the collaboration between TMI and Alogo on a horse-tracking system permit an inference that Mr. Sadeghi conspired with Abedini to help SDRA in Iran obtain parts from ADI. The prosecution points to Exhibit 196, the schematic found on Mr. Sadeghi's computer in a folder for TMI's horse-tracking project, *see* Ex. 196-1 (version with file location in folder directory), and it asserts, "SDRA designed the Sepehr Navigation System, which according to a schematic from SDRA, used a part manufactured by the U.S.-based company ADI" and was sold in "significant quantities" to "the Iranian military." D.E. 333 at 4. But as the prosecution knows from the drone evidence that this Court excluded, D.E. 192, *the Sepehr Navigation System contained no ADI parts*. The trial evidence proved Mr. Sadeghi used a schematic template with residual Sepehr markings—Ex. 196—to design a GNSS/INS device for Alogo. *See* Tr. 9/112-18. Nevertheless, under the guise of viewing the evidence in the light most favorable to the verdict, the prosecution repeats its baseless and false claims, which this Court already rejected.

## II. Alternatively, this Court should order a new trial.

### A. The prejudicial disruption of the defense closing and erroneous exclusion of transcript excerpts from its slide deck warrant a new trial.

The prosecution does not dispute this Court's observation that closings were critically important, with the jurors "hanging on every word." Tr. 6/189-90. Nor does it defend its baseless, disruptive objection to displaying transcript excerpts during the defense closing. Instead, relying

[6] The prosecution is correct that the quotation from *United States v. Medina*, 155 F.4th 11, 21 (1st Cir. 2025), contains a typo—the opinion reads "determination," not "termination"—but that regrettable error makes no difference. The basic point, which the prosecution concedes, remains: motive, while not an element of the charged offenses, is relevant to intent. Just as evidence of motive tends to show an intent to violate the law, the absence of motive suggests the opposite. The undisputed evidence was that Mr. Sadeghi had no reason to help Abedini evade U.S. sanctions, and everything to lose (his liberty, career, ability to provide for his family, etc.). To be clear, Mr. Sadeghi has never argued—and does not now argue—that he once had the intent to violate U.S. export laws or conspire with Abedini but that, at some point, his intent "terminated."

on inapposite cases, the prosecution argues only that there was no abuse of discretion.

In downplaying the prejudice to Mr. Sadeghi, the prosecution cites inapposite cases. *United States v. Bradley*, 869 F.2d 121 (2d Cir. 1989), found no abuse of discretion where the court denied advance permission to distribute copies of transcript excerpts during summation. *See id*. at 122. Here, in contrast, counsel did not seek to provide jurors with printed excerpts that were not in evidence. And unlike the "minor restriction" imposed before the closing in *Bradley*, *id.* at 123, the objection, sidebar, and ruling severely disrupted the defense closing, which was already underway. *United States v. Perez*, No. 01-cr-848, 2003 U.S. Dist. LEXIS 2666 (S.D.N.Y. Feb. 28, 2003), involved excerpts of grand jury testimony, which was not in evidence, not trial transcripts. *Id*. at *43. And *United States v. Boulerice*, 325 F.3d 75 (1st Cir. 2003), concerned a jury's request to "listen to" testimony during deliberations, not the defense's closing. *Id*. at 84.

While a trial court undoubtedly has broad discretion over closings, that authority may not be abused. Here, this Court's concern that "showing" excerpts of the transcripts—official copies from the court reporter as to which the prosecution raised no accuracy concern—was "suggesting" the transcripts were "exhibits" was not a valid reason to derail the defense presentation. Tr. 11/101. The testimony itself was the evidence; the transcripts were neither admitted as exhibits nor made available to the jury during deliberation; and this Court instructed the jury that argument was not evidence, Tr. 11/163-64, and its memory of the testimony was controlling, Tr. 11/104; *see* Tr. 2/22-23. Further, the notion that displaying transcripts excerpts has never been done is incorrect. Tr. 11/102. To the contrary, it has been a common practice, drawing no prosecution objection, in many sessions for years—and recommended as a "best practice" by at least one judge in this District.

The unwarranted disruption and erroneous ruling denied Mr. Sadeghi an impactful visual presentation during the critical defense closing and unfairly left the jury with the impression that

counsel had done something wrong, unfairly undermining trust in everything defense counsel said. Accordingly, this Court should order a new trial.

**B. The erroneous admission of so-called "foreign bank records" unfairly prejudiced Mr. Sadeghi.**

The prosecution does not dispute: (1) Exhibit 222-1 was the only purported evidence that placed *in Iran* several people who supposedly worked for SDRA; (2) it emphasized Exhibit 222-1 in its closing, and (3) if the admission of Exhibit 222-1 was improper, the error was harmful and, thus, requires a new trial. Instead, the prosecution incorrectly insists Exhibit 222-1 was properly admitted, under Rule 807, as a "foreign bank record."

The prosecution pays only lip service to the principle that the residual exception to the hearsay rule "should be used stintingly." *United States v. Nivica*, 887 F.2d 1110, 1127 (1st Cir. 1989); *see United States v. Kidd*, 2025 U.S. App. LEXIS 33174, *3 (2d Cir. Dec. 19, 2025) ("very rarely, and only in exceptional circumstances"). It also ignores that most cases about foreign bank records feature evidence about the records themselves. *See Nivica*, 887 F.2d at 112 (noting FBI agent testified company's treasurer "reviewed and identified" documents); *United States v. Wilson*, 29 F.3d 366, 375-76 (5th Cir. 2001) (citing evidence bank records from Bahamas were obtained by bankruptcy trustee from bank's counsel). The prosecution offered no such evidence here.

Rather, the prosecution contends that, on its face, and without more, Exhibit 222-1 satisfies Rule 807's requirement for "exceptional guarantees of trustworthiness." *United States v. Turner*, 718 F.3d 226, 233 (3d Cir. 2013). But no evidence established that "Eghtesad Novin Bank" is a real bank in Iran; SDRA did business at "ENBANK," or Exhibit 222-1 is a statement from that bank. *See United States v. El-Mezain*, 664 F.3d 467, 498-99 (5th Cir. 2011) (holding trial court abused its discretion by admitting under Rule 807 bank records from Palestinian Authority because "nothing is known about the circumstances under which the documents were created").

Contrary to the prosecution's claim, Exhibit 222-1 does not even *look like* a bank record. The narrative descriptions in the "Notes" column about the *business* purpose of transactions do not typically appear in *bank* records. As other courts have recognized, "[a] spreadsheet can be easily modified," and anyone can add information or slap a bank logo on a document. *United States v. Guo*, No. 23-cr-118, 2024 U.S. Dist. LEXIS 80747, at *18 (S.D.N.Y. May 2, 2024) (denying prosecution's motion to admit purported bank records with "First Abu Dhabi Bank" logo). And in this case, the evidence was that Abedini forged or falsified other documents. *Compare* Exs. 18 and 20-1 (original DigiKey invoice received by Mr. Sadeghi and version forwarded by Abedini with inflated quantities and prices). Having cast Abedini as a deceptive crook, the prosecution cannot credibly insist that all documents found on his computer are necessarily trustworthy.

At bottom, the bald assertion that Exhibit 222-1 appears to be a foreign bank record cannot justify an end-run around the hearsay rule, especially where the document was critical to the prosecution's case. *See United States v. Tome*, 61 F.3d 1446, 1452 (10th Cir. 1995) ("Courts must use caution when admitting evidence under [Rule 807], for an expansive interpretation of the residual exception would threaten to swallow the entire hearsay rule.").

## **CONCLUSION**

For the foregoing reasons, Defendant Mahdi Sadeghi respectfully requests that this Court enter a judgment of acquittal on Count 1, 2, and 8 or, in the alternative, order a new trial.

Respectfully submitted,

**MAHDI SADEGHI**

by his attorneys,

*/s/ Daniel N. Marx*
William W. Fick (BBO #650562)
Daniel N. Marx (BBO #674523)
Amy Barsky (BBO #601111)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
*wfick@fickmarx.com*
*dmarx@fickmarx.com*
*abarsky@fickmarx.com*

Dated: September 14, 2026

**CERTIFICATE OF SERVICE**

I, Daniel N. Marx, hereby certify that on September 14, 2026, I caused this document to be filed through the ECF system.

*/s/ Daniel N. Marx*
Daniel N. Marx