UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>MAHDI MOHAMMAD SADEGHI,<br>Defendant. | ) | Criminal Action No.<br>1:24-cr-10391-IT-1 |

BEFORE THE HONORABLE INDIRA TALWANI, DISTRICT JUDGE

JURY TRIAL - DAY 11

Wednesday, July 8, 2026
8:59 a.m.

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts

Robert W. Paschal, RMR, CRR
Official Court Reporter
rwp.reporter@gmail.com

**A P P E A R A N C E S**

On behalf of the Government:

UNITED STATES ATTORNEY'S OFFICE
BY: JARED C. DOLAN
ALATHEA E. PORTER
One Courthouse Way
Suite 9200
Boston, MA 02210
(617) 748-3220
jared.dolan@usdoj.gov
alathea.porter@usdoj.gov

UNITED STATES DEPARTMENT OF JUSTICE
BY: LESLIE ESBROOK
950 Pennsylvania Avenue NW
Suite 7700
Washington, DC 20530
(202) 616-3321
leslie.esbrook@usdoj.gov

On behalf of the Defendant:

FICK & MARX LLP
BY: WILLIAM W. FICK
DANIEL N. MARX
AMY BARSKY
24 Federal Street
4th Floor
Boston, MA 02110
(857) 321-8360
wfick@fickmarx.com
dmarx@fickmarx.com
abarsky@fickmarx.com

**TABLE OF CONTENTS**

**TRIAL PROCEEDINGS**


| | Page |
|---|---|
| Preliminary Matters | 4 |
| Closing by Mr. Dolan | 50 |
| Closing by Mr. Fick | 94 |
| Rebuttal by Ms. Porter | 140 |
| Jury charge | 152 |


**EXHIBITS**


| | Admitted |
|---|---|
| (None) | |

**P R O C E E D I N G S**

(On record at 8:39 a.m.)

(The following conducted in the conference room.)

MR. DOLAN: So on our way in this morning, Ms. Porter had a conversation with one of the CSOs, which is why we requested to meet in chambers, just because if one CSO is in the courtroom, we don't want him to communicate with another one. That CSO reported to Ms. Porter that he had a conversation with a juror, and that juror expressed an opinion about the case.

MS. PORTER: To be clear, I did not inquire of the CSO. He said hello to me on the way in. I said, "Hello." He said, "Are you closing today?" I said, "Possibly."

And then he proceeded to tell me about this one juror.

I did not inquire about the juror. He said it. I came upstairs. We talked about it. As soon as we came down, we told counsel, and asked to be seen.

THE COURT: Seems like we do an inquiry of the juror, but I'm guessing that we're probably going to have to let the person go depending what --

So the CSO reported to you, Juror said X to me?

MS. PORTER: Uh-huh. Yes.

THE COURT: That's a problem.

MR. DOLAN: Yes.

MS. PORTER: Yes.

THE COURT: So --

MR. MARX: That would appear to be the case. We do not yet know what the X is, obviously, so -- to the extent it affects the decision one way or the other.

THE COURT: I'm not sure it does, right? We know is we have a juror who said something. I mean, I suppose it depends whether the person said, "This has been a long trial," versus a comment of more substance than that.

MR. DOLAN: It was of more substance.

MS. PORTER: It was -- it was stating a position already, formed an opinion already about the case. It was not clear that that had been relayed to anyone else, but it was that the particular juror had formed an opinion herself.

THE COURT: I mean, I think we're there if we're there. It's, unfortunately, where it is.

So I think what I will do is, we'll call the juror in and inquire as to the conversation.

I don't think I need to ask in open court what the opinion was.

MS. PORTER: No, Your Honor. I think it's -- the question is whether she communicated that to other jurors.

THE COURT: Well, no, it's whether she communicated it to anyone.

MR. DOLAN: I think there's two questions. The

first is whether she violated the Court's order about not talking about the case. That's part one.

If --

THE COURT: Part two is, did she have it, the conversation, with anyone else; in which case, we have a problem of the tainted juror -- tainted jury.

MR. DOLAN: Well, yes, I think that's part three, maybe.

I would say part two is, has she formed -- you know, the Court has instructed all the jurors, like, don't form an opinion about the case, wait until instructions. And So the question is -- the second question is whether she has formed an opinion about the case, and whether she can -- whether that can be cured, if she has.

THE COURT: I think the problem with that set of inquiry is that, no matter how much I instruct people that you shouldn't be thinking this through, we're all human beings, and we tend to -- we can keep -- couch -- coaching ourselves, "Wait. I don't know the whole story yet. I don't even know what the instructions are. I don't even know what the law is." You can keep coaching yourself, but the reality is that people do start having an opinion formed.

I think it's the articulating of an opinion that then changes it to what's happening secretly in front of your -- inside your head, which is -- I don't want to be the

thought police at that level --

MS. PORTER: Right.

THE COURT: -- but I do want to be the police of, once it comes out.

MR. FICK: I mean, it seems to me the question is, was -- did the communication to the CSO happen? I don't know that there's a basis to start asking more broadly, did you talk to anybody? I think that's sort of a --

THE COURT: Well, except that the fact that -- if the person says, "Yes, I talked to the court security officer" -- I suppose if the person says, "No, I didn't talk to the court security officer," that's a whole other problem we haven't figured out.

But if the person says, "Yes, I talked to the court security officer," and did you express an opinion about the case, did you express your thoughts on the case to the court security officer, then I think we have a problem.

But then I think I need to know whether he has or she has said anything to anybody else.

Right? Why wouldn't I ask that question?

MR. FICK: I mean, I suppose it would be based on the inference that if she said something to one person, she probably said something to somebody else. I just --

THE COURT: No, it's not that she has; it's that she hasn't followed my order, so, therefore, I need to ask if

she has followed my order in the other context.

MR. FICK: In the other respects.

THE COURT: My assumption is that there's a different level of what she's thinking about, you know, there's people sort of think, okay, I see why this could be harmless or this could be a problem versus I see -- where that didn't even occur to me.

But I think I need to ask that, because if the jury is tainted, I need to know that.

MR. FICK: Well, I don't disagree with that basic proposition. I guess I just -- I'm always sort of reticent to sort of expand inquiry about a juror beyond the specific, you know, apparent event. I mean, to sort of start -- I mean, if we -- you know, in any given trial, if you called in every juror and started fishing about who they might have talked to, I think that's opening a huge Pandora's box. I think just because she said something to the CSO, it doesn't mean it's likely she said something to anybody else, so . . . .

THE COURT: I am going to ask the follow-up question. I anticipate she will say, "No, I didn't say anything to anybody else." And I anticipate that the mere fact that she did say something to the CSO means that I need to let her go.

Any disagreement with that?

MR. MARX: I don't think so. Were you intending to

ask whether it fell into the category of this has been a long time as opposed to a view about the case, a prejudgment? This is a jury that has been vocal about the menu and the cleaning services and many things about the case. And, again, we don't know anything about the substance --

THE COURT: Oh, is it the juror who thought it was dusty?

MR. DOLAN: Oh, no. That was Juror Number 1.

MR. MARX: No, it may have been one with the yogurt order, Your Honor.

So -- so, anyway, I wasn't clear whether you intended to --

THE COURT: Well, is there any reason not to -- except that maybe I want to clear the courtroom on it. Is there any reason not to ask what was said?

MR. FICK: I mean, again, my instinct is to be just sort of hypercautious about the extent of inquiry into anything, you know, a juror does or says. Obviously, ascertaining whether the order was violated is one thing, but, like, getting into content, I don't know.

THE COURT: So -- so help me here, because I don't have an instinct on this that tracks yours. I see a very strong instinct once they have started deliberations that I don't want to be anywhere near that. But prior to the start of deliberations, I don't see a reason not to probe.

MR. FICK: I guess in this situation, simply the fact of expressing a view about the case, regardless of what it was, would be grounds for dismissal. We don't really need to get into what it was.

THE COURT: Well, perhaps I should proceed this way, which is to say, "Did you have a conversation with the court security officer?"

Was it this morning?

MS. PORTER: I don't know when it was.

THE COURT: "Have you had a conversation about the case with the court security officer? Did you express an opinion about anything in the case to the court security officer?"

And if she says, yes, then leave it at that, and disqualify her; or we'll then ask, "Did you have a similar conversation with any other jurors?"

If she says no, then, "Can you tell us what you did say to the court security officer?" So that it's not a question of her interpreting where it falls on that side of the line versus mine.

Any reason to clear the courtroom or not clear the courtroom, in your view?

I don't want reporters reporting on what the jurors are thinking, so that would be my -- my concern about having a full courtroom.

MR. DOLAN: My only concern, which is why we're here, is to the extent that there's a dispute about what was said, I'd want to make sure that -- I don't know where it would go if the juror says no, because then there's a factual issue that the Court has to look into. Because we weren't there.

THE COURT: And, therefore, as to clearing the courtroom?

MS. PORTER: The concern, Your Honor, being the other CSO that would be in the courtroom.

THE COURT: Can we huddle close enough in here so that we could have the juror just come and sit in here?

MR. FICK: I think so.

THE COURT: I'm happy to move that --

MR. MARX: Or I can let the juror sit next to Robert.

THE COURT: Yeah, it's just a problem getting in this room.

MS. PORTER: I don't know if she's here yet.

THE COURT: Oh. Okay.

THE DEPUTY CLERK: I don't know which juror it is, Your Honor.

MS. PORTER: I don't remember her last name.

MR. DOLAN: [redacted]

MS. PORTER: [redacted] was the first name.

MS. ESBROOK: She's Number 22.

LAW CLERK: Do you want me to go ask the CSO?

THE COURT: No, we're keeping the CSO out of the loop.

So it's Juror 22?

MS. PORTER: I don't remember the number. It is -- [redacted] was her first name.

THE COURT: Okay. Do you want to bring her in, if she's there?

THE DEPUTY CLERK: Yes, ma'am.

THE COURT: And if not, we'll wait here for her.

THE DEPUTY CLERK: Pardon me as I squeeze by.

THE COURT: Let me actually ask you guys to switch orders. I want Mr. Sadeghi over on this side with his counsel. I want the government over here, because she's going to come walk around to this seat, and I think that's more appropriate.

We're off the record.

(Pause in proceedings.)

THE COURT: The government suggested an extra line on the causing, that the person doesn't have to have -- as to that person's intent. I think that's an accurate statement of the law. It did -- and I understand the defendant doesn't appreciate that it's coming in at this point. But it did focus a little bit, to me, on where the difficulty is with

the word "cause" and the defendant's prior proposed causation instruction, which is that if causation is cause in the sense of a set of events start unfolding, we end up with the problem that the defendants were pointing to.

But I think what the government's wording points out is that what we're talking about -- is that what we're talking about is causing a person to do something. And in that sense -- so I've added two different changes in there. One is I've added the language the government asked for about what that person's intent is, but then I've modified causing to not have it just be cause as in a stream, a rock causes ripples, but that you're causing a person to do something, that you're acting through a person. That's the intent of those changes.

MR. MARX: Are we on the record?

THE COURT: We're on the record.

And it's a manually done redline, so hopefully it's 100 percent correct, but I don't know how to make a PDF while you're using redline.

MR. MARX: I apologize if Your Honor already explained this, but was the addition of the language in Instruction 17 on page 28 describing the conspiracy; was that intended to obviate the need for the redacted superseding indictment?

THE COURT: Yes.

MR. MARX: Okay. Thank you.
THE DEPUTY CLERK: Your Honor, I have the juror.
THE COURT: Okay.
(Juror present.)
THE DEPUTY CLERK: Can you please step in here? We have a seat.
THE COURT: Good morning.
JUROR: Good morning.
THE COURT: Did you have a conversation with a court security officer about anything in the case?
JUROR: Yesterday, he told me that he asked someone and thought that we were going to be moving into, like, longer days. That's all me told me.
THE COURT: Okay. And did you say anything to him?
JUROR: I don't think I told him, like, anything about, like, what's going on.
THE COURT: Did you say anything about your view of the case?
JUROR: No, I didn't, like, say, like, what my perspective was or if he was -- like, what my opinion is.
THE COURT: Have you formed an opinion in this case?
JUROR: Not, like -- no. There hasn't been time to.
THE COURT: If we received a report that you

expressed something more than that, would you have anything that -- more that you can help us clarify?

JUROR: I don't remember, like, exactly, like, what I said; but I think, like, he just brought that to my attention, that he talked to someone that thought we were moving into longer days, so I might have just said something, like, nonchalantly, just to, like, finish the conversation. But I didn't, like, actually express, like, where I stand or the details of the court case.

THE COURT: What's your best recollection of what you might have said nonchalantly?

JUROR: I think he was, like, just saying, like, that we were moving into, like, longer days. I was like, "I hope that we are done by this week. Hopefully we don't move into next week."

THE COURT: Okay. I'm going to -- have you said -- oh, have you said anything to anyone else other than the court security officer as to this -- case.

JUROR: No, I've just been saying, like, to work, like, I was supposed to be, like, a three-week case that I'm, like, in jury for.

THE COURT: And within the jury room, have you had any conversations substantive at all about the case?

JUROR: No. We kind of just were talk- -- like, just hoping that, like, it -- kind of, like, guessing the

timeline, but we haven't shared, like, specific details about opinions, like, where we'd fall on where we stand.

THE COURT: Okay. I'm going to have you take her back out and we will figure out what next.

Thank you.

JUROR: Okay.

THE DEPUTY CLERK: Do you want to take her to the jury room, do you mind?

LAW CLERK: Yeah.

(Juror not present.)

THE COURT: I think I need to ask the court security officer what she said to him.

MR. DOLAN: Yes.

MS. PORTER: Yes, Your Honor. It was [redacted]. I forget [redacted] last name.

THE DEPUTY CLERK: Should I have [redacted] come up?

MS. PORTER: He was at the front desk this morning.

THE COURT: At the front downstairs?

MS. PORTER: Yes.

THE DEPUTY CLERK: All my phone numbers are in the courtroom, Your Honor.

THE COURT: What do you need? Just the front desk, the CSO number?

Off the record.

(Pause in proceedings.)

THE COURT: Back on the record.

I do want to use our time if there's anything that needs to be addressed.

MS. ESBROOK: Your Honor, I think the only thing we were looking at was incorporation from the superseding indictment of the fact that the person the defendant is accused of aiding and abetting would be his co-defendant, Mr. Abedini. I think we started to have this discussion yesterday at the end of our colloquy. And this is page 26, the aiding and abetting instruction.

So I don't know if there's a way to make it clear what the allegation is as to who he would have aided and abetted. That's the only comment from the government on this the draft.

THE COURT: And you're looking at the clean or the redline version?

MS. ESBROOK: I'm looking at the redline version.

MS. PORTER: You know, I think this only becomes the issue if the indictment doesn't go back, which we understood it won't.

THE COURT: Right. So, "the superseding indictment charges, dot, dot, dot, through December 16th, Mr. Sadeghi and his co-conspirators, comma, including Mr. Abedini."

MS. ESBROOK: Is that proposal to come at the beginning of --

THE COURT: Oh, that's the -- yeah, that's the beginning of the conspiracy.

MS. ESBROOK: The conspiracy.

THE COURT: Count 1, the second paragraph, "the superseding indictment charges" -- I'm on page 20- -- it says it's the redline version but there's no redlines on it, so I'm probably not --

MS. PORTER: That would -- that would be an addition we would like for page 28. It does not address, I think, the issue with respect to the substantive counts on -- and aiding and abetting specifically, which would be page 26.

THE COURT: Okay. Wait. So let me just stop for a minute.

The superseding indictment language, I'm looking now on page 28, that actually already has Abedini in the second sentence, "directly and indirectly to Iran, including to Abedini."

So we don't need a change there.

So you're asking me for, on the aiding and abetting, does the superseding indictment on Counts 2, 4, 7, and 8 -- it charges both of them.

MS. PORTER: Yes.

THE COURT: I see. They all -- each one of the counts charges both of them?

MS. PORTER: Yes. There are other counts that

charge Mr. Abedini only, but each of these four counts charge both.

THE COURT: So if Counts 2, 4, 7, and 8 also charge that Mr. Sadeghi aided and abetted Mr. Abedini in the charged violations? Is that what you're asking for?

MS. PORTER: I think it could say another person, including --

THE COURT: Well, except it's not a conspiracy charge, so the only other person charged there is -- so -- or you're saying he could be charged with aiding and abetting without specifying who he's aiding and abetting?

MS. PORTER: I think technically that is correct, but --

MR. DOLAN: For example, if we didn't charge Mr. Abedini at all, Mr. Sadeghi could still be found guilty of aiding and abetting Mr. Abedini despite his presence not in the charged count.

THE COURT: But you're at least then saying that Mr. Abedini -- I guess the question is, if you have aiding and abetting another person, that person has to have committed the violation.

MR. DOLAN: Exactly.

THE COURT: Are you going to say any other person committed the violation, other than Mr. Abedini?

MR. DOLAN: No.

THE COURT: So does it make sense to say -- also charge that Mr. Sadeghi aided and abetted Mr. Abedini in the charge violations?

MS. PORTER: I think that's fine.

MR. DOLAN: Yes.

MR. MARX: No objection, if that's the government's theory of the case.

THE COURT: Can I get a pen?

And I'm not sure where the first time Mr. Abedini's name comes in; that may be it --

LAW CLERK: I'll find it.

THE COURT: -- but wherever it is, he gets his first name, too.

Anything else on the instructions?

MR. MARX: Two issues, Your Honor. One I hope is relatively straightforward. Including some of the language from the indictment back into the charge --

THE DEPUTY CLERK: It's only me.

MR. MARX: The phrase is "technology and services."

THE COURT: Can you give me the pages?

MR. MARX: Oh. So this -- so, for example, I'm now looking at Instruction 15 on page 23.

THE COURT: Okay.

MR. MARX: The substantive charge.

THE COURT: Yep.

MR. MARX: And it refers, in the --

THE COURT: Yeah, I quoted the --

MR. MARX: Right.

THE COURT: -- the superseding indictment.

MR. MARX: So our view would be, to the extent that this is intending to capture a -- what's now a redacted indictment, the government's theory is limited to goods, that we don't reopen the issue of technology and services, which then leads us into concerns about the need for describing exceptions and datasheets and other things.

THE COURT: Any disagreement with doing "goods, dot, dot, dot, and, dot, dot, dot, electronic components"?

MS. ESBROOK: No disagreement to removing technology and services. But I think the indictment might have had another word here, because I think electronic components is a subset of goods here. So -- like, "to wit," potentially, would work there or --

THE COURT: Okay. It's out there.

LAW CLERK: I can go grab it, Judge.

THE COURT: Can you? Thank you.

Off record.

(Pause in proceedings.)

(Court security officer present.)

THE COURT: Good morning.

COURT SECURITY OFFICER: Hi, Judge.

THE COURT: Good.

I wanted to ask you about one of my jurors saying something to you about the case.

COURT SECURITY OFFICER: She -- never. No. I ask her every day when she comes in, how's everything going, good? You know, is she confusing or whatever she says, but that's about it.

THE COURT: So do you remember exactly what it was that she said most recently when you talked with her?

COURT SECURITY OFFICER: She came in -- I'm trying to think if it was yesterday -- and I asked her how everything was going? And she said fine. And that was about it. She didn't say much about the case.

THE COURT: Did you have any impression that she had made her mind up one way or another about the case?

COURT SECURITY OFFICER: No.

THE COURT: Did you have any impression as to whether she thought this was going to be a -- quick and done deliberations or anything of that sort?

COURT SECURITY OFFICER: No. I asked -- she came in today.

THE COURT: Yeah.

COURT SECURITY OFFICER: And I said are you here all day?

And she said yes.

And she's -- very friendly, she's very nice. And not -- she didn't say anything about it.
THE COURT: Okay. So you don't have any sense that she has already -- well, let me ask you that open-ended --
COURT SECURITY OFFICER: No.
THE COURT: -- as to whether she has made her mind up on this case?
COURT SECURITY OFFICER: No.
THE COURT: Okay.
COURT SECURITY OFFICER: No.
THE COURT: Anything else you would like me to ask?
MR. DOLAN: I think if we could just all speak privately for a moment and then decide how to proceed?
COURT SECURITY OFFICER: What did you say?
MR. DOLAN: Would you mind waiting outside just for a moment?
COURT SECURITY OFFICER: Yeah.
THE COURT: Thank you.
COURT SECURITY OFFICER: Sorry, Your Honor.
THE COURT: That's okay.
(Court security officer not present.)
MR. DOLAN: So we don't really know what to do, because my understanding -- and Ms. Porter can clarify -- is that was not exactly the information that we received.
THE COURT: It was this CSO?

MS. PORTER: Yes. And --

THE COURT: What's your best recollection of the words he used?

MS. PORTER: My best recollection of the words that he used was that he asked if we were closing today. I said, "Possibly." And then he said, you know, one of the jurors -- I had asked if it was wrapping up or closing or something to that effect today, and she said, basically, like, I hope so, ready, essentially. And that she sort of indicated to him she had made up her mind about it.

THE COURT: But what's your best recollection of the words he used to you to convey that?

MS. PORTER: Something to the effect of -- now I'm trying to remember the specific words because I don't want to get it wrong -- that it was a "yes" for her.

MR. DOLAN: And?

MS. PORTER: He did it.

MR. DOLAN: And?

Our conversation with you about what she intended.

MS. PORTER: Just that she intended to kind of make her position clearly known, not before, but during deliberations; like, that she was looking -- essentially -- this is now my interpretation of what he said, but that she was ready to get the case because she had formed an opinion and wanted to get to deliberations, and that she felt

strongly about her position.

I don't know if that's him interpreting things she said. That's what he said to me and not specifically what she said necessarily.

THE COURT: Is it a fair summary that she said she was ready for deliberations?

MS. PORTER: Yes. I mean, I don't know if she used those words, but that she was ready to be done and that she had formed an opinion about the case.

THE COURT: The difficulty for me is that the two people who had the firsthand conversation stopped short of that.

MS. PORTER: I understand.

THE COURT: And that doesn't mean that that's -- I didn't ask him what he said to you. That doesn't mean that's not how he then interpreted it and then conveyed it.

MS. PORTER: Yes.

THE COURT: But I do have to think that what he said here, in reflecting of what she and he said -- I didn't ask him what he said to you. It's not really -- I assume what he said to you is what you're recounting.

So the question is just whether that was, then, his conclusions from what she said or whether he's reporting it slightly differently now.

But I have, at this point, the two of them

consistently saying that she didn't talk about it.

MR. DOLAN: We have made the report --

THE COURT: Is either side asking that I strike her from the jury?

Based on what has happened, not on -- based on your prediction of what she's going to do.

MR. FICK: I mean, it's a very, very odd situation.

I mean, can we confer?

THE COURT: Sure. You can take different parts of the hallway. The only thing I would warn you is that, as you go towards the end, those nice, little pretty tables where you sit to confer, it's open above and below, so everything can be heard on the next floor up.

Actually, can we -- can we let them into one of the next -- I think the next conference room or jury room are open --

THE DEPUTY CLERK: That's Judge Kelley's lobby.

THE COURT: It didn't used to be.

THE DEPUTY CLERK: It didn't used to be, and I used to go there all the time.

(Off record at 9:17 a.m. and reconvened at 9:19 a.m.)

THE COURT: Back on the record.

MR. FICK: So on this record, the defense would not move to strike her at this time.

MR. DOLAN: We agree with the defense.

THE COURT: Okay. So then we have a number of things we needed to do this morning that now we're a little bit behind schedule. Is the juror back in with the others?

THE DEPUTY CLERK: Yes. Yes, yes.

THE COURT: So I think what we need to do is to just let them know that we're running a little bit behind schedule and we'll get them all in to proceed as soon as we can.

THE DEPUTY CLERK: And can I release [redacted]?

THE COURT: You can release [redacted].

THE DEPUTY CLERK: Will you continue in here, or are you going to continue in the -- I'm just thinking of Robert's setup, that's all.

THE COURT: I don't have a strong preference. Why don't we see what we can get done in here.

We might then need to move -- some of the other parts should be done in open court -- in fact, all of it should be done in open court. There's no reason to have a closed proceedings.

MS. PORTER: I think we are closed -- well, we were done on instructions. I don't know if you had anything further.

MR. MARX: Yes, there are a couple of issues.

THE COURT: Okay. So let's re-set up there and go

from there.

(Off record at 9:21 a.m.)

(In open court at 9:25 a.m.)

THE COURT: Back on the record.

We're going through the revisions on the instructions. And on page 23 of the redline, if I was going to do a better job tracking the superseding indictment, the fourth line down, "supply of," and then cut out "one or more." So it's "supply of goods," dot, dot, dot, "to wit, one or more US-origin," and then the rest of it as it is.

Will that fix that problem?

MS. ESBROOK: Yes. If I could just restate that. It's now "supply of goods, to wit, one or more US-origin electronic components"?

THE COURT: Yeah, because I have it as a quote, I have "supply of goods, dot, dot, dot, comma, to wit, one or more US-origin."

MS. ESBROOK: Fine by the government. Thank you.

THE COURT: Okay. Any other concerns with this latest iteration?

MR. MARX: Yes, Your Honor.

So on page 28, in Instruction 17, we have the same issue, which I think can be resolved the same way.

In the new red text in the second paragraph, the reference to technology and services.

THE COURT: Yeah. So I'll change that exactly, "The objects of the conspiracy were to export US goods" -- This one isn't a quote.

Including electronic components?

MS. ESBROOK: I think it's not quoted in the proposed instructions, but it currently tracks the language of the superseding indictment, so I don't believe there's US-origin components in the conspiracy allegation.

THE COURT: So if it just says "were, colon, to export US goods," is that enough? Take out the technology and services?

MS. ESBROOK: Yes, Your Honor.

MR. MARX: Yes, Your Honor.

THE COURT: Okay.

MR. MARX: And while we're on page 28, Your Honor, in that same paragraph, in the same sentence, I think the revision appears to define Iran here to include Mr. Abedini himself, and/or SDRA. I think that's an inappropriate definition of Iran.

The law doesn't define the place to include any national of that place, so I think it should just say to Iran, period.

MS. ESBROOK: Again, this is tracking the language that's stated in the superseding indictment, as it's currently written.

THE COURT: But -- it is, but it isn't an accurate statement to say that just giving it to Mr. Abedini -- I was just tracking that, but --

MS. ESBROOK: One moment, Your Honor.

Yeah, it's fine to remove "including to Abedini, and/or SDRA" from that statement.

THE COURT: Okay.

MR. MARX: And then, Your Honor, our other concern relates to Instruction 15, which starts on page 23.

THE COURT: Okay.

MR. MARX: I'm focused specifically on page 24.

THE COURT: Okay.

MR. MARX: The -- the new language about cause. So I understand this -- and the government sent an email about this late last night -- essentially to insert into the substantive instruction on the IEEPA count concepts from the aiding and abetting charge, a 2(b)-type charge, which is where I understand the language about causing another person to commit an indispensable element comes from.

I think that confuses the two causation issues, and what it does here is expand the notion of causation pretty dramatically for the purposes of the substantive charge, without -- still without telling the jury what it means to actually cause someone to do something.

THE COURT: So on this one, we've been wrestling

with a statute that uses the word "cause." I've overruled the argument that we shouldn't have cause at all.

You expressed a concern about, you know, should we use proximate cause, should we use some other concept to explain the progression. And I had been responding to you that I didn't think that was necessary.

But what this proposed language from the government did was focus for me that what the statute is talking about is not proximate cause, but it's causing someone to do something. And so I -- I think the two revisions go together and help clarify or sufficiently clarify what is meant by "cause," which is not that you put a ripple in the water, and there are layers and layers of waves that come from it, but that you had -- you caused another person to do something.

And I think it's that adding in the other person gives it some definition. And then once you add in the other person, it is legally correct that the other person can just be a tool of yours. It doesn't have to have the intent.

So I -- your objection is noted, but I think it actually helps solve some of the cause problems that had been raised earlier.

MR. MARX: Okay. Well, to the extent the objection is noted, our concern is that the language coming from 2(b) talks about cause in the context of a principal agent-type relationship. That's what 2(b) is about. And so --

THE COURT: But I need something from -- I understand that this language doesn't come directly from instructions on -- model instructions on IEEPA. If we had a better handle on model instructions on IEEPA, we wouldn't be having this discussion.

But I do think it is trying to define the word "cause" in a way that makes sense here just as much as it does in the --

MR. MARX: And I understand that. And I think -- I understand what the Court is trying to accomplish -- and I think it does in that respect -- what it means to cause in terms of what you're causing; but what it means to cause something, the definition of that word, of the verb, I think is what the instruction doesn't help the jury understand.

THE COURT: Okay. That objection is noted. The fact that this language wasn't presented earlier and is in a different section of instructions doesn't help me with the question whether this is an accurate statement of what it is the government should be having to prove here or not.

And I don't think you're taking the position that the government has to prove that -- for example, if you didn't mail something directly, but you gave it to your secretary to mail, you have caused that person to mail. That person didn't have to have any bad intent. I think that's an accurate statement of the law.

MR. MARX: That's right. And that's the sort of prototypical 2(b) case, Your Honor, where you have a principal and agent. And --

THE COURT: But it's also the using cause here where the statute has "cause" in it.

MR. MARX: Correct. But the problem is, for example, if I make a recommendation that someone get lunch at the courthouse cafeteria, I haven't caused that person to get lunch there. If I send a colleague, or if I send an associate, someone who I have supervisory authority over to go get me a sandwich, I've caused that to happen.

THE COURT: But I've included your wording -- I've included making sure that "willfully" is modifying it. So I'm willfully causing someone else to engage in this violative act.

MR. MARX: And our concern is that if someone willfully starts long chains of causation that years later results in what the government contends is even an innocent violation of IEEPA, that will be sufficient when we don't believe that's a correct statement of the law.

THE COURT: I think the plain language, "caused the other person to" -- "willfully caused the other person to violate" doesn't encapture a long stream of events where there is no willful intent.

MS. BARSKY: Well, if I could just make one

recommendation. Your Honor said "using the other person as a tool," and I think that's what we're getting at. The FedEx person is a tool, and we're just looking for some kind of language indicating that that person is either an agent, a tool, they're carrying out --

THE COURT: I think "willfully caused the other person" gets you that.

MS. ESBROOK: We agree, Your Honor. No objection to the language as stated here in the proposal.

THE COURT: Okay. Anything else?

MR. MARX: No. So our objection is noted for the record.

THE COURT: Yes.

MR. MARX: And we'd preserve our objections to the extent Your Honor didn't endorse them, and we'll preserve them again after the charge, but thank you.

MS. ESBROOK: Nothing further from the government.

THE COURT: Okay. So that's the instructions.

On the verdict form, I went back and forth. I put the order originally to track the order of the instructions. It then looks weird when it doesn't go in order of the counts.

I will probably elaborate, when I read the instructions, to say, "Here's the verdict form. You can answer these questions in whatever order you find helpful."

And I've taken out the numbering, one, two, three, four, five, to just sort of push against that. So that's where the verdict form is.

Anything else on either of those?

MR. MARX: Just on the verdict form, Your Honor, we'd ask that, with regard to Counts 2, 4, 7, and 8, you remove the reference to aiding and abetting. We think that's a theory of liability. It's not actually the charged offense. The case law is clear that Section 2 doesn't define a crime. It just describes how you can be found guilty of it.

So we'd ask that that be removed and just list those as substantive violations of IEEPA and ITSR.

THE COURT: Any disagreement?

MS. ESBROOK: It is a theory of liability. I think it's an appropriate description of what Counts 2, 4, 7, and 8 are charging, that aiding and abetting can -- if the jury finds that Mr. Sadeghi aided and abetted another principal on the substantive counts, he may be held guilty as to those counts. So we would argue it should stay in.

THE COURT: The superseding indictment titles the counts this way.

MR. MARX: Right. But as we've discussed, we haven't wed ourselves to the language of the superseding indictment, and we've tried as much a possible to make it a

useful tool for the jury now to understand what Your Honor will say was -- the law is. So, you know, it says, "goods, technology, and services." We're not going to use that language. It does title -- whether that's appropriate or not to title the charge aiding and abetting --

THE COURT: Well, it titles it and it charges him with it. I mean, it is -- he's --

MR. MARX: But that's the crime, Your Honor, that he's charged -- it's a theory under which he could be held guilty for the crime of violating -- for example, if it just charged aiding and abetting, period, that wouldn't be a valid indictment. That wouldn't be an allegation of a crime.

THE COURT: But if the charge -- if it didn't charge aiding and abetting, you'd be saying I can't include an aiding and abetting instruction.

MR. MARX: I actually wouldn't, Your Honor, because the First Circuit says pretty clearly that can be read into every indictment whether it's alleged or not. So that would be a losing argument if I made it.

THE COURT: Okay. On that grounds, any disagreement that we can take out aiding and abetting from this? It's read in in every one, and the instructions say it, and this is just capturing the violation.

MS. ESBROOK: We think it's better and clearer for the jury to have it in the verdict form. It distinguishes

those counts from the conspiracy count in terms of how the jury can think about them. But if Your Honor takes it out --

THE COURT: I'm going to take it out.

MS. ESBROOK: -- we'll submit on that.

THE COURT: Okay. Anything else on those two things, the instructions and the verdict form?

MS. ESBROOK: Nothing from the government.

MR. MARX: No, Your Honor.

THE COURT: Okay. Have we cleared up all of the exhibits?

MS. PORTER: Yes, Your Honor. We confirmed that we have already offered all of the exhibits. We provided a copy to defense counsel. I believe we've made a few edits to some of the file names for what will go to the jurors -- to the jury on the JERS electronic copy. And I believe Ms. Lewis either is working on that or will have -- has it for the clerk already.

THE COURT: Okay. And then is the government, then, resting other than the *Petrozziello* ruling?

MS. PORTER: Yes, Your Honor.

THE COURT: And with regard to the *Petrozziello* ruling, I think I have excluded already the -- Ms. Hosseini's statements. So I believe the statements we have are the -- Mr. Abedini's and Mr. -- the Swedish --

MR. MARX: Swiss --

THE COURT: -- Swiss --

MS. PORTER: Mr. Khosrownejad, Your Honor.

THE COURT: And I believe we have excluded -- I have already excluded, as offered for the truth of the matter, the statements made prior to the 2016 conspiracy.

MS. PORTER: Yes, that's correct, Your Honor. Exhibit 2, which was the 2024 business plan for SDRA, was for a limited purpose -- 2014 -- and then also Exhibit 105 was the initial agreement of Mr. Khosrownejad. That also had a limiting instruction as to the -- what those were coming in for the purpose of, and those were not co-conspirator statements.

THE COURT: So on that, I do find that the statements of Mr. Abedini and Mr. Khosrownejad that have been conditionally offered thus far do meet the burden of probable -- the preponderance of the evidence that Mr. Abedini and Mr. Khosrownejad statements -- that when the statements were made, those individuals were members of a conspiracy, that Mr. Sadeghi at some point was also a member of the conspiracy, and that the statements were made in furtherance of the conspiracy. And I am allowing those to be considered by the jury.

Okay.

MR. MARX: Just please note our objection to the ruling, Your Honor. Thank you.

THE COURT: With that, is the defendant planning to put on a case or testify?

MR. FICK: No.

THE COURT: Okay. So let me do the colloquy with Mr. Sadeghi.

Mr. Sadeghi, do you understand that you have a constitutional right to testify?

THE DEFENDANT: Yes.

THE COURT: Do you understand that you have a constitutional right not to testify?

THE DEFENDANT: Yes, I do.

THE COURT: Have you freely discussed your right to testify and your right not to testify with your lawyer?

THE DEFENDANT: Yes.

THE COURT: To defense counsel: Have you had a sufficient opportunity to thoroughly discuss the case and the right to testify and the right not to testify with Mr. Sadeghi?

MR. FICK: Yes.

THE COURT: And, Mr. Sadeghi, do you understand that the decision whether to testify or not to testify is for you to make?

THE DEFENDANT: Yes.

THE COURT: Has anyone pressured you, made any threats or promises to you -- sorry. Has anyone pressured

you or made any threats or promises to you to testify or not to testify?

THE DEFENDANT: No.

THE COURT: Have you made a decision as to whether to testify or not to testify?

THE DEFENDANT: I made a decision, yes.

THE COURT: And what is your decision?

THE DEFENDANT: Not to testify.

THE COURT: Okay. So with that, I think -- do we have anything else we need to do out of the presence of the jury?

MR. FICK: I don't think so. I would appreciate a quick break before we do the closings, just to use the facilities.

MR. MARX: Well --

MR. FICK: And we --

MR. MARX: We also have a Rule 29 motion, if Your Honor wants to do that now that the government has rested.

THE COURT: I think this would be good so we don't have to call the jury back in and then break.

MR. MARX: I agree, Your Honor.

THE COURT: Do you want to do that first or take your break first?

MR. FICK: Can do the argument first, Your Honor.

That's fine.

THE COURT: Let's do that.

MR. MARX: Okay. So, Your Honor, at this time, now that the government has rested, we would move, pursuant to Rule 29, for a judgment of acquittal because the government's evidence presented at trial is insufficient to permit a rational jury to find proof beyond a reasonable doubt on all elements of all of the charged offenses.

I just want to focus briefly this morning, Your Honor, on a few of what we believe are the most glaring deficits in the prosecution's case. With respect to the substantive counts, 2, 4, 7, and 8, the jury heard no evidence that Mr. Sadeghi himself sent any goods to Iran, directly or indirectly, or that he caused anyone else to send goods to Iran, directly or indirectly.

What the jury heard was that Mr. Sadeghi had introduced Illumove as a vendor, but that ADI made an independent decision, which, in fact, Mr. Sadeghi did not influence. And the testimony was emphatic on that point.

And to the extent that the substantive charges relate not just to the project itself, but to the charged shipments which start in 2023, those happened years later and are after many, many independent decisions and activities by other people, which we don't think that the evidence supports a finding that Mr. Sadeghi caused.

Case 1:24-cr-10391-IT Document 351 Filed 07/10/26 Page 42 of 185



In addition, there's no evidence that the charged goods were ever sent or taken to Iran. And here I want to be very specific about this for the purposes of Rule 29. While the evidence may lead a jury to have a general impression that there was a lot of activity on the evaluation board project that involved a whole host of product families -- we saw that slide a number of times -- the charged -- the substantive charges actually relate to only two ADI products. Those are the ADXL380 and the 382, an accelerometer; and the ADIS16607, which is sometimes called the Raptor, which is an IMU product.

The jury heard no evidence whatsoever that those particular products, the subject of the substantive counts in the indictment, were ever taken or sent to Iran by any person. There's no evidence that anyone in Iran used them, had them; no photographs or other things. There may be evidence from which the jury could conclude that other devices or parts may have been found in Iran, but not the actual charged parts.

Further, there's no evidence that those charged goods, even if they were ever taken or sent to Iran, the particular accelerometer and the particular IMU, which are the subjects of Counts 2, 4, 7, and 8, that they were exported to Iran. I won't belabor that point. This is the argument we've made based on *United States v. Ehsan*.

There was no intention by anyone and the facts don't suggest that those goods were exported to Iran for the purposes of being integrated into trade or commerce in that country.

They were always intended to be used for the evaluation board project, which was a project for ADI, a US customer, in the United States, to create a marketing tool for itself for its use with its own customers.

Finally, with regard to the substantive counts, the jury didn't hear sufficient evidence to rationally conclude that Mr. Sadeghi willfully violated IEEPA or caused a violation of IEEPA in this unusual circumstance involving a vendor to a company that was working in Switzerland and allegedly also had activities going on in Iran.

There was no evidence that ITSR or OFAC, in its guidance, addresses this particular complicated scenario. While there's a lot of talk about embargoes and broad restrictions, the testimony the jury heard was, in fact, the ITSR doesn't even use the word "embargo," much less define the word "export."

To the extent that ADI employees generally have a notion that it's not appropriate to, quote, do business with Iran, the evidence is that the only training Mr. Sadeghi got on this topic was a single brief generic 20-minute online training at some time in early 2020, which was not, according

to Ms. DeCarr, focused on Iran.

He also got contrary advice and guidance from the company, from ADI, that he could take his work computer to Iran, do work there, and bring it back. He should just take the things he needs to get his work done, and use a VPN while he's there. And Mr. Del Corro testified, in fact, that's what he would do. He would go to Iran and do his work for ADI from there.

There's no evidence in the record that anyone ever told Mr. Sadeghi that the scenario the government describes in its case or what it alleges would itself violate ITSR or IEEPA or that he believed that or that he -- he demonstrated a consciousness of guilt in that regard in any way.

I think he was also entitled to rely on the fact that ADI has a very, very large compliance department, and it had to review all contracts and all shipments. It was not his responsibility, and it had information at its disposal about who Mr. Abedini was and who Illumove was, and it wasn't Mr. Sadeghi's responsibility to ensure either the company or its vendors' compliance.

With regard to the conspiracy counts, Your Honor, not only do they suffer from those same deficits, but, additionally, I think there are problems about intent, both with regard to Mr. Abedini and with regard to Mr. Sadeghi.

With regard to Mr. Abedini, the government needs to

establish, to the extent that he's the co-conspirator -- and I'm not sure there's anyone else who's really alleged to be, or the government can prove to be a co-conspirator -- the evidential record is incredibly thin. I believe there are only two documents in the case that even use the word "sanction" that are associated with Mr. Abedini.

One is the business plan document Your Honor referred to a moment ago. That's the 2014 document, which was sent by Mr. Abedini. No one's entirely sure for what purpose. And the other is the -- the initial agreement document related to Swiss Person 1, which also has a reference to sanctions.

Neither of those documents refer to US sanctions law. They don't refer to the evasion of any sanctions. And we don't think even though Your Honor ruled that they're admissible as some evidence that may reflect someone's intent because they were found in people's OneDrives or emailed by people, that's a far cry from saying that they are adequate proof for a rational jury to conclude beyond a reasonable doubt that people associated with those documents had the intent to violate US export law.

So we don't think they can establish that case even with regard to Mr. Abedini, even if they could show that he took things from Switzerland to Iran inappropriately. There's no evidence that he understood that to be a violation

of US sanctions law or he intended to be violating US sanctions law in that regard.

And that leaves us with Mr. Sadeghi. We don't think there's any evidence that the extent -- to the extent that he may have assisted Mr. Abedini in making a proposal to Illumove, in being helpful with a business associate that he knew, who wanted to pitch this work and, in fact, was a good candidate and was chosen on objective bases by ADI and did good work -- in fact, ADI wanted him to do more work when he was done -- there's no evidence to suggest that Mr. Sadeghi was motivated by anything other than trying to help what he believed was a strong candidate for a lawful job as a third-party vendor with ADI from getting that work and from performing capably for ADI.

There's no indication -- there's no documentary evidence or circumstantial evidence that would permit a rational jury to conclude that what Mr. Sadeghi really intended was somehow to help Mr. Abedini illegally acquire ADI parts. And it would be, I think, irrational for a jury to conclude that based on the record that -- that has been presented to them, given the extensive evidence we have that Mr. Abedini could have easily gotten all of these same parts directly from ADI simply by reaching out from EPFL and saying, "Can I have some free samples?" or going on DigiKey or Mouser or going to the markets that are available in

China, whether lawful or not.

There was just -- there was no reason to engage in this complicated scheme to use the evaluation board project as a way to get hands-on -- a handful of samples of old parts, obsoleted parts, which would be returned to ADI. And there's no evidence on this record to suggest beyond a reasonable doubt that that was Mr. Sadeghi's intent that he intended to join a conspiracy to accomplish that unlawful objective.

So for that reason, we'd ask that Your Honor enter a judgment of acquittal on all counts.

THE COURT: I'm reserving.

And on that, I think we're at the right time now to just take a short break before we start on the closings.

MR. DOLAN: Yes, Your Honor.

THE COURT: And I'm going to put these changes we've made into production. And so once we're done with the closing, I will hopefully be able to give the instructions. It may be that we have to, at that point, break in order to do that production, but I will try to do it now.

So see in you five -- ten minutes.

THE DEPUTY CLERK: All rise. We are in recess.

(Court in recess at 9:53 a.m.
and reconvened at 10:00 a.m.)

MR. FICK: I think the parties should rest on the

record too, right? And then we should actually renew the motion each time.

MR. MARX: Which we can do without elaboration, Your Honor --

MR. FICK: To renew the motion.

MR. MARX: -- but to satisfy the First Circuit.

THE COURT: So while you're working on the technology, we can still do those first couple things, which is, having you rest.

Having you rest, or having you --

MR. FICK: Move, rest, move.

THE COURT: -- rest, then I -- you'll do the motion on the whisper tech.

MR. MARX: Yes, Your Honor.

(Pause in proceedings.)

(Jury present.)

THE COURT: Apologies to the jury for our delay this morning.

And for the government?

MS. PORTER: The government rests, Your Honor.

THE COURT: Okay. And then I will hear from the defense quickly.

(Beginning of sidebar.)

MR. MARX: Thank you, Your Honor.

So at this time, now that the government has

rested, we would renew our motion for judgment of acquittal on counts for the reasons stated earlier on the record.

THE COURT: Your motion is noted. I'm reserving.

I take it there's no further reason to do any colloquy on -- for Mr. Sadeghi, but just so I'm clear, Mr. Sadeghi, now that the government has rested, do you -- you still choose not to testify; is that correct?

THE DEFENDANT: Yes.

THE COURT: Thank you.

MR. MARX: Thank you, Your Honor.

(End of sidebar.)

MR. FICK: Your Honor, the defense rests.

THE COURT: Okay. So we're now -- as soon as we get the technology all set --

Are we set?

MR. DOLAN: I believe we're changing batteries very briefly, Your Honor.

THE COURT: Okay. Okay. And then we will be ready for closing argument.

One more thing?

(Beginning of sidebar.)

MR. MARX: Thank you, Your Honor.

In an abundance of caution, now that the defense has rested, we'd again renew our motion for judgment of acquittal under Rule 29.

THE COURT: And, again, I'm reserving.
MR. MARX: Thank you.
(End of sidebar.)
MR. DOLAN: May I proceed?
THE COURT: Yes, you may.
MR. DOLAN: Members of the jury, the evidence in this case spanned more than a decade. Mohammad Abedini wanted to get American technology, specifically, ADI's sensors, to Iran for use in his business, SDRA.
Mahdi Sadeghi met him around 2016. This trial was about the fruits of that relationship, and the relationship that Abedini culted [*sic*] at ADI with the defendant's help.
The defendant knew that ADI products could not go to Iran. He knew about the sanctions. Circumstantial evidence has established that the defendant knew Abedini was bringing ADI parts, including those pre-released sensors, back to Iran.
But the evidence has also established that the defendant knew what Abedini was doing because Abedini told him in writing. The defendant helped him anyway. And ADI was none the wiser.
There are five counts for you to consider when you go back to deliberate. The first count is conspiracy to violate IEEPA. And then there's four violations of IEEPA. And the judge will give you instructions on the elements of

those offenses, but I want to start now with Count 1, the conspiracy.

And you'll receive her instructions. Again, her instructions are what control, not what I say or what the defense says. The judge gives you the law.

You'll learn that a conspiracy is -- here -- was an agreement to violate the sanctions against Iran. The defendant must have known the essential features of that agreement, what the object was. He must have known about the sanctions.

In the center of this conspiracy is SDRA. You've heard a lot about that over the course of this trial. You recognize the logo. You've seen it a number of times in various forms during the course of the evidence. Let's talk about what SDRA was.

So this is Exhibit 2-1, and I should say you will not have this PowerPoint back with you in the jury room. For the most part, I'm going to try to show my work and put exhibit stickers and pages on the PowerPoint. If that's helpful to you to know where you can find exhibits, great; if not, also great.

This is 2-1. This is an email from Mohammad Abedini back in 2014 to Hassan Salarieh. "Subject: Business Plan." And you saw that attachment.

Now, when you go to the actual document, you

remember this was admitted for a limited purpose, to show knowledge and intent. This is not a signed document. You can't say that it's a final business plan. That evidence isn't before you. But the fact that Mr. Abedini sent it shows something about his knowledge and intent for this new company back in 2014.

You see here his name, his details. You recognize that email address, mabedinyna@yahoo.com. And you recognize that name, SDRA.

And it had more details about the description of the main idea back in 2014: the design, implementation, and production of flight computers for navigation, guidance, and control of unmanned aerospace systems, missile systems, vehicles, and subsurface maritime products.

The products made in secondary fields of function: military applications, border surveying applications, returnable cargo, unmanned airplanes, airplane and vehicle remote control.

What else does this document tell you about Mr. Abedini's intent? It tells you how he evaluated the idea. Some of the issues was, it had a complex access due to advanced technology and lack of expertise. This is not the easiest idea to implement in the world. It's not rocket science, but it might be close. And among -- and this is among the technologies included in sanctions and hard to

access.

And Mr. Abedini identified sanctions as a risk for the business, and that he intended to procure parts from low-level sources.

You know, based on this document found on the defendant's computer, now in 2018, that this -- that Mr. Abedini made progress with his idea. The Sepehr navigation system, and you heard a lot of talk about that manual during the course of this trial. His idea became a reality.

You also know that because of some of the documents that came into evidence during -- at the very end of the government's case. This is a ledger from SDRA. And you can see here who owned the company: Hassan Salarieh, the individual that Mr. Abedini emailed way back in 2014; Kaveh Merat, another individual that you heard -- saw some evidence about; and Mohammad Abedininajafabadi.

And they were -- and they were actually doing business. This is a list of the customers. The ledger is quite long. You can use this evidence to see that that idea back in 2014 became a reality. SDRA was a going concern. They had a number of customers. They had a number of sales. This is a long document. It's technical. But you can see their number one customer, the Self Sufficiency of the Corps Aerospace Force. His idea became a reality.

And the defendant had experience with SDRA. He knew who they were. And he dealt with them throughout the conspiracy charged in the superseding indictment.

He knew who Mohammad Abedini was. You heard what he said to the FBI during his interview, that Mohammad Abedini was an expert in the fusion algorithm, that he knew what he was doing, well educated, and that he was -- had an impressive system.

It started back with Tacit Motion. You saw that email back in 2016 between Mr. Sadeghi and the individual at the top, Eugene Dariush Daneshvar. And you see Mr. Sadeghi's email, sending the SDRA website and talking about a meeting. It's Exhibit 3.

You know that that progressed to a contract. This email from Mr. Sadeghi to another individual in -- on January 8, 2018, forwarded what purports to be a contract. Let's look at that for a moment. It's the attachment "final Vira SDRA contract.pdf."

This is the first page. You can see that it purports to be a contract between SDRA represented by Kaveh Merat and the defendant, represented -- Tacit Motion, represented by the defendant.

This is the final page. Now, it's not signed. I believe it's a Word document originally. So how can you know that there was actually a contract? How can you conclude

without a signature that this contract was actually signed?

Well, look at the date. The date that the -- that this document says it was signed was February 7, 2017. What else happened on February 7, 2017, based on the evidence before you? Well, you saw this picture from the defendant's cell phone recovered during the search. He appears to be holding a pen, as does the individual next to him, with papers opened, shaking hands, smiles on their faces.

Where was the picture taken? Again, you have the metadata that tells you it was taken on or -- on February 7, 2017, the same day that the contract said it was going to be signed at the seller's -- at SDRA's offices in Tehran. And you have the lat/lon, the lat/lon going back to a location in Tehran. It's reasonable to conclude that the contract was actually signed, despite you not having a wet ink signature in evidence.

And the defendant took picture with the team. You can see that same day this picture was taken, same location, with a number of individuals, including Mr. Merat on the left, the individual that the defendant was posing with, signing the contract; Mr. Abedini in the middle.

You have evidence from the WhatsApp chats showing pictures taken with Mr. Abedini -- you can go back to that -- and a number of other people. We'll get to those individuals in a moment. So it started with Tacit Motion, and this

venture included testing in Iran. So you remember this. You remember the testimony from Mehdi Aghagolzadeh about what Tacit Motion was doing and the pitch deck that was provided to Analog Devices. And you see the pictures of the testing that was being done.

Look at the tiles in the picture of the Tacit Motion pitch deck. This is another page in the pitch deck of individuals demonstrating the motion capture system.

Going back to the pictures on Mr. -- on the defendant's phone, you can see the tiles in this picture kind of matches. And do you see the individuals there in that picture? Going to the pictures on the defendant's slide deck, some of them are the same individuals that engaged in the testing. You can make that comparison yourself, Exhibit 50.

And you know that this progressed to SadraLabs. Mr. Abedini, when he first started thinking about incorporating a business in Switzerland with Mr. Khosrownejad. And there was a letter of intent in that business plan -- you can look at that -- and a demonstration of the product.

You recognize the Sepehr navigation system on the left and a demonstration on the right of an individual about to demonstrate motion capture, the motion capture system.

But look at that picture. First of all, there's a

letter of intent. And this is being developed by SadraLabs, their first customer.

If you look at the picture a little more closely, I wonder what you see in the background. It's the SDRA logo. This was being done in Iran, and the defendant knew it. It was his company. It was his partnership.

And this is the letter of intent that said they were in business together. The defendant's signature. And talk about a verbal agreement that was submitted alongside the business plan.

I don't think you'll see the name of the company in this letter of intent. Your recollection controls when you review the evidence, and there's a reason why, but this is an attachment to the business plan.

And you know that parts went out. This is the email that Mr. Sadeghi forwarded to Abedini on April 4, 2017, with the receipts from DigiKey and from Mouser, a number of electronic parts. You see that the customer reference number for some of those was SDRA, some of them populated just the part that was being purchased. Others populated to SDRA. That is not a coincidence.

And you saw the subsequent forward by info.sdra. -- info@sdra.co.ir of those same documents.

You know that the defendant was on site at SDRA. This is the evidence from the defendant's computer showing

that he had the password to the Wi-Fi, the same as his cell phone also had the password to the Wi-Fi. And a number of network connections actually connecting to the Wi-Fi that he had the password for. You can see that, as far as this password, it last auto connected on September 7, 2020. And you can see, going to the chats between Abedini and the defendant, that they talked about meeting that very day, September 7, 2020.

And there's the address that Abedini gave the defendant as to where the SDRA office was on that date. You see the location going back to the metadata, Darya Dead-End Drive, the same address that the defendant -- that Abedini gave the defendant on that day where they were to meet.

You also knew that -- know that the defendant was familiar with SDRA from other chats that the defendant had with Abedini. For example, back in 2017, he received these forwards from another individual, Hamidreza Razavi, and you'll hear -- see some more evidence about him as we go forward today.

You see the file name. You don't know what was in it. The file name is SDRA2.mp4, SDRA.mp4.

This matches what the Defendant told the FBI. He said he went back to Iran every year. He said he regularly visited the SDRA offices. And he understood their product. Remember, the defendant is highly educated. You heard him

tell the FBI that, and it's true. He has a PhD in MEMS. He had the manual and the schematic on his laptop.

And you heard testimony that those are the things that people in his position regularly consult when they want to know how a product is going to work and its applications. The defendant was well trained and had enough experience to understand exactly what this was and what it did.

And this is the schematic. You can see, at the top left, that it was designed for an ADI part. And he understood -- the defendant understood -- that all this was based in Iran.

Going back to the chats, you see this is the chat where the defendant received an email in Farsi, that is Analog Devices account once he started at that company. He immediately reached out to Abedini, said, "Is this you?"

Mr. Abedini said it wasn't.

And then he said, "Oh, yeah. It's also to Analog's email." Everyone knew you were not supposed to be doing that.

Mr. Abedini said, "No, our guys are not this obvious."

And defendant said, "Exactly. I figured it wasn't. I figured it wasn't you. I know you're not that obvious." This is approximately 2022. You saw that they first met in 2016. This is well into the relationship. The defendant

very well understood exactly how the relationship was working at this point.

And there's also some discussion about locations. You saw some evidence from the Illumove ledger about the use of VPNs. That's something that the defendant understood as well. For example, this text from Abedini to the defendant, "I finally made a new account, man. And it worked with that. I placed the order, then it cursed at me and said I logged in from a bad place and we will close your account. I was logged in with my Switzerland computer."

You can infer exactly what Abedini meant. The bad place was Iran. You cannot log in to a US business and attempt to order electronic parts with an IP address that goes back to Iran. This is what happens. They close your account. And the defendant responded to this email -- or this text message.

And you recall the testimony from Dakota Hopper about the defendant's interview with CBP, where he said that he had no business in Iran. There's a reason why he said that. It wasn't true, but there was a reason why he said that, because he knew what it would have meant to say the opposite at that point in time. The defendant had plenty of business in Iran. He had started business in 2016, and it continued unbroken until the day of his arrest.

The defendant also knew about the sanctions. You

heard the testimony from the OFAC witness, early in the case, about two weeks ago, about exactly what the sanctions are. You also received instructions from the judge about what the sanctions are as well. You can't send anything to Iran without a license. It's a broad prohibition, with very few exceptions that are not applicable here.

The defendant knew about that. You heard him say at his interview with the FBI, recorded, that he had -- that he learned about export control through his training at ADI. And then you heard him argue with Special Agent Neal about whether it was legal to send the algorithm back and forth from -- to Iran. And you heard him quibble with the details.

This is not about the algorithm. This is about the goods. These are about the sensors that we've talked about throughout this case. But you heard what the defendant said exactly about that. And the fact that he was quibbling about technicalities shows he understood exactly what those technicalities are.

And even if -- and you know also that he received that understanding from his training at ADI. The day he signed up, he received this attachment to that agreement -- it's in evidence -- talking about Iran being in Country Group E. It's a no-go.

You also saw that he received export control training very early in his tenure at ADI. Now, export

control training might be complicated until you get to the embargo, until you get to companies where you just can't send anything. That's where it gets real simple. And you heard that testimony over the course of this trial from all those ADI witnesses over and over and over again. ADI company policy matches the law. You can't send anything to Iran.

And the defendant was told that. He was told that often. He was told that through emails like this, where Russia was added to the embargo list, and there was a reminder: Here are the countries that fit, Cuba, Iran, North Korea, Russia, Sudan, Syria. Those are companies that ADI will not do business with as of at a date. And Iran has been on that list for a while. There's no confusion.

But even if there was, this is not the type of item -- these sensors, these pre-released sensors, whether it's the Raptor, whether it's the Osprey, whatever the goods that we're talking about -- and we're going to talk about in a little more detail -- although I realize we've thrown a lot of numbers at you, we've thrown a lot of abbreviations at you.

You've probably learned more than you ever wanted to know about sensors and accelerometers and gyroscopes. Those are dual-use goods. Those are goods where, even if it wasn't going to Iran, you need to be careful about where they go.

You heard testimony from Spencer Thompson about that. This is the Osprey. And these are -- this is a list of a number of other ADI IMUs. They certainly have their applications in other fields other than the military. That's absolutely clear. And the defendant was not -- did not work in the military component of ADI.

But he well understood that these things could apply to that as well, that these were dual-use goods, that you have to be careful about where they go.

You remember the testimony of Dakota Hopper about what he said to CBP. "I understand that I'm in a sensitive field. That's why I'm careful."

He said, "I know about sanctions because I have to know about sanctions because it's my job." And you heard what he said to the FBI, Special Agent Neal, about his knowledge.

So now let's transition. We've talked about -- a lot so far about pre-2019 -- the conspiracy when the defendant was -- Tacit Motion and working his own business and had that initial relationship with Mr. Abedini. And then he got hired at Analog Devices. He got hired into their Wilmington office, right here in Massachusetts. And despite that, the relationship with Abedini did not end. In fact, it continued and it grew.

You heard about the setup and introduction of

Illumove, how that company was introduced to ADI. You heard Tzeno Galchev's testimony. Pretty simple, from his perspective. There was an email recommendation from a colleague he had known for a long time about a company and an individual in Switzerland that could help ADI out with a project that they needed, a project that would be useful, and a project that they did not have the internal capability to do.

From Tzeno Galchev's perspective, this was all arm's length and on the up-and-up. You now know differently.

You've seen the WhatsApp records. You've seen the Telegram records. You've seen behind the scenes of the relationship between Abedini and the defendant and what was really happening.

You saw the record of Mr. -- of the defendant purchasing the airline ticket for Mr. Abedini to Switzerland from Iran. Shortly before, Illumove was officially stood up in Switzerland. And you saw the purchase of the website, GoDaddy.com, August 17, 2019. Before then, Illumove had no web presence. This is the website.

And you saw the testing of the emails and the text messages going back and forth leading up to the introduction. Abedini telling Sadeghi, "Here's the first email. Let's test it."

Here's another email, m.abedini@illumove.com.

Let's test that.

And then, finally, the defendant testing it with his Analog Devices email, leading into that introduction to Tzeno Galchev.

Now, this was not the actual introduction. "Hi Tzeno, here is the contact person of the company I was talking about: Mohammad Abedini at m.abedini@illumove.com." There was a first conversation before this happened where the defendant talked about who Abedini was and what he could do for ADI, and then there was a subsequent email providing Tzeno Galchev the information so that he could follow up. Mr. Abedini was bcc'd on this communication.

What happened next? Mr. Galchev reached out to Abedini, carbon copying Sadeghi, taking the next step in the relationship so that they could have an NDA.

Interestingly, even this simple step of signing an NDA needed a little bit of conversation behind the scenes. You see here on September 2, 2019, Abedini is sending to Sadeghi a file. You don't have that file, but you have the title. "ILL-MAI-10716-Mutual Confidentiality Agreement January 2017."

And then you have, a day later, Abedini sending that same file back to Tzeno Galchev, and Tzeno Galchev executing it. He wanted to make sure with Sadeghi that he was doing it right. Same file name. You can infer that it's

the same file.

That was the first step. Now the introduction is made. Now it's time for the RFP to get the evaluation board project. Again, you heard testimony from ADI witnesses, whether it's Tzeno Galchev or Mark Looney, about how this all appeared to be on the up-and-up. They were a simple vendor. There was a bidding process. It was arm's length. And nothing was amiss. You now know differently.

You saw the WhatsApp and the Telegram records behind the scenes of how the defendant cultivated that relationship and facilitated everything to make sure that this would go smoothly to help -- to help Mr. Abedini get the project.

Here's that initial email from Tzeno Galchev, now in October 11th of 2019, sending the slide deck for the proposal. Sadeghi is not on it. And so then, if you look at the top, Sadeghi, now from his Gmail, receives the proposal from Abedini, not to his Analog Devices account, but to his personal account.

November 20, 2019, it's time to set up a meeting to talk about the Illumove proposal. Now, this is the evaluation board proposal. From Tzeno Galchev to Mr. Abedini to the defendant and to another ADI employee, look at the date: November 20, 2019.

One day later, you can see Abedini sending a file:

"Proposal v0.3.docx."

And Sadeghi responds the following day with another file: "v0.3_MS."

The defendant was providing edits and comments to the proposal for Abedini to submit. That was on November 22, 2019. The initial proposal was submitted that same day, the same day that the defendant submitted his comments and edit to Abedini.

Now, the other individual on this proposal, Mostafa Khosrownejad, you've heard some evidence of his involvement with Illumove. So let's take a pause and talk about him for a moment.

This is Exhibit 88 from Khosrownejad to a Mohammad Abedini, and it's forwarding a long email chain. And there's one part of it that's relevant, and it's right there before you, that they were changing the name of the company from SadraLab to Illumove. Khosrownejad said that the name had not been approved by their board, and so please refer to them as Illumove SA going forward.

This is another email from Leila Hosseini talking about the setup of Illumove. What's interesting about this email is -- Hosseini -- and we'll talk about her more in a little while, but she was doing both. She was ordering office furniture for SDRA and setting up a logo for Illumove, it's because of the relationship between SDRA and Illumove.

It's the same person doing both jobs, getting things squared away in the lead-up to -- moving forward with this proposal and project. You see the date, December 29th of 2019.

This is Exhibit 105-1. This is another one of those documents that you can only consider for a limited purpose. This is a document that was found in Mr. Khosrownejad's cloud account. It's unsigned. You can see that it -- the name of the document file is "Agreement Initial," but it's not signed. You don't know if it was executed. You don't have the same type of indicia that you have to say that this was a formal agreement as you do for the SDRA -- the SDRA contract that the defendant signed in Iran, where you can conclude from other circumstances that this is the document and this went forward.

You can consider this for Mr. Khosrownejad's intent and his understanding of Illumove and SDRA.

So you can see that this agreement that was found, this initial agreement that was found in Mr. Khosrownejad's OneDrive account, stated that it was going to be between SDRA and Mr. Khosrownejad. And the purpose was to register a joint stock company in Switzerland called Illumove. It was the sales and branding arm of SDRA.

It talked about Mr. Abedini. And look at the bottom. Look at Note 2. That's a CYA. "In performing his duties, Party 2," meaning Mr. Khosrownejad, "will not take

responsibility for any illegal activities that violate international laws." Let's get specific -- specifically the laws of Iran or Switzerland or for circumvention of sanctions.

The reason why this was saved to Mr. Khosrownejad's cloud account, even unexecuted, is because this was what was in his mind about Illumove and SDRA. He wanted to make sure that he CYA, that he knew that he had a document that said he wasn't responsible for what was going to happen.

This is back to the RFP. In case you have any -- any questions about where this information came from or some of the data inside, let's look at some of the pictures. This is on page 8. This is a picture of the proposal from Illumove and what they were going to do.

If you look at the details, you can see the logo, the SDRA logo on the top. They didn't change the software. They didn't change the icon at the top of the picture.

And the defendant noticed. Let's go to the text messages. "Mahdi" -- Abedini said, "Mahdi, you didn't say. Why shouldn't we open the software?"

Sadeghi responds, "Because there will be questions as to who did you make this for?"

Those are questions that the defendant knew the answer to. And that wasn't the answer. "You can say you made it for us (Tacit Motion)," not "You made it for us,

Tacit Motion." "You can say that you made it for us." The answer would not have been acceptable to ADI. None of them were told about Abedini's connection to SDRA. None of them were told about Abedini's connection to an Iranian company. None of them were told the backstory.

But Sadeghi continued facilitating the conversation, talking about the meeting with Abedini. And you can see in the middle conversation Mr. Sadeghi's comment, "I'm doing all I can so that you guys would get it." That means the proposal.

Abedini responds, "Thank you."

But it keeps going. You see on the left, on the date November 6, 2019, from Abedini, "I sent you a file on Telegram. Take a look if you have time."

Then you go to the Telegram, and you can see the file: "Proposal.v0.5.docx." And you see Sadeghi's response, 11 -- on November 27, 2019, same file, now "_MS." He provided edits and comments to the proposal again.

Now, you heard that the project didn't move forward. COVID happened. A lot of things changed. It was delayed, as were many things. But it picked back up in March -- in March of 2021. You see this initial email from Mark Looney. You heard him testify about what he knew and his involvement with Illumove. This was to Mr. Sadeghi, talking about a meeting, looking forward to our discussion

and to getting this rolling, talking about the evaluation platform and Illumove. They seem -- "Based on your assessments, Illumove seems to offer a nice plan and has a lot of good starting points."

Let's go behind the scenes, the things that Mr. Looney did not know about. You see on the left this text message from Abedini, copying an email from Ian Beavers into the text and asking Sadeghi, "Hello, he emailed this."

Sadeghi responding, "If you confirm, he will cancel the project right away."

Abedini, "So would it be too late if I responded tomorrow?"

"I have to convince Kaveh." You know who Kaveh is. The defendant knows who Kaveh is.

Sadeghi says, "Respond tomorrow. No, it wouldn't be too late."

And then Sadeghi responds again, "I checked. Before you talk to Kaveh, let's talk on the phone. Also, don't respond to Ian for now." The defendant was facilitating the relationship throughout behind the scenes.

Abedini sends his proposed response to Mr. Beavers in the chat, and Sadeghi responds, wordsmithing a little bit, but otherwise approving it.

And the defendant gave him the good news. "Do you have any news from Ian and friends?"

The defendant says, "Yes, I will tell you."

"It's good news. We want to close on your second proposal."

And that's what happened. Mr. Abedini got the proposal from ADI. He got the project. The evaluation board went forward. And you heard a lot of testimony about what that was.

This is the statement of work, and you can see, on paper, Ian Beavers signed on behalf of ADI, Abedini signed on behalf of Illumove. And the defendant was only listed as a backup engineer, backup -- backup ADI support engineer. That was not his role.

But you know that the evaluation board platform was pretty broad. It was designed to support a whole range of ADI sensors to make it easier for customers to work -- for customers to work with ADI products.

You heard what the defendant said to the FBI. First, he said Mr. Abedini was an acquaintance. He then said, "This wasn't my project. I knew about it. I knew Mr. Abedini, but other people did this."

That was the goal. The goal for this -- for the defendant was to be able to say that, to keep his name off the records and to have Mr. Looney say what he said to you in this courtroom: "I thought he was aboveboard. He came to me separately and said, 'Hey, I just want to make sure that I'm

not really influencing this, like, I want it to be your decision.'"

Classic manipulation so that he would get that testimony.

Because the defendant had a bigger role. See this text message from the defendant? "Look, Ian messed up the project a little. We need your help. We want you to also add our new product to your first release of eval board, 380/2."

And you remember what that product is. It's one of the products that's supported on the big board.

"We can also send you samples. Let me know soon."

And this was Abedini's response: "Look, we have not worked on the 367 to be delivered in Phase 1. We are supposed to work on these," listing off a number of products. "Do you want us to replace that one with 380x? We have not started the last one yet."

And then Mr. Abedini's response: "I am boarding the airplane right now to go to Switzerland. I will be there for one week. It would be great if you could send the samples tomorrow so I get them while I'm there. If I'm not there to take delivery of it myself, getting it to Iran will become an issue again."

He told him. He knew already, but he told him in writing.

"To be honest, by the end of October is a little difficult, but we will try."

Now, Sadeghi -- the defendant responds, on the right-hand side of this, "I just spoke to Pablo. We agreed to do 380/2 instead of 317. And he will also send you the sample."

But think about this email on the left. "To be honest, by the end of October is a little difficult, but we will try."

Abedini was leaving. He was going back to Iran. He told the defendant that. This work was not going to be done in Switzerland. It was going to be done in Iran. The defendant understood the evaluation board proposal. He understood that Abedini needed the sensors to be able to do the testing. He needed to run the test on site. You heard testimony from Pablo del Corro about that. That's how you get all of the data to know what things are doing and whether it's working. It's not something that you can do remotely. You need to actually be -- have it with you.

By the end of October, he's back in Iran shortly thereafter. And we'll talk about the exact timing of that in a moment.

But this work was done by SDRA throughout. And you'll see the evidence of that through the course of the exhibits.

For example, you recognize this. This is an email from the defendant to the team forwarding the videos that Abedini sent about where they were in the project. This was the phase of the project that they were in, and it was the videos showing proof of concept, showing that it worked.

Take a look at -- there's a still of the video; you can watch it back in the jury room. There's a system to do that. Recognize the logo? They were still using the SDRA logo on all of the applications. That email from Hosseini trying to get a new logo for Illumove apparently hadn't taken yet or it hadn't been incorporated.

And this is another email from Abedini to Hosseini, attaching, basically, a draft of the statement of work. And so what I want to focus on here is Hosseini, because this is evidence -- and we'll walk through a little bit of this right now -- that the individuals that were working on the project were SDRA employees based in Iran.

And so take a look at -- remember this name, and we'll go over it a few more times, Leila Hosseini, and you see on the right, this is -- you recognize this design. This is the Illumove project that was being suggested by Abedini at the time.

And then compare it to Exhibit 222. And we'll go through the details; I'll zoom in on a few of these so you don't have to strain your eyes. These are the bank records

of SDRA. These were recovered from Abedini's account. It's a long file. But it has details of what SDRA was doing and who it was paying.

You can see that it has -- and there's the Farsi version. This is the translated version. There's a logo on here. But you can see that these are not the same type of records that you have for the business plan, for the -- in 2014. They're not the same type of records from Khosrownejad, where it appears to be a draft document you can't conclude that it is what it is. These are bank records. You have them from this account because they're bank records from Iran instead of Bank of America or Chase or what have you.

But what do they say? Let's go back to Leila Hosseini: "Salary for June" -- I'm just going to give a few examples, one example for each individual -- she was receiving salary from SDRA. She was a SDRA employee.

Recognize this individual, vakh1375@gmail.com, and then on the right, Vahid Khodaei, the email self-populated for that one, receiving the Raptor datasheet from Abedini that had been forwarded from the defendant.

And then also on the right, receiving details of what was going to by shipped by Pablo del Corro at ADI to Illumove.

You've heard a lot about datasheets. You know the

datasheet is necessary in order to actually work with the product. You can't know what the product is doing unless you have the datasheet. And that's why ADI was sending these draft preliminary datasheets to -- to Illumove and to Abedini.

So let's look -- he did other work, Vahid Khodaei. You see the -- remember this attachment, the MCB tester proposal? And the metadata shows that it was created by Vahid Khodaei. And it has a date.

Who was Vahid Khodaei? Another SDRA employee. "Salary for March."

Let's talk about another one. This is another attachment setting forth a number of questions for Pablo del Corro about how the project was working and troubleshooting.

Arman Ilmak, the metadata says, created this one. "Salary for May." Another SDRA employee.

This is another attachment that went to ADI with questions. You can see that this was created by Hamidreza Razavi. Who was that? Another SDRA employee.

These are the individuals that you had to have the expertise to work on this project. These are the ones who did the work. Remember the testimony from the ADI people. You needed someone who would understand the software, the hardware, and how it all worked together. This was not a

one-man job. These were the rest of the individuals that were doing the work.

And we've talked about Kaveh. Who was Kaveh? Another SDRA employee.

When you go through the evidence back in the jury room, look for those names. They're sprinkled throughout. Vahid Khodaei, Leila Hosseini, Arman Ilmak, Hamidreza Razavi, Kaveh Merat.

You know where they are not? In the Illumove ledger. There's a separate exhibit that came in, Exhibit 220-1, that laid out all of the expenses for Illumove in pretty significant detail.

You see that it laid out salary of individuals, Mohammad, Zohreh, Mostafa, Khosrownejad, and another individual. None of those individuals are in any of the documents you will see about doing the work, setting aside Abedini. We talked about him. But you've heard nothing else about any of those other individuals.

Hamidreza Razavi, Arman Ilmak, Kaveh Merat, none of those individuals were getting -- were being paid Swiss insurance so that they could be listed as Swiss employees. None of them were on the books as Illumove employees, according to Abedini's records. That's because they weren't. They were employees of SDRA, based in Iran.

What was happening in Switzerland was they were

checking the mail. They had to get the mail out the door. They had to get things that they were receiving from ADI and send it back after the work was done. And so they had to pay, periodically, a fee so that someone would check the mail.

And Khosrownejad knew that. You see this email that he sent to the EPFL individuals? "As you know, we only have a mailbox there, and we do not produce any trash." It's because they're not doing the work there. There's no one home. They're not producing any trash, despite working with hardware and samples and soldering things on and all -- the reason why is because it's not happening there.

And then you see the response from EPFL. Not, "Oh, you don't have an office?" It's, "You should contact them directly and provide them with a certificate so that they can see you do not have office space. Maybe you can dodge that tax." It wasn't happening in Switzerland.

And you saw, through the course of the evidence and some of the other exhibits, that there were issues with shipments, that Abedini was playing a little bit of shell game, a shell game that the defendant helped him with and that he was aware of.

So this is 206-1 from Abedini to the defendant, "Look, this is what happened: when I was in Switzerland, I sent Pablo two boards. I checked the boards initially and

they worked properly. Of course we had not activated all the features of the board at that time, so I can't say for certain that everything worked well. The boards don't work properly right now."

Going down, possible there was an issue.

Look at the bottom: "Now Pablo says send me two boards that you are sure they work, and I don't know what to do."

Now, what you would actually do is send him two boards that work.

He said it -- send it in a way that I would receive it at home by the end of the week and start working with it on Monday. He also provided his home address.

Now, why is this problem? It's a problem because you can't send the boards from Iran to the United States. That's the whole purpose of going to Switzerland or to Italy and mailing things from there. You can't do it.

And you don't see the defendant providing the answer that is obvious to everybody else, walk over to the post office and put them in the mail and send them with whatever costs you have to pay to get them there when Mr. del Corro wants them.

He says, "Well, tell him it won't reach you by the end of the week." The defendant understood the issue. He understood immediately why Abedini could not send the boards

the way Mr. del Corro wanted them and get them to him so quickly.

And then you see the excuse, "Finally, we had to ship it from Italy, because the DHL Switzerland just could start shipping from Tuesday next week."

The mail works in Switzerland. It's not -- it's not a problem. The reason why he had to make this excuse was so del Corro would not have any suspicion about why there was a delay.

You saw the summary chart of Abedini's travel; and, obviously, you know that that's not complete. You know it just from looking at its face. But look at the bottom, starting from the bottom and going to the top. Once that Illumove project kicked off -- back and forth, back and forth, staying in Switzerland for a week at a time, maybe two, and going right back.

There's a reason for that. He was going to ship and then return. He was going to pick up and then return so he could get the work done in Iran.

This was not the only project that Mr. Abedini was able to get from ADI. You recall the SEA project and the testimony of Gary Wolberg. The software-enabled analog, SEA. Now, you heard him say that the defendant wasn't really involved in that. And while that's true on paper, you can see that Abedini did consult with him.

On the left, you see Abedini forwarding to Sadeghi, word for word, the email he received inviting him to participate in the project. You can see on the right that Sadeghi isn't on that email, that it's from del Corro to Abedini. And the bottom one is talking about Gary Wolberg, sending it to a number of individuals at ADI.

Looking at the top, that's an email that Abedini forwarded to Kaveh Merat. This was the next stage of the relationship. This was advancing beyond -- beyond the evaluation board proposal.

At this point, Abedini is known. ADI knows who he is, knows that he's capable, knows that he's a good engineer, knows that his team is good, and they want to broaden the relationship.

Here's the email from Gary Wolberg talking about the meeting. You can see the attendees, Mohammad -- Mohammad Abedini, the CEO; Kaveh Merat -- it just says Kaveh, the main CTO; and the Illumove hardware team. It doesn't say who those individuals are in this email, 156.

But the next one does, from Gary Wolberg, "Please provide email addresses for Arman and Hamid, and I'll look for openings on the days that you mentioned."

You know who those individuals are, and Abedini confirms. A. Almack and H. Razavi, SDRA employees, individuals that were being paid salary by SDRA throughout.

This work was going to be done in Iran, too, if it had happened.

There were additional opportunities that the defendant facilitated for Abedini and for SDRA. On the right, you have a text message from the defendant -- from Abedini to the defendant, again, laying out -- this looks fine if you look at it right like this. It's fairly formal. That's because it's a copy of an email, an email that the defendant told Abedini to send about a new proposal.

And you see, word for word, Abedini sent that email to Sadeghi at his Analog address after making sure it was okay on the other side.

And then you see the response from Sadeghi, forwarding it up the chain, "Hi Mark, what do you think? I guess we should have a call with them." "I guess." He was facilitating this throughout.

That included other proposals. You see on the left, Abedini is sharing the ADIS16550_NAV_proposal_v0.2 with the defendant.

And then on the right, that same proposal is shared less than a month later officially with Sadeghi. I mean, he had already seen it, but now it's going to his Analog account and copying Mr. Galchev.

The defendant was involved throughout, facilitating the relationship, facilitating Abedini's access, making sure

that nothing was going wrong, helping his business partner from as far back as 2016 build a better relationship with ADI, with ADI not knowing any of the true facts. It's an Iranian company. Mr. Abedini is the CEO of SDRA. Never mentioned.

And you heard about Sensors Converge. This is the Osprey. This is Spencer Thompson's testimony. Again, here, you have Abedini sending the potential proposal to Sadeghi in advance of formal submission, v0.3.PDF. After receiving it, "What are the next steps?" That's from Sadeghi.

We'll talk more about Sensors Converge in a minute, but what I want to focus on here is the date for this next email -- text message from Mr. Abedini to Sadeghi, "We sorted out the wires. Is it good?"

Mr. Sadeghi, "The appearance of it is much better." He was involved throughout, until and including this text message on December 15, 2024, the day before his arrest. On December 16, 2024, this conspiracy was ongoing. The relationship was live. The access continued until that date, until the arrest. It didn't stop. It didn't end. It was continuing. And from Mr. Abedini's perspective, it was growing stronger. He was getting additional opportunities. He was getting additional parts. He had moved past the evaluation board project and was getting other opportunities with ADI with parts that weren't even in that project, like

the Osprey, which we'll talk about in a moment.

This is the Illumove ledger. And if you compare this ledger to some of the other evidence that you've seen, it shows that Illumove was doing the work of SDRA too, that they were receiving parts in Switzerland separate and apart from the Illumove -- from ADI, that they were purchasing parts for something called the Rasam and the Shahab, and you're familiar with the Sepehr, 151.

That's their products. This is the -- Exhibit 223, the financial statement from SDRA found on the cloud, in the cloud storage. These are the products. These are SDRA products. This is SDRA's fiscal year-ending statement: the Sepehr, the Rasam, the Shahab.

And the bank statements, down payment for Rasam. It was SDRA the whole time. Illumove was a front designed for one purpose: to look good to the outside world.

Because if you're just dealing with Tacit Motion, you don't need it, but when you move up the chain to ADI, they know you cannot deal with an Iranian company. You cannot deal with Mr. Abedini. It needs to be something else. Something the defendant understood.

That's the conspiracy. That's the conspiracy that began in 2016 and ended in December 2024. That's the conspiracy of Mr. Abedini, that the defendant joined and participated in throughout, facilitating that relationship

with ADI, where the defendant well understood that parts were going to be shipped to -- to Abedini and then brought to Iran for work. He knew it because of his understanding of SDRA, and he knew it because of his long relationship with Abedini.

So the substantive counts, the actual shipments that are charged are Counts 2, 4, 7, and 8.

The judge will instruct you on the law. What I'll say for right now is it involves -- the act that has to have occurred is the export, reexport, or supply of goods. And, here, we're talking about those sensors that you've heard so much about.

She'll tell you that it can't go to Iran either directly or indirectly. It doesn't become legal just because there's a layover in Switzerland. It can't go direct. It can't go indirect.

She's going to give you an instruction about causing. And so her instruction controls. She's the one -- the judge is the one that will tell you about the law.

But what causing means is if you cause something to happen, just because you use an innocent intermediary to do it doesn't mean that you're not liable for the offense. And so we'll walk through an example of what that looks like as to Count 2 in a moment, but pay attention to "causing" and what the defendant actually did to make sure that these shipments to Abedini happened.

And you'll hear about aiding and abetting. Aiding and abetting is another form of liability. So you'll have instructions about that too, but the defendant is guilty just as if he did it himself, as someone else-- as if Mr. Abedini caused these illegal exports to happen and the defendant helped him. That's what aiding and abetting means, and you'll hear the judge's instructions on that as well.

And so let's walk through Count 2 for a moment. Count 2, you'll see that this is the date of the shipment. This is September 29th of 2022. The ADXL382, this is the internal Analog Devices record reflecting the shipment that went out the door. You saw evidence about what was going on behind the scenes for this specific shipment.

Look at the date: September 27, 2022. This is, again, that discussion where Abedini told him -- Abedini told Sadeghi, "If I'm not there to take delivery of it myself, getting it to Iran will become an issue again."

One of the other interesting things about this text message is the level of familiarity it conveys. He didn't have to explain that there was a prior issue before, because, remember, this is right after the defendant visited Abedini in Iran. He was on-site at SDRA. They toured the office, like, they were together. They took selfies. Like, this was right after that happened. There's a level of understanding about what's happening with Abedini and SDRA at the time of

this text message.

"To be honest, by the end of October is a little difficult, but we will try."

And here's the comment from Sadeghi, "I just spoke to Pablo. We agreed that you will do 380/2 instead of 317. He will also send you the sample."

That's causing. That's what causing is. "He will also send you the sample." And then it happened. And then Pablo went to the shipper at ADI, and they sent the samples to Abedini and Illumove in Switzerland. Caused, knowing exactly where the final destination was. "If you don't send it now, getting it back to Iran will become an issue again."

And Sadeghi knew exactly how long Abedini was going to be there. Look at the new date. "How long are you going to be in Switzerland?"

"Until the day after tomorrow." That's October -- so that's now October 4th, Mr. Abedini was going to leave.

And here's the record showing that the shipment was received and signed for on October 3, 2022, at EPFL. That's Count 2.

Let's move to Count 4. Count 4 is the shipment that occurred on or about July 11, 2023. You see that at the top left. You see it was received by Abedini on or about -- or at EPFL, anyway, on or about July 13, 2023. And going to the next record, you see here that it's the part number for

this, from the internal ADI document, the ADIS16607. And you remember what this is. This is the Raptor. This is the part that the defendant was the manager for, and we'll talk more about this in the next count, but this is -- these are the parts where he was the one to decide who got samples.

Count 7, another shipment, 2 of the Raptor, 10 of the -- 10 of one version of the Raptor, 15 of another version of the Raptor, and then -- then 10 of two different versions of the ADXL380/1 and /2, the accelerometers and an evaluation board. You can see the date here of March 15, 2024.

And this is an email talking about -- leading up to the shipment shortly before. This is March 8, 2024, where Mr. Del Corro was told to, "Align with Mahdi on what these parts should be used for, and then feel free to swing back, and I can hand them off by myself."

The defendant is the one who decided what would happen with the Raptor samples. These were re-released parts not available to the public. He was the one who decided what vendors or which customers would get them, given the limited supply, and he decided Illumove. That's causing. That's aiding and abetting given his level of knowledge at that time regarding SDRA and Abedini and the truth of what was going on behind the scenes.

And it was delivered. This is the FedEx tracking record showing delivery at EPFL, March of 2024.

Count 8, this is the Osprey. You see this initial email from Spencer Thompson to Abedini copying the defendant, adding the Osprey datasheet. You heard a lot about the Osprey during the course of this trial from Mr. Thompson, and from -- I believe Mr. Looney testified about it as well.

"Please send back your address and how many samples you need."

And this was a Teams message, but it was an email form -- from the defendant to Spencer Thompson, "No, I stayed at the garage. Can you get some samples sent to Illumove?"

And then the defendant following up with another individual, Alex Nolan, "Do you have two to three samples to give to Spencer? We wanted them for Illumove to do a demo for sensors."

And then the defendant giving the address for Abedini where they were supposed to go: Illumove SA, EPFL Park, Scientific Building C, Lausanne, Switzerland. No office, no trash. Just a mailbox.

This is causing. This is aiding and abetting.

And that's what happened. The part went out the door. It went to Abedini. You know what he did with it. The ADIS16575, three units, a part that was not available to the public, the parts that Spencer Thompson talked about, those dual-use parts.

That wasn't it. So we've talked about those

specific parts, but make no mistake. You heard during the course of this trial from Pablo del Corro and from other ADI witnesses that that's the least of it. Illumove got tons of parts from ADI. This was not -- they weren't -- they were using them to do the evaluation board project. Look at how many shipments Illumove received from ADI over the course and scope of the conspiracy. And you heard testimony from other ADI witnesses that this is not a complete list.

This is the list that begins in March 2022 and continues until September 2024. This is the evaluation board project. But they got other parts too.

That's the conspiracy. We talked about the substantive counts, about the specific shipments, but this is the conspiracy, conspiracy to receive these parts in Iran when it's not allowed. You cannot send things to Iran. Everyone was clear about that. The defendant was clear about that. But he helped Abedini anyway because it was part of the conspiracy that he joined.

You don't have to write it out. Now, Abedini did write it out, but you don't have to write it out. An agreement can be spoken or unspoken.

The evidence you have here is that the defendant well knew about SDRA, and he kept it secret. He didn't tell anyone. He didn't tell Galchev. He didn't tell del Corro. He didn't tell Looney. He didn't tell Beavers. He didn't

tell Thompson. He did not tell ADI about who Mr. Abedini really was and what he was really doing. He wasn't just an acquaintance.

This was a long-term relationship that the defendant facilitated and helped Abedini grow at ADI. The defendant knew the work was being done in Iran, not just because Abedini told him, but because of all the other evidence about his knowledge about what SDRA was.

The defendant facilitated the shipments. He worked behind the scenes, and he told his colleagues where things should go and what Mr. del Corro should do as to Count 2 and where the Raptor should go and where the Osprey should go. But he was working behind the scenes even more to make sure that Illumove and Abedini portrayed themselves to ADI a certain way and that it was successful.

The conspiracy is about the agreement. They didn't have to send a thing. Once there was an agreement, that's the end of the story for Count 1. And, here, the agreement went far beyond the shipment of parts, although that's what's charged in the indictment. That's what the agreement has to be.

But this conspiracy was about the relationship, about the relationship that Sadeghi facilitated, first with Abedini through Tacit Motion, and then continuing through what -- his work at ADI, so he could work with someone he

liked and respected without caring about what the law was, without caring about where the work was being done, or about sanctions, despite the training and experience that he had.

It's about the elicit agreement that they had to do this work in Iran and send it to SDRA, where he knew it couldn't go.

The government has the burden of proof, proof beyond a reasonable doubt. When you go back to deliberate, I'd ask you to review all the evidence, listen to the judge's instructions on the law, and you should reach the only verdict that is supported by that law and the facts as you've seen them in this trial, that the defendant is guilty of each of the counts in the indictment.

THE COURT: It's defense's turn, but feel free to step -- stand up and stretch for a minute. We will have defense --

MR. FICK: Thank you, Your Honor. Just get the tech switched over. I'll make sure that's working.

THE COURT: And we know normally have an eleven o'clock break. We didn't start until 10:00, but I'm -- no reason to think that the defense is any shorter. So if anybody wants a quick break, we can do a quick break and then have the defense or we can go forward --

MR. FICK: I actually would appreciate a quick break myself, Your Honor.

THE COURT: Okay. Ten-minute break.
THE DEPUTY CLERK: All rise for the jury.
(Jury not present.)
THE COURT: We're in recess. Back in ten minutes.
(Court in recess at 11:15 a.m. and reconvened at 11:23 a.m.)
MR. FICK: We have a tech issue we're working on.
THE COURT: Okay.
MR. FICK: I will do the reboot, see if that works.
(Pause in proceedings.)
(Jury present.)
THE COURT: You may be seated. We're off the record. We're just dealing with another tech issue for a minute.
(Pause in proceedings.)
THE COURT: All set?
Thanks.
Back on the record.
MR. FICK: May I proceed, Your Honor?
THE COURT: Yes, you may.
MR. FICK: Thank you.
Good morning, everyone.
I want to start with the following observation: If you look at the world through dirty glasses, everything looks dirty. If you look at the world through dirty glasses,

everything looks dirty.

And that, fundamentally, is what the prosecution is asking you to do here. The prosecution is asking you to view even the smallest and most mundane facts and events as evidence of some kind of grand conspiracy to export electronic parts from the United States to Iran.

Facts sprinkled over the course of years, often plucked from context, cobbled together and presented through reader witnesses, FBI agents who know nothing about the investigation, apparently sometimes even uncontroversial facts about the world, agents who often didn't even read the documents in full before they testified about them, agents who could not answer the most simple questions about them on cross-examination.

Think about some of the things the prosecution highlighted as suspect during the trial: making an introduction for a business opportunity; helping a friend apply for a business opportunity; helping to create a website; coming up with a new name, Illumove, because some other random person already registered the SadraLabs.com Internet domain; assisting a nonnative English-speaker; write business correspondence; draft and edit documents; paying for a one-way plane ticket once; making a one-time Google Play purchase for $25. The smallest acts of courtesy or friendship viewed cynically through dirty glasses.

Now, separately, with the benefit of hindsight and a parade of unexplained documents that Mr. Sadeghi never saw, including what may or may not be internal Illumove and SDRA documents recovered from somebody's OneDrive, the prosecution has also tried to make the case that Mohammad Abedini is some kind of bad guy, a villain who wanted to get his hands on US electronic parts because he's supposedly some kind of defense contractor in Iran.

But as Mr. Marx told you in the opening, Mr. Abedini is not on trial here. And most of this evidence has nothing whatsoever to do with Mr. Sadeghi, and Mr. Sadeghi never saw it. Mr. Sadeghi never knew about it. So whatever the prosecution thinks Abedini may have been up to, you have to view the world through extremely dirty glasses to conclude that Mr. Sadeghi was a part of it, much less that he was willfully -- supported it with the specific intent to violate the law.

And I want to just step off script for a minute and talk about one example that the prosecution started its opening with. That's this Exhibit 2-1, the so-called business plan translated from Farsi from back in 2014.

They presented it to you, I think, to suggest that it was the business plan for SADRA to be a defense contractor.

But take a careful look at the document, the first

page of the document. It's not the SADRA business plan. SADRA already existed in 2014. It is a business plan on some kind of template -- who knows if any company was ever actually created. It's a business plan to create a new company of which SADRA would be an owner. That's what that document is. There is no evidence that any such company ever came into existence. We don't know who wrote it, why Mr. Abedini may have had it; but in any event, this is a random document out in the air that does not say what SADRA does. It's an idea in somebody's head about something new that SADRA might have invested in but apparently never did, or at least we have no evidence of that. So be very, very careful about conclusions you draw from some of this evidence that came from who knows where.

One thing everybody does seem to agree about is that Mr. Abedini was a very talented and effective engineer. He had a company in Iran called SDRA. And he later founded a company in Switzerland, Illumove, when he was living there, actually living there with his wife and child, buying insurance, paying for visas and work permits, doing postdoc work at EPFL, the MIT of Switzerland.

Illumove was real. It existed. It had employees. It did really good work. The start-up dream, a dream like Mr. Sadeghi had himself with Tacit Motion.

Now, Mr. Sadeghi borrowed one of SADRA's

off-the-shelf devices and tapped Mr. Abedini's expertise in fusion algorithms for his start-up, Tacit Motion.

Later, Mr. Sadeghi introduced Abedini to ADI, where Abedini won a contract to do valuable work on real, complex projects.

Mr. Abedini's knowledge and talents for the benefit of an American company; that's all -- was what Mr. Sadeghi was about, employing Mr. Abedini's talents and knowledge for Tacit Motion, bringing in Mr. Abedini's talents and knowledge to help ADI.

It had nothing to do with helping Mr. Abedini get American electronic parts to Iran. Mr. Abedini plainly didn't need any help at all to do that. There's ample evidence -- and we'll talk about some of it -- that he could get parts whenever, wherever, and for whatever he wanted. And Mr. Sadeghi had no reason whatsoever to risk his career and the decades of life he'd built in this country to break the law for Mr. Abedini.

The prosecution's conspiracy theory makes no sense. The evidence does not remotely support it, and Mr. Sadeghi is not guilty.

I hope by now it's at least clear what Mr. Sadeghi is actually charged with. He's charged with, quote/unquote, causing four specific shipments from ADI to Switzerland in 2022, 2023, and 2024, that the prosecution claims later wound

up in Iran. And he is also charged with conspiracy to do the same thing, exporting electronic parts to Iran. So that's it, four discrete shipments and this conspiracy.

So why, then, at this trial, have we spent so much time talking about things that date back to 2016 or earlier?

Well, the prosecution is asking you to view history through dirty glasses, to conclude that everything about Mr. Sadeghi, Abedini, SDRA, Tacit Motion, Illumove, everything was somehow evidence of a grand conspiracy from the beginning that started in 2016 and culminated in parts getting shipped from ADI.

But let's be clear about one thing about all this so-called historical evidence: Nobody is saying that it was illegal to travel to Iran, to exchange information, technical ideas, datasheets, draft datasheets, to visit SDRA's office, to use SDRA's devices and software, to create a little Iranian company called VFI and then draft up some preliminary agreements that, signed or not, never went anywhere, all during the JCPOA, the Iran nuclear deal, when there was broad hope that relations between the US and Iran might get better, that sanctions might dissipate, and that real opportunities to collaborate might blossom.

None of these things, or events related to them, are charged as crimes. But the prosecution wants you view them through dirty glasses, to conclude that all of this

somehow provides evidence for the conspiracy theory.

So let's talk about one particular piece of historical evidence, the DigiKey Mouser invoices that are in Exhibits 18, 19, and 20, where Mr. Sadeghi ordered some parts from these companies in 2016 and then forwards the invoices to Mr. Abedini, who then, unbeknownst Mr. Sadeghi, forwards inflated versions of those invoices to some medical foundation in Iran. That's the sequence we're talking about.

It seems like the prosecution is asking you to infer that Mr. Sadeghi bought the items for Mr. Abedini in Iran and took them there. But the evidence doesn't support that. The search warrant photos establish that a number of these items were found in Mr. Sadeghi's basement years and years later.

And the first one is here on the screen. This is the launchpad device from the Mouser invoice and the launchpad box for that device found in Mr. Sadeghi's basement, with the cord and everything.

Mr. Galchev confirmed that other items in Mr. Sadeghi's basement found in the search match parts in the Tacit Motion body -- body motion capture prototype. You see the STM32L4 and the CC2604F. Those are the items specified in the pitch deck for the Tacit Motion system that Mr. Galchev saw in person, that was demonstrated from Mr. Galchev, and the stuff is found in Mr. Sadeghi's basement

years and years later.

This is the testimony summary of Mr. Galchev confirming the correspondence of the items on the invoice and the items depicted in the picture from Mr. Sadeghi's basement.

MR. DOLAN: I'm sorry: I'm going to object to transcripts being in the PowerPoint.

THE COURT: I don't think the transcripts should be here. You can review them out loud, but I don't think we're getting transcripts -- please, take it down.

MR. FICK: Okay. This is -- okay. May we be heard briefly?

(Beginning of sidebar.)

MR. FICK: I am not sure of the basis for the objection. I've used transcripts in closing argument for decades.

THE COURT: So the jury is not getting -- the jury is not getting the transcript, and so to show it now is suggesting that you're showing it as another exhibit, that this is what it is. If I instruct the jury it's a chalk, they can't consider it, I suppose it's no different; but it's -- it is a difference of hearing the testimony versus now reading the testimony.

MR. DOLAN: I strongly -- the government strongly objects. I've never had this happen before. And the idea

that the defense can put up a transcript suggesting after all the testimony that the Court -- or the instructions the Court has given about that their memory controls, to now have an objective same-day transcript that we've never -- that they've never shared with us and say this is what happened, we've never reviewed it. We didn't review their PowerPoint.

I've never had that happen, and it should not happen now.

THE COURT: I haven't had it happen either. This is a first time for me.

I'm going to let you read, but I'm not going to show them what you want.

MR. FICK: Okay. So it's a little tricky because the PowerPoints are full of excerpts of transcripts. I have to sort of jump and --

THE COURT: I don't -- I've told them the transcripts aren't going back.

MR. FICK: I mean, to just be able to show what the testimony was, I think I -- I just -- I don't understand why that is objectionable.

THE COURT: Because we live in this really strange world where we have juries having to remember testimony, whereas they get hard exhibits. It's just the way it has been. Should it be that way? I don't know. But that's the instruction I gave at the beginning, that they're not getting

the transcripts. So to now read the transcript is a little bit --

MR. FICK: I just -- with all respect, I think not getting the transcript is a standard instruction; but, again, I -- you know, showing pieces, I thought, was a standard practice. But I will comply with the order. It's going to be choppy.

MR. DOLAN: Is the Court going to sustain the objection regarding the transcripts? I just want to make sure.

THE COURT: Yes. But I'm going to let him read it. So we may need to be going back and forth so he can read it off the PowerPoint without showing the jury. I'm not sure how well that will work.

MR. DOLAN: I just -- I don't want to object during closing. I really don't. But I think it needs to be cautious to suggest that he's not reading a transcript to the jury, because it --

THE COURT: I'm letting him do that because he can, and it's still their memory that's controlling. It's a silly rule that we do it this way, that a hard exhibit gets more value than the testimony. But it is the rule. But I'm going to let him read it.

MR. DOLAN: I'm fine with him reading it. I think he should not be allowed to say I'm reading a transcript of

what the witness said.

THE COURT: I'm going to let him read it. I don't know what else to do at this point, but that's what I'm going to let him do.

MR. DOLAN: I just want to put on the record, we also have not reviewed any of the transcripts that he's reading, so we have no idea as to their accuracy.

THE COURT: These are the final contracts -- final exhibit -- final --

MR. FICK: I mean, we offered the government to split the cost at the beginning of the trial. They declined. These are the official transcripts. They're quite expensive, but they're real.

THE COURT: I'm going to allow it.

(End of sidebar.)

MR. FICK: Apologies for the interruption.

THE COURT: As I instructed at the very beginning, you don't get the transcripts. Nonetheless, I'm going to allow the reading of what the current understanding is of what that testimony was. Your memory of the testimony controls, but I am going to allow the reading of it, and we're just not going to have it on the screen in front of you.

MR. FICK: And I will very quickly blip through, if it -- it's on a slide, we'll go past it. Thank you,

Your Honor.

So, anyway, we were talking about -- it's your memory, of course, that controls -- Mr. Galchev went through with us various items on the invoices from Mouser and DigiKey, confirmed that they correspond to the items in the Tacit Motion pitch deck that depicted the body motion sensor. A lot of this stuff is in Mr. Sadeghi's basement, or was in Mr. Sadeghi's basement, years later in 2024.

One of the other things --

I do think we -- I do want to get the screen back now to go to -- oops.

One of the other things the prosecutor talked a lot about are these references to SDRA, S-D-R-A, in two of the line items on the DigiKey invoice. Of course, we have no idea what that means or how it got there. One of these parts cost less than a nickel, the first one. The second one appears to be some kind of power amplifier that costs 39 bucks.

It's certainly not evidence of a sanctions-busting conspiracy. Mr. Sadeghi was talking to SDRA and working with Mr. Abedini, and they were communicating about, you know, what things to use and how to crunch algorithms.

This -- these invoices do not show that Mr. Sadeghi was sending any parts to SDRA in 2016.

And, by the way, when Mr. Sadeghi was making these

purchases in 2016, Mr. Abedini was a postdoc at EPFL and was regularly ordering and getting parts directly from ADI, without hiding his affiliation with SDRA. He was buying ADI parts in the name of SDRA as early as 2016 without any help or participation by Mr. Sadeghi.

So I'm going to end the sort of historical section now, but, just please be very skeptical of the conclusions the prosecution is asking you to draw about historical events and what they mean.

So let's talk now about the substantive charges and some of the reasons why the prosecution has not come close to proving those charges beyond a reasonable doubt.

First, Mr. Sadeghi did not make or cause any of the charged exports to Switzerland or anywhere else. The prosecution does not allege that Mr. Sadeghi made any of the exports himself. Instead, their theory is that he caused ADI to make them, but in any sort of rational or common understanding or normal person's understanding of cause, that just -- the evidence does not come close to supporting that.

Of course, you know -- we've seen this document many times -- that Mr. Sadeghi introduced Abedini and Illumove in 2019 as a potential vendor on the project. Tzeno Galchev then solicited the proposal and signed the NDA with Illumove.

And, yes, Mr. Sadeghi helped his friend, his

acquaintance, his colleague, Mr. Abedini, with his bid, and encouraged him along the way. But, notably, he told Mr. Abedini that he would not cross the ethical line and give him any kind of inside information.

You see the sequence of texts. "If I knew, I would tell you that I know, but I can't tell you." You know, Mr. Abedini is peppering him for information. He's giving him some, you know, basic background about what's going on and facilitating and helping, whatever, helping with the proposals, but, "Look, I'm drawing the line."

The question is about pricing. "I don't even know, but I would tell you if I knew, but I wouldn't tell you the answer."

Now, Pablo del Corro and Jiayuan Wang reviewed the proposals and scored the candidates -- the scoring pages that they made. Mark Looney reviewed -- Mark Looney reviewed all of the materials, and your memory is what controls, but his testimony was very clear that he made the final decision. He was asked: "And you ultimately made that decision for the company?

"ANSWER: Yes."

Now, as Mr. Looney wrote in his email, "Mahdi has a relationship with the founder, but, in my view, Mahdi has gone out of his way to disclose that relationship and to avoid giving them unmerited favor in this process."

So, yeah, Mr. Sadeghi's helping Abedini behind the scenes make the proposal, but he's not giving him any inside information. And inside ADI, he's being very careful with his colleagues to stay at arm's length. He doesn't want to appear to do anything improper, certainly doesn't do anything improper. There's no evidence whatsoever that he did.

So Beavers, Looney, and ADI executives all approved the project with Illumove, multiple layers of approval up and down the company.

Mr. Sadeghi did not approve or sign the contracts. The testimony was very clear about that. He had no role in the approval process or the selection process.

Beavers signed the scope of work and the contracts on November 1, 2021. And this is all a long way of saying that ADI made an independent decision to enter the contract with Illumove. ADI is a multibillion dollar global company with an elaborate compliance apparatus, access to proprietary databases, of course, the Internet. And, you know, Illumove and Mr. Abedini, they're on LinkedIn. They had a website. There's sort of no secret about their background, Sharif University in Tehran. You could find out about it in a number of ways. No one was keeping that secret.

And ADI certainly knew that Abedini was from Iran just based on its own sales data and systems, right? ADI is intimately familiar with this guy from long, long before

Mr. Sadeghi entered the picture.

You remember that in 2013, when Abedini is still a student, he writes to ADI and said, "I'm a student at Sharif University in Tehran. Can I get some parts?"

The answer was, of course, "No, you're a student in Tehran. We can't send stuff to Iran." But it stays in ADI's system. If they want to do a search, they can figure out, you know, the first time they had contact with this guy. 2013. No secret.

Then as we saw a few minutes ago, ADI sent parts to Abedini in Switzerland for SDRA in 2016. In 2020 -- again, before the project, with no involvement of Mr. Sadeghi -- ADI sent samples to Abedini in Switzerland at EPFL.

In 2021, ADI sent samples to Jan Skaloud and Abedini at EPFL in Switzerland. He's doing postdoc work with a Swiss professor. They asked for parts. They get them. I mean, if he's trying to hide his tracks -- right? -- how hard would it be just to ask a Swiss guy to make whatever order he wants. There's no problem getting access to ADI parts. He does not need Mr. Sadeghi to do that.

2021, again, still before the evaluation board project was approved, ADI sends more samples to Abedini in Switzerland, this time as affiliated with Illumove.

Now, there was testimony, pretty clear testimony, that Ian Beavers and Pablo del Corro led the project for ADI.

Question to Ian Beavers: "Once the evaluation board project got started as kind of going forward from October of '21, you were the primary interface with Illumove for ADI; is that right?

"ANSWER: Correct."

Pablo del Corro:

"QUESTION: After Ian Beavers left ADI in 2022, you took over as lead of the evaluation board project, right?

"ANSWER: Yes.

"QUESTION: And throughout the project, in your role as lead, you continued to report up to Mark Looney?

"ANSWER: Yes.

"QUESTION: And you never reported to Mr. Sadeghi in that capacity?

"ANSWER: No."

They worked primarily and directly with Abedini, Beavers, and del Corro. Mr. Sadeghi would appear from time to time. He would, like, help speed things up or, you know, facilitate the conversation, get some response. But Beavers and del Corro ran the show.

Beavers -- or del Corro was asked: "Typically, Mr. Sadeghi would not take part in the regular update meetings about the progress of the evaluation board project?

"ANSWER: Correct."

Beavers was asked: "It wasn't typical that

Mr. Sadeghi would participate in these regular update calls, was it?

"ANSWER: That's correct."

So, you know, he participated from time to time, but he's not making -- making the decisions. The contract has been entered by the company so the stuff is going to go, one way or the other, to get the job done.

The bottom line is, as a matter of common sense, Mr. Sadeghi cannot in any rational way be said to have caused any of that to happen. I mean, it's like if I introduce two people and they enter a relationship, I'm not responsible -- I'm not the cause of what may later happen in the relationship, what one of the other of them might do, and that's true even if I stay in contact with them and I continue to have contact with them.

They are independent actors who make their own choices and decisions. Illumove and ADI were independent actors who made their own choices and decisions. ADI is a giant, multibillion dollar global corporation. It did not fall off the turnip truck yesterday. Mahdi Sadeghi did not make or cause the charged exports; and, therefore, cannot be guilty of those charges.

So Mr. Sadeghi is also -- the government has failed to meet its burden of proof, in addition, because it has not ever proven that any of the specific parts in the charged

shipments were ever actually exported to Iran. There's been a lot of noise about, well, something must have been there because there were these messages and people back and forth, and some of the work was done there. None of that ties back specifically to any of the charged shipments.

It's not our burden to prove what was where. It's theirs. And they have not met that burden.

The substantive charges are very specific, a handful of individual parts each time on specific dates. There's no testimony, no emails, no texts, no photographs, nothing clearly places any of the charged samples specifically in Iran ever.

We'll get to the two ambiguous text exchanges the government talked about in a moment.

The best the prosecution could do is imply that Abedini and some of its colleagues may have been doing some of the work on the project in Iran, but that evidence is far from conclusive.

First of all, there is ample evidence that Mr. Abedini actually lived with his family in Switzerland for years and worked there. It's also clear that Illumove had employees in Switzerland. You've seen their ledger, including Mr. Khosrownejad, who is a -- you know, an electrical engineer, PhD, himself.

So there's evidence that he started -- that Abedini

started his postdoc in 2015/2016 at EPFL. He made a start-up pitch to something called Innovaud in 2018. He worked with Alogo, which was Tacit Motion's horse product in 2019. He did research with Jan Skaloud in 2020. He got a visa and work permit extension in 2021. He was buying insurance even later. All of this is -- there's ample evidence.

Now, I want to talk a little bit now about the prosecution's travel chart related to Abedini. And, first of all, I think there's enormous reason to take the information, the dates, the places in that travel chart, to treat it with extreme skepticism. I mean, do you remember the testimony of the agent who put it into evidence?

"QUESTION: What did you look at?

"ANSWER: I looked at some flight information.

"QUESTION: And what do you mean about flight information?"

"QUESTION: So documents confirming -- or coming from where?

"ANSWER: A variety of locations I -- it was just -- it was just documents from the case team.

"QUESTION: So let me make that more clear. Do you mean documents meaning coming from an airline or a government or the government or an email?

"ANSWER: I don't recall.

"QUESTION: Okay. But for the flights that are

listed on this chart, did you check airline records to confirm whether Mr. Abedini actually flew on those flights?

"ANSWER: I did not.

"QUESTION: Okay. So you don't know whether he booked -- whether he boarded these flights?

"ANSWER: That's correct.

"QUESTION: Did you check airline records to see whether there were any additional flights that are not reflected in this chart?

"ANSWER: I did not."

So there's a chart that's created by somebody, given to an agent who knows nothing, is going to testify about it.

She basically said, "Yeah, I can confirm some kind of record for all of the entries here, but I don't know if those records are accurate, I don't know if there are more records, but this is what we've got." So that's the starting point.

Now, if you actually count the days between some -- like, let's assume the chart, you know, is more or less accurate, for the sake of argument. If you start counting the days between the flights back and forth between Iran and Switzerland -- you can do the counting yourself, but as a demonstrative, as a sort of just a -- for purposes of illustration here, I made a little bar graph.

And you'll see that -- you know, the red line is Switzerland. For those -- you know, from 2019 into 2021, it seems pretty clear Mr. Abedini is living in Switzerland.

We also have the airline record with the date of birth of -- you know, the 2021 date of birth, 4th of March, for Mahyad, and we see, that, like, if you believe the chart, that he would have been born in Switzerland.

Then you see the insurance records. They're buying -- Mr. Abedini is buying insurance for himself, for Mahyad, and for Zohreh over the course of years; all indicia of somebody who is, at least a substantial part, living in Switzerland.

And the prosecution's claims about travel conflict with other evidence, or at least it's hard to reconcile some of the evidence. If you look, for example, there was a shipment from ADI to Mohammad Abedini on the 21st of October of 2022. That's not a charged shipment, but it was a shipment.

And if you look at the -- the travel chart, it would seem that Abedini is at the start of a long stint in Iran at this point. So if that's the case, why is ADI sending the shipment to Switzerland, and how is Abedini getting it? Is the chart wrong? Did it sit in Switzerland for months? Who knows?

Then -- took another record -- so this is

October -- 21st of October, '22. Then we look at an email on the 11th of October, 2022, one of the ones that was shown in the government's closing, that Mr. Abedini is telling Pablo that a DHL package with a tracking number is going back to ADI. But if you believe the travel chart, that's also happening when Mr. Abedini is supposedly in Iran.

That doesn't make a lot of sense, does it? So, I mean, these two shipments, October 21st and November 11th, they kind of suggest that whatever the travel chart says, one might infer that Abedini is working in Switzerland during this time. He gets a shipment. He sends out a shipment. All during times when the prosecution is trying to tell you he's in Iran. It doesn't make a lot of sense.

And this chronology sheds some really interesting light on the text -- a couple of the text messages the government showed you and wants you to draw inferences about.

Remember the text exchange from October -- November 11, 2022. That's the text exchange between the two shipment dates we just talked about: The one coming from ADI, the one going to ADI; when the travel chart says he's supposed to be in Iran. But it doesn't make any sense.

The government wants you to think that the reference to "here" in this message means "here" means Iran. But it doesn't match up with what you would -- a rational person might conclude from the travel chart, right?

We don't know if he's in Iran. It would seem more likely that he's in Switzerland, because he's -- just before this date, he's just gotten the package; just after this date, he's just sent a package.

And in any event, even if he is working in Iran at some point during this time, there's no evidence tying that back to specifically charged shipments and parts. It's not enough to say, "Yeah, maybe he took some parts to Iran sometime."

The government has to prove to you, beyond a reasonable doubt, that he took the specific parts in the specific charged counts to Iran and that that was a violation of the law. Whether that's true is another question that we'll talk about later.

Let's next look at another shipment to Mr. Abedini dated July 11, 2023. That's the shipment underlying Count 4, Exhibit 138. Again, if you believe the chart, this shipment is sent to Abedini in Switzerland when the chart would say he's doing a long stint in Iran, when he would be in no position to get it or work on it.

What are we supposed to conclude from that? Probably, it sounds like, the chart is mess. But, again, it's not Mr. Sadeghi's burden to prove anything. It is the government's burden to prove beyond a reasonable doubt that these crimes even occurred -- alleged crimes even occurred.

Finally, look at the shipment to Abedini on March 15, 2024, the shipment underlying Count 7. Again, if you believe this chart, the shipment is sent to Abedini during a long stint in Iran when he could not receive it, work on it, or do anything with it.

So is the travel chart complete? Does Abedini have a team working in Switzerland during his absence? Either way, the government hasn't proven that any of the charged samples were taken to Iran. The chart certainly doesn't help them.

The other exchange that the prosecution points to is the one from September 27, 2022, the one where there was some testimony, some cross-examination about the translator, kind of difficult to follow or to do, but where we were attempt to go illustrate why the translation might be inaccurate, right?

This is the exchange where Abedini says "I'm boarding the plane right now to go to Switzerland. I'll be there for a week. It would be great if you could send the samples tomorrow so I'll get them there while I'm there."

Now, this is in the context --

THE COURT: Slower.

MR. FICK: This is in the context of something changed in the project. They want to do some certain parts first that they weren't planning to do first, so there's some

urgency, some time urgency here, and that's the context in which this exchange occurs.

Then the translated response says, "If I'm not there to take delivery of it myself, getting it to Iran will become an issue again."

Now, this was, of course, difficult to follow when we were trying to cross-examine the translator. But we tried very hard to explain why this translation is not reliable or at least ambiguous.

First of all, we pointed out that references to samples in the first message were plural, while the singular "it" is inexplicably used in the translation of the second message. So does "it" refer to the plural samples, even though it's singular, or does it refer to some other goal, something else that's going on?

So the other thing we tried to explain and got the translator to at least work with us is the notion that this verb, resandan can be used to relate to either a place or time, getting it to Iran or getting it done by Iran will become an issue.

The interpreter insisted that "Iran" could only refer to a place in this message, but then had to acknowledge that he had used place as a proxy for time just a few messages later, right?

The idea here is that -- just as an example in

English, you know, sometimes when we refer to a place, we're referring to a time in which we might be in the place rather than the place itself. If I say I'm going to go to Maine next week, and then I tell somebody, I'm going to do this after Maine, Maine is a proxy for time in that sense. So the idea is that this text message in Farsi, which none of us can read, is ambiguous or certainly could be viewed by somebody as ambiguous.

So -- oops -- the -- the bottom line, though, is that whatever this message means, Mr. Sadeghi does not acknowledge it. He doesn't respond to it. We don't know what Abedini actually did, whatever he may have meant in the message. And there are no other messages among the hundreds exchanged over years that discuss Abedini taking parts to Iran.

And we know just -- that just -- from the messages we looked at a minute ago, that a few weeks later in October -- right? -- just a few weeks after this, on October 21st, Abedini is receiving another shipment in Switzerland and then, a couple weeks after that, sending a shipment back out to ADI.

So did he change his plans to stay in Europe? The shipment evidence would seem to look like that, even if the airline records might suggest he was supposed to fly. It's a mess. We don't know. That is far from proof beyond a

reasonable doubt of anything.

So putting aside the -- Abedini himself, there's no evidence that proves any other members of the Illumove team only worked in Iran or what they worked on, if they were working in Iran. Now, the government is, of course -- they pulled this metadata out of these -- these Word files and these email attachments that nobody had seen until someone looked at it now, so it's certainly not something Mr. Sadeghi would have been aware of at the time, and then they correlate that to what they think are payroll records for SDRA in Iran and say, "Aha, these guys must have been in Iran."

Well, maybe. We don't know that for sure. We don't know exactly what they did. And we also don't know what they did on the evaluation board project.

Now, yes, there was testimony that some of the work -- you have to have the chips in hand to, like, plug and play solder. Okay.

But we know from other testimony from lots of witnesses, including Mehdi Aghagolzadeh, at the very beginning of the trial, that a lot of the work on the software, the algorithms, none of that requires in-person presence.

It's math on a computer. It's processing data. So even if there are people in Iran working on this project in some capacity, there's no evidence that they're the ones with

the stuff.

We know Illumove has a staff in Switzerland, where the products have to come and go from. Even if there is a back office in Iran processing data, which, again, sort of opaque to everybody at this time. No one knows where anybody is. It's not proof beyond a reasonable doubt of an export violation.

I want -- I next want to talk about the export question from another angle, which is the nature of the evaluation board product itself. So we heard a lot of testimony over and over again about what this was, but I'm going to summarize it again, right? There are three parts. There's the MCB, the motion capture board, and then two things, the evaluation board or the breakout board, the EB or the BB. And in creating these boards, Illumove would solder -- permanently affix -- the ADI parts to be tested in either an evaluation board or a breakout board. And then they would send the fully assembled collection back to ADI.

And that's exactly what they did.

Oops.

You remember the picture -- unfortunately, it's part -- it's on a slide with something I can't show you, but there was a picture in Exhibit 131 of the -- that Pablo del Corro testified about, a big box that he got back from Illumove that had the various evaluation boards in it,

including having the ADI-soldered devices onto the EB and the BB.

The point here is that the idea from the very beginning is that samples were being sent to Illumove in Switzerland. They would be returned to ADI, soldered onto one of these EBs or BBs.

Now, the prosecution's case is even weaker as to Count 8. That's the one in connection with the -- with the demos, the one that Spencer Thompson testified about, the three IMU samples that he sent to Illumove on May 6, 2024. He testified that those samples were for the demos, the gimbal and the head tracker.

He agreed the gimbal needed two IMUs and the head tracker needed one. He sent three IMUs to Illumove. Illumove successfully completed the project and sent the demos back to ADI.

Now, standing here today, I can't point to evidence that proves every single sample sent to Illumove in Switzerland made its way back to ADI. But, again, it's not Mr. Sadeghi's burden to prove anything. The prosecution has the burden of proof, and they cannot prove that any particular sample ever went to Iran, much less that it stayed in Iran, much less that Mr. Sadeghi willfully intended any of those things to happen.

In short, the prosecution hasn't come close to

proving that any export to Iran actually happened, whoever caused it. So I hope I've made clear, at least, why the substantive charges -- why proof of the substantive charges fail.

With those off the table, of course, the alleged conspiracy to ship stuff to Iran sort of becomes an empty shell, right, because export what exactly? But I want to point out one more thing that -- or two more things, I guess, that undermine the government's conspiracy theory here.

At its core, the idea was that there was a conspiracy between Mr. Sadeghi and Abedini to unlawfully export parts to Iran. And it makes no sense -- two reasons, at least two reasons. First, for reasons we've already talked about, Mr. Abedini does not need Mr. Sadeghi's help to get parts.

There was testimony -- again, there are some -- Ian Beavers testified that Illumove was already familiar with ADI parts and already had many in its stock before the project began.

"QUESTION: Illumove already had a lot of the parts to make the board in its stock, right?

"ANSWER: They had some.

"QUESTION: Both the ADI parts and the ones from other companies it was going to use to make the boards?

"ANSWER: Correct."

There are also emails about this. Exhibit 558 is an email from Mr. Looney saying that "They are already familiar with our products, both the components and the IMUs, and our competitors."

Exhibit 562, a message from Pablo del Corro to Mr. Abedini, "Illumove has it in their stock," referring to a particular part. So that's number one.

Second thing is, of course, there was a lot of testimony that these parts are very easy to obtain on the global market from a lot of sources.

Ian Beavers again:

"QUESTION: It wasn't difficult for a company like Illumove to get a hold of the types of electronic parts it would need to build these evaluation boards; is that fair?

"ANSWER: It was average lead times, right. That's correct.

"QUESTION: These weren't hard things to get for a company like Illumove to get on the market for electronic parts?

"ANSWER: Yeah, I would agree with that."

There was also testimony in evidence that Illumove and Abedini could buy parts from online resellers, DigiKey and Mouser. There was evidence that Illumove and Abedini could and did buy parts on the China black market, quote, unquote.

Mr. Looney testified:

"QUESTION: There is an international black market for electronic components.

"ANSWER: I am aware.

"QUESTION: And that includes electronic components that ADI makes?

"ANSWER: Yes.

"QUESTION: And China is one of the places where those -- that the black market exists?

"ANSWER: Yes."

And then there was the email from Ian Beavers where he sort of was joking around his colleagues, "Mohammad often casually references accessing the China black market."

Illumove also sent parts from China to ADI when ADI didn't have the part. That was testimony from Pablo -- Pablo del Corro.

"QUESTION: For the microcontrollers, he did manage to get 25 pieces and was sending them by DHL from China?

"ANSWER: Yes.

"QUESTION: You got those parts, and, in fact, used them to put together the MCB?

"ANSWER: Correct."

And there was testimony that suppliers in China even sell ADI parts below ADI prices in large volume, talking about the Alogo horse project. Mr. Galchev testified:

"QUESTION: Alogo came back to ADI and said, 'We' want better pricing because the assembly company in China that's going to actually build our thing says that they can get this part cheaper than you're offering it for us, right?'
"ANSWER: Yes."

So, you know, getting a handful of parts, 3, 10, 15 at a time, going into an elaborate conspiracy to get parts when you can just buy them anywhere in massive quantities, it makes no sense. There is no motive for this so-called conspiracy.

Another reason why sort of -- if Mr. Abedini wants parts, the evaluation board is really a stupid way to try to get them, right? First of all, as I noted earlier, the idea is, you're going to get the samples, put them into an EB or BB and send them back. So you don't get to keep them.

And on top of that, there was testimony that many of the samples were sort of early Rev 0, Rev A, Rev B versions of the products with lots of bugs that essentially became trash when a new revision came out when ADI stops making the early revisions.

There was even testimony in an exhibit that an ADI employee said, "Yeah, we're going to disregard these. We don't need them."

So you're going to enter a massive decades-long criminal conspiracy to get stuff you have to send back, some

of it is crappy, and you can get whatever you want from dozens of other sources anyway? It makes no sense, for Mr. Abedini's side of the equation.

And for his part, Mr. Sadeghi has even less of a reason to be part of a criminal conspiracy. I mean, what's in it for him? Absolutely nothing.

The prosecution doesn't even have a conspiracy theory for why Mr. Sadeghi would want to willfully violate the Iran sanctions. He had nothing to gain and everything to lose. Before his arrest, he had lived in this country for decades. He lived peacefully with his family in Natick. He was a well-regarded and well-respected employee at ADI on his way up in the company.

Of course, he wanted the evaluation board project to succeed because he was a loyal ADI employee, but he had no financial interest in the project, no bonus, nothing. He also had no financial interest in Illumove or SDRA. He didn't get any kind of payment or kickback from Mr. Abedini or anyone else. He didn't receive any money at all for this. You know, he even actually shelled out a few bucks just because he's nice. Right? He bought Mr. Abedini a plane ticket. He made a Google store purchase for 25 bucks. He's just a generous and kind person, but he has nothing to gain from this personally, nothing.

You know, Mr. Sadeghi has always focused on using

his skills to improve people's health and well-being.

I'm going to forward through a bunch of stuff.

There we go. You'll remember that the original Tacit Motion idea was to make wearable sports technology for sports training, injury prevention, and that kind of thing.

At ADI, he wanted to work on healthcare and industrial applications of ADI products. And he wanted nothing to do with the defense side of the business. And you'll remember his friend, Mr. Galchev, was asked:

"QUESTION: You would agree with me, based on your interactions with Mr. Sadeghi, you understood that he" -- "you understood that he did not want to work on military or defense applications at ADI, correct?

"ANSWER: Correct.

"QUESTION: You understood that, instead, he wanted to work on healthcare and industrial applications at ADI, correct?

"ANSWER: Correct."

So from two sides, right, the conspiracy theory here makes no sense. There was no reason for either of these gentlemen to enter a grandiose conspiracy to violate the law for the host of reasons.

There's one more -- pardon me for a moment.

There's one more overarching principle that applies to all the charges, and that's the concept of willfulness.

It's a legal term. The judge is going to instruct you about it. I expect that what she's going to tell you is that in order to convict Mr. Sadeghi, the government has to prove beyond a reasonable doubt that he acted willfully; and, that is, with the intent to do something he knows the law forbids.

And evidence of that is completely absent here, right? Because even if you think that Mr. Sadeghi somehow caused the exports, and even if you think that he was -- or that Mr. Abedini was bringing ADI parts back and forth, and even if you think Mr. Sadeghi knew it, there's no reason to think Mr. Sadeghi believed that kind of, like, back-and-forth was illegal or that he intentionally violated the law.

And, of course, Mr. Sadeghi, and everyone who testified in this case, was aware that Iran is subject to sanctions. There's an embargo. Generally speaking, you can't send goods there. But, you know, when you get down to the brass tacks, it's a little bit more complicated.

As Mr. Krizek, the OFAC witness testified, export law and especially the Iran sanctions can be convoluted, fluid, and surprising. Those were his words, right?

"It can be a little convoluted when you get down to the details?

"ANSWER: Correct.

"QUESTION: You'd agree the sanctions programs, the scope over time tends to be fluid?

"ANSWER: Can change, can be fluid, correct.

"QUESTION: The word 'export' is a technical term, right?

"Correct.

"QUESTION: Has a meaning that can be surprising sometimes to people what an export means in different contexts?

"ANSWER: Yes."

He acknowledged the sanctions regime doesn't define the words "exports" or refer to an embargo. The words don't appear once in the 50 pages of ITSR regulations. And even Mr. Krizek was a little bit unsure about, like, at the edges what's allowed and what's not allowed, right?

The question was asked: "I bring a laptop my company knows to Iran. There's no law against that, right?

"ANSWER: There's no law against you bringing your personal laptop to Iran.

"QUESTION: Well, I was talking about my company laptop.

"ANSWER: Okay.

"QUESTION: So can I bring that one too, right?

"ANSWER: You might be able to. I'm just not 100 percent sure."

That's the guy who works at OFAC. At the edges? Where are the edges?

Now, you know that Mr. Sadeghi got pretty clear advice about this at ADI. ADI told Mr. Sadeghi that bringing his laptop to Iran was fine.

Mr. Sadeghi also, of course, in an abundance of caution, checked in advance. That, I would suggest, is an indicia of good faith, exercising care, wanting to be careful, certainly not willfully scoffing at the sanctions laws.

And you heard testimony from Mr. Del Corro about how, yeah, when Mr. Sadeghi was in Iran, we would communicate with him just like always. He'd use a VPN. He was on his computer. He worked in Iran. No one thought it was an issue.

So, again, to answer the question here, you have to sort of put yourself in Mr. Sadeghi's mind or ask what he thinks, right? What is his intent? Is he willfully violating the law? Why would he think twice about Abedini taking a handful of samples in his personal baggage to work as he traveled if he was going to bring them out again and send them back to ADI?

This is all in the context of a project where the products were being incorporated into boards that were supposed to be shipped back to ADI. Why would Mr. Sadeghi even be thinking about this in the context of an export?

And, remember, the other thing we learned from

Mr. Krizek about Mr. Sadeghi's sort of experience in this area is that he had some prior contact with OFAC, right? He had tried to send $1,600 to his brother in Switzerland, but Bank of America blocked the transfer. Something about mistaking his brother's name for someone who is on the SDN prohibited list.

So Mr. Sadeghi wouldn't let it go, though, right? He contacted -- he complained to OFAC. He provided extensive personal information and documentation to OFAC about him and his brother, and he successfully got the transaction unblocked.

Well, actually, technically, he got a license from OFAC for a transaction that shouldn't have been blocked in the first place.

But think about that. I mean, if this is a guy who is part of some kind of years-long, sanctions-busting conspiracy, why is he going to put himself on the OFAC radar going and complaining and trying to free up 1,600 bucks he tried to send to his brother? It doesn't make any sense.

And you can also see Mr. Sadeghi's good faith, which is the opposite of willfulness, in his responses to questioning when he was arrested, right? We all saw the video. Even though it had to be one of the most stressful and unpleasant experiences of his life, he answered the agent's questions.

He didn't shy away from the fact that he had created a company in Iran during the JCPOA, now dormant. He didn't pretend not to know Mr. Abedini like, apparently, Mr. Aghagolzadeh had done when he got confronted by the FBI.

He answered the agents' questions, and his answers, I submit to you, were consistent with all of the evidence you have heard in this case.

The evidence confirms he told the truth, and he did that because he didn't believe he had committed any crime, and he had nothing to hide.

The prosecution sort of made something of the customs agent of the airport and the memory of that encounter thousands of interviews and years later, where after a grueling globe-hopping trip with his wife and small children in tow, he's questioned at the border.

The government says answering the question by saying, "I don't do business in Iran," somehow that's a lie? I mean, in the present tense, it's true. Mr. Sadeghi, in 2024, or whenever this encounter was, is no longer doing business in Iran.

And even if the agent had asked the question, "Have you ever done business with anybody in Iran?" how is somebody who has lived half their life in Iran supposed to answer that? I mean, you sort of process the question: What's the question you're getting at? Well, he's getting at: Do I do

anything with Iran now? He answered the question. It was true.

And, look, you know, there's no recording left. We don't know really what happened in the airport in that short encounter after this long transatlantic -- not transatlantic, but transglobal -- travel. But, you know, the evidence you have in front of you is the interview with the FBI. And he's not comfortable. It's not pleasant. He pushes back on them on a few things. But as a general matter, if you look at what he says -- watch it again, look at what he says. Look at the evidence in this case. He's not lying to them.

So before I finish, I want to return to one other issue where the prosecution is urging you to view the world through dirty glasses, and that is the sort of -- the cloud in the air about the potential military application of this technology.

And if I understand correctly, what the prosecution wants you to get out of Mr. Thompson's testimony was an opinion that Mr. Sadeghi having the Sepehr user manual and a schematic representing the ADIS16488, that he should have known that this is military stuff and that having that on his computer means he must have known SDRA was involved in military stuff, something like that. I'm not sure what -- I'm sort of -- that may have been the purpose of that testimony. You'll make your own decisions.

But, I mean, it didn't hold up very well, did it, right? First of all, it's a little surprising that the prosecution chooses to have Spencer Thompson testify about this, the least credentialed and least experienced of all the ADI witnesses who came and testified in this case.

And they just give him the schematic and the Sepehr manual and say, "Read it and tell us, you know -- see if you can find some, like, indicia of military in there," or something, I guess.

He performs that task, but he has no context about what these documents mean, what they were used for, where they are.

Of course, you know, we have known since very early in the case that whatever other devices the Sepehr navigation manual -- whatever other uses the Sepehr navigation manual might have, Mr. Sadeghi and Tacit Motion actually used it on horses to test the concept of using a GNSS/INS device to do horse motion tracking. So they actually used it for that purpose. We have a picture. We know it. And we have testimony from Mr. Aghagolzadeh and others about the data that was processed.

He tests the concept. Then he goes on to design his own thing.

The schematic -- well, we know that it was in a folder on Mr. Sadeghi's laptop, associated with Alogo, and

more specifically, Alogo MOVE HW design. Using an old schematic to make a new schematic is nothing terribly surprising.

Mr. Galchev and Mr. Sadeghi, right around the dates when this thing is looked at on Mr. Sadeghi's computer, they're having a text exchange about the relative merits of the 16448, which is a compatible family chip, and the 16470, which is what actually eventually came to be used in the Alogo boards.

So, I mean, none of this is nefarious. It's all, you know, using industry standard equipment that, yeah, I mean, it could have dual uses. Everyone knows that. But that's not what Mr. Sadeghi is interested in. That's not what he is doing.

And, you know, Mr. Thompson's testimony about why the Sepehr device is somehow uniquely military, that didn't stand up very well, right? I mean, it's like -- and it's got Bluetooth. You don't use that in a military device. It's got data collection and an SD card. You don't put that in something on a missile that's making a one-way trip and never coming back.

I mean, the thing -- it's a GNSS/INS navigation devise. It's used for all kinds of purposes. A very similar one is used by NovAtel, we saw, which is automotive company. Mr. Sadeghi used it to test -- to test an approach to a

project and then developed a slightly different one with slightly different parts to actually implement the project.

So, again, dirty glasses. I mean, really? Nothing sinister about these files being on Mr. Sadeghi's computer at all.

Before I finish, I do want to say a word also about the concept of proof beyond a reasonable doubt. This is a core bedrock constitutional principle. It protects all of us from overreach by the government. It's a high burden. It also reflects what I want to suggest to you is a kind of -- what I would call civic humility or civic humbleness, recognizes we're all fallible, so before we make a momentous decision about somebody's life, we want to have some reasonable -- not absolute certainty, but reasonable certainty, high burden.

And as the judge also said at the beginning of the case, and I expect will repeat in her instructions shortly, even though, of course, we all want to be fair, it's not always easy because we all have built up biases and expectations that come from our life experiences. And sometimes we don't even know about them.

Overcoming those biases requires a certain humility or humbleness. And I think it's important to think about, in this case in particular, in the following way: Of course, export laws and export controls and embargoes are important.

We don't want people stealing American technology. We don't want to help adversaries. Violations of the law, obviously, should be identified and punished.

But sometimes it's not about us. A little humility is in order. Not everyone is out to steal our stuff. There are a lot of smart people in other countries. There are a lot of smart people that come from other countries. Their contributions have helped to make this country great.

And I really hope that if you take a clear-eyed view of the evidence, you will see that all Mahdi Sadeghi was doing, building on his own experience as an immigrant, was trying to bring others into the fold to contribute to the intellectual capital of this country.

This is a case about importing knowledge and talent into the United States for Tacit Motion, for ADI. It's not about exporting anything to Iran. Mahdi Sadeghi is not guilty.

Thank you.

THE COURT: The government gets a short rebuttal. You can stretch for a minute before they stand up.

MS. PORTER: Microphone.

Just getting the microphone.

THE COURT: Sorry. I thought you needed something.

MS. PORTER: Oh, sorry. I've never been told I need one before, but for the court reporter, I think --

THE COURT: Because, otherwise, he has to move. Much easier this way.

MS. PORTER: Good afternoon, everybody. I will try to keep this brief. We appreciate all of your attention over the last few weeks and today; it's already been kind of a long day, so . . .

I want to start with the concept of dirty glasses that defense counsel just spent a lot of time talking to you about. My glasses are clean. I don't care if they're dirty. It's not what I think, it's not what he thinks, or the state of the glasses. It's what your memory is. It's what the evidence that was presented to you and how you view it.

It's true there were a lot of documents in this case. We did our best to read from them, the parts that we thought might be important to you. And Mr. Dolan went through a lot of those with you today too.

We were not going to read through 600 pages of text messages, so we read some of them to you. Defense counsel referred to some. I'm going to refer to some again, too, and Mr. Dolan did as well. You have all of them. You have the full set. I encourage you to go through them. Look at the ones from slightly before. Look at the ones from slightly after. They're all going to be at your disposal in the jury room.

Defense counsel told you a very long story, but he

left out some very critical details. Just like the defendant did when he told ADI about Abedini and Illumove.

And Mr. Dolan went through that in detail with you about the behind-the-scenes story, so I'm not going to go through that with you again. But keep all of that in mind when you're looking through the evidence and when you are reviewing all of the evidence and the testimony as you remember it. Because everything wasn't above board. You know that there was a lot going on behind the scenes.

I also want to talk to you about the concept of motive versus intent. Defense counsel talked to you a lot about why would he do this, what's his motive? Guess what? We have to prove a lot of things, and we have to prove them beyond a reasonable doubt. Make no mistake. That is our burden. And the judge will instruct you on the law.

But we don't have to prove motive. You'll see, when she gives you those instructions, that's not an element of the offense. His intent was. And we do have to prove that he willfully violated this law.

So -- but let's think about some things about what might have been in it for him anyway. Why would he have done this? Well, you know that he valued Mr. Abedini, and he valued his knowledge and his experience, and that he had something that the defendant did not. The defendant was highly educated, an engineer, PhD in MEMS, well respected in

his field.

But Mr. Abedini brought something else to the table, and you know that the defendant valued that. And you also know that, despite the fact that Tacit Motion didn't take off in the way that the defendant had hoped it would, he still had hopes for it in the future.

Remember what he said in his FBI interview. He didn't say Tacit Motion was defunct. He didn't say that's gone. We don't do that anymore. He said it's a company in hibernation. He had an interest in keeping that relationship going with Mr. Abedini because he valued his knowledge and his experience.

There's also conversation about -- a discussion about these parts and that Mr. Abedini could get them from other locations. Well, guess what? He couldn't get unreleased parts. He couldn't get pre-released parts. Those are parts that are still in development, and those are some of the very parts at issue here.

I want to talk just briefly also about this concept about military applications. And Mr. Dolan touched upon this, about dual use.

That evidence was put before you to give you the bigger picture of ADI products, to give you a bigger sense of what they were, lest there be any doubt at all about what Mr. Sadeghi knew about what you could and could not send to

Iran; and I'll get to that in a bit, because I think it was very clear. He knew you couldn't send dual-use parts to Iran. There's no question about that.

Mr. Krizek's testimony to you about that was clear. Every single ADI employee that got up there on that witness stand told you unequivocally -- Ms. DeCarr, Mr. Looney, Mr. Beavers, Mr. Galchev, Mr. del Corro, and Mr. Thompson -- and the defendant himself also said he knew about sanctions. They know you cannot send goods to Iran. It's that simple. That part of this case, ladies and gentlemen, is incredibly straightforward.

Let's talk a little bit about this idea about whether or not the parts actually went to Iran or whether they came back to the United States. I want to think about that for a minute, and also the quantities.

Let me just be clear: The judge is about to instruct you on the law. She's going to instruct you on what it means to export. There's not a quantity requirement. There's not a price requirement. That's not part of the law. Those goods have to go to Iran.

What you know is that as early as December of 2016, the defendant was facilitating getting parts to Mr. Abedini in Iran. You know that from the parts that you see in Exhibits 18, 19, and 20. You know that he ordered those parts from DigiKey and Mouser, and he forwarded those

invoices to Mr. Abedini.

Now, there's all this noise about the SDRA reference in the customer line. Well, this is one of those times where you can use your common sense and draw reasonable inferences from the evidence before you, because Mr. Sadeghi forwarded those invoices to Mr. Abedini, and then it gets forwarded on from SDRA.

You also know that those parts were shipped to the defendant's home in Massachusetts. Now, defense counsel wants you to believe that those parts, the same exact ones, were still there in 2024. You don't know one way or another, but why would he be sending those invoices to Mr. Abedini?

And, also, if it's just a random coincidence that the letters SDRA happen to be a customer reference, that's pretty incredible of a coincidence.

Let's talk about the idea of those parts coming back to the United States. First of all, to be clear, if those parts went to Switzerland, made their way to Iran, the employees at SDRA worked on those parts while in Iran to put them on to an evaluation board that was then shipped back to the United States; that is a violation of US export law. That is a violation of the sanctions. That would not be okay.

And the evidence before you is that is what happened with some of the parts, but also not all of them.

So let's start with how you know that that is what happened with some of the parts.

Because you know, if you look back to that chat where they were talking about, in September, getting the parts and Pablo del Corro sending the parts, this was the 380, 382. And you know that those parts ultimately did go to Iran.

How do you know this? Look at all of the exhibits that followed.

If you look about -- at those exhibits, you will see -- look at Exhibits 114, 116, 117, 120, and 122. You will see that there's an exchange back and forth throughout that whole time frame, from the end of September through November, between Mr. del Corro and Mr. Abedini. And they're talking about all these problems that they're having with the 382, that the team is having with the 382, and they send emails back and forth, and Mr. Abedini attaches, "Here are the questions from the team."

You know from the metadata who that team was. You know that that team are the people who are employees in SDRA. And you know that because it's on Exhibit 222. They were getting paid by SDRA. And you know that they were doing the work in Iran because that's the back-and-forth between Mr. Abedini and Mr. del Corro.

So let's talk -- focus on that for just a minute.

The chat -- the chat you've heard all about, you've seen it a bunch, and there was a lot talk about it today, there was talk about it over the course of the trial.

That chat, in September of 2022, I encourage you to go back to that conversation and read the full conversation. It starts around page 240. This is Exhibit 206-1, the WhatsApp chat.

And there's been some conversation about -- discussion about what the correct translation is.

Well, Mr. Khamooshi testified, and he told you that was the correct translation. And you'll recall that there was all kinds of cross-examination. We got into the weeds about conjugating the verb "get" and what it means. But what he told you is it definitely doesn't say getting it done before. That is not what it says.

But also think to yourselves, why did they spend so much time focused on that one line? There were hundreds of pages of translations in this case. Why did they spend so much time on that one line?

Well, because that chat is devastating evidence of this conspiracy and Count 2, which you can look through all of the exhibits for that. But let's just think about why.

Because Mr. Abedini tells Mr. Sadeghi, he says, "I need to get delivery of it while I'm there. I will be in Switzerland for one week. If I'm not there to receive it

myself, getting it to Iran will become an issue again."

Again.

Now, counsel just suggested to you that Mr. Sadeghi did not respond, that the defendant did not respond. Well, he did respond. But he didn't respond with, "What? You're getting it to Iran? You can't do that. You can't take those parts to Iran." No, no, no. He said, "I'll talk to Pablo" -- or, "I talked to Pablo. He will send you the samples," because the defendant knew. The defendant knew that that work was being done in Iran.

Now, there also was some conversation; Mr. Fick was trying to argue that, well, the work was being done by Mr. Abedini in Switzerland. That's why he needed to get the parts there, so he could get it done before he went back to Iran. But you know that's not true too Because he told Mr. Sadeghi he would only be there for one week. The travel records support that.

There was some conversation about this travel chart. That's true. There's maybe some things that are not on there. But I encourage you to go and look at Exhibit 191. Those are the Qatar airline records. And those airline records show you that Mr. Abedini did travel from Iran to Switzerland and back in that one-week time frame that's described in that chat.

In fact, go through the chats, because there's a

lot of other points in time that will corroborate the other travel that mattered in this case. Go through and look through those. I encourage you.

But you also know from all of those exhibits I went over before, the back-and-forth with Mr. del Corro. That chat in September refers to the 380/382 part. And you see that from the end of September, all the way through November, they're still working on it. "They," the team. The team in Iran. That's who is working on these parts.

There's a lot of other evidence about who that team is. You can look at Exhibits 220, which is the Illumove ledger, which has no other employees, really, on it. There's no -- there's no rent for a building. There's no office space.

But what there is are payments to people to check the mailbox for him. There's also a payment to someone to ship something for him. Interestingly, the exact same time frame that Mr. Fick just pointed out to you when Mr. Abedini was in Iran. Take a look at that.

Now, there's been a lot of commentary about testimony and things like that. That is going to be what you remember. What you remember holds. You will not have a transcript of this trial in front of you, and so it has to be your memory.

But if you recall, when Officer Hopper, the CBP

officer, testified about that interview with Mr. Sadeghi, he said not, "I wasn't just doing business in Iran"; "I haven't ever done business in Iran."

Now, it's true; that could be confusing, because he lived there for part of his life, and how do you give a correct answer? No, no, no. Mr. Sadeghi had a company in Iran. That was VFI. Mr. Sadeghi entered into a contract with another company in Iran, SDRA. You have all of those records. That simply was not true.

Going back to the idea of why would they do this and all that. Again, you don't have to figure that out. You just have to know that he knew and that he did it intentionally, that he willfully violated the law.

But he also was interested in helping Mr. Abedini to encourage -- to facilitate that relationship with ADI. It wasn't just about the unreleased parts. It's also about access to ADI engineers, ADI know-how. It was about growing that business.

Because you know Mr. Abedini was playing the long game. You see his business plan all the way back from 2014 and what his intent was at that time.

And you know that it worked because that initial introduction, that initial introduction led to additional potential projects going forward that Mr. Abedini was working towards getting, and that in the background, through all of

it, Mr. Sadeghi was helping him. He was helping him to get more business.

Okay. Just to wrap up, it's been a long day, it's been a long few weeks. This trial was long. At times, it was highly technical.

But at its core, this case is straightforward. You cannot send goods, especially not the goods like those at issue here, to Iran. That is straightforward. Period. Full stop.

The defendant knew that, and he conspired with Abedini to do that. He caused the shipment of those parts, knowing that Abedini was ultimately going to get those parts to Iran where he was going to work on them.

The defendant is guilty.

Thank you.

THE COURT: Okay. We're going to stop right now. And I'm just going to ask you to still hold off for a very short time, to not start talking about the case yet, not start discussing it. Hopefully -- I don't know if lunch was already there when you got there, but eat your lunch now.

We'll be back -- I'm going to make it a short lunch so that you can just take a little break now.

I'm going to instruct you, and then you will start your deliberations.

So you might want to talk with each other about how

long you can stay today as you need to, and make your plans and -- with each other about that. But, otherwise -- other than that, don't discuss the case yet. Hold off. I'm going to give you instructions after you have a little bit of a short break.

All rise for the jury.

(Jury not present.)

THE COURT: Okay. Short break for you as well. We'll get everyone back here, and we'll read the instructions.

I'd say let's try to aim to be back at 20 after.

MR. DOLAN: That's fine, Your Honor.

MS. PORTER: Yes. I was just -- do we get the final set of instructions?

THE COURT: I think they're on the press upstairs, but we can --

LAW CLERK: I can run them down.

THE COURT: If you can bring them down so they can read them over lunch.

MS. PORTER: Thank you, Your Honor.

THE DEPUTY CLERK: We are in recess.

All rise.

(Court in recess at 12:49 p.m. and reconvened at 1:24 p.m.)

THE COURT: Are we ready to get the jury in?

THE DEPUTY CLERK: Yes, Your Honor.

All rise for the jury.

(Jury present.)

THE COURT: I need to read these to you. I'm also giving you a copy to follow along, on the theory that that's easier.

Okay. Everyone got a copy?

JUROR: Almost.

THE COURT: Okay. These instructions shall guide your deliberations. You are to follow these instructions and not any instructions given to you by counsel.

These instructions will be in three parts. Part 1 contains the rules that define and control your duties as jurors and that explains a little more about what is and is not evidence that you may consider in deciding this case.

Part 2 contains instructions concerning the elements of the offenses charged and the superseding indictment in this case; in other words, what the government must prove beyond a reasonable doubt to obtain a conviction.

And Part 3 contains rules for your deliberations in the jury room and the return of your verdict.

When you retire to the jury room to deliberate, you will each have your own copy of these instructions, and there will also be an electronic version that you can review together.

1. Duties of the Jury: It is your duty to find the evidence -- find from the evidence what the facts are. To those facts, you must apply the law as I give it to you. The determination of the law is my duty as the judge. It is your duty to apply the law exactly as I give it to you, whether you agree with it or not. You must not be influenced by any personal likes or dislikes, prejudices, or sympathies.

It would be equally improper for you to allow any feelings you might have about the nature of the crime charged to interfere with your decision-making process. That means that you must decide the case solely on the evidence before you and according to the law. You will recall that you took an oath promising to do so at the beginning of the case.

In following my instructions, you must follow all of them and not single out some and ignore others; they are all equally important. You must not read into these instructions, or into anything I may have said or done, any suggestions by me as to what verdict you should return -- that is a matter entirely for you to decide.

2: Presumption of Innocence: Proof Beyond a Reasonable Doubt.

It is a cardinal principle of our system of justice that every person accused of a crime, including Mr. Sadeghi, is presumed to be innocent unless and until you find in your deliberations that the government has proven his guilt beyond

a reasonable doubt. The presumption is not a mere formality. It is a matter of the most important substance.

The presumption of innocence alone may be sufficient to raise a reasonable doubt and to require the acquittal of a defendant.

The presumption of innocence until proven guilty means that the burden of proof is always on the government to satisfy you that a defendant is guilty of the crime with which he is charged beyond a reasonable doubt.

A reasonable doubt may arise not only from the evidence produced, but also from a lack of evidence. Reasonable doubt exists when, after weighing and considering all the evidence, using reason and common sense, you cannot say that you have a settled conviction that the charge is true. Of course, a defendant is never to be convicted on suspicion or conjecture. If, for example, you view the evidence in the case as reasonably permitting either of two conclusions -- one that defendant is guilty as charged, the other that the defendant is not guilty -- you must find the defendant not guilty.

The government's burden is a heavy burden, but the law does not require that the government prove guilt beyond all possible doubt. The law does require, however, that evidence exclude reasonable doubt concerning a defendant's guilt. This burden never shifts to the defendant. The

defendant is never required to prove that he is innocent or to present any evidence at all. It is always the government's burden to prove each of the elements of the crimes charged beyond a reasonable doubt by the evidence and the reasonable inferences to be drawn from that evidence. The defendant has the right to rely upon the failure or inability of the government to establish beyond a reasonable doubt any essential element of a crime charged against him. Mr. Sadeghi has no obligation to do anything at trial. He need not question the government's witnesses, call his own witnesses, or present any evidence of his own.

If, after fair and impartial consideration of all the evidence, you have a reasonable doubt as to the defendant's guilt of a particular crime, it is your duty to find him not guilty of that crime.

On the other hand, if, after fair and impartial consideration of all the evidence, you are satisfied beyond a reasonable doubt of the defendant's guilt of a particular crime, you should find him guilty of that crime.

3: Defendant's constitutional right not to testify:

The defendant has a constitutional right not to testify. That is his absolute right, and in no respect may his election not to testify be considered by you as evidence against him or as a basis for any negative presumption or

inference. For any of you to draw such an inference would be wrong. Indeed, it would be a violation of your oath as a juror.

You must not discuss the fact that the defendant did not testify. You must not permit that fact to weigh against the defendant, nor should it enter in any way whatsoever in your deliberations or discussions, nor should you speculate in any way as to the reason why the defendant chose not to testify. You simply must not consider it at all.

4: The government as a party:

You are to perform the duty of finding the facts without bias or prejudice as to any party. You are to perform your duty in an attitude of complete fairness and impartiality.

The case is important to the government, for the enforcement of criminal laws is a matter of prime concern to the community. Equally, it is important to the defendant, who is charged with a serious crime.

The fact that the prosecution is brought in the name of the United States of America entitles the government to no greater consideration than that accorded to any other party to a litigation. By the same token, it is entitled to no less consideration. All parties, whether the government or individuals, stand as individual -- stand as equals at the

bar of justice.

5: Fairness and avoiding bias:

Our system of justice depends on judges and jurors being able and willing to make careful and fair decisions. All people deserve fair and equal treatment in our system of justice regardless of their race, national origin, political views, or any other personal characteristic.

I am sure that you want to be fair, but that is not always easy. One difficulty comes from our own built-in expectations and assumptions. They exist even if we are not aware of them and even if we do -- even if we believe we do not have them. Let me share a few strategies to ensure that you are deciding this case based on the evidence rather than any preconceptions you may have.

First, slow down; do not rush to a decision. Hasty decisions are the most likely to reflect stereotypes or hidden biases rather than decisions based on evidence. Take time to consider all the evidence.

Second, as you start to draw conclusions, consider what evidence, if any, supports the conclusions you are drawing and whether any evidence casts doubt on those conclusions. Double check whether you are actually using unsupported assumptions instead of evidence.

Third, as you think about the people involved in this case, consider them as individuals, rather than as

members of a particular group.

Fourth, ask yourself: Would I view the evidence differently if the people were from different groups, such as different racial or ethnic groups, different national origins, or had different political beliefs?

Fifth, listen to your fellow jurors. They may have a different point of view. If so, they may help you determine whether you are focusing on the facts or making assumptions, perhaps based on stereotypes. Of course, your fellow jurors could be influenced by their own unstated assumptions, so don't be shy or hesitate to speak up. You should both listen and participate actively, particularly if you think the other jurors are overlooking or undervaluing evidence you find important. In fact, when you explain your thoughts out loud to other jurors, you are also helping yourself to focus on the evidence, instead of assumptions.

If you use these strategies, then you will do your part to reach a decision that is as fair as humanly possible. That is your responsibility as jurors.

6: What is evidence?

The evidence from which you are to decide what the facts are consists of: (1) sworn testimony of witnesses, both on direct and cross-examination, regardless of who called the witness; (2) the exhibits that have been received into evidence; and (3) the stipulations made by the parties

during the trial.

Do we have stipulations? I guess we did have one.

MS. PORTER: There were three fact stipulations read into the record.

THE COURT: Thank you.

A stipulation means simply that the government and the defendant accept the truth of a particular proposition or fact. Since there is no disagreement, there is no need for evidence apart from the stipulation. You must accept the stipulations given in this case as fact, to be given whatever weight you chose.

And I'm going to add here I did conditionally admit certain exhibits. Those will be going back with you to the jury room. I also gave you certain limiting instructions. Wherever I gave you limiting instructions, those continue to apply.

Inferences: Although you may consider only the evidence presented in the case, you are not limited to the bald statements made by witnesses or contained in the documents. You're permitted to draw from the facts that you find to have proven such reasonable inferences as you believe are justified in the light of common sense and personal experience.

Let me give you an example of what an inference is. If your mailbox was empty when you left the home this

morning, and you find mail in it when you get home tonight, you may infer that the mailman delivered the mail. Now, obviously, you did not see the mailman deliver the mail but you may infer -- from the fact that it was empty this morning and is filled tonight -- that the mailman came in the interim and delivered the mail. That is all that I mean by an inference.

8: Kinds of evidence: Direct and circumstantial:

Lawyers and judges refer to two kinds of evidence: direct and circumstantial. Direct evidence is direct proof of a fact, such as testimony of an eyewitness that the witness saw something. Circumstantial evidence is indirect evidence, that is, proof of a fact or facts from which you could draw an inference, by reason and common sense, that another fact exists, even though it has not been proven directly.

In my example about the delivery of the mail, you may have one witness testify about leaving the house and there being no mail and arriving home to find mail (circumstantial evidence that the mailman came by) and you may have another witness testify that she watched the house all day and never saw anyone go near the mailbox (direct evidence that the mailman did not come by).

You're entitled to consider both direct and circumstantial evidence. The law permits you to give equal

weight the both, but it is for you to decide how much weight to give to any evidence.

9: Credibility of witnesses:

Whether the government has sustained its burden of proof does not depend upon the number of witnesses it has called or upon the number of exhibits it has offered, but instead upon the nature and quality of the evidence presented. You do not have to accept the testimony of any witness if you find the witness not credible. You must decide which witnesses to believe and which facts are true. To do this, you must look at all the evidence, drawing upon your common sense and personal experience.

In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe. You may believe everything a witness says, part of it, or none of it.

In deciding what to believe, you may consider a number of factors, including: (1) the witness's ability to see or hear or know the things the witness testifies to; (2) the quality of the witness's memory or whether, given the passage of time or other factors, it is unlikely that the witness remembers a fact or facts as well as they claim to remember them; (3) the reasonableness or unreasonableness of the recollections they provide you; (4) the witness's manner while testifying; (5) whether the witness has an interest in

the outcome of the case or any motive, bias, or prejudice; (6) whether the witness is contradicted by anything he or she said or wrote before trial or by other evidence; (7) whether the testimony is consistent or inconsistent with other witnesses' testimony; and (8) how plausible the witness's testimony is when considered in the light of other evidence that you believe.

10: Credibility of law enforcement witnesses:

You've heard the testimony of several law enforcement officials. The fact that a witness may be employed as a law enforcement official does not mean that his or her testimony is deserving or more or less consideration or greater or less weight than that of an ordinary witness. A law enforcement witness who takes the stand subjects his or her testimony to the same examination and the same tests that any other witness does. You should evaluate law enforcement witnesses' demeanor on the stand, their manner of testifying, the substance of their testimony, and any personal or professional interest they may have in the outcome of the case and weigh and balance each such witness's testimony just as carefully as you would the testimony of any other witness.

11: Inconsistencies in witness testimony:

You may consider inconsistencies or differences as you weigh evidence, but you do not have to discredit testimony merely because an inconsistency or difference

exists. In weighing the effect of any inconsistency or difference, consider whether it concerns a matter of importance or an unimportant detail and whether it results from innocent error or intentional falsehood.

On the other hand, you're not required to accept testimony merely because it is uncontradicted. You may decide, because of a witness's bearing and demeanor or because of inherent improbability or for whatever reason, that a witness's testimony is not worthy of belief. You may accept all of a witness's testimony or reject all of it, or you may accept part and reject another part.

12. Expert Witnesses: You heard testimony from a person referred to as an expert witness. The Court has allowed this witness to offer his opinion and other testimony without direct personal knowledge of the specific matter. You may accept or reject such testimony.

In weighing the testimony, you should consider the factors that generally bear upon the credibility of a witness, as well as the expert witness's education and experience, the soundness of the reasons given for the opinion, and all other evidence in the case. Remember, you alone decide how much of a witness's testimony to believe and how much weight it should be given.

What is not evidence: Opening statements, closing arguments, questions, and comments by the parties' lawyers

Case 1:24-cr-10391-IT Document 395 Filed 07/11/25 Page 164 of 185


are not evidence. In their opening statements, counsel tried to help you understand what the evidence would be. The opening statements themselves are not evidence in this case.

In their closing arguments, the lawyers for each side attempted to summarize and help you understand evidence that was presented. Again, those closing arguments are not evidence.

Objections by counsel are also not evidence. It is the duty of the attorney for each side of a case to object when the other side offers testimony or evidence that the attorney believes is not properly admissible.

Counsel also have the right and duty to ask the lawyers to make -- to ask the Court to make rulings on law and to request conferences at sidebar out of the hearing of the jury. You should not show any prejudice against an attorney or his client because the attorney objected to the admissibility of evidence, asked for a conference out of the hearing of the jury, or asked for a ruling of law.

As I've already indicated, my rulings on the admissibility of evidence do not indicate any opinion about the weight or effect of such evidence. You are the sole arbiters of the credibility of all witnesses and the weight and effect of all evidence.

Testimony that I struck from the record or told you to disregard is also not evidence and must not be considered.

Finally, the superseding indictment is not evidence of anything. An indictment is merely a formal method used by the government to accuse a person of a crime.

Okay. Finally, Part 2 - Instructions Concerning the Elements of the Offenses.

The defendant has been charged by the government with violations of federal law. The charges against the defendant are contained in a superseding indictment. You must remember that the superseding indictment is simply the description of the charges against the defendant. You are not to draw any adverse inferences against the defendant from the fact that he was indicted.

For each count charged in the superseding indictment, the government must prove certain elements beyond a reasonable doubt. You will have to decide whether the government has presented proof beyond a reasonable doubt of each and every element of each offense before you can find Mr. Sadeghi guilty of that particular offense.

Each count will be set forth separately on the verdict form you will be asked to return. You must consider each count separately, and you must return a separate verdict as to each count.

Your verdict as to each count must be unanimous and must be determined based solely on the evidence or lack of evidence presented against the defendant on that count.

Mr. Sadeghi is not charged with any other crimes, and you should not consider whether Mr. Sadeghi may have committed some other crime that has not been brought against him in the superseding indictment.

14. The International Emergency Economic Powers Act, 50 USC, Section 1705(c), and the Iranian Transactions and Sanctions Regulations, 31 CFR, Sections 560.203 through 206: The superseding indictment charges five separate counts against Mr. Sadeghi: Count 1, Count 2, Count 4, Count 7, and Count 8.

At all times relevant to each of these counts, the International Emergency Economic Powers Act (IEEPA) and the Iranian Transactions and Sanctions Regulations (ITSR) were in effect and prohibited acting or attempting to act to export, to reexport, to supply, or to cause either directly or indirectly another person to export, reexport, or supply any goods from the United States to Iran without first having obtained a license from the US Department of the Treasury.

I will start with the elements for Count 2, Count 4, Count 7, and Count 8 before instructing you on the elements of Count 1.

Counts 2, 4, 7, and 8, violation of the International Emergency Economic Powers Act, 50 USC 1705(c) and the Iranian Transactions and Sanctions Regulations, 31 CFR 560.203 through 206.

Counts 2, 4, 7, and 8 of the superseding indictment charge Mr. Sadeghi with, quote, knowingly and willfully exporting, reexporting, supplying, and causing the exportation, reexportation, and supply of goods; to wit, one or more US-origin electronic components, including MEMS, from the United States to Iran, including through Switzerland, and attempting to do so without prior authorization or license from the Department of the Treasury, violating the IEEPA and the ITSR on or about the following dates:

Count 2, September 29, 2022; Count 4, July 11, 2023; Count 7, March 15, 2024; Count 8, May 6, 2024.

To find Mr. Sadeghi guilty of any of those counts, you must find that the government has proved each of the following four elements beyond a reasonable doubt:

First, on or about the charged dates, Mr. Sadeghi acted or attempted to act to export, to reexport, to supply or to cause, either directly or indirectly, another person to export, reexport, or supply of certain goods from the United States to Iran.

To cause an act to be done, the government must prove beyond a reasonable doubt that, one, another person committed a violation of IEEPA or committed an indispensable element of a violation of IEEPA; and, two, Mr. Sadeghi willfully caused the other person to violate IEEPA or to commit an indispensable element of a violation of IEEPA, even

though Mr. Sadeghi did not personally commit the act.

The government need not prove that the person who did commit the violation of IEEPA or indispensable element of the violation of IEEPA did so with criminal intent. That person may be an innocent intermediary.

An export is the act of sending or carrying goods out of one country to another. A reexport is the sending of goods originally from the United States out of one foreign country to another foreign country.

Goods do not include datasheets or baggage accompanying a traveler for personal use.

Second, that Mr. Sadeghi's acts or attempts to export, reexport, supply, or cause, either directly or indirectly, another person to export, reexport, or supply of certain goods to Iran were done knowingly. To act knowingly means that the act was done voluntarily and intentionally and not because of mistake or accident.

Third, that Mr. Sadeghi acted willfully. An act is done willfully if it is committed voluntarily and intentionally and -- sorry -- voluntarily and intelligently, and with the intent to do something that the law forbids; that is to say, with bad purpose, either to disobey or disregard the law, not to act by ignorance, accident, or mistake.

And, fourth, Mr. Sadeghi did not have a license to

export or reexport the charged items to Iran.

16. Counts 2, 4, 7, and 8, Aiding and Abetting, 18 USC, Section 2:

Counts 2, 4, 7, and 8 also charge that Mr. Sadeghi aided and abetted Mohammad Abedini in the charged violations of US export law. For Mr. Sadeghi to be guilty of aiding or abetting another person in committing the crimes charged in Counts 2, 4, 7, or 8, the government must prove each of the following elements beyond a reasonable doubt:

First, that someone else committed the charged crime, including all of its elements as set forth above; second, that Mr. Sadeghi consciously shared that other person's knowledge of the underlying criminal act and intended to help him; and, third, that Mr. Sadeghi willfully took part in the endeavor seeking to make it succeed.

Mr. Sadeghi need not have performed the underlying criminal act, been present when it was performed, or been aware of the details of its execution to be guilty of aiding and abetting; but a general suspicion that an unlawful act may occur or that something criminal is happening is not enough. Mere presence at the scene of a crime and knowledge that a crime is being committed are also not sufficient to establish aiding and abetting.

Count 1, conspiracy to violate the International Emergency Economic Powers Act, 50 USC, Section 1705, and the

Iranian Transactions and Sanctions Regulations, 31 CFR, Sections 560.203 through 206:

Count 1 of the superseding indictment charges a conspiracy to violate IEEPA and ITSR. The superseding indictment charges that, from in or about January 2016 through December 16, 2024, Mr. Sadeghi and his co-conspirators conspired to violate US export laws, specifically, IEEPA and ITSR.

The superseding indictment charges that the objects of the conspiracy were: to export US goods, directly and indirectly, to Iran; to conceal the prohibited activities and transactions from detection by the US government to avoid penalties and disruption of the illegal activities; and to violate and evade the prohibitions and licensing requirements of the IEEPA and the ITSR.

A conspiracy is an agreement, spoken or unspoken, among two or more conspirators to accomplish an unlawful purpose. The conspiracy does not have to be a formal agreement or plan in which everyone involved sat down together and worked out all the details.

But the government must prove beyond a reasonable doubt that those who were involved shared a general understanding about the crime, including the object of the conspiracy. Mere similarity of conduct among various people or the fact that they may have associated with each other or

discussed common aims and interests do not necessarily establish proof of the existence of a conspiracy, but you may consider such factors.

To find Mr. Sadeghi guilty of conspiracy to violate US export law, you must be convinced that the government has proved each of the following elements beyond a reasonable doubt:

First, that the agreement specified in the superseding indictment and not some other agreement or agreements existed between Mr. Sadeghi and at least one other person to commit the crime of violating IEEPA and ITSR, which I have just detailed above. The crime of violating IEEPA and ITSR is the object of the charged conspiracy.

Second, that Mr. Sadeghi willfully joined that agreement. The government must prove two types of intent beyond a reasonable doubt before Mr. Sadeghi can be said to have willfully joined the conspiracy: an intent to agree, and an intent that the underlying crime be committed. Intent may be inferred from the surrounding circumstances.

To act willfully means to act voluntarily and intelligently in violation of a known legal duty and with the specific intent that the underlying crime be committed; that is to say, with bad purpose, either to disobey or disregard the law, and not to act by ignorance, accident, or mistake.

Proof that Mr. Sadeghi willfully joined in the

agreement must be based upon evidence of his own word -- words and/or actions. You need not find that Mr. Sadeghi agreed specifically to or knew about all the details of the charged conspiracy, that he knew of every other co-conspirator or knew of all of their actions, that he participated in each of the -- each act of the agreement or that he played a major role in it. But the government must prove beyond a reasonable doubt that he knew the essential features and aims of the conspiracy.

Even if Mr. Sadeghi was not part of the agreement at the very start, he can be found guilty if the government proves that he willfully joined the agreement later. On the other hand, a person who does not share the aims of a conspiracy but simply happens to act in a way that furthers some object or purpose of the conspiracy does not, thereby, become a member of the conspiracy.

The government does not have to prove that the defendant or any other person committed a substantive violation of IEEPA, attempted to commit a violation of IEEPA, or that a substantive violation of IEEPA actually occurred in order for you to find him guilty of the conspiracy charge.

The government must, however, prove that the defendant willfully participated in a conspiracy to commit a violation of IEEPA.

The government also does not have to prove that the

conspiracy succeeded or was achieved. The crime of conspiracy is complete upon the agreement to commit the underlying crime.

18. Consideration of Co-Conspirators: You have heard evidence that certain individuals, who are alleged in Count 1 of the superseding indictment to have been co-conspirators of Mr. Sadeghi, did or said things during the period of the charged conspiracy, allegedly, to further or accomplish the supposed goal of that conspiracy. You may consider such actions and statements by these other individuals in deciding whether or not the government has proven beyond a reasonable doubt that Mr. Sadeghi conspired to violate US export laws. To the extent that these actions and statements may have been done and said outside of Mr. Sadeghi's presence or otherwise without his knowledge, you should examine such evidence with particular care.

There is no requirement that all members of a conspiracy be charged and prosecuted or tried together in one proceeding, nor is there any requirement that the names of the other conspirators be known. An indictment can charge a defendant with a conspiracy involving people whose names are not known, as long as the government can prove that the defendant conspired with one or more of them. Whether they are named or not does not matter. No other ADI employee is alleged to be a co-conspirator in this case.

You may not draw any inference, whether favorable or unfavorable, as to either side from the fact that no persons other than the defendant is on trial here. You may not speculate as to the reasons why other people are not on trial. Those matters are wholly outside your concern and have no bearing on your function as jurors.

Part 3: Rules for your deliberations:

19: The foreperson's role:

I come now to the last part of the instructions, the rules for your deliberations.

The juror sitting in the first chair shall serve as the foreperson. You shall permit your foreperson to preside over your deliberations. The foreperson will have the same voice and the same vote as the other deliberating jurors. And I recommend that the foreperson sit in the middle on one side of the long sides of the table, rather than at the head of the table, to better facilitate your discussion. Your foreperson will speak for you here in court.

Reaching agreement, unanimity:

Each of you must decide the case for yourself, but you should do so only after considering all of the evidence, discussing it fully with your fellow jurors, and listening to the views of the other jurors. Do not be afraid to change your opinion if you think you are wrong, but do not come to a decision simply because other jurors think it is right. It

is important that you reach a verdict if you can do so conscientiously. There is no reason for you to think that another jury would be better qualified than you to decide this case.

If it looks at some point as if you may be having difficulty in reaching a unanimous verdict, and if a greater number of you are agreed on a verdict, the jurors in both the majority and the minority should re-examine your positions to see whether they have given careful consideration and sufficient weight to the evidence that has favorably impressed the jurors who disagree with them.

You should not hesitate to reconsider your views from time to time and to change them if you're persuaded that doing so is appropriate. It is important that you attempt to return a verdict, but only if each of you can do so after having made your own conscientious determination. Do not surrender an honest conclusion as to the weight and effect of the evidence simply to reach a verdict, but any verdict you return must be unanimous.

I want to read to you now what is called the "verdict form." This is simply the written notice of the decision you will reach in the case.

You're going to get one copy of this to take back with you, but you'll also have it up on the screen so you can all see it.

So the jury verdict form says:

We the jury find -- unlike my instructions, this is an order, Count 1, then Count 2, then Count 4, et cetera, in numerical order. But you can fill this out in whatever order is appropriate to you.

So as to Count 1, conspiracy to violate the International Emergency Economic Powers Act and the Iranian Transactions and Sanctions Regulations from in or about January 2016 through December 16, 2024, we find the defendant, Mahdi Sadeghi -- and then there's a blank for not guilty or guilty.

And your decision needs to be unanimous.

And then as to Count 2, violation of International Emergency Economic Powers Act and the Iranian Transactions and Sanctions Regulations, on or about September 29, 2022, we find the defendant, Mahdi Sadeghi -- again, a blank for not guilty and a blank for guilty.

Count 4 is the same as Count 2, except the date is on or about July 11, 2023.

Count 7 is the same as Counts 2 and 4, except the date is March 15, 2024.

And Count 8 is the same as Counts 2, 4, and 7, except that the date is May 6, 2024.

And, again, for each one, not guilty or guilty, and it needs to be unanimous.

And then it says, at the bottom, "I certify that the foregoing is the unanimous verdict of the jury," and is to be signed by the foreperson and dated.

So after you reach unanimous agreement on a verdict, your foreperson will fill in the form that has been given to you, sign and date it, and advise the court security officer outside your door that you're ready to return to the courtroom.

And after you return to the courtroom, your foreperson will deliver the completed verdict form as directed in open court.

Last thing, if it becomes necessary during your deliberations to communicate with me, you may send a note through the jury officer outside your door. The note must be signed by your foreperson or by one or more members of the jury.

No member of the jury should attempt to communicate with me on anything concerning the case except by a signed writing, and I will communicate with the member of the jury concerning the case only in writing or orally here in open court.

If you send out a question, I will consult with the parties before answering it, and I will do so as promptly as possible. You may continue your deliberations while waiting for the answer to any question.

Remember throughout the process not to tell anyone, including me, how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict or have been discharged.

So, with that, I'm going to have all of you return to the jury room, and then I'm going to ask the last two of you -- ooh, sorry -- Ms. Orme and Mr. Brennan -- to come back with your things. You're not going to be staying there for the deliberations, so I'll have you come back here.

And Ms. Marchione will go in with you and help you work through the technology.

MR. MARX: Your Honor, do you want us to wait to address any objections until after the jury has gone back to the jury room?

THE COURT: Unless there's something you want to quickly do on --

MR. MARX: I'm just concerned that the appeals court may insist that we do it briefly now on the whisper tech. Thank you.

THE COURT: Yes, they do.

(Beginning of sidebar.)

MR. MARX: Are you able to hear me, Your Honor?

THE COURT: I am.

MR. MARX: Okay. So -- thank you. At this time, we'd renew our request for the jury instructions as set forth

in the filings we made on the docket.

In addition and including those, we object to the instruction of cause as a basis for liability, under 1705(c). We also would ask again that you define, further define as we propose, the concept of cause. I think that's become particularly important where the government, during its closing, equated cause with facilitation of an export, which we think further waters down the definition and misinforms the jury about the law.

We object to the definition of "export" and request that you provide our proposed instruction, based on *Ehsan*, that it's for the purpose of trade or, in the alternative, at a minimum, based on *Soussi*, that it means having goods come to rest.

We request instruction that it --

THE COURT: Whisper.

MR. MARX: It's --

THE COURT: Whisper.

MR. MARX: It's -- IEEPA and ITSR are subject to exemptions and exceptions at the relevant times. We renew our request for an independent instruction on good faith, particularly where that's a statutory immunity under 1702.

And finally, we renew our request for an instruction about a company policy being irrelevant to the jury's analysis, again, in light of the government's closing,

where I believe they have expressly invoked ADI policy as relevant to Mr. Sadeghi's conduct.

THE COURT: Objections are noted. I'm sticking with -- I think we've got everything covered. Thank you.

MR. DOLAN: Your Honor -- Your Honor?

THE COURT: Yes.

MR. DOLAN: Similarly, the government must -- renews our objection to the failure to give a *Pinkerton* instruction, just for the purposes of preserving the record. We understand the Court's ruling, but I think we have to do the same thing.

THE COURT: So noted. And, again, over your -- your objection's overruled.

(End of sidebar.)

THE COURT: With that, all rise for the jury.

Once the two jurors and Ms. Marchione leave the room, you may then begin your deliberations. But she's first going to show you your way through the exhibits -- through the technology.

(Juror not present.)

THE COURT: You may be seated and clear up your desks while we're waiting for the two jurors to come back in.

MR. FICK: So the Court is, as we discussed previously, dismissing the gentleman in the front row?

THE COURT: I'm going to dismiss the gentleman in

the front row as we previously stated, and I'm going to make the poor alternate sit separately, but I needed her out of that room.

MR. FICK: Okay. But the first alternate becomes the new juror?

THE COURT: The person sitting in Seat 7 is being dismissed; and the person seated in Seat 13 is part of the jury now. And the person sitting in Seat 14 is going to have to sit around and cool their heels.

(Jurors present.)

THE COURT: We're back on the record.

So, Mr. Brennan, in light of the circumstances with your employment, we're going to release you. You don't need to come back tomorrow. And I just want to thank you again for your service. And I hope it all ends up working out okay, and I'm -- really an unfortunate circumstance that this has transpired this way. But I do know that everybody here in this courtroom appreciates your service, and it's not the way we want things to work.

JUROR: Thank you.

THE COURT: And, Ms. Orme, you're, unfortunately for you, the alternate, which means you have to still stay around, but you can't join in their deliberations. If we lose another juror, they will have -- you will then join them, and they will have to start deliberations from scratch.

So you have to continue to not discuss the case or research the case or do anything about the case, and Ms. Marchione will find a place for you to sit comfortably.

Assuming that this doesn't get decided in the next two hours or whatever, if they need more time than that, you will still need to come back tomorrow. And I just suggest you bring some reading material or something.

Okay.

THE DEPUTY CLERK: All rise.

THE COURT: All rise for the jury -- jurors.

(Jurors not present.)

THE COURT: And we're off the record.

(Court in recess at 2:13 p.m. and reconvened at 4:05 p.m.)

THE COURT: The exhibit log is the -- just the table of contents?

THE DEPUTY CLERK: Yes.

THE COURT: Show them.

THE DEPUTY CLERK: Oh, they have it. Thank you.

THE COURT: I'm going to, obviously, give them additional copies. That doesn't seem a problem.

THE DEPUTY CLERK: All set?

THE COURT: Yeah.

THE DEPUTY CLERK: All rise for the jury.

(Jury present.)

THE COURT: I understand you guys are ready to leave for the day, and I just want to give you our end of the day instructions again.

Please don't talk to anyone else about the case. Don't talk amongst yourselves in small groups about the case. Don't do any research about the case. Don't post about it and so forth.

Tomorrow, all of the same rules, obviously, as important as ever. Tomorrow when you arrive, you're all -- including the alternate, are welcome to go into the jury room, but do not discuss the case until the 12 of you are there.

At which point, you need to leave the room.

And you can resume deliberations at that point. Please get here no later at 9:00. If you're interested in starting early, that is fine, too, but certainly by nine o'clock.

I won't bring you in here to start. I will leave you to -- once the 12 of you are there, the alternate leaves the room, and you may recommence your deliberations at that point.

Again, please no research, no discussing, no posting.

All rise for the jury.

(Jury not present.)

THE COURT: You're free to go, I think. I don't think we have anything we need to discuss, correct?

MS. PORTER: Do we need to initial this, Gail?

THE DEPUTY CLERK: For me. If you want to go through it, if you want to do it tomorrow, that's fine.

MS. PORTER: This is the same other than that one change.

THE DEPUTY CLERK: I changed 570 and I added 600.

MS. PORTER: I've reviewed them.

THE COURT: And they're wanting individual copies.

MS. PORTER: Did you guys get the chance to confirm?

MR. MARX: We're going to take a look at the office. We will sign.

MS. PORTER: Do we need to be the same one or does it not matter?

MR. MARX: I think Gail gave us copies of the same thing.

THE DEPUTY CLERK: As long as it's initialed, I don't mind two. That's fine.

THE COURT: We're in recess.

(Court in recess at 4:08 p.m.)

**CERTIFICATE OF OFFICIAL REPORTER**

I, Robert W. Paschal, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 8th day of July, 2026.

/s/ Robert W. Paschal
______________________________
ROBERT W. PASCHAL, RMR, CRR
Official Court Reporter